15 CV 03216

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x

PAUL NUNGESSER,                                      Civ. Act. No.

            Plaintiff,

    v.                                          <u>COMPLAINT</u>

COLUMBIA UNIVERSITY, TRUSTEES
OF COLUMBIA UNIVERSITY,
LEE C. BOLLINGER, and JON KESSLER,                   **JURY**
                                                     **DEMANDED**
           Defendants.

-------------------------------------------------------------x

RECEIVED
APR 23 2015
U.S.D.C. S.D. N.Y.
CASHIERS

       Plaintiff Paul Nungesser, by and through his undersigned attorneys Nesenoff &

Miltenberg LLP, hereby alleges as follows:

<u>**PRELIMINARY STATEMENT**</u>

       1.      This is an action for damages, injunctive relief and declaratory relief against

Defendants Columbia University, the Trustees of Columbia University, Columbia University's

President Lee C. Bollinger and Columbia University's Visual Arts Professor Jon Kessler

(hereinafter sometimes collectively referred to as "Defendants"), for their acts and omissions

with regard to Paul Nungesser in violation of both federal and state law which have significantly

damaged, if not effectively destroyed Paul Nungesser's college experience, his reputation, his

emotional well-being and his future career prospects. This case exemplifies the types of student-

on-student and teacher-on-student gender based harassment and misconduct that the Supreme

Court has held is prohibited by Title IX of the Education Amendments of 1972, 86 Stat. 373, *as*

*amended*, 20 U.S.C. §1681 *et seq.* ("Title IX").

       2.      Paul Nungesser has been an outstanding and talented student at Columbia

University. He thrived in his first two years at Columbia University and then became the victim

of harassment by another student, to devastating, long lasting results. Columbia University knew about the harassment from the beginning, and had the power, as well as the legal and contractual obligation, to protect Paul Nungesser. It did not. By refusing to protect Paul Nungesser, Columbia University first became a silent bystander and then turned into an active supporter of a fellow student's harassment campaign by institutionalizing it and heralding it.

## THE PARTIES

3.     Plaintiff Paul Nungesser ("Paul") is a German national who currently is a scholarship student in his senior year at Columbia University and who resides in "on campus" Columbia University housing in New York, New York.  He is a non-resident alien living in the United States with a valid F1 Visa.  After graduation, remaining in the United States on this Visa will require employment.

4.     Defendant Columbia University ("Columbia" or the "University") is an elite private Ivy League University located in New York, New York.  Upon information and belief, Columbia receives nearly $645,000,000 in federal funding for research and development.

5.     Upon information and belief, Columbia University operates under a 1787 charter that places the institution under a Board of Trustees -- namely, Defendant Trustees of Columbia University ("Board of Trustees").  Overall governance of the University lies in the hands of its twenty-four-member Board of Trustees. The Board of Trustees is entrusted to select the President, oversee all faculty and senior administrative appointments, monitor the budget, supervise the endowment, and protect University property.

6.     Defendant Lee C. Bollinger ("President Bollinger") is Columbia's President.

7.     Defendant Jon Kessler ("Columbia Professor Kessler") is a Professor of Visual Arts at Columbia.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1332.  The parties are diverse and the amount in controversy well exceeds the statutory limit, exclusive of interest and costs.

9.      Venue is proper pursuant to 28 U.S.C. § 1391 because all Defendants reside in this district and a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

## FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

### *Paul's Initial Thriving Experience at Columbia*

10.      When Paul was accepted at Columbia University as a John Jay Scholar four years ago, he and his whole family were delighted. At that time, Paul was a curious and open 19-year-old with a wide range of interests and was eager to contribute to the community of one of the most prestigious universities in the country with his multitude of interests, which he wished to expand and develop in return. His parents were convinced that Columbia would be the place where Paul would receive important stimuli for his academic and personal advancement. Paul and his parents imagined Columbia University to be a place where Paul's critical thinking, his alert mind, and his intellectual curiosity would be fostered, and where he would make experiences that would nurture and strengthen him for life.

11.      In the first two of his years at Columbia University, before the events at issue in this case began, Paul was extensively involved in student life at Columbia. He participated in COÖP, ADP, lightweight rowing, the WBAR radio show, stage design, and student film production group (an initiative started by Paul). He also had an on-campus paid job as an audio-visual technician.

12.     Paul was also active in many social events, and he had a lot of friends. One of those friends was Emma Sulkowicz ("Emma").

***Emma's Intimate Conversations with Paul***

13.     Paul's relationship with Emma began platonically. They were just friends.

14.     On December 16, 2011, Emma sent private Facebook messenger messages as a friend to Paul, asking him to speak with Emma's sexual partner, John Doe, on her behalf, to urge John Doe to use condoms when he had sex with women other than Emma. The conversation, in relevant part, is as follows:

Emma:       John Doe and i are all cool – hahahah – i was excited.

Paul:        oh thanks god good to hear – so wats da nuse

Emma:       he and i went to an art opening and tacos tonight – and we
            talked it out – like im not gonna force him to be exclusive
            but i was like "just use condoms with other girls" – so
            yeah – he'll use condoms if he fucks other girls.
. . .

Paul:        . . . its just i mean im glad you talked it out and stuff and im
            not the one trying to kill the boner here but how are you gonna
            have any idea whether he actually uses a condom with other girls
            or not . .

Emma:       yeah i realize that's true – i mean there's a lot of faith involved –
            i feel like he needs another boy to tell him to use condoms  –
            can you, in like your next bro talk, just be like yo, use condoms
            when you fuck other girls

Paul:        i have tried to talk to him – thats why i talked to you in the first
            place cause i felt i wasn't gettin anywhere

Emma:       oh forrealz? – goddamnit – yeah he's totally not gonna do it then

Paul:        :S

Emma:       why can't he just only love me

Paul:        -.-

[4]

> man i feel kinda bad as f\*\*\* puttin you through this..
> its just i really dunno wat 2do
> hu?

Emma:    hu?
         no you should feel proud of being a good guy

Paul:    naah not so sure . . meh

Emma:    no seriously, i'm thankful

Paul:    but yeah i guess, its just im kinda overwhelmed. thought John Doe
         was a good guy just acting tough you know

Emma:    ur saying that you thought he was a good guy but now you're
         seeing he's a straight up bad guy?

Paul:    not straight up bad – but like why is he doing this?  like maybe at
         the end of the day its none of my fuckin business.  but then again i
         feel like it is

Emma:    I don't knowwwww – do you think he's going to be hooking up
         with more girls or is it a one time thing that he's gotten over????

Paul:    i have no clue, like really.

15.     Emma and Paul began having frequent intimate talks about very personal things.

During one of those conversations, she told Paul that she had been raped while in high school.

Paul was distraught to hear this and offered her assistance in seeking support for Emma.

16.     While they were still freshmen and before any physical relationship had begun,

Emma broached the topic of anal sex with Paul by private Facebook messenger as follows:

Emma:    fuck me in the butt

Paul:    eehm
         maybe not?
         jk
         I miss your face tho

Emma:    hahahah
         you don't miss my lopsided ass?

Paul:        i do.
                 just not that much
                 good I am actually too tired to choose a movie
                 *god
                 also to tired to spell apparently

### *Emma and Paul's Friendship and Sexual Encounters*

17.      While they were still freshman at Columbia, Paul and Emma progressed to becoming "friends with benefits." The two shared Emma's bed for platonic sleepovers, and then, on two separate occasions during the spring of their freshman year, they engaged in sexual intercourse.

18.      On the second occasion that they had sexual intercourse that spring, Emma asked Paul to engage in anal sex with her. Paul stated that he had no experience with it. Emma said she had enjoyed it in the past with other men and wanted him to proceed. The two engaged in anal sex as part of their foreplay. They then progressed to vaginal intercourse.

19.      Following their sexual encounters on both occasions, the two discussed their relationship. Both times, they concluded that they would remain primarily as friends and that they would not enter into a monogamous romantic relationship. An important factor in their decision was that Emma had previously been having sex with Paul's close friend, John Doe. Despite broaching the topic of anal sex with Paul, Emma later denied doing so.[1]

20.      During the summer following their freshman year, Emma frequently sent private Facebook messages to Paul, who was then living abroad. She messaged Paul that she had tested positive for an STD after having had sex at a party "with both John Doe and his best friend Joe."

---

[1] See: *http://bwog.com/2014/01/23/accessible-prompt-and-equitable-an-examination-of-sexual-assault-at-columbia/* (Bwog, Jan. 23, 2014). The author refers to Emma as "Sara" and Paul as "Tom": "Sara said, minutes in, Tom grabbed her wrists and pinned her arms behind her head. He pushed her legs against her chest and forcefully penetrated her anus. They had never had anal sex before. They had never discussed it."

21.     Emma further communicated to Paul stories and allegations of sexual abuse that she had experienced from other sexual partners. She stated: *"i've officially had sex with all of John Doe' best friends . . . - did lotsa drugs – jk – just got very drunk – well anyways – now i have an std – i actually hate John Doe like if a girl is about to puke – don't put your unprotected dick into her . . . I realy don't want to be known as the girl who contracted an std because she was drunk you know?  it is more his fault for fucking me unconscious – i mean i was conscious but clearly not in my right mind . . . i was literally blackout . . . like i puked all over the place."*[2]

22.     In response to Emma telling Paul about her having a sexually transmitted disease, Paul invited Emma to come to Berlin and talk to him about it. Paul had wanted to comfort Emma in the troubles she was experiencing.

23.      Emma also messaged Paul frequently throughout that summer with messages including: *"wuv youuuu,"* – *"i miss and love you btw"* – *"Paul i really miss you"* – *"i really mis you"* – *"Paul I wuv you so much.  Please stay w me foevah"* – *"paul I miss you so much"* – *"like u know when you tell people you miss them and you don't really mean it? - i actually mean it  – i miss you so much – ahhh"* – *"pookie – i miss you"* – *"I LOVE YOU – SO MUCH"* – *"I MISS YOU MORE THAN ANYTHING"* – *"I love youuuu"* – *"and I would LOVE to have you here – omg – we could snuggle"* – *"PAUL I MISS YOU PAUL I MISS YOU PAUL I MISS YOU PAULLL"* – *"DUDE I MISS YOU SO MUCH"* – *"I love you Paul!!!!!!."*  These messages spanned from May 2012 through August of 2012, and similar messages continued until October 2012.

24.     When Paul messaged Emma that he had been seeing a woman while abroad, Emma typed *"are u guyz in luvvvvv?"*  Paul responded *"yeah seed time – *sad – well i dunno – I*

---

[2] Upon information and belief, Emma contracted chlamydia and fully treated it with medication.

*mean its not gonna last."*  Emma asked *"are you guys a thing?'"* and Paul responded that it was

*"more like a summer fling if you now what i mean."*

      25.     On August 21, 2012, just prior to their return to Columbia campus for sophomore

year, Emma wrote to Paul, *"i want to snuggle with you - and talk about our summers - but not*

*right now – I also love you."*

      26.     On August 27, 2012, on their first night back at Columbia campus, (the

"Sophomore Sexual Encounter"), Emma invited Paul to her room.  Once again, they engaged in

consensual sex in Emma's bed. The Sophomore Sexual Encounter involved vaginal and anal sex,

followed by oral intercourse.

      27.     Two days later on August 29, 2012, Paul Facebook messaged Emma to invite her

to a gathering in his room, stating, *"small shindig in our room tonight ~ bring cool freshmen."*

Emma messaged back four minutes later, *"lol yussss – also i feel like we need to have some real*

*time where we can talk about life and thingz."*  Paul immediately agreed, writing *"word."*

Emma continued, *"because we still haven't really had a paul-emma chill sesh since*

*summmerrrrr."*  Paul responded *"when are you guys coming through."*  Emma wrote, *"I'll*

*probs come at 10:45.  Is that cool?0."*  Paul wrote back *"sweet – yeah – you at the fencing*

*thing."*  Emma wrote back *"Yeah I'm just gonna chill with them for a bit haha is adp a rager?"*[3]

Paul wrote back *"naah – a little too many guys right now haha – so bring some peepz."*  Emma

wrote back *"Okay let them know I'll be der w da females spon."*  At 11:06 p.m., she messaged

Paul *"Ack are people still there?  Heading over now."*

      28.     Paul remained at the ADP party but he and Emma did not see one another.  The

next day, he messaged her at 4:55 p.m., *"part II tonight – you're coming?"*  She messaged him

---

[3] Her reference to ADP, Alpha Delta Pi, was to the coed fraternity of which she and Paul were both members.  Some ADP members live in the ADP house near campus.

back seconds later, *"lol i came and left already!!!"*  Paul responded, *"lolcats – when were you here – I dont believe you – its not the truth – to the tune of pretty women."*

29.     Two weeks later, on September 9, 2012, Emma messaged Paul, "I wanna see yoyouououyou."  Thereafter, Paul sent Emma a happy birthday message as follows:  *"oh hai. happy born day!  you better be celebrating muchos, no?*  also:  *donde estas tu i mi viva – see i'm so desperate with out you, i even try to speak spanish.*[4]  *– anywho:  merry happy days!"*  Emma responded, *"I love you Paul.  Where are you?!?!?!?!"*

### *Emma's Efforts For Affection From Paul Go Unreciprocated*

30.     As is evident from Emma's Facebook messages to Paul during the summer prior to their sophomore year, Emma's yearning for Paul had become very intense. Emma repeatedly messaged Paul throughout that summer that she loved and missed him. She was quick to inquire whether he was in love with the woman he was seeing abroad.

31.     Thereafter, she continued pursuing him, reiterating that she loved him.  However, when Paul did not reciprocate these intense feelings, and instead showed interest in dating other women, Emma became viciously angry.

### *Emma Files A False Complaint With The University*

32.     More than seven months after the Sophomore Sexual Encounter with Paul, Emma filed a gender-based misconduct incident report (the "Report") at Columbia's Office of Gender Based Misconduct.  Shockingly, she alleged that during the Sophomore Sexual Encounter with Paul, *"he began to choke her, slapped her face, pinned her arms ad penetrated her anally.  She*

---

[4] Emma had previously told Paul that her first words were spoken in Spanish.

*said she had screamed for him to stop, but that he would not.*  She also stated that *"It could take two minutes for it to stop, or he could have strangled me to death."*[5]

33.   Upon information and belief, Emma alleged that Paul pinned down her arms above her head while also strangling her throat and hitting her across the face.  She further alleged that he walked out of her room immediately thereafter.

34.   Columbia proceeded with an investigation (the "Emma Investigation") that spanned seven months and culminated with a two-hour hearing (the "Hearing"), which took place on October 29, 2013, at which Emma and Paul both testified.  At the conclusion of the Hearing, Columbia discredited Emma's entire story, finding Paul "not responsible" for the alleged "non-consensual sexual intercourse."

35.   Paul readily prevailed against Emma's false allegations in spite of his being precluded from presenting Emma's Facebook messages either during the Emma Investigation or at the Hearing itself. Nonetheless, Paul was vindicated despite the fact that Emma's burden of proof was only a "preponderance of the evidence standard" (i.e. more likely than not).

36.   Pursuant to the University's Confidentiality Policy, Emma, Paul, and all other persons involved in the Investigation and Hearing were to keep all aspects of it confidential.

37.   As stated in the complaint letter served to Paul on April 18, 2013,

the university will make <u>all reasonable efforts to maintain the confidentiality/privacy of the involved parties</u> . . . you should use the utmost discretion and <u>not discuss the evidence with others.</u>

### *Emma's Failed Efforts to Bolster Her False Complaint*

38.   In an effort to bolster her case, and driven by her feelings of rejection and interest in making a public impact and statement, Emma approached several women with whom she was

---

[5] *See* http://www.nytimes.com/2014/05/04/us/fight-against-sex-crimes-holds-colleges-to-account.html?_r=0 (NY Times, May 4, 2014)

friendly, encouraging them to each report Paul to the University for sexual misconduct.  Two women acquiesced.

39.     The first, Jane Doe #1, who was also a member of ADP, filed her complaint against Paul at the end of April or early May 2013, shortly before her graduation.  Jane Doe #1 erroneously and wrongfully alleged that a full year prior to her filing (i.e. during the end of her junior year, which was the end of Paul's freshman year), Paul had grabbed her at a party and tried to kiss her.  This allegation was sheer fabrication. Columbia agreed with Paul, ultimately finding him "not responsible" for the alleged "non-consensual sexual contact."[6]

40.     Jane Doe #2, who had been Paul's girlfriend for several months while they were both freshman (prior to Paul's sexual intercourse with Emma), was also enticed to file a false report against Paul, alleging sexual misconduct. Jane Doe #2 reported that she had the impression while Paul was her boyfriend, that she could only see him if she had sex with him, and thus she felt obligated to have sex with him. She never alleged physical coercion, violence, or rape.  She filed her complaint at the same time as Jane Doe #1.  Columbia found a lack of "sufficient information to indicate that reasonable suspicion exists" of any alleged "intimate partner violence" and thus terminated Jane Doe # 2's investigation without any need for a hearing.

41.     Throughout the course of the Emma Investigation conducted by Columbia, Paul's request to be represented by an attorney was denied by Columbia, important evidence was excluded, and Paul faced immediate social isolation due to the interim measures and Confidentiality Policy on Columbia campus. Since Paul's friends and resources on campus were

---

[6] Jane Doe #1 later stated, "I wasn't emotionally scarred or anything.  I'm used to people grabbing my ass in bars – that's the shitty state of the world today. Honestly, I didn't even think it was a reportable offense covered by the misconduct policy."  See *http://bwog.com/2014/01/23/accessible-prompt-and-equitable-an-examination-of-sexual-assault-at-columbia/* (Bwog, Jan. 23, 2014).

the only ones Paul had in the United States, Paul remained in complete social isolation throughout the course of the Emma Investigation and beyond.

42.     In contrast, Columbia fully accommodated Emma's needs and desires throughout the entire Emma Investigation. For example, Emma was able to continuously alter and tweak important facts in her allegations, such as dates and places of alleged events, and "witness testimony" in support of Emma's allegations were exclusively hearsay statements with no first person knowledge of the alleged events.

43.     Despite many challenges and accommodations to his accuser, Paul was found not responsible.

44.     During the hearing, Emma stated repeatedly that her goal was to have Paul expelled from Columbia.  On appeal of her case against Paul, Columbia affirmed its decision. Thus, all three cases terminated with Paul's name officially cleared in all respects, and Emma's scheme to have Paul expelled had failed.

### The Baselessness of Emma's Claims

45.     Columbia reached its decision clearing Paul of charges multiples times and for good reason. Emma was never able to present any evidence whatsoever to support her defamatory and serious allegations. Although Emma claims that she was almost strangled to death and subject to a brutal anal rape in her dorm room in Summer 2012,[7] there is not one single piece of evidence that could confirm her severe allegations:

     a.     There were no witnesses to Emma's alleged screams in the badly soundproofed student dorm.

---

[7] *See http://www.nytimes.com/2014/05/04/us/fight-against-sex-crimes-holds-colleges-to-account.html?_r=1* (NY Times, May 4, 2014); *See also http://bwog.com/2014/01/23/accessible-prompt-and-equitable-an-examination-of-sexual-assualt-at-columbia/* (Bwog, Jan. 23, 2014).

[12]

b.    There was no medical report, even though an attack as massive as described would with great likelihood have caused serious injuries in dire need of medical attention and would have left visible bruises on Emma's body for days.[8]

c.    There was no testimony from Emma's friends or family members who could confirm such injuries or changes in her behavior caused by discomfort from these injuries. On the contrary, in the days following the alleged attack, Emma participated in various social events on campus, such as parties with friends and social events with the fencing team. Given the multitude of social contact, any physical injuries would have likely been noticed by people on campus or those close to Emma.

d.    There were varying accounts by Emma as to whether and when she had spoken to anyone about the alleged assault: At times she claims she hadn't spoken to anyone, not even her parents,[9] at other times she claims that she told a few good friends.[10] Her latest claim was that she spoke to a friend days after the alleged event who had to make clear to her that being nearly strangled to death and being penetrated anally while struggling against it and screaming "NO" constituted rape.[11]

e.    There was also no evidence whatsoever that Emma's attitude or behavior regarding Paul had changed after the alleged incident. On the contrary, Paul was able to present numerous love messages that Emma wrote to him before and after the alleged event with no apparent change in mood. Even though these messages were excluded as

---

[8] Compare: Wyatt, J. and Squires, T.: Oxford Handbook of Forensic Medicine, Oxford University Press, 2011, p. 372.
[9] See http://www.democracynow.org/2014/9/16/a_survivors_burden_columbia_student_carries (Democracy Now; Sept. 16, 2014).
[10] See http://bwog.com/2014/01/23/accessible-prompt-and-equitable-an-examination-of-sexual-assault-at-columbia/ (Bwog, Jan. 23, 2014)
[11] See http://jezebel.com/how-to-make-an-accused-rapist-look-good-1682583526 (Jezebel, Feb. 6, 2015). On the same occasion Emma presented a fourth accuser, a close friend of hers and a fellow visual arts student at Columbia, who made up another false allegation against Paul. Paul was informed about this complaint first by reporters to whom Emma presented this complaint, when Paul started to go public to defend himself against Emma's campaign.

exculpatory evidence from the investigation, Columbia was informed about their existence and their content.

      f.      Columbia was also informed that Emma had a history of alleging of sexual assault. During the investigation, Paul had provided further messages from Emma to Columbia, in which she alleged abuse and sexual assault by other students at Columbia University, including her former boyfriend. These messages, too, were excluded from evidence. Nonetheless Columbia was informed that Emma had a history of alleging to be a victim of sexual assault and should have included this knowledge in their assessment of Emma's harassment campaign in the course of the events.

### *Emma Goes Public With Her Scheme Branding Paul a "Rapist"*

46.      Emma's efforts to brand Paul a "serial rapist" had begun during the Emma Investigation conducted by Columbia. Since then, those efforts have intensified.

47.      In April 2013, days after the Emma Investigation had begun, Emma orchestrated that the President of ADP would notify its alumni board and several members that an alleged rapist was living at ADP. This notification occurred.

48.      On December 3, 2013, only a few days after Emma's appeal had been rejected, Paul was ambushed in front of his dorm by reporters from the New York Post and followed by a paparazzo on his way to class. At that time, Emma was already being advised by a publicist[12] and/or a lawyer with great media expertise, something she had threatened in her appeal letter in November 2013.[13] Columbia was put on notice by Paul's parents' mail to president Bollinger,[14] even before the article was published. The article in the New York Post made clear that all three

---

[12] *See* http://nymag.com/thecut/2014/09/emma-sulkowicz-campus-sexual-assault-activism.html (NY Magazine, Sept. 21, 2014).

[13] *See* http://bwog.com/2014/01/23/accessible-prompt-and-equitable-an-examination-of-sexual-assault-at-columbia/ (Bwog, Jan. 23, 2014).

[14] Paul's parents sent letters on December 4, 2013 to President Bollinger, et al., as well as to Melissa Rooker.

accusers had spoken to the author Tara Palmeri and identified Paul to the reporters. This clear breach of confidentiality had no consequences for the accusers.[15]

49.     There were also no consequences for the next breaches of confidentiality. Starting at the latest in December 2013, Emma forwarded confidential information, including Paul's name, to Anna Bahr, a student reporter and activist, whose subsequent article appeared on January 23, 2014.  This article did not include Paul's name, but did make him identifiable to most of his peers on campus.

50.     What made this breach of confidentiality even more hurtful and unjust was the fact that Paul, who was in Berlin on his way to his semester abroad in Prague with the prestigious NYU Tisch program, was still under the confidentiality policy and faced disciplinary action if he violated this policy. He also had been advised by Columbia University to ignore the press publicity and to stay silent when Anna Bahr reached out to Paul for comment in the preparation of her article.

51.     Even though the Anna Bahr article generated more than 60 comments in its first 11 hours online, Columbia University did not inform Paul of its appearance and did not do anything else with respect to what was obviously a major breach of the University's confidentiality policy. Only after Paul complained to Columbia University about this new and massive breach of confidentiality did University officials express concern and note the online witch-hunt started in the comment section of the article.

52.     Columbia University, however, again did not penalize any of the accusers, who once more had blatantly violated the University's confidentiality policy.

53.     Instead, President Bollinger only two weeks later issued a statement[16] in which he announced a change of Columbia's policies with regard to sexual assault. He also announced that

---

[15] This was documented by correspondence from Melissa Rooker on December 4, 2013.

data on sexual assault and Gender based Misconduct will be released -- which had been a demand by activists at Columbia. The timing implies that this was direct reaction to the criticism from Anna Bahr's article, as is noted in the press:

> Columbia University will release data about sexual assault complaints after pressure from students, President Lee Bollinger announced Wednesday afternoon. Columbia is the latest in a string of prestigious universities facing student action and scrutiny over the way it handles assaults on campus.
>
> The controversy came to a head when Columbia's student magazine, The Blue and White, launched an in-depth series featuring stories from assault victims last week. In the first installment, a junior who was raped by a close friend described her decision to report to the school rather than the police: "I heard so many horrible stories about how badly the police handle cases like these. Columbia also advertises its resources so much that I thought they would really listen to me. I thought I would be taken care of."[17]

54.     At the latest at this time it was clear for Emma and the other two accusers that they did not have to fear any disciplinary action for her defamatory breach of confidentiality. This knowledge becomes a booster for the harassment campaign against Paul by Emma and her advisors.

55.     Thereafter, media stories began to emerge that did not include Paul's name, but insidiously included enough identifiable information to reveal him to other Columbia students.

56.     Emma's first public press statement was in April 2014, at a press conference with Senator Gillibrand at Columbia University. At that press conference, Emma stated: *"My rapist— a serial rapist—still remains on campus…"* and *"Every day I live in fear of seeing him."* However, at that time Paul was abroad in Prague, and was not in fact on Columbia campus. Emma, who was still Facebook friends with Paul at the time, easily knew this information as it was posted about throughout Paul's Facebook page.

---

[16] *See http://www.columbia.edu/node/16295.html* (Columbia University Statement Regarding Gender-Based Misconduct and Sexual Assault, Jan. 29, 2014).
[17] *See http://thinkprogress.org/health/2014/01/30/3225781/columbia-sexual-assault* (Think Progress, Jan. 30, 2014).

57.     President Bollinger, instead of correcting Emma's false and defamatory statement, published a statement in which he bowed to the activists' demands by announcing further measures.[18]

58.     In May 2014, a so-called "rapist-list" appeared in several Columbia bathrooms, listing Jean-Paul Nungesser[19] as a "serial rapist."   Fliers with the same list were circulated at several Columbia student events. Paul was never notified about these events by Columbia administrators.

59.     In Emma's May 2014 Time Magazine op-ed piece, entitled "My Rapist is Still on Campus," Emma states, amongst other things, *"Every day, I am afraid to leave my room."*[20]

60.     However, on May 18, 2014, Emma makes is clear that she is aware Paul is in fact out of the country, and not on the Columbia campus. Emma twists that information to insinuate that Paul is a fugitive: *"Sulkowicz says the assistant district attorney has contacted her about beginning an investigation, and she has been told police are currently looking for her alleged rapist, who she says is out of the country."*[21]

### *Emma Files False Charges With The NYPD With The Sole Purpose Of Making Paul's Name Publicly Accessible; The NYPD Dismisses All Charges*

61.     Having gained some traction in denouncing Paul by name, Emma proceeded to the New York Police Department ("NYPD") to criminally charge Paul with rape.  Her goal was to publicly brand Paul as a rapist.  She stated as follows:

---

[18] *See http://www.columbia.edu/node/16841.html* (Columbia University Update on Prevention of Sexual Assault, Apr. 7, 2014)
[19] Paul's given name is Paul Jonathan Nungesser.  Jean-Paul was Paul's user name on Facebook.
[20] *See http://time.com/99780/campus-sexual-assault-emma-sulkowicz/* (Time Magazine, May 15, 2014).
[21] *See http://nymag.com/daily/intelligencer/2014/05/columbia-spectator-prints-name-from-rape-list.html* (NY Magazine, May 18, 2014).

One of my main goals was to have his name somewhere so if he committed another crime in New York City it would show up on his record so the next person he might assault would have a better time than I did in prosecuting him.[22]

62.    Having failed to get Paul expelled, Emma's next goal was to have Paul withdraw from the University.  Emma was impressed by the actions of Lena Sclove, a Brown University student who had publicized the name of a male student suspended by Brown University for sexual misconduct.  Like Lena Sclove, she intended to publicize Paul's name such that he would withdraw from Columbia.  Emma stated as follows:

I was recently friended on Facebook by Lena Sclove, who has been such an inspiration for me, and to see the way that she was able to create a safe space for herself definitely made me realize that after I had made the police report I had that as an option to me as well.[23]

63.    In May 2014, Emma succeeded with her plan to publish Paul's name.   The Columbia Spectator (the University's student newspaper) published Emma's false rape allegation and included Paul's name.

64.    On August 11, 2014, the New York County District Attorney's Office interviewed Paul for three hours. Immediately upon hearing of the police report, Paul (who was abroad at that time) had a criminal lawyer contact police and the District Attorney's office on his behalf, expressing Paul's intent to speak to the District Attorney to clear his name. Although Paul was never summoned, he returned to the United States and voluntarily spoke to Assistant District Attorney Kat Holderness and Assistant District Attorney Martha Bashford.

65.    Immediately thereafter, Kat Holderness informed Paul's criminal lawyer that no charges would be brought against Paul, as there was a lack of reasonable suspicion to proceed.

---

[22] *Id.*
[23] *Id.*

66.     Three weeks after Paul's criminal attorney was informed that rape charges would not be brought against him, Emma falsely announced that she personally decided not to pursue criminal charges against Paul:

> I decided I didn't want to pursue it any further because they told it me it would take nine months to a year to actually go to court, which would be after I graduated and probably wanting to erase all of my memories of Columbia from my brain anyway, so I decided not to pursue it.[24]

Emma conveniently omitted the fact that the Sex Crimes Unit refused to bring any charges against Paul following its investigation, due to a lack of any reasonable suspicion.

67.     At that point, Emma's efforts to vilify Paul already had considerably damaged Paul's reputation on campus and beyond, but had not yet gone global.

### Columbia Sponsors On-Campus Gender Based Harassment and Defamation of Paul

68.     Emma's efforts to wreak havoc on Paul's life were reignited by Columbia Professor Jon Kessler.   Professor Kessler directed Emma to transform her personal vendetta against Paul into a Columbia-sponsored calumny.   Under the guise of "performance art," Professor Kessler and Emma jointly designed her senior thesis project (the "Mattress Project").

69.     The Mattress Project, named "Carry That Weight" involves Emma carrying a mattress around campus at all times during her senior year.   In her words, *"I will carry the mattress with me to all of my classes, every campus building, for as long as my rapist stays on the same campus with me."*[25]   She has also publicly called Paul a *"serial rapist"* and has vowed to carry the mattress to her and Paul's graduation if Paul is in attendance.[26]

---

[24] *See* http://nymag.com/thecut/2014/09/columbia-emma-sulkowicz-mattress-rape-performance-interview.html (NY Magazine, Sept. 4, 2014).
[25] *See* http://www.democracynow.org/2014/9/16/we_will_not_be_silenced-students (Democracy Now, Sept. 16, 2014).
[26] *See* "Carry That Weight," Conversations With Roberta Smith, co-chief art critic for the New York Times, presented by the Elizabeth A. Sackler Center for Feminist Art at the Brooklyn Museum on December 14, 2014, available at *http://www.you tube.com/watch?v=OMXp3RLOVNg* (95.32 min.).

70.     Emma made clear that the Mattress Project – for which she was getting Columbia class credit for specifically as an art piece – was not about art but was specifically about Paul and stalking him:

> The protest in mind, I ask if she can articulate exactly what she wants to convey to Columbia. "Get my rapist off campus." She says it slowly, enunciating, putting into words what her piece shows. But she laughs and atones for her gravity: "…in those few words."[27]

71.     Columbia Professor Kessler not only approved Emma's Mattress Project for course credit, but also publicly endorsed her harassment and defamation of Paul, stating: *"carrying around your university bed – which was also the site of your rape – is an amazingly significant and poignant and powerful symbol . . . with all this evidence coming up … it's so clear the way uni feels about this issue."*[28]

72.     Columbia Professor Kessler also guided Emma in developing the Mattress Project, knowing that her piece was targeted at a fellow Columbia student. Columbia Professor Kessler stated:

> The impulse was there for her to carry the bed around, and she didn't necessarily have the information as to how that would fit into the context or the history of performance art. So this summer we got involved in phone conversations about the nature of endurance art, talking about pieces by Tehching Hsieh and Marina and Ulay and Chris Burden.

> But what struck me from the get-go . . . is that, more than any of those people, Emma's work comes from something which is so much more personal and so much deeper and so much less of a programmatic idea about what to do, but really about working something out cathartically and also making an enormous statement for change. And that's what makes it so powerful.[29]

(Emphasis added.)

---

[27] See *http://bwog.com/2014/09/05/speaking-with-emma-sulkowicz/* (Bwog, September 5, 2014).
[28] *See http://columbiaspectator.com/news/2014/09/02/emma-sulkowiczs-performance-art-draws-support-campus-activists* (Columbia Spectator, Sept. 2, 2014).
[29] *Two Weeks Into Performance, Columbia Student Discusses the Weight of Her Mattress,* Hyperallergic, Jillian Steinhauer (Sept. 17, 2014).

73.     Emma has been engaging in the Mattress Project ever since.  She is actively earning course credit from Columbia for this outrageous display of harassment and defamation of Paul and she is using this to fulfill her graduation requirement of a senior thesis, even despite clear notice by Paul and his parents to President Bollinger and other Columbia persons of authority, that Paul's legal rights are being violated and that his well-being and future prospects are suffering immensely.

74.     In complete disregard of Paul's rights to be free of, among other things, gender based harassment and gender based stalking, Columbia has allowed Emma to carry the mattress into each of her classes, the library, and on Columbia campus-provided transportation.

75.     During the course of the Mattress Project, Emma has repeatedly and publicly called Paul a "serial rapist," gaining national and international attention in the mass media.

76.     President Bollinger has basked in the spotlight that this display has brought. Regarding Emma, President Bollinger stated:

> This is a person who is one of my students, and I care about all of my students.
> And when one of them feels that she has been a victim of mistreatment, I am
> affected by that. This is all very painful.[30]

President Bollinger showed no public regard for a student in Paul, who was being victimized by Emma's campaign of false charges of criminal conduct that the University had rightly determined lacked any substance.  President Bollinger thus displayed a contemptible moral cowardice in bowing down to the witch hunt against an innocent student instead of standing up for the truth and taking appropriate steps to protect Paul from gender based harassment.

77.     The Mattress Project, as well as Emma's public declarations in support of her project, constitute gender-based harassment and misconduct against Paul. Although cleared of all

---

[30] See http://nymag.com/thecut/2014/09/emma-sulkowicz-campus-sexual-assault-activism.html (NY Magazine, Sept. 21, 2014).

charges numerous times, Paul was publicly branded a "serial rapist" by Emma. He was targeted because he is a male, and attacked for his (consensual) sexual activity. The Mattress Project subjected Paul to verbal aggression, intimidation, and hostility based on his gender. Emma's purpose for and effect of her project was to interfere with Paul's academic performance (and actually have him removed from the University) and create an intimidating, hostile, demeaning, and offense learning and living environment.  Columbia University's effective sponsorship of the gender based harassment and defamation of Paul resulted in an intimidating, hostile, demeaning, and offense learning and living environment.

### *Emma's Gender Based Harassing and Defamatory Message Spreads Worldwide*

78.    Emma's campaign has even ensnared United States Senator Kirsten Gillibrand, who has also irresponsibly publicly branded Paul a serial rapist in the course of bringing Emma to President Obama's State of the Union Address as the Senator's guest of honor. This action was taken by Senator Gillibrand despite knowing that Paul was cleared of any wrong-doing multiple times by Columbia and the District Attorney[31] and despite a public responsibility to know the circumstances that demonstrated that Emma's charges were false.

79.    Senator Gillibrand stated:

I believe Emma. . .  And I believe rapes that have happened to her and other students across the country have had very little justice. I think campuses are generally ill-equipped to handle the review of these cases. Those who are asked to adjudicate them are not trained; they don't know anything about the crime, the nature of a rapist, the nature of recidivism, that they commit these crimes over and over again. In Emma's case, three girls talked about the same incident, same perpetrator, same type of circumstances ... too often our survivors are not being heard.[32]

---

[31] At the latest, on December 20, 2014, it was publicly known that Paul had been cleared by the University and that the NYPD did not pursue charges.  See *http://www.nytimes.com/2014/12/22/nyregion/accusers-and-the-accused-crossing-paths-at-columbia.html?_r=0* (NY Times, Dec. 22, 2014).

[32] See *http://www.journalandrepublican.com/article/20150121/OGD/150129759* (Journal & Republican, January 21, 2015).

(Emphasis added.)

80.   Senator Gillibrand further stated:

Last night at the President's State of the Union Address, I was honored to invite as my guest Emma Sulkowicz, the Columbia University student who has inspired us all with her performance art piece 'Carry That Weight' in which she carries her mattress everywhere she goes to symbolize the burden she carries every single day as long as her rapist is still on campus.[33]

(Emphasis added.)

81.   Emma's campaign of gender based harassment and defamation of Paul received widespread news coverage both nationally and internationally.

82.   During the time frame of early September 2014 through early November 2014, the first months of the Mattress Project, Emma's campaign has been covered by major print media, online media and television stations in at least the following thirty-five countries:

| North America | 1. Canada |
|---|---|
| | 2. United States |
| South America | 3. Argentina |
| | 4. Brazil |
| | 5. Colombia |
| | 6. Mexico |
| | 7. Panama |
| | 8. Peru |
| Europe | 9. Austria |
| | 10. Belgium |
| | 11. Croatia |
| | 12. Czech Republic |
| | 13. Denmark |
| | 14. France |
| | 15. Germany |
| | 16. Greece |
| | 17. Hungary |
| | 18. Ireland |
| | 19. Italy |
| | 20. Netherlands |

[33]See *http://www.huffingtonpost.com/rep-kirsten-gillibrand/carrying-their-weight-giv_b_6516630.html* (Huffington Post, Jan. 21, 2015).

| | 21. Norway |
| | 22. Poland |
| | 23. Romania |
| | 24. Slovakia |
| | 25. Spain |
| | 26. Switzerland |
| | 27. Sweden |
| | 28. Turkey |
| | 29. United Kingdom |
| Asia | 30. China |
| | 31. India |
| | 32. Sri-Lanka |
| | 33. Vietnam |
| Australia | 34. Australia |
| | 35. New Zealand |

83.     During this time, a Google search for "Emma Sulkowicz" automatically suggested Paul's full name as part of the auto-complete search feature. It to this day suggests "who raped Emma Sulkowicz" when googling "Emma Sulkowicz," and reveals Paul's name immediately.

84.     Almost all international articles are linked to the Columbia Spectator, (which published Paul's name as early as May 2014) and its You Tube video about "Carry That Weight" which received 1.896 Million views as of April 18, 2015.[34]

### Paul's Safety and Well-Being Are Threatened

85.     Emma has publicly threatened Paul, stating, *"[i]t's not safe for him to be on this campus."*[35]

86.     Further threats to Paul have been posted to Emma's public Facebook page, which has approximately 1,900 friends/followers.  The first post was by a friend of Emma's named Jay

---

[34] *See https://www.youtube.com/watch?v=l9hHZbuYVnU* (YouTube, Sept. 2, 2014).
[35] *See http://www.nytimes.com/2014/12/22/nyregion/accusers-and-the-accused-crossing-paths-at-columbia.html?_r=0* (NY Times, Dec. 21, 2014).

[24]

Good, appearing in September 2014, stating in relevant part, *"I'm only pissed that I'm not in NY to CUT HIS THROAT MYSELF."*

87.    Jay Good posted again on December 22, 2014, at 1:40 pm, stating in relevant part that Paul *"needs to practice silence or suicide before he gets dealt with accordingly."* Emma publicly "liked" the post by commenting with a "thumbs up" icon.  This post and her "like" remain publicly posted:[36]



**Defendants Endorse, Fund, and Encourage Public Campaign Against Paul**

88.    Columbia University, President Bollinger, and Professor Kessler have actively encouraged Emma's campaign of gender based harassment and defamation against Paul.

---

[36] Statements evidenced by following screenshots from a) Jay Good's post and b) Emma's "like" of the same post as of April 22, 2015.

89.     "Carry That Weight" was publicly promoted on a Columbia-owned Website, IRW&G Blog/Institute for Research on Women and Gender, Columbia University ("IRW&G"). IRW&G even closed its office on September 9, 2014, shortly after Emma had started the Mattress Project, to support Emma.[37]

90.     On September 17, 2014, the same site presents as fact that Paul sexually assaulted Emma, who is called a survivor: *"In solidarity with Sulkowicz's aptly titled "Mattress Performance: Carry That Weight" - in which Sulkowicz has promised to carry a mattress to each of her classes so long as she attends school with the same student who sexually assaulted her."*[38] (Emphasis added.)

91.     IRW&G announced on its official website the support of the "Carry That Weight National Day of Action" on October 29, 2014, and motivated people to participate in the event which in great part was used to engage in gender based harassment and defamation of Paul.

92.     Columbia University has even provided financial endorsement to it by paying a portion of the clean-up fee at a Columba campus rally at which Emma publicly declared that Paul is her rapist.

93.     This campus rally, entitled "Carry That Weight National Day of Action" was organized by Emma and her supporters from No Red Tape and the Carry That Weight Campaign. Emma publicly stated as follows:

> I'm no less afraid [now] of seeing my rapist every time I leave my dorm . . . . I don't need to say his name. You know who it is.[39]

---

[37] *See http://irwgs.columbia.edu/blog/announcement-office-closed-today-support-carrying-weight* (Columbia University Institute for Research on Women, Gender, and Sexuality, Sept. 9, 2014).

[38] *See http://irwgs.columbia.edu/blog/carry-weight-day-action-happening-today* (Columbia University Institute for Research on Women, Gender, and Sexuality, Oct. 29, 2014).

[39] *See http://www.thedailybeast.com/articles/2014/11/06/is-columbia-failing-campus-rape-victims.html.* (The Daily Beast, Nov. 6, 2014).

94.     The rally centered on a list of ten demands that were read to the public and were published in writing on one of the mattresses which was signed by activists, including Emma. The last demand explicitly alleges that Paul poses *"an ongoing threat to the community"*:

> The investigation and adjudication process of the sexual assault report made by Emma Sulkowicz against Jean-Paul[40] Nungesser was grossly mishandled. <u>An alleged serial perpetrator remains on our campus and presents an ongoing threat to the community.</u> Given these facts, we demand you re-open this case and evaluate it under the newly revised policy.[41]

(Emphasis added.)

95.     In response, Columbia published the following statement, in relevant part:

> <u>Columbia embraces its responsibility to be a leader in preventing sexual assault and other gender-based misconduct anywhere it may occur, with a special duty to protect the safety and well-being of our own students. Student activism plays an important role in encouraging these efforts, and the University appreciates this attention to a significant issue affecting the lives of college and university students around the nation.</u>
>
> We understand that reports about these cases in the media can be deeply distressing and <u>our hearts go out to any students who feel they have been mistreated.</u> Importantly, the University will not address reports about individual cases or experiences. This is so not only because of federal student privacy law but also—and most fundamentally—because of our commitment to help students feel as comfortable as possible accessing the many resources to support them on campus without concern that the University would ever comment publicly on them or their experiences. <u>As a University we have made substantial new investments to further strengthen our personnel, physical resources, and policies dedicated to preventing and responding to gender based-misconduct.</u>[42]

(Emphasis added.)  This statement did not include anything to deal with the actual breaches of the University's confidentiality policy and press publicity and the University sponsored activities that had falsely branded Paul a rapist and constituted gender based harassment.

---

[40] Paul's given name is Paul Jonathan Nungesser.  Jean-Paul is a username he used on Facebook.
[41] *See http://bwog.com/2014/10/29/carry-that-weight-day-of-action-at-columbia/* (Bwog, Oct. 29, 2014).
[42] *See http://www.sexualrespect.columbia.edu/columbia-university-statement-enhanced-personnel-physical-resources-and-policies-october-29-2014* (Columbia University Statement on Enhanced Personnel, Physical Resources, and Policies, Oct. 29, 2014)

96.     The same day, October 29, 2014, President Bollinger co-authored an article in *The New Republic* that opens with a large picture of a smiling Emma carrying her mattress. The article stated in part:

> There is a long history in America of movements seeking to change deeply rooted behavioral norms that show promise and then, disappointingly, produce only marginal recalibrations of the status quo. No one can guarantee that the present public focus on sexual assault and other forms of gender-based misconduct will result in the degree of prevention and culture change we seek across society. What we can and must do, though, is sustain the effort to make our campuses safer over the long term and to encourage and train students to contribute thoughtfully to these changes in their own communities, both while they are in school and as they take their place in the broader world.[43]

Again, this statement did not include anything to deal with the actual breaches of the University's confidentiality policy and press publicity and the University sponsored activities that had falsely branded Paul a rapist and constituted gender based harassment.

97.     In December, 2014, Columbia student activists from No Red Tape and Carry That Weight, Allie Rickard, Becca Breslaw, Michela Weihl, and Zoe Ridolfi-Starr (the "Activists"), read a letter at President Bollinger's office containing the following passage:

> Since then, Emma Sulkowicz's senior thesis *Mattress Project: Carry That Weight* has called national attention to the injustices survivors have been forced to carry alone for too long. You have not responded once to this piece, and her serial rapist remains on campus today.[44]

(Emphasis added.)

98.     Columbia initially told the Activists it would cost $1,500 to clean up the protest, but then only billed them $471 because it decided to sponsor the balance. Columbia thus spent over $1,000 (one thousand dollars) effectively sponsoring a defamation and harassment

---

[43] *See http://www.newrepublic.com/article/120021/columbia-president-lee-bollinger-campus-sexual-assault* (New Republic, Oct. 29, 2014).
[44] *See http://columbiaspectator.com/spectrum/2014/12/15/activists-deliver-mattress-representing-check-and-letter-bollinger-protest* (Columbia Spectator, Dec. 15, 2014).

movement against Paul. President Bollinger, continuing to show moral cowardice, issued no statement to the effect that the University and the District Attorney had cleared Paul of any wrong-doing.

### *Paul's Columbia Experience Is Effectively Destroyed*

99.    As a result of Defendants' actions, Paul's entire social and academic experience at Columbia has suffered tremendously. In adherence to Columbia's Confidentiality Policy, he did not discuss any of the investigations with any of his classmates. Yet Emma did the exact opposite, gaining support from classmates, professors, the administration, and President Bollinger. Emma has not faced any consequences for breaching the confidentiality policy.

100.    Silenced, and also enduring suspensions and increasing ostracism from his two main social activities (ADP and the Columbia Outdoor Orientation Program ("COÖP")), Paul's social life crumbled to the point of isolation. Even after being cleared of the outrageous allegation, no serious attempt was ever made by the university to rehabilitate him within those groups. Day-to-day life is unbearably stressful, as Emma and her mattress parade around campus each and every day.

101.    Due to this ostracism, and threats to Paul's physical safety, University resources such as dorms, libraries, dining halls, and the gym are not reasonably available for Paul's access. Even attending classes has become problematic, as he has endured harassment and has had his photo taken against his will while in class.

102.    The gender based harassment and defamation in the "Carry That Weight" campaign continues to this day. On the "Carry That Weight" Facebook page, activists and official hosts of events Zoe Ridolfi Star and Allie Richard stated: *"This campaign is inspired by the activism and art of Emma Sulkowicz, who is boldly carrying a dorm mattress around campus*

*with her as long as her rapist continues to attend Columbia University.*"[45] Zoe Ridolfi Star and Allie Richard were two of the activists who signed the ten demands and read the defamatory statements at President Bollinger's office.  These activists have incited and supported gender-based harassment and defamation of Paul in the past and have publicly announced their intention to continue their activism.[46]

103.    While Paul supports awareness of sexual violence and activism regarding it, Paul realizes that the gender based harassment and defamation to which he has been subject will not die down.  Paul can no longer tolerate being victimized by Defendants.

104.    Paul has suffered substantially in (i) his ability to work at his campus audio-visual technician job; (ii) his ability to perform academically; and (iii) his physical and emotional well-being.

### *Paul's Career and Ability to Remain in the United States Is in Imminent Jeopardy*

105.    The Mattress Project and related events are precluding Paul from attending vital on-Columbia campus career recruiting events.

106.    These events are being hosted at Columbia now and through the end of classes on May 8, 2015.

107.    Graduation is scheduled for May 20, 2015.  Emma has vowed to continue the Mattress Project and carry the mattress to Graduation.  Such an occurrence may effectively exclude Paul (and his parents, who wish to fly in from Germany for the event) from attending graduation, especially since on April 12, 2015, during the recent "Days on Campus" at Columbia University, activists projected "Rape happens here" and "Columbia protects rapists" onto Low Library and held banners reading "Carry That Weight" and "Columbia Protects Rapists" over

---

[45] *See https://www.facebook.com/events/1550372131902005 (Facebook, 2014)*
[46] *See https://vimeo.com/125262075 (Vimeo, Apr. 17, 2015).*

Low steps and ledges by Kent Hall. Columbia University did not stop them, even though it was clear to everyone on campus that the projected slogans and banners referred to Paul and was another attempt to shame him away.

108.  Paul's ability to obtain employment has been severely jeopardized by Defendants' wrongdoings. Essentially, Paul has been prevented from seeking employment opportunities to which the rest of Columbia's students have access. All the while, Paul has been cleared of all charged and complaints against him, and he has attempted to go on with his life. Emma, with Defendants' assistance and encouragement, has worked tirelessly to make sure that cannot happen.

109.  Paul's staying in America is contingent upon his full time employment.

### Paul's Dream of Living in the United States

110.  The foregoing turn of events destroyed Paul's long-held dream of living in the United States and attending college at Columbia University. That dream had become a reality back in the spring of 2011, when he was accepted to Columbia as a John Jay Scholar.

111.  Paul, an only child, was born and raised in Germany by parents who had been educated internationally.

112.  Paul was born in Berlin in 1991, two years after the fall of the Berlin Wall.

113.  Paul and his family have always honored the United States as the country whose government and people were critical in defeating Fascism in Europe (Hitler's National Socialism and Mussolini's National Fascism) and re-establishing freedom, democracy, and the rule of law in western Germany following World War II.

114.  Paul was raised in a progressive egalitarian home in which both of his parents assumed full-time responsibilities as caretakers and as breadwinners.

115.    Paul's mother, Karin, is a long-time journalist for the National Council of German Women's Organizations, *Deutscher Frauenrat*.   She is the co-founder, and a writer, on the feminist writer's blog *weibblick* and has published on gender-related issues such as feminist theory, women in the media, discrimination of migrant women, equal pay, and women's rights as human rights.

116.    His father, Andreas, is a long-time teacher at one of Berlin's most culturally-diverse and underprivileged neighborhoods. His job as a teacher included working with children of all ages who were victims of child molestation, and sexual harassment, as well as physical and sexual abuse.

117.    In the mid-1990s, while Paul's father was an exchange student at Yale University, Paul's parents brought him to visit the United States.  This experience fostered Paul's dream to study at an Ivy League college and thereafter build a prosperous career here in the United States.

118.    While attending school in Germany (prior to attending high school in Swaziland in southern Africa), Paul was class president and head of the student council.  He initiated a day-long program entitled "Work 4 Peace" that raised funds for teenage day-laborers in Africa.  He was also involved in various choral and athletic clubs.   In addition, he organized a CD production of his school choir to raise funds for a classmate suffering from Leukemia.

119.    Paul attended high school on full scholarship at the esteemed Waterford Kamhlaba United World College ("UWC") of Southern Africa (Swaziland).   Well adept at integrating into a new and multi-cultural environment, he spent extensive time in Africa working on social community projects.  These projects included teaching literacy to fourth graders at a local elementary school, managing a soup kitchen, and working at a facility caring for orphans and vulnerable children.

120.   At UWC, Paul also participated in numerous drama productions as a director and stage designer.  His productions toured in Johannesburg and at the Grahamstown National Arts Festival.  For his contributions to the community, he was awarded a principal's recommendation three semesters in a row.  All the while, Paul performed at the highest academic level and graduated at the top of his class.

121.   Paul viewed Columbia as the ideal place for him to advance his intellect, pursue his various passions (such as drama, architecture, photography, and outdoor adventure) and to interact socially with a diverse and highly engaging student body.

122.   Upon his acceptance to Columbia, he was granted an F1 Visa.  Pursuant to this Visa, he is entitled to remain in the United States during his four-year undergraduate program at Columbia.

123.   Paul aspires to continue to stay and work in the United States following his graduation.  Despite the gender based harassment and defamation that he has faced, Paul has built a life for himself in the United States. He has a girlfriend who he has been dating for over a year, and he is currently seeking consulting work in New York.

124.   To remain in the country, Paul must secure employment to apply for additional Optional Practical Training, which is granted for up to twelve months following graduation.

***Columbia Breaches Its Own Gender-Based Misconduct and Confidentiality Policies***

125.   Following Emma's sexual misconduct charge against Paul, Columbia provided him a copy of its Gender-Based Misconduct Policies for Students (the "2013 Gender-Based Misconduct Policy").  Columbia amended this policy in August 2014 (the "2014 Gender-Based Misconduct Policy").

126.   The 2013 Gender-Based Misconduct Policy states in relevant part:

[33]

Columbia University, Barnard College, and Teachers College are committed to providing a learning environment free from gender-based discrimination and harassment. As such, the University does not tolerate any kind of gender-based discrimination or harassment, which includes sexual assault, sexual harassment, and gender-based harassment. The University community is committed to fostering a healthy and safe environment in which every member of the community can realize her or his fullest potential.

. . . .

Students who believe they have been subjected to gender-based discrimination or harassment are encouraged to report these incidents Upon receiving a report, the University will respond promptly, equitably, and thoroughly. In addition, the University will take steps to prevent the recurrence of the discrimination or harassment and correct its effects, if appropriate.

(Emphasis added.)

127.   In the 2013 Gender-Based Misconduct Policy, Columbia promises the following rights students accused of gender-based misconduct:

- To be treated with respect, dignity, and sensitivity throughout the process.
- To seek support services at the University.
- To confidentiality and privacy to the extent provided under applicable law. The University will make all reasonable efforts to ensure preservation of privacy, restricting information to those with a legitimate need to know.
- To be informed of the University's Gender-Based Misconduct Policies and Procedures for Students.
- To a prompt and thorough investigation of the allegations.
- To an adequate amount of time to prepare for the hearing. Participants shall be given at least five (5) calendar days' notice prior to the hearing except in rare circumstances.
- To review all applicable documents prior to the hearing in the Student Services for Gender-Based and Sexual Misconduct office.
- To challenge investigator(s) or any hearing panel member if a possible conflict of interest is present.
- The right to replace the student panelist with a dean or senior-level administrator if both parties agree.
- To be accompanied at the hearing by a supporter.
- To participate or decline to participate in the investigation or hearing panel process. However, the disciplinary process will continue with the information

[34]

available, and not participating in the investigation may preclude participation in the hearing panel.

- To refrain from making self-incriminating statements. However, the disciplinary process will continue with the information available.

- To appeal either the hearing panel's decision or the sanctions determined by the Dean of Students.

- To be notified, in writing, of the case resolution including the outcome of the appeal.

- To understand that information collected in this process may be subpoenaed in criminal or civil proceedings.

(Emphasis added.)

128.    Columbia's 2013 Confidentiality/Privacy & Non-Retaliation Policy states:

When a report of gender-based misconduct is filed, the complainant, the respondent, and all identified witnesses who are named in the investigation, will be notified of the University's expectation of confidentiality/privacy. The University will make all reasonable efforts to maintain the confidentiality/privacy of parties involved in gender-based misconduct investigations. **Breaches of confidentiality/privacy or retaliation against any person involved in the investigation, including the complainant, respondent, witnesses, or the investigators, may result in additional disciplinary action.**

(Emphasis added.)

129.    Columbia wrongly did not take any disciplinary action against Emma for her breaches of the confidentiality/privacy rules and her retaliation.

### *Columbia Removes Students' Right to Confidentiality in its 2014 Policy*

130.    In a comparison of the 2013 and 2014 versions of Columbia's Gender Based Misconduct Policies, it is evident that Columbia deleted any references with regard to the privacy of the respondent. This deletion occurred after Emma had begun a campaign against Paul, spreading confidential information to Jane Doe #1 and Jane Doe #2, as well as to the press. Regardless of Columbia's accommodation of Emma's practices, what remained in the 2014

Gender Based Misconduct Policy should have still protected Paul from the abuse and harassment that he has faced and continues to face to this day.

131.    The 2014 Gender Based Misconduct Policy states in relevant part:

Columbia University, Barnard College, and Teachers College are <u>committed to fostering an environment that is free from gender-based discrimination and harassment,</u> including sexual assault and all other forms of gender-based misconduct. The University recognizes its responsibility to increase awareness of such misconduct, <u>prevent its occurrence, support victims,</u> deal fairly and firmly with offenders, and diligently investigate reports of misconduct. In addressing issues of gender-based misconduct, all members of the University must come together to respect and care for one another in a manner consistent with our deeply held academic and community values.

. . .

**Anti-Retaliation/Anti-Intimidation Policy**

<u>The University strictly prohibits retaliation against and intimidation of any person because of his or her</u> reporting of an incident of gender-based misconduct or <u>involvement in the University's response</u>. The University will take strong disciplinary action in response to any retaliation or intimidation. The University will pursue such discipline through the applicable student conduct policy or other disciplinary process and follow the applicable time frames within such policies or processes.

. . .

**Rights of the Complainant and Respondent**

In order to provide accessible, prompt, and fair methods of investigation and resolution of incidents of student gender-based misconduct, the University has developed a process for investigation and adjudication of misconduct reports. Throughout this process, both the complainant and respondent have the following rights:

- To respect, dignity, and sensitivity.

- To appropriate support from the University.

- To privacy to the extent possible consistent with applicable law and University policy.

- To information about the University's Gender-Based Misconduct Policy for Students.

- To the presence of an advisor throughout the process.

- To participate or to decline to participate in the investigation or hearing panel process. However, a decision to refrain from participating in the process either

wholly or in part will not prevent the process from proceeding with the information available.

- To a prompt and thorough investigation of the allegations.
- To adequate time to review documents in the Gender-Based Misconduct Office following the investigation.
- To adequate time to prepare for a hearing.
- To an opportunity to challenge investigator(s) or hearing panel member(s) for a possible conflict of interest.
- To refrain from making self-incriminating statements.
- To appeal the decision made by the hearing panel and any sanctions.
- To notification, in writing, of the case resolution, including the outcome of any appeal.
- To report the incident to law enforcement at any time.
- To understand that information collected in the process may be subpoenaed in criminal or civil proceedings.

(Emphasis added.)

132.    The Privacy provision states as follows:

The University will reveal information about its investigations and adjudication of gender-based misconduct only to those who need to know the information in order to carry out their duties and responsibilities. It will inform all University personnel participating in an investigation, proceeding, or hearing that they are expected to maintain the privacy of the process. This does not prohibit either a complainant or respondent from obtaining the assistance of family members, counselors, therapists, clergy, doctors, attorneys, or similar resources.

133.    Also provided to Paul upon Emma's charge against him was a copy of

Columbia's Student Policies and Procedures on Discrimination and Harassment as of April 2013

("Student Policies").  This document states in relevant part as follows:

Columbia University is committed to providing a learning, living, and working environment free from discrimination and harassment and to fostering a nurturing and vibrant community founded upon the fundamental dignity and worth of all of its members. Consistent with this commitment and with applicable laws, the University does not discriminate against any person in the administration of its educational policies, admissions policies, scholarship and loan programs, and

[37]

athletic and other University - administered programs or permit the harassment of any student or applicant for admission on the basis of membership in a Protected Class as defined below. The University provides students who believe that they have been the subject of discrimination or harassment with mechanisms for seeking redress.

Nothing in this policy shall abridge academic freedom or the University's educational mission. Prohibitions against discrimination and harassment do not extend to statements or written materials that are germane to the classroom subject matter.

All members of the University community are expected to adhere to the applicable policies, to cooperate with the procedures for responding to complaints of discrimination and harassment, and to report conduct or behavior they believe to be in violation of these policies to the Office of Equal Opportunity and Affirmative Action or Student Services for Gender - Based and Sexual Misconduct.

Management and supervisory personnel have a duty to act as defined below; they are responsible for taking reasonable and necessary action to prevent discrimination and harassment and for responding promptly and thoroughly to any such claims. Management and supervisory personnel include any officer having formal supervisory responsibility over employees. For the purpose of these policies, faculty are supervisors of other faculty when they are acting in a supervisory role as department chair, dean, academic vice president, institute director, center director, or similar position. Faculty and officers of research who are the principal investigators on a grant or contract act in a supervisory capacity over the individuals in the lab they lead. A manager or supervisor who fails to act may be found to have violated Columbia's policies even though the underlying event does not constitute discrimination or harassment.

University officers who learn of an allegation of gender-based misconduct, discrimination or harassment have a duty to report as defined below. An officer who fails to report may be found to have violated Columbia's policies even though the underlying event does not constitute gender-based misconduct, discrimination or harassment.

All students are protected from retaliation for filing a complaint or assisting in an investigation under Columbia's Student Policies and Procedures on Discrimination and Harassment. Appropriate disciplinary action may be taken against any student or employee who violates these policies.

**Discriminatory Harassment**

Discriminatory Harassment is defined as subjecting an individual on the basis of her or his membership in a Protected Class to humiliating, abusive, or threatening conduct that denigrates or shows hostility or aversion toward an individual or group; that creates an intimidating, hostile, or abusive learning, living, or working environment; that alters the conditions of the learning, living, or working environment; or that unreasonably interferes with an individual's academic

[38]

<u>performance</u>. Discriminatory harassment includes but is not limited to: epithets or slurs; negative stereotyping; threatening, intimidating or hostile acts; denigrating jokes; and display or circulation (including through e-mail) of written or graphic material in the learning, living, or working environment. Sexual harassment and gender-based harassment which are defined in detail below, are forms of discriminatory harassment.

## Gender-based Misconduct

Gender-based misconduct includes sexual harassment, sexual assault, gender-based harassment, stalking, and intimate partner violence. Misconduct can occur between strangers or acquaintances, including people involved in an intimate or sexual relationship. Gender - based misconduct can be committed by men or by women, and it can occur between people of the same or different sex.

## Gender-based Harassment

Gender-based harassment is defined as acts of verbal, nonverbal, or physical aggression, intimidation, stalking, or hostility <u>based on gender or gender - stereotyping. The conduct must be such that it has the purpose or effect of unreasonably interfering with an individual's academic performance or creating an intimidating, hostile, demeaning, or offensive learning, living or working environment</u>. Gender-based harassment can occur if students are harassed either for exhibiting what is perceived as a stereotypical characteristic for their sex, or for failing to conform to stereotypical notions of masculinity or femininity.

## Protected Class

A Protected Class is a class of persons who are protected under applicable federal, state or local laws against discrimination and harassment on the basis of: race, color, sex, gender (including gender identity and expression), pregnancy, religion, creed, marital status, partnership status, age, sexual orientation, national origin, disability, military status, or any other legally protected status.

## Retaliation

<u>Retaliation occurs when</u> an alleged perpetrator or respondent, her or his friends or associates, or <u>other member of the University community intimidates, threatens, coerces, harasses, or discriminates against an individual who has </u>made a complaint, or<u> participated in any manner in an investigation, proceeding or hearing under these policies and procedures</u>. A retaliatory action is an action taken to deter a reasonable person from opposing a discriminatory or harassing practice, participating in a discrimination or harassment proceeding or, more generally, pursuing her or his rights under these policies. Retaliation may take the form of name - calling and taunting.

. . . .

## Stalking

Stalking is defined as repeated and continued harassment made against the expressed wishes of another individual, which causes the targeted individual reasonably to feel emotional distress, including fear and apprehension.

[39]

(Emphasis added.)

134.    Paul and his parents have lodged numerous written complaints to Columbia's administration regarding its mistreatment of Paul, its breach of its own policies, and its violations of federal and state law.  Columbia has utterly failed to act.

## AS AND FOR THE FIRST CAUSE OF ACTION
### (Violation of Title IX of the Education Amendments of 1972)

135.    Paul repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

136.    Title IX of the Education Amendments of 1972 provides, in relevant part, that:

No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

137.    Title IX of the Education Amendments of 1972 applies to an entire school or institution if any part of that school receives federal funds; hence, athletic programs are subject to Title IX of the Education Amendments of 1972, even though there is very little direct federal funding of school sports.  Upon information and belief, Columbia receives nearly $645,000,000 in federal funding for research and development.

138.    Both the Department of Education and the Department of Justice have promulgated regulations under Title IX that require a school to "adopt and publish grievance procedures providing for the prompt and equitable resolution of student. . . complaints alleging any action which would be prohibited by" Title IX or regulations thereunder. 34 C.F.R. § 106.8(b) (Dep't of Education); 28 C.F.R. § 54.135(b) (Dep't of Justice). Such prohibited actions include all forms of sexual harassment, including sexual intercourse, sexual assault, and rape. *See* U.S. Dep't of Education, Office for Civil Rights, *Revised Sexual Harassment Guidance:*

[40]

*Harassment of Students by School Employees, Other Students, or Third Parties -- Title IX* (2001) at 19-20, 21 & nn. 98-101.

139.    The procedures adopted by a school covered by Title IX must not only "ensure the Title IX rights of the complainant," but must also "accord[] due process to both parties involved..." U.S. Dep't of Education, Office for Civil Rights, *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties -- Title IX* (2001) at 22.

140.    A school also has an obligation under Title IX to make sure that all employees involved in the conduct of the procedures have "adequate training as to what conduct constitutes sexual harassment, which includes "alleged sexual assaults." U.S. Dep't of Education, Office for Civil Rights, *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties -- Title IX* (2001) at 21.

141.    Columbia, in violation of Title IX, has intentionally discriminated against Paul on the basis of his male sex by condoning a hostile educational environment due to knowingly permitting Columbia student Emma and Columbia Professor Kessler to engage in prolonged gender based harassment of and gender based misconduct as to Paul based on what Columbia had determined after investigation to be untrue allegations and permitting that gender based harassment of and gender based misconduct in the school's programs or activities with actual knowledge of, a deliberate indifference to and an apparent approval of said gender based harassment and gender based misconduct, with the consequence that Paul has been effectively denied equal access to Columbia's resources and opportunities, thereby undermining and detracting from Paul's educational experience.

[41]

142.    Paul has suffered from student-on-student gender based harassment and gender based misconduct from Columbia student Emma engaged in a campaign of gender based harassment and defamation, falsely labeling Paul a "serial rapist" and walking around on campus with a mattress, and Columbia took no action to intercede and stop that gender based harassment and gender based misconduct. To the contrary, in complete disregard of Paul's rights, Columbia allowed Columbia student Emma to carry the mattress into each of her classes, the library, and on campus-provided transportation and thereby endorsed Columbia student Emma's gender based harassment, even though it was based on what Columbia had found after investigation to be untrue allegations.

143.    Paul has suffered from teacher-on-student gender based harassment and gender based misconduct from Columbia Professor Kessler who approved Columbia student Emma's project of walking around with a mattress for course credit and publicly endorsed her gender based harassment and defamation campaign, making public statements endorsing Columbia student Emma's carrying around a mattress as a powerful symbol, and Columbia took no action to intercede and stop that gender based harassment and gender based misconduct. To the contrary, in complete disregard of Paul's rights, Columbia permitted, with deliberate indifference to known acts of gender based harassment and gender based misconduct of Columbia Professor Kessler to grant credit for Columbia student Emma's mattress carrying and to invoke the support of the university for Columbia student Emma's campaign of gender based harassment and defamation against Paul, even though it was based on what Columbia had determined after investigation to be untrue allegations.

144.    As a result of Columbia's approved gender based harassment and gender based misconduct, Paul has been subjected to severe, pervasive and objectively objectionable harassing

[42]

and threatening behavior by other Columbia students, believing that Paul is a "serial rapist," whenever Paul has appeared at university activities.

145. Numerous reports and complaints by Paul and his parents have been made to Columbia officials about the gender based harassment and defamation of Paul, but Columbia has acted with at best deliberate indifference to and at times apparent approval of what have been known acts of gender based harassment and gender based misconduct in Columbia's programs and activities.

146. As a result of Columbia's approved gender based harassment and gender based misconduct, Paul has had his educational experience at Columbia undermined and detracted from as described above.

147. As a result of the foregoing, Paul is entitled to injunctive relief to prevent threatened future acts of gender based harassment and gender based misconduct that subject Paul to a hostile educational environment in violation of Title IX.

148. As a result of the foregoing, Paul is entitled to damages for past acts of gender based harassment and defamation in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## AS AND FOR THE SECOND CAUSE OF ACTION
### (Violation of New York Executive Law Section 296(4))

149. Paul repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

150. New York Executive Law, Article 15, Human Rights Law, section 296(4) provides in pertinent part:

> It shall be an unlawful discriminatory practice for an education corporation or association ... to permit the harassment of any student or applicant, by reason of

his race, color, religion, disability, national origin, sexual orientation, military status, sex, age, or marital status[.]

151.    Columbia, in violation of New York Executive Law, Article 15, Human Rights Law, section 296(4), has intentionally discriminated against Paul on the basis of his male sex by condoning a hostile educational environment due to knowingly permitting Columbia student Emma and Columbia Professor Kessler to engage in prolonged gender based harassment of and gender based misconduct as to Paul based on what Columbia had determined after investigation were untrue allegations and permitting that gender based harassment and gender based misconduct in the school's programs or activities with actual knowledge of, a deliberate indifference to and an apparent approval of said gender based harassment and gender based misconduct, with the consequence that Paul has been effectively denied equal access to Columbia's resources and opportunities, thereby undermining and detracting from Paul's educational experience.

152.    As a result of the foregoing, Paul is entitled to injunctive relief to prevent threatened future acts of gender based harassment and gender based misconduct that subject Paul to a hostile educational environment in violation of New York Executive Law, Article 15, Human Rights Law, section 296(4).

153.    As a result of the foregoing, Paul is entitled to damages for past acts of gender based harassment and defamation in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

### AS AND FOR THE THIRD CAUSE OF ACTION
### (Violation of New York Civil Rights Law Section 40-c)

154.    Paul repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

[44]

155.    New York Civil Rights Law section 40-c states:

1. All persons within the jurisdiction of this state shall be entitled to the equal protection of the laws of this state or any subdivision thereof.

2. No person shall, because of race, creed, color, national origin, sex, marital status, sexual orientation or disability, as such term is defined in section two hundred ninety-two of the executive law, be subjected to any discrimination in his or her civil rights, or to any harassment, as defined in section 240.25 of the penal law, in the exercise thereof, by any other person or by any firm, corporation or institution, or by the state or any agency or subdivision of the state.

147.    Columbia, in violation of New York Civil Rights Law section 40-c, has intentionally discriminated against Paul on the basis of his male sex by condoning a hostile educational environment due to knowingly permitting Columbia student Emma and Columbia Professor Kessler to engage in prolonged gender based harassment of and general based misconduct as to Paul based on what Columbia had determined after investigation were untrue allegations and permitting that gender-based harassment in the school's programs or activities with actual knowledge of, a deliberate indifference to and an apparent approval of said gender based harassment and gender based misconduct, with the consequence that Paul has been effectively denied equal access to Columbia's resources and opportunities, thereby undermining and detracting from Paul's educational experience.

148.    As a result of the foregoing, Paul is entitled to injunctive relief to prevent threatened future acts of gender based harassment and gender based misconduct that subject Paul to a hostile educational environment in violation of New York Civil Rights Law section 40-c.

149.    As a result of the foregoing, Paul is entitled to damages for past acts of gender based harassment and defamation in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

[45]

## AS AND FOR THE FOURTH CAUSE OF ACTION
### (Breach of Contract)

150.    Paul repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

151.    Based on the aforementioned facts and circumstances, Columbia breached express and/or implied agreement(s) with Paul.

152.    Columbia committed several breaches of its agreements with Paul, including, without limitation, to provide a learning environment free of gender based discrimination and harassment and to maintain the confidentiality and privacy of parties involved in gender-based misconduct investigations.

153.    As a direct and foreseeable consequence of these breaches, Paul sustained tremendous damages, including, without limitation, emotional distress, loss of educational and athletic opportunities, economic injuries and other direct and consequential damages.

154.    Paul is entitled to recover damages for Columbia's breach of the express and/or implied contractual obligations described above.

155.    As a direct and proximate result of the above conduct, actions and inactions, Paul has suffered physical, psychological, emotional and reputational damages, economic injuries and the loss of educational and athletic opportunities.

156.    As a result of the foregoing, Paul is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## AS AND FOR THE FIFTH CAUSE OF ACTION
### (Covenant of Good Faith and Fair Dealing)

157.    Paul repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

[46]

158.    Based on the aforementioned facts and circumstances, Columbia breached and violated a covenant of good faith and fair dealing implied in the agreement(s) with Paul by intentionally discriminating against Paul on the basis of his male sex by condoning a hostile educational environment due to knowingly permitting Columbia student Emma and Columbia Professor Kessler to engage in prolonged gender based harassment of and gender based misconduct as to Paul based on what Columbia had determined after investigation were untrue allegations and permitting that gender based harassment and gender based misconduct in the school's programs or activities with actual knowledge of, a deliberate indifference to and an apparent approval of said gender based harassment and gender based misconduct, with the consequence that Paul has been effectively denied equal access to Columbia's resources and opportunities, thereby undermining and detracting from Paul's educational experience.

159.    As a direct and foreseeable consequence of these breaches, Paul sustained tremendous damages, including, without limitation, emotional distress, psychological damages, loss of educational and athletic opportunities, economic injuries and other direct and consequential damages.

160.    Paul is entitled to recover damages for Columbia's breach of the express and/or implied contractual obligations described above.

161.    As a result of the foregoing, Paul is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## AS AND FOR THE SIXTH CAUSE OF ACTION
### (Unfair or Deceptive Trade Practices)

162.    Paul repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

163.    Section 349(a) of New York General Business Law provides consumer protection by declaring as unlawful "deceptive acts and practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state."

164.    Columbia's Student Policies and Procedures on Discrimination and Harassment state, among other things:

> Columbia University is committed to providing a learning, living, and working environment free from discrimination and harassment and to fostering a nurturing and vibrant community founded upon the fundamental dignity and worth of all of its members. **The University does not tolerate discrimination or harassment on the basis of membership in a Protected Class**, and it provides students who believe that they have been the subject of discrimination or harassment with mechanisms for seeking redress. Nothing in this policy shall abridge academic freedom or the University's educational mission. **All members of the University community are expected to adhere to the applicable policies, to cooperate with the procedures for responding to complaints of discrimination and harassment, and to report conduct or behavior they believe to be in violation of these policies to EOAA.** Management and supervisory personnel have a duty to act; they are responsible for taking reasonable and necessary action to **prevent discrimination and harassment and for responding promptly and thoroughly to any such claims.** University officers who learn of an allegation of gender-based misconduct, discrimination, or harassment have a duty to report the allegation to EOAA or Student Services for Gender-Based and Sexual Misconduct. All students are protected from retaliation for filing a complaint or assisting in an investigation under these policies. **Appropriate disciplinary action may be taken against any student or employee who violates these policies.**

(Emphasis added.)

165.    According to Columbia's Gender-Based Misconduct Policies for Students:

> Columbia University, Barnard College, and Teachers College are committed to providing a learning environment **free from gender-based discrimination and harassment**. As such, the University does not tolerate any kind of gender-based discrimination or harassment, which includes sexual assault, sexual harassment, and gender-based harassment. **The University community is committed to fostering a healthy and safe environment in which every member of the community can realize her or his fullest potential.**

[48]

Gender-based misconduct is a serious concern on college campuses throughout the country. To address this problem, the University provides educational and preventive programs, services for individuals who have been impacted by gender-based and sexual misconduct, and accessible, prompt, and equitable methods of investigation and resolution.

Students who believe they have been subjected to gender-based discrimination or harassment are encouraged to report these incidents. Upon receiving a report, the University will respond promptly, equitably, and thoroughly. In addition, the University will take steps to prevent the recurrence of the discrimination or harassment and correct its effects, if appropriate.

(Emphasis added.)

166. According to Columbia University's Confidentiality, Privacy, & Non-Retaliation Policy:

**The University will make all reasonable efforts to maintain the confidentiality and privacy of parties involved in gender-based misconduct investigations**, restricting information to those with a legitimate need to know. Individuals participating in an investigation, proceeding, or hearing are encouraged to maintain the privacy of the process in order to assist the office in conducting a thorough, fair, and accurate investigation. Individuals are also encouraged to seek appropriate administrative support on-campus. Strictly confidential on-campus resources include counseling services, medical care providers, the Rape Crisis/Anti-Violence Support Center, and clergy members. All other University administrators, such as faculty and advising staff, cannot promise strict confidentiality but can provide private support.

(Emphasis added.)

167. Columbia has engaged in the following acts or practices that are deceptive or misleading in a material way, or committed deceptive acts or practices, which were aimed at the consumer public at large, that were a representation or omission likely to mislead a reasonable consumer acting reasonably under the circumstances:

a. by causing Paul to believe that Columbia would follow its policies, copies of which were provided to Paul and are also available on Columbia's Internet website; and

[49]

b.  by causing Paul to believe that if he paid tuition and fees to Columbia, that Columbia would uphold its obligations, covenants and warranties to Paul described in its policies.

168.    Columbia had no intention of following its own policies and procedures for Paul when intentionally discriminating against Paul on the basis of his male sex by condoning a hostile educational environment due to knowingly permitting Columbia student Emma and Columbia Professor Kessler to engage in prolonged gender based harassment of and gender based misconduct as to Paul based on what Columbia had determined after investigation were untrue allegations and permitting that gender based harassment and gender based misconduct in the school's programs or activities with actual knowledge of, a deliberate indifference to and an apparent approval of said gender based harassment and gender based misconduct, with the consequence that Paul has been effectively denied equal access to Columbia's resources and opportunities, thereby undermining and detracting from Paul's educational experience.

169.    Columbia's stated policies and procedures, together with its violations thereof only with respect to Paul as the male accused of sexual assault demonstrates Columbia's deceptive practices with respect to males accused of sexual assault at Columbia.

170.    Based on the foregoing facts and circumstances, Columbia engaged in unfair or deceptive trade practices in violation of Section 349(a) of the General Business Law.

171.    As a result of Columbia's deceptive acts and practices, Paul sustained tremendous damages, including, without limitation, emotional distress, psychological damages, loss of educational and athletic opportunities, economic injuries and other direct and consequential damages.

172.    As a result of the foregoing, Paul is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

[50]

## AS AND FOR THE SEVENTH CAUSE OF ACTION
### (Estoppel and Reliance)

173.   Paul repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

174.   Columbia's various policies constitute representations and promises that Columbia should have reasonably expected to induce action or forbearance by Paul.

175.   Columbia expected or should have expected Paul to accept its offer of admission, incur tuition and fees expenses, and choose not to attend other colleges based on its express and implied promises that Columbia would not tolerate, and Paul would not suffer, gender based harassment and gender based misconduct by fellow students and would not subject Paul to a hostile educational environment on the basis of his male sex that has effectively denied Paul equal access to Columbia's resources and opportunities, thereby undermining and detracting from Paul's educational experience.   .

176.   Paul relied to his detriment on these express and implied promises and representations made by Columbia.

177.   Based on the foregoing, Columbia is liable to Paul based on estoppel.

178.   As a direct and proximate result of the above conduct, Paul sustained substantial damages, including, without limitation, emotional distress, psychological damages, loss of educational and athletic opportunities, economic injuries and other direct and consequential damages.

179.   As a result of the foregoing, Paul is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## AS AND FOR THE EIGHTH CAUSE OF ACTION
### (Intentional Infliction of Emotional Distress)

180.   Paul repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

181.   Based on the foregoing facts and circumstances, Columbia intentionally discriminated against Paul on the basis of his male sex by condoning a hostile educational environment due to knowingly permitting Columbia student Emma and Columbia Professor Kessler to engage in prolonged gender based harassment of and gender based misconduct as to Paul based on what Columbia had determined after investigation were untrue allegations and permitting that gender based harassment and gender based misconduct in the school's programs or activities with actual knowledge of, a deliberate indifference to and an apparent approval of said gender based harassment and gender based misconduct, with the consequence that Paul has been effectively denied equal access to Columbia's resources and opportunities, thereby undermining and detracting from Paul's educational experience.

182.   The above actions and inactions by Columbia were so outrageous and utterly intolerable that they caused mental anguish and severe psychological and emotional distress to Paul, as well as physical harm, financial loss, humiliation, loss of reputation and other damages.

183.   As a direct and proximate result of the above conduct, Paul sustained substantial damages, including, without limitation, emotional distress, loss of educational and athletic opportunities, economic injuries and other direct and consequential damages.

184.   As a result of the foregoing, Paul is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## AS AND FOR THE NINTH CAUSE OF ACTION
### (Negligence)

185.   Paul repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

186.   Columbia owed duties of care to Paul, an enrolled student at the school.  Such duties included a duty of reasonable care to protect a student from the tortious acts of third parties.

187.   Columbia breached its duties owed to Paul by condoning a hostile educational environment due to knowingly permitting Columbia student Emma and Columbia Professor Kessler to engage in prolonged gender based harassment of and gender based misconduct as to Paul based on what Columbia had determined after investigation were untrue allegations and permitting that gender based harassment of and gender based misconduct in the school's programs or activities with actual knowledge of, a deliberate indifference to and an apparent approval of said gender based harassment and gender-based misconduct to maintain the confidentiality and privacy of parties involved in investigations of gender based misconduct, with the consequence that Paul has been effectively denied equal access to Columbia's resources and opportunities, thereby undermining and detracting from Paul's educational experience.

188.   As a direct and proximate result of the above conduct, Paul sustained substantial damages, including, without limitation, emotional distress, psychological damages, loss of educational and athletic opportunities, economic injuries and other direct and consequential damages.

189.   As a result of the foregoing, Paul is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

# PRAYER FOR RELIEF

**WHEREFORE,** for the foregoing reasons, Paul demands judgment against the

Columbia as follows:

(i)  on the first cause of action for violation of Title IX of the Education
Amendments of 1972, a judgment awarding Paul: (i) damages in an amount to
be determined at trial, including, without limitation, damages to physical well-
being, emotional and psychological damages, damages to reputation, past and
future economic losses, loss of educational and athletic opportunities, and loss
of future career prospects, plus prejudgment interest, attorneys' fees, expenses,
costs and disbursements, (ii) injunctive relief from to prevent threatened future
acts of harassment that subject Paul to a hostile educational environment in
violation of Title IX, and (iii) a declaratory judgment pursuant to 28 U.S.C. §
2201, that Defendant Columbia has intentionally discriminated against Paul on
the basis of his male sex by condoning a hostile educational environment due
to knowingly permitting Columbia student Emma and Defendant Columbia
Professor Kessler to engage in prolonged gender based harassment of and
gender based misconduct as to Paul and permitting that gender-based
harassment in the school's programs or activities with actual knowledge of, a
deliberate indifference to and an apparent approval of said gender based
harassment and gender based misconduct, with the consequence that Paul has
been effectively denied equal access to Defendant Columbia's resources and
opportunities, thereby undermining and detracting from Paul's educational
experience;

(ii)  on the second cause of action for violation of New York Executive Law
Section 296(4), a judgment awarding Paul: (i) damages in an amount to be
determined at trial, including, without limitation, damages to physical well-
being, emotional and psychological damages, damages to reputation, past and
future economic losses, loss of educational and athletic opportunities, and loss
of future career prospects, plus prejudgment interest, attorneys' fees, expenses,
costs and disbursements, (ii) injunctive relief from to prevent threatened future
acts of harassment that subject Paul to a hostile educational environment in
violation of New York Executive Law Section 296(4), and (iii) a declaratory
judgment pursuant to 28 U.S.C. § 2201, that Defendant Columbia has
intentionally discriminated against Paul on the basis of his male sex by
condoning a hostile educational environment due to knowingly permitting
Columbia student Emma and Defendant Columbia Professor Kessler to engage
in prolonged gender based harassment of and gender based misconduct as to
Paul and permitting that gender based harassment and gender based
misconduct in the school's programs or activities with actual knowledge of, a
deliberate indifference to and an apparent approval of said gender based
harassment and gender based misconduct, with the consequence that Paul has
been effectively denied equal access to Defendant Columbia's resources and

[54]

opportunities, thereby undermining and detracting from Paul's educational experience;

(iii)     on the third cause of action for violation of New York Civil Rights Law section 40-c, a judgment awarding Paul: (i) damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and athletic opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, (ii) injunctive relief from to prevent threatened future acts of harassment that subject Paul to a hostile educational environment in violation of New York Civil Rights Law section 40-c, and (iii) a declaratory judgment pursuant to 28 U.S.C. § 2201, that Defendant Columbia has intentionally discriminated against Paul on the basis of his male sex by condoning a hostile educational environment due to knowingly permitting Columbia student Emma and Defendant Columbia Professor Kessler to engage in prolonged gender based harassment of and gender based misconduct as to Paul and permitting that gender based harassment and gender based misconduct in the school's programs or activities with actual knowledge of, a deliberate indifference to and an apparent approval of said gender based harassment and gender based misconduct, with the consequence that Paul has been effectively denied equal access to Defendant Columbia's resources and opportunities, thereby undermining and detracting from Paul's educational experience;

(iv)     on the fourth cause of action for breach of contract, a judgment awarding Paul damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and athletic opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(v)     on the fifth cause of action for breach of the covenant of good faith and fair dealing, a judgment awarding Paul damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and athletic opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(vi)     on the sixth cause of action under Section 349(a) of the New York General Business Law, a judgment awarding Paul: (i) damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and athletic opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements and (ii) injunctive relief from to prevent threatened future acts of gender based harassment and gender based misconduct that

[55]

subject Paul to a hostile educational environment in violation of Section 349(a) of the New York General Business Law;

(vii)    on the seventh cause of action for estoppel and reliance, a judgment awarding Paul damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and athletic opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(viii)   on the eighth cause of action for intentional infliction of emotional distress, a judgment awarding Paul damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and athletic opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(ix)     on the ninth cause of action for negligence, a judgment awarding Paul damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and athletic opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements; and

(x)      awarding Paul such other and further relief as the Court deems just, equitable and proper.

Dated:   New York, New York
         April 22, 2015

                              NESENOFF & MILTENBERG, LLP
                              *Attorneys for Plaintiff Paul Nungesser*

                       By: _____
                           Andrew T. Miltenberg, Esq. (AM 7006)
                           Philip A. Byler, Esq. (PB 1234)
                           Diana R. Zborovsky, Esq. *(admission pending)*

                           363 Seventh Avenue, Fifth Floor
                           New York, New York 10001
                           (212) 736-4500
                           amiltenberg@nmllplaw.com
                           pbyler@nmllplaw.com
                           dzborovsky@nmllplaw.com

[56]