**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------x

| | |
|---|---|
| PAUL NUNGESSER, | Civ. Act. No. 15-3216 |
| **Plaintiff,** | |
| v. | **AMENDED &** |
| | **SUPPLEMENTED** |
| | **COMPLAINT** |
| COLUMBIA UNIVERSITY, TRUSTEES | |
| OF COLUMBIA UNIVERSITY, | |
| LEE C. BOLLINGER, individually and as | |
| agent of Columbia University, and JON | |
| KESSLER, individually and as agent of | |
| Columbia University, | **JURY TRIAL** |
| | **DEMANDED** |
| **Defendants.** | |

------------------------------------------------------------x

Plaintiff Paul Nungesser, by and through his undersigned attorneys Nesenoff & Miltenberg LLP, hereby alleges as follows:

### PRELIMINARY STATEMENT

1.      This is an action for damages, injunctive [PN1] relief and declaratory relief against Defendants Columbia University, the Trustees of Columbia University, Columbia University's President Lee C. Bollinger and Columbia University's Visual Arts Professor Jon Kessler (hereinafter sometimes collectively referred to as "Defendants"), for their acts and omissions with regard to Paul Nungesser in violation of both federal and state law which have significantly damaged, if not effectively destroyed Paul Nungesser's college experience, his reputation, his emotional well-being and his future career prospects.  This case exemplifies the types of student-on-student and teacher-on-student gender-based harassment and misconduct that the Supreme Court has held is prohibited by Title IX of the Education Amendments of 1972, 86 Stat. 373, *as amended*, 20 U.S.C. §1681 *et seq.* ("Title IX").

2.　　Paul Nungesser has been an outstanding and talented student at Columbia University.  He thrived in his first two years at Columbia University and then became the victim of harassment by another student, to devastating, long lasting results. Columbia University knew about the harassment from the beginning, and had the power, as well as the legal and contractual obligation, to protect Paul Nungesser. It did not. By refusing to protect Paul Nungesser, Columbia University first became a silent bystander and then turned into an active supporter of a fellow student's harassment campaign by institutionalizing it and heralding it.

## THE PARTIES

3.　　Plaintiff Paul Nungesser ("Paul") is a German national who was a scholarship student at Columbia University, graduating in May 2015,.  During his time in the U.S., he was living there as a non-resident alien with a valid F1 Visa.  After graduation, remaining in the United States on this Visa would have required employment, which he was unable to secure due to the events at issue in this case. As a result he has returned to Germany.

4.　　Defendant Columbia University ("Columbia" or the "University") is an elite private Ivy League University located in New York, New York.  Upon information and belief, Columbia receives nearly $645,000,000 in federal funding for research and development.

5.　　Upon information and belief, Columbia University operates under a 1787 charter that places the institution under a Board of Trustees -- namely, Defendant Trustees of Columbia University ("Board of Trustees").  Overall governance of the University lies in the hands of its twenty-four-member Board of Trustees. The Board of Trustees is entrusted to select the President, oversee all faculty and senior administrative appointments, monitor the budget, supervise the endowment, and protect University property.

6.     Defendant Lee C. Bollinger ("Defendant Bollinger") is President of Columbia University.

7.     Defendant Jon Kessler ("Defendant Kessler") is a Professor of Visual Arts at Columbia University.

## JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1332.  The parties are diverse and the amount in controversy well exceeds the statutory limit, exclusive of interest and costs.

9.     Venue is proper pursuant to 28 U.S.C. § 1391 because all Defendants reside in this district and a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

## FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

### *Paul's Initial Thriving Experience at Columbia*

10.     When Paul was accepted to Columbia University as a John Jay Scholar in 2011, he and his whole family were delighted. At that time, Paul was a curious and open-minded 19-year-old with a wide range of interests. He was eager to contribute to the community of one of the most prestigious universities in the country with his multitude of interests, which he wished to expand and develop in return. His parents were convinced that Columbia would be the place where Paul would receive important stimuli for his academic and personal advancement. Paul and his parents imagined Columbia University to be a place where Paul's critical thinking, his alert mind, and his intellectual curiosity would be fostered, and where he would make experiences that would nurture and strengthen him for life.

11.     In his first two years at Columbia University, before the events at issue in this case began, Paul was extensively involved in student life at Columbia. He participated in COÖP, ADP, lightweight rowing, the WBAR radio show, stage design, and student film production group (an initiative started by Paul). He also had a paid on-campus job as an audio-visual technician.

12.     Paul was also active in many social events, and he had a lot of friends. One of those friends was Emma Sulkowicz ("Emma").

### *Emma's Intimate Conversations with Paul*

13.     Paul's relationship with Emma began platonically.  They were just friends.

14.     On December 16, 2011, Emma sent private Facebook messenger messages to Paul, as a friend. She asked him to speak with Emma's sexual partner, John Doe, on her behalf, and asked him to urge John Doe to use condoms when he had sex with women other than Emma. The conversation, in relevant part, was as follows:

| | |
|---|---|
| Emma: | John Doe and i are all cool – hahahah – i was excited. |
| Paul: | oh thanks god good to hear – so wats da nuse |
| Emma: | he and i went to an art opening and tacos tonight – and we talked it out – like im not gonna force him to be exclusive but i was like "just use condoms with other girls" – so yeah – he'll use condoms if he fucks other girls. |
| . . . | |
| Paul: | . . . its just i mean im glad you talked it out and stuff and im not the one trying to kill the boner here but how are you gonna have any idea whether he actually uses a condom with other girls or not . . |
| Emma: | yeah i realize that's true – i mean there's a lot of faith involved – i feel like he needs another boy to tell him to use condoms  – can you, in like your next bro talk, just be like yo, use condoms when you fuck other girls |

| | |
|---|---|
| Paul: | i have tried to talk to him – thats why i talked to you in the first place cause i felt i wasn't gettin anywhere |
| Emma: | oh forrealz? – goddamnit – yeah he's totally not gonna do it then |
| Paul: | :S |
| Emma: | why can't he just only love me |
| Paul: | -.- <br> man i feel kinda bad as f*** puttin you through this.. <br> its just i really dunno wat 2do <br> hu? |
| Emma: | hu? <br> no you should feel proud of being a good guy |
| Paul: | naah not so sure . . meh |
| Emma: | no seriously, i'm thankful |
| Paul: | but yeah i guess, its just im kinda overwhelmed. thought John Doe was a good guy just acting tough you know |
| Emma: | ur saying that you thought he was a good guy but now you're seeing he's a straight up bad guy? |
| Paul: | not straight up bad – but like why is he doing this?  like maybe at the end of the day its none of my fuckin business.  but then again i feel like it is |
| Emma: | I don't knowwwww – do you think he's going to be hooking up with more girls or is it a one time thing that he's gotten over???? |
| Paul: | i have no clue, like really. |

15.    Emma and Paul began having frequent intimate talks about very personal topics. During one of those conversations, she told Paul that she had been raped while in high school. Paul was distraught to hear this and offered her assistance in seeking support.

16.    While they were still freshmen, and before any physical relationship had begun, Emma broached the topic of anal sex with Paul by private Facebook messenger as follows:

[5]

| Emma: | fuck me in the butt |
|---|---|
| Paul: | eehm<br>maybe not?<br>jk<br>I miss your face tho |
| Emma: | hahahah<br>you don't miss my lopsided ass? |
| Paul: | i do.<br>just not that much<br>good I am actually too tired to choose a movie<br>*god<br>also to tired to spell apparently |

### *Emma and Paul's Friendship and Sexual Encounters*

17.     While they were still freshman at Columbia, Paul and Emma progressed to becoming "friends with benefits."  The two shared Emma's bed for platonic sleepovers, and then, on two separate occasions during the spring of their freshman year, they engaged in sexual intercourse.

18.     On the second occasion that they had sexual intercourse that spring, Emma asked Paul to engage in anal sex with her.  Paul stated that he had no experience with it.  Emma said she had enjoyed it in the past with other men and wanted him to proceed.  The two engaged in anal sex as part of their foreplay.  They then progressed to vaginal intercourse.

19.     Following their sexual encounters on both occasions, the two discussed their relationship.  Both times, they concluded that they would remain primarily as friends and that they would not enter into a monogamous romantic relationship.  An important factor in their decision was that Emma had previously been having sex with Paul's close friend, John Doe. Despite broaching the topic of anal sex with Paul, Emma later denied doing so.[1]

---

[1] See: *http://bwog.com/2014/01/23/accessible-prompt-and-equitable-an-examination-of-sexual-assault-at-columbia/* (Bwog, Jan. 23, 2014). The author refers to Emma as "Sara" and Paul as "Tom": "Sara said, minutes in, Tom

20.    During the summer following their freshman year, Emma frequently sent private Facebook messages to Paul, who was then living abroad.  She messaged Paul that she had tested positive for an STD after having sex at a party "with both John Doe and his best friend Joe."

21.    In response to this confession, Paul invited Emma to come to Berlin and talk to him about it. Paul had wanted to comfort Emma in the troubles she was experiencing.

22.    Emma further communicated to Paul stories and allegations of sexual abuse that she had experienced with other sexual partners. She stated: *"i've officially had sex with all of John Doe' best friends . . .  - did lotsa drugs – jk – just got very drunk – well anyways – now i have an std – i actually hate John Doe like if a girl is about to puke – don't put your unprotected dick into her . . . I realy don't want to be known as the girl who contracted an std because she was drunk you know?  it is more his fault for fucking me unconscious – i mean i was conscious but clearly not in my right mind . . . i was literally blackout . . . like i puked all over the place."*[2]

23.    Emma also messaged Paul frequently throughout that summer with messages including: *"wuv youuuu,"* – *"i miss and love you btw"* – *"Paul i really miss you"* – *"i really mis you"* – *"Paul I wuv you so much.  Please stay w me foevah"* – *"paul I miss you so much"* – *"like u know when you tell people you miss them and you don't really mean it? - i actually mean it  – i miss you so much – ahhh"* – *"pookie – i miss you"* – *"I LOVE YOU – SO MUCH"* – *"I MISS YOU MORE THAN ANYTHING"* – *"I love youuuu"* – *"and I would LOVE to have you here – omg – we could snuggle"* – *"PAUL I MISS YOU PAUL I MISS YOU PAUL I MISS YOU PAULLL"* – *"DUDE I MISS YOU SO MUCH"* – *"I love you Paul!!!!!!."*  These messages spanned from May 2012 through August of 2012, and similar messages continued until October 2012.

---

grabbed her wrists and pinned her arms behind her head.  He pushed her legs against her chest and forcefully penetrated her anus.  They had never had anal sex before.  They had never discussed it."

[2] Upon information and belief, Emma contracted chlamydia and fully treated it with medication.

24.     When Paul messaged Emma that he had been seeing a woman while abroad, Emma typed "*are u guyz in luvvvvv?*" Paul responded *"yeah seed time – \*sad – well i dunno – I mean its not gonna last."* Emma asked *"are you guys a thing?'"* and Paul responded that it was *"more like a summer fling if you now what i mean."*

25.     On August 21, 2012, just prior to their return to Columbia for sophomore year, Emma wrote to Paul, *"i want to snuggle with you - and talk about our summers - but not right now – I also love you."*

26.     On August 27, 2012, on their first night back at Columbia (the "Sophomore Sexual Encounter"), Emma invited Paul to her room.  Once again, they engaged in consensual sexual intercourse in Emma's bed. The Sophomore Sexual Encounter involved vaginal and anal sex, followed by oral intercourse.

27.     Two days later, on August 29, 2012, Paul Facebook messaged Emma to invite her to a gathering in his room, stating, "*small shindig in our room tonight ~ bring cool freshmen.*" Emma messaged back four minutes later, *"lol yussss – also i feel like we need to have some real time where we can talk about life and thingz."*  Paul immediately agreed, writing *"word."* Emma continued, *"because we still haven't really had a paul-emma chill sesh since summmerrrrr."*  Paul responded *"when are you guys coming through."*  Emma wrote, *"I'll probs come at 10:45.  Is that cool?0."*  Paul wrote back *"sweet – yeah – you at the fencing thing."*  Emma wrote back *"Yeah I'm just gonna chill with them for a bit haha is adp a rager?"*[3] Paul wrote back *"naah – a little too many guys right now haha – so bring some peepz."*  Emma wrote back *"Okay let them know I'll be der w da females spon.*"  At 11:06 p.m., she messaged Paul *"Ack are people still there?  Heading over now."*

---

[3] Her reference to ADP, Alpha Delta Pi, was to the coed fraternity of which she and Paul were both members.  Some ADP members live in the ADP house near campus.

28.     Paul remained at the ADP party but he and Emma did not see one another.  The next day, he messaged her at 4:55 p.m., *"part II tonight – you're coming?"*  She messaged him back seconds later, *"lol i came and left already!!!"*  Paul responded*, "lolcats – when were you here – I dont believe you – its not the truth – to the tune of pretty women."*

29.     Two weeks later, on September 9, 2012, Emma messaged Paul, *"I wanna see yoyououoyou."*  Thereafter, Paul sent Emma a happy birthday message as follows:  *"oh hai. happy born day!  you better be celebrating muchos, no?*  also:  *donde estas tu i mi viva – see i'm so desperate with out you, i even try to speak spanish.*[4]  *– anywho:  merry happy days!"*  Emma responded, *"I love you Paul.  Where are you?!?!?!?!"*

### Emma's Efforts to Gain Affection From Paul Go Unreciprocated

30.     As is evident from Emma's Facebook messages to Paul during the summer prior to their sophomore year, Emma's yearning for Paul had become very intense. Emma repeatedly messaged Paul throughout that summer that she loved and missed him. She was quick to inquire whether he was in love with the woman he was seeing abroad.

31.     Thereafter, she continued pursuing him, reiterating that she loved him.  However, when Paul did not reciprocate these intense feelings, and instead showed interest in dating other women, Emma became viciously angry.

### Emma Files A False Complaint With The University

32.     More than seven months after the Sophomore Sexual Encounter with Paul, Emma filed a gender-based misconduct incident report (the "Report") at Columbia's Office of Gender-Based Misconduct.  Shockingly, she alleged that during the Sophomore Sexual Encounter with Paul, *"he began to choke her, slapped her face, pinned her arms ad penetrated her anally.  She*

---

[4] Emma had previously told Paul that her first words were spoken in Spanish.

*said she had screamed for him to stop, but that he would not.*"  She also stated that *"It could take two minutes for it to stop, or he could have strangled me to death."*[5]

33.     Upon information and belief, Emma alleged that Paul pinned down her arms above her head while also strangling her throat and hitting her across the face.  She further alleged that he walked out of her room immediately thereafter.

34.     Columbia proceeded with an investigation (the "Emma Investigation") that spanned seven months and culminated with a two-hour hearing (the "Hearing") on October 29, 2013, at which Emma and Paul both testified.  At the conclusion of the Hearing, Columbia discredited Emma's entire story, finding Paul "not responsible" for the alleged "non-consensual sexual intercourse."

35.     Paul readily prevailed against Emma's false allegations, in spite of being precluded from presenting Emma's Facebook messages during the Emma Investigation or during the Hearing itself. Paul was vindicated even though Emma's burden of proof was only a "preponderance of the evidence standard" (i.e. more likely than not).

36.     Pursuant to the University's Confidentiality Policy, Emma, Paul, and all other persons involved in the Investigation and Hearing were required to keep all aspects of the investigation confidential.

37.     As stated in the complaint letter served to Paul on April 18, 2013,

"the university will make <u>all reasonable efforts to maintain the confidentiality/privacy of the involved parties</u> . . . you should use the utmost discretion and <u>not discuss the evidence with others.</u>"

(emphasis added).

---

[5] *See* http://*www.nytimes.com/2014/05/04/us/fight-against-sex-crimes-holds-colleges-to-account.html?_r=0* (NY Times, May 4, 2014)

### *Emma's Failed Efforts to Bolster Her False Complaint*

38.    In an effort to bolster her case, and driven by her feelings of rejection and interest in making a public impact and statement, Emma approached several women with whom she was friendly, and encouraged each of them to report Paul to the University for sexual misconduct. Two of these women acquiesced.

39.    The first, Jane Doe #1, who was also a member of ADP, filed her complaint against Paul at the end of April or early May 2013, shortly before her graduation.  Jane Doe #1 erroneously and wrongfully alleged that a full year prior to her filing (i.e. during the end of her junior year, which was the end of Paul's freshman year), Paul had grabbed her at a party and tried to kiss her.  This allegation was sheer fabrication. Columbia found Jane Doe #1's story not credible, ultimately finding Paul "not responsible" for the alleged "non-consensual sexual contact."[6]

40.    Jane Doe #2, who had been Paul's girlfriend for several months while they were both freshman (prior to Paul's sexual intercourse with Emma), was also enticed to file a false report against Paul, alleging sexual misconduct. Jane Doe #2 reported that she had the impression while Paul was her boyfriend, that she could only see him if she had sex with him, and thus she felt obligated to have sex with him. She never alleged physical coercion, violence, or rape.  She filed her complaint at the same time as Jane Doe #1.  Columbia found a lack of "sufficient information to indicate that reasonable suspicion exists" of any alleged "intimate partner violence" and thus terminated Jane Doe # 2's investigation without any need for a hearing.

---

[6] Jane Doe #1 later stated, "I wasn't emotionally scarred or anything.  I'm used to people grabbing my ass in bars – that's the shitty state of the world today. Honestly, I didn't even think it was a reportable offense covered by the misconduct policy."  See *http://bwog.com/2014/01/23/accessible-promppt-and-equitable-an-examination-of-sexual-assault-at-columbia/* (Bwog, Jan. 23, 2014).

41.     Throughout the course of the Emma Investigation conducted by Columbia, Paul's request to be represented by an attorney was denied by Columbia, important evidence was excluded, and Paul faced immediate social isolation due to the interim measures and Confidentiality Policy of Columbia. Since Paul's friends and resources on campus were the only ones Paul had in the United States, Paul remained in complete social isolation throughout the course of the Emma Investigation, and beyond.

42.     In contrast, Columbia fully accommodated Emma's needs and desires throughout the entire Emma Investigation. For example, Emma was able to continuously alter and tweak important facts in her allegations such as the dates and places of alleged events. Additionally, the "witness testimony" admitted in support of Emma's allegations were exclusively hearsay statements, obtained from individuals with no first person knowledge of the alleged events.

43.     Despite the many challenges he faced and the accommodations provided to his accuser, Paul was nonetheless found not responsible for sexual misconduct.

44.     During the hearing, Emma stated repeatedly that her goal was to have Paul expelled from Columbia.  When Emma appealed her case against Paul, Columbia affirmed its decision.   Thus, all three cases alleging sexual misconduct against Paul were ultimately terminated. Paul's name was officially cleared in all respects, and Emma's scheme to have Paul expelled from Columbia failed.

*The Baselessness of Emma's Claims*

45.     Columbia reached its decision clearing Paul of charges multiples times and for good reason. Emma was never able to present any evidence whatsoever to support her defamatory and serious allegations. Although Emma claimed that she was almost strangled to

death and subject to a brutal anal rape in her dorm room in Summer 2012,[7] there was not one single piece of evidence that could confirm her severe allegations:

  a.  There were no witnesses to Emma's alleged screams in the badly soundproofed student dorm.

  b.  There was no medical report, even though an attack as massive as described would, with great likelihood, have caused serious injuries requiring medical attention and would have left visible bruises on Emma's body for days.[8]

  c.  There was no testimony from Emma's friends or family members who could confirm such injuries or changes in her behavior caused by discomfort from these injuries. On the contrary, in the days following the alleged attack, Emma participated in various social events on campus, such as parties with friends and social events with the fencing team. Given the multitude of social contact, any physical injuries would have likely been noticed by people on campus or those close to Emma.

  d.  There were varying accounts by Emma as to whether and when she had spoken to anyone about the alleged assault: At times she claimed she hadn't spoken to anyone, not even her parents;[9] at other times, she claimed that she told a few good friends.[10] Her latest claim was that she spoke to a friend days after the alleged event who

---

[7] See http://www.nytimes.com/2014/05/04/us/fight-against-sex-crimes-holds-colleges-to-account.html?_r=1 (NY Times, May 4, 2014); See also http://bwog.com/2014/01/23/accessible-prompt-and-equitable-an-examination-of-sexual-assault-at-columbia/ (Bwog, Jan. 23, 2014).

[8] Compare: Wyatt, J. and Squires, T.: Oxford Handbook of Forensic Medicine, Oxford University Press, 2011, p. 372.

[9] See http://www.democracynow.org/2014/9/16/a_survivors_burden_columbia_student_carries (Democracy Now; Sept. 16, 2014).

[10] See http://bwog.com/2014/01/23/accessible-prompt-and-equitable-an-examination-of-sexual-assault-at-columbia/ (Bwog, Jan. 23, 2014)

had to make clear to her that being nearly strangled to death and being penetrated anally while struggling against it and screaming "NO" constituted rape.[11]

    e.    There was also no evidence whatsoever that Emma's attitude or behavior regarding Paul had changed after the alleged incident. On the contrary, Paul was able to present numerous love messages that Emma wrote to him before and after the alleged event with no apparent change in mood. Even though these messages were excluded as exculpatory evidence from the investigation, Columbia was informed about their existence and their content.

    f.    Columbia was also informed that Emma had a history of alleging sexual assault. During the investigation, Paul had provided further messages from Emma to Columbia, in which she alleged abuse and sexual assault by other students at Columbia University, including her former boyfriend. These messages, too, were excluded from evidence. Nonetheless, Columbia was informed that Emma had a history of claiming to be a victim of sexual assault and should have included this knowledge in its assessment of Emma's harassment campaign in the course of the events.

### Emma Goes Public With Her Scheme Branding Paul a "Rapist"

46.    Emma's efforts to brand Paul a "serial rapist" began during the Emma Investigation conducted by Columbia.  Since then, those efforts have intensified.

47.    In April 2013, days after the Emma Investigation began, Emma encouraged the President of ADP to notify its alumni board and several members that an alleged rapist was living at ADP.  This notification occurred.

---

[11] *See http://jezebel.com/how-to-make-an-accused-rapist-look-good-1682583526* (Jezebel, Feb. 6, 2015). On the same occasion Emma presented a fourth accuser, a close friend of hers and a fellow visual arts student at Columbia, who made up another false allegation against Paul. Paul was informed about this complaint first by reporters to whom Emma presented this complaint, when Paul started to go public to defend himself against Emma's campaign.

48.     On December 3, 2013, only a few days after Emma's appeal had been rejected, Paul was ambushed in front of his dorm by reporters from the New York Post, and was followed by a paparazzo on his way to class. At that time, Emma was already being advised by a publicist[12] and/or a lawyer with great media expertise, something she had threatened in her appeal letter in November 2013.[13] Columbia was put on notice of this situation, by mail from Paul's parents to Defendant Bollinger,[14] even before the article was published. The article in the New York Post made clear that all three accusers had spoken to the author, Tara Palmeri, and identified Paul to the reporters. This clear breach of confidentiality had no consequences for the accusers.[15]

49.     There were similarly no consequences for the subsequent breaches of confidentiality.  Starting at the latest in December 2013, Emma forwarded confidential information, including Paul's name, to Anna Bahr, a student reporter and activist, whose subsequent article appeared on January 23, 2014 in BWOG, Columbia's Student News Blog. This article did not include Paul's name, but did make him easily identifiable to most of his peers on campus.

50.     What made this breach of confidentiality even more hurtful and unjust was the fact that Paul, who was in Berlin on his way to his semester abroad in Prague with the prestigious NYU Tisch program, was still under the confidentiality policy and faced disciplinary action if he violated this policy. He also had been advised by Columbia University to ignore the press publicity and to stay silent when Anna Bahr reached out to Paul for comment in the preparation of her article.

---

[12] *See http://nymag.com/thecut/2014/09/emma-sulkowicz-campus-sexual-assault-activism.html* (NY Magazine, Sept. 21, 2014).

[13] *See http://bwog.com/2014/01/23/accessible-prompt-and-equitable-an-examination-of-sexual-assault-at-columbia/* (Bwog, Jan. 23, 2014).

[14] Paul's parents sent letters on December 4, 2013 to President Bollinger, et al., as well as to Melissa Rooker.

[15] This was documented by correspondence from Melissa Rooker on December 4, 2013.

51.     Even though the Anna Bahr article generated more than 60 comments in its first 11 hours online, Columbia University did not inform Paul of its appearance and did not do anything else with respect to what was obviously a major breach of the University's confidentiality policy. Only after Paul complained to Columbia University about this new and massive breach of confidentiality did University officials express concern and note the online witch-hunt that had started in the comment section of the article.

52.     Columbia University, however, again did not penalize any of the accusers, who once more had blatantly violated the University's confidentiality policy as well publicly harassing a fellow student.

53.     Instead, two weeks later, Defendant Bollinger issued a statement[16] in which he announced a change of Columbia's policies with regard to sexual assault. He also announced that data on sexual assault and Gender-based Misconduct would be released -- which had been a demand made by activists at Columbia. The timing of this policy change implies that this was a direct reaction to the criticism from Anna Bahr's article, as is noted in the press:

> "Columbia University will release data about sexual assault complaints after pressure from students, President Lee Bollinger announced Wednesday afternoon. Columbia is the latest in a string of prestigious universities facing student action and scrutiny over the way it handles assaults on campus.
>
> The controversy came to a head when Columbia's student magazine, The Blue and White, launched an in-depth series featuring stories from assault victims last week. In the first installment, a junior who was raped by a close friend described her decision to report to the school rather than the police: "I heard so many horrible stories about how badly the police handle cases like these. Columbia also advertises its resources so much that I thought they would really listen to me. I thought I would be taken care of."[17]

---

[16] *See http://www.columbia.edu/node/16295.html* (Columbia University Statement Regarding Gender-Based Misconduct and Sexual Assault, Jan. 29, 2014).
[17] *See http://thinkprogress.org/health/2014/01/30/3225781/columbia-sexual-assault* (Think Progress, Jan. 30, 2014).

54.     At this time, it became clear that neither Emma nor the other two accusers had to fear any disciplinary action for their defamatory breach of confidentiality as well as their public harassment of Paul. This knowledge only further incited the harassment campaign against Paul, by Emma and her advisors.

55.     Thereafter, media stories began to emerge that did not include Paul's name, but insidiously included enough identifiable information to reveal him to other Columbia students.

56.     Emma's first public press statement was in April 2014, at a press conference with Senator Gillibrand at Columbia University. At that press conference, Emma stated: *"My rapist— a serial rapist—still remains on campus…"* and *"Every day I live in fear of seeing him."* However, at that time Paul was abroad in Prague, and was not in fact on Columbia's campus. Emma, who was still Facebook friends with Paul at the time, undoubtedly knew this information as it was posted about throughout Paul's Facebook page. Yet, she still made these false and misleading statements to the press.

57.     Defendant Bollinger, instead of correcting Emma's false and defamatory statement, published a statement in which he bowed to the activists' demands by announcing further measures to address the issue of sexual assault at Columbia.[18]

58.     In May 2014, a so-called "rapist-list" appeared in several Columbia bathrooms, listing Jean-Paul Nungesser[19] as a "serial rapist."  Fliers with the same list were circulated at several Columbia student events. Paul was never notified about these events by Columbia administrators.

---

[18] *See http://www.columbia.edu/node/16841.html* (Columbia University Update on Prevention of Sexual Assault, Apr. 7, 2014).
[19] Paul's given name is Paul Jonathan Nungesser.  Jean-Paul was Paul's user name on Facebook.

59.     In Emma's May 2014 Time Magazine op-ed piece, entitled "My Rapist is Still on Campus," Emma states, amongst other things, *"Every day, I am afraid to leave my room."*[20]

60.     However, on May 18, 2014, Emma admitted that she was aware Paul was in fact out of the country, and not on the Columbia campus. Emma twisted that information to insinuate that Paul was a fugitive: *"Sulkowicz says the assistant district attorney has contacted her about beginning an investigation, and she has been told police are currently looking for her alleged rapist, who she says is out of the country."*[21]

### *Emma Files False Charges With The NYPD With The Sole Purpose Of Making Paul's Name Publicly Accessible; The NYPD Dismisses All Charges*

61.     Having gained some traction in denouncing Paul by name, Emma proceeded to the New York Police Department ("NYPD") to criminally charge Paul with rape.  Her goal was to publicly brand Paul as a rapist.  She stated as follows:

> "One of my main goals was to have his name somewhere so if he committed another crime in New York City it would show up on his record so the next person he might assault would have a better time than I did in prosecuting him."[22]

62.     Evidently, because she failed to get Paul expelled from Columbia, Emma's next goal was to have Paul withdraw from the University.  Emma was impressed by the actions of Lena Sclove, a Brown University student who had publicized the name of a male student suspended by Brown University for sexual misconduct.  Like Lena Sclove, she intended to publicize Paul's name such that he would withdraw from Columbia.  Emma stated as follows:

> "I was recently friended on Facebook by Lena Sclove, who has been such an inspiration for me, and to see the way that she was able to create a safe space for herself definitely made me realize that after I had made the police report I had that as an option to me as well."[23]

---

[20] *See*  http://time.com/99780/campus-sexual-assault-emma-sulkowicz/ (Time Magazine, May 15, 2014).
[21] *See http://nymag.com/daily/intelligencer/2014/05/columbia-spectator-prints-name-from-rape-list.html* (NY Magazine, May 18, 2014).
[22] *Id.*
[23] *Id.*

63.     In May 2014, Emma succeeded with her plan to publicly identify Paul when the Columbia Spectator (the University's student newspaper) published Emma's false rape allegation and included Paul's name in the story.

64.     On August 11, 2014, the New York County District Attorney's Office interviewed Paul for three hours. Immediately upon hearing of the police report, Paul (who was abroad at that time) had a criminal lawyer contact police and the District Attorney's office on his behalf, expressing Paul's intent to speak to the District Attorney to clear his name. Although Paul was never summoned, he returned to the United States and voluntarily spoke to Assistant District Attorney Kat Holderness and Assistant District Attorney Martha Bashford.

65.     Immediately thereafter, Kat Holderness informed Paul's criminal lawyer that no charges would be brought against Paul, as there was a lack of reasonable suspicion to proceed.

66.     Three weeks after Paul's criminal attorney was informed that rape charges would not be brought against him, Emma falsely announced that she personally decided not to pursue criminal charges against Paul:

> "I decided I didn't want to pursue it any further because they told it me it would take nine months to a year to actually go to court, which would be after I graduated and probably wanting to erase all of my memories of Columbia from my brain anyway, so I decided not to pursue it."[24]

Emma conveniently omitted the fact that the Sex Crimes Unit refused to bring any charges against Paul following its investigation, due to a lack of any reasonable suspicion.

67.     At that point, Emma's efforts to vilify Paul had already considerably damaged Paul's reputation on campus and beyond, but they had not yet gone global.

---

[24] *See http://nymag.com/thecut/2014/09/columbia-emma-sulkowicz-mattress-rape-performance-interview.html* (NY Magazine, Sept. 4, 2014).

***Columbia Sponsors On-Campus Gender-Based Harassment and Defamation of Paul***

68.     Emma's efforts to wreak havoc on Paul's life were reignited by Columbia Professor Jon Kessler.  Defendant Kessler directed Emma to transform her personal vendetta against Paul into a Columbia-sponsored and course-approved calumny.   Under the guise of "performance art," Defendant Kessler and Emma jointly designed her senior thesis project (the "Mattress Project").

69.      The Mattress Project, named "Carry That Weight" involved Emma carrying a mattress around campus at all times during her senior year.  In her words, "*I will carry the mattress with me to all of my classes, every campus building, for as long as my rapist stays on the same campus with me."*[25] She also publicly called Paul a *"serial rapist"* and vowed to carry the mattress to hers and Paul's graduation if Paul was in attendance.[26]

70.     Emma made clear that the Mattress Project – a "performance art piece" for which she earned Columbia class credit– was not about art but was specifically about Paul and stalking him:

> The protest in mind, I ask if she can articulate exactly what she wants to convey to
> Columbia. "Get my rapist off campus." She says it slowly, enunciating, putting
> into words what her piece shows. But she laughs and atones for her gravity: "…in
> those few words."[27]

71.     Defendant Kessler not only approved Emma's Mattress Project for course credit, but also publicly endorsed her harassment and defamation of Paul, stating: *"carrying around your university bed – which was also the site of your rape – is an amazingly significant and*

---

[25] *See* http://www.democracynow.org/2014/9/16/we_will_not_be_silenced-students (Democracy Now, Sept. 16, 2014).
[26] *See* "Carry That Weight," Conversations With Roberta Smith, co-chief art critic for the New York Times, presented by the Elizabeth A. Sackler Center for Feminist Art at the Brooklyn Museum on December 14, 2014, available at *http://www.you tube.com/watch?v=OMXp3RLOVNg* (95.32 min.).
[27] See *http://bwog.com/2014/09/05/speaking-with-emma-sulkowicz/* (Bwog, September 5, 2014).

*poignant and powerful symbol . . . with all this evidence coming up ... it's so clear the way uni*

*feels about this issue.*"[28]

72.     Defendant Kessler also guided Emma in developing the Mattress Project, knowing that her piece was targeted at a fellow Columbia student. Defendant Kessler stated:

> "The impulse was there for her to carry the bed around, and she didn't necessarily have the information as to how that would fit into the context or the history of performance art. So this summer we got involved in phone conversations about the nature of endurance art, talking about pieces by Tehching Hsieh and Marina and Ulay and Chris Burden.
>
> But what struck me from the get-go . . . is that, more than any of those people, Emma's work comes from something which is so much more personal and so much deeper and so much less of a programmatic idea about what to do, but really about working something out cathartically and also making an enormous statement for change. And that's what makes it so powerful."[29]

(Emphasis added.)

73.     Emma engaged in the Mattress Project for the entirety of her senior year.  She actively earned course credit from Columbia for this outrageous display of harassment and defamation against Paul and used this to fulfill her graduation requirement of a senior thesis, despite clear notice from Paul and his parents to Defendant Bollinger and other Columbia persons of authority, that Paul's legal rights are being violated and that his well-being and future prospects are suffering immensely.

74.     In complete disregard of Paul's rights to be free of, among other things, gender-based harassment and gender-based stalking, Columbia has allowed Emma to carry the mattress into each of her classes, the library, and on Columbia campus-provided transportation.

---

[28] *See http://columbiaspectator.com/news/2014/09/02/emma-sulkowiczs-performance-art-draws-support-campus-activists* (Columbia Spectator, Sept. 2, 2014).
[29] *Two Weeks Into Performance, Columbia Student Discusses the Weight of Her Mattress,* Hyperallergic, Jillian Steinhauer (Sept. 17, 2014).

75.     During the course of the Mattress Project, Emma has repeatedly and publicly called Paul a "serial rapist," while gaining national and international attention in the mass media.

76.     Defendant Bollinger has basked in the spotlight that this display has brought. Regarding Emma, Defendant Bollinger stated:

> "This is a person who is one of my students, and I care about all of my students. And when one of them feels that she has been a victim of mistreatment, I am affected by that. This is all very painful."[30]

Defendant Bollinger showed no public regard for Paul, another one of his students who was being victimized by Emma's campaign of false allegations of criminal conduct that the University had rightly determined lacked any substance.   Defendant Bollinger thus displayed a contemptible moral cowardice in bowing down to the witch hunt against an innocent student instead of standing up for the truth and taking appropriate steps to protect Paul from gender-based harassment.

77.     The Mattress Project, as well as Emma's public declarations in support of her project, constitute gender-based harassment and misconduct against Paul. Although cleared of all charges against him numerous times, Paul was publicly branded a "serial rapist" by Emma. He was targeted because he is a male, and attacked for his (consensual) sexual activity. The Mattress Project subjected Paul to verbal aggression, intimidation, and hostility based on his gender. Emma's explicitly stated purpose, and the ultimate effect of her project, was to interfere with Paul's academic performance (and actually have him removed from the University) and create an intimidating, hostile, demeaning, and offensive learning and living environment. Columbia University's effective sponsorship of the gender-based harassment and defamation of Paul resulted in an intimidating, hostile, demeaning, and offensive learning and living environment

---

[30] *See* http://nymag.com/thecut/2014/09/emma-sulkowicz-campus-sexual-assault-activism.html (NY Magazine, Sept. 21, 2014).

that deprived him of equal access to educational benefits and opportunities at Columbia on the basis of his gender.

***Emma's Gender-Based Harassing and Defamatory Message Spreads Worldwide***

78.    Emma's continued campaign of gender-based harassment and defamation of Paul eventually received widespread news coverage both nationally and internationally.

79.    During the time frame of early September 2014 through early November 2014, the first few months during which the Mattress Project was implemented, Emma's campaign was covered by major print media, online media and television stations in *at least* the following thirty-five countries:

| | |
|---|---|
| North America | 1.  Canada<br>2.  United States |
| South America | 3.  Argentina<br>4.  Brazil<br>5.  Colombia<br>6.  Mexico<br>7.  Panama<br>8.  Peru |
| Europe | 9.   Austria<br>10.  Belgium<br>11.  Croatia<br>12.  Czech Republic<br>13.  Denmark<br>14.  France<br>15.  Germany<br>16.  Greece<br>17.  Hungary<br>18.  Ireland<br>19.  Italy<br>20.  Netherlands<br>21.  Norway<br>22.  Poland<br>23.  Romania<br>24.  Slovakia<br>25.  Spain<br>26.  Switzerland<br>27.  Sweden<br>28.  Turkey |

|  | 29. United Kingdom |
|---|---|
| Asia | 30. China |
|  | 31. India |
|  | 32. Sri-Lanka |
|  | 33. Vietnam |
| Australia | 34. Australia |
|  | 35. New Zealand |

80.     Emma's campaign even ensnared United States Senator Kirsten Gillibrand, who irresponsibly and publicly branded Paul a "serial rapist" in the course of bringing Emma to President Obama's State of the Union Address as the Senator's guest of honor on January 20, 2015. This action was taken by Senator Gillibrand despite her knowledge that Paul was cleared of any wrong-doing on multiple occasions by both Columbia and the District Attorney,[31] and despite her responsibility to recognize that the evidence demonstrated Emma's charges were false.

81.     Senator Gillibrand stated:

"I believe Emma. . .  And I believe rapes that have happened to her and other students across the country have had very little justice. I think campuses are generally ill-equipped to handle the review of these cases. Those who are asked to adjudicate them are not trained; they don't know anything about the crime, the nature of a rapist, the nature of recidivism, that they commit these crimes over and over again. In Emma's case, three girls talked about the same incident, same perpetrator, same type of circumstances ... too often our survivors are not being heard."[32]

(Emphasis added.)

82.     Senator Gillibrand further stated:

"Last night at the President's State of the Union Address, I was honored to invite as my guest Emma Sulkowicz, the Columbia University student who has inspired us all with her performance art piece 'Carry That Weight' in which she carries her

---

[31] At the latest, on December 20, 2014, it was publicly known that Paul had been cleared by the University and that the NYPD did not pursue charges.  See *http://www.nytimes.com/2014/12/22/nyregion/accusers-and-the-accused-crossing-paths-at-columbia.html?_r=0* (NY Times, Dec. 22, 2014).

[32] *See http://www.journalandrepublican.com/article/20150121/OGD/150129759* (Journal & Republican, January 21, 2015).

mattress everywhere she goes to symbolize the burden she carries every single day <u>as long as her rapist is still on campus.</u>"[33]

(Emphasis added.)

83.     During this time, a Google search for "Emma Sulkowicz" automatically suggested Paul's full name as part of the auto-complete search feature. To this day, it suggests a search for "who raped Emma Sulkowicz" when googling "Emma Sulkowicz," and reveals Paul's name immediately.

84.     Almost all international articles are linked to the Columbia Spectator, (which published Paul's name as early as May 2014) and its You Tube video about "Carry That Weight" which received 1.896 Million views as of April 18, 2015.[34]

### Paul's Safety and Well-Being Are Threatened

85.     Emma has publicly threatened Paul, stating, *"[i]t's not safe for him to be on this campus."*[35]

86.     Further threats to Paul have been posted to Emma's public Facebook page, which has approximately 1,900 friends/followers.  The first post was made by a friend of Emma's named Jay Good, appearing in September 2014, which stated in relevant part, *"I'm only pissed that I'm not in NY to CUT HIS THROAT MYSELF."*

87.     Jay Good posted again on December 22, 2014, at 1:40 pm, stating in relevant part that Paul *"needs to practice silence or suicide before he gets dealt with accordingly."*  Emma

---

[33]See *http://www.huffingtonpost.com/rep-kirsten-gillibrand/carrying-their-weight-giv_b_6516630.html* (Huffington Post, Jan. 21, 2015).
[34] See *https://www.youtube.com/watch?v=l9hHZbuYVnU* (YouTube, Sept. 2, 2014).
[35] *See http://www.nytimes.com/2014/12/22/nyregion/accusers-and-the-accused-crossing-paths-at-columbia.html?_r=0* (NY Times, Dec. 21, 2014).

publicly "liked" the post by commenting with a "thumbs up" icon.  This post and her "like" remain publicly posted:[36]



***Defendants Endorse, Fund, and Encourage the Public Campaign Against Paul***

88.     Columbia University, Defendant Bollinger, and Defendant Kessler have actively encouraged Emma's campaign of gender-based harassment and defamation against Paul.

89.     "Carry That Weight" was publicly promoted on a Columbia-owned Website, IRW&G Blog/Institute for Research on Women and Gender, Columbia University ("IRW&G").

---

[36] Statements evidenced by following screenshots from a) Jay Good's post and b) Emma's "like" of the same post as of April 22, 2015.

IRW&G even closed its office on September 9, 2014, shortly after Emma had started the Mattress Project, to support Emma.[37]

90.    On September 17, 2014, the same site presented as fact that Paul sexually assaulted Emma, who is called a survivor: *"In solidarity with Sulkowicz's aptly titled "Mattress Performance: Carry That Weight" - in which Sulkowicz has promised to carry a mattress to each of her classes so long as she attends school with <u>the same student who sexually assaulted her.</u>"*[38] (Emphasis added.)

91.    IRW&G announced on its official website that it supported the "Carry That Weight National Day of Action" which took place on October 29, 2014. Columbia's IRW&G also motivated people to participate in the event, which in great part was used to engage in further gender-based harassment and defamation of Paul.

92.    Columbia University even provided financial endorsement to the "Carry That Weight National Day of Action" by paying a portion of the clean-up fee for a Columba campus rally at which Emma publicly declared that Paul is her rapist.

93.    This campus rally, entitled "Carry That Weight National Day of Action", was organized by Emma and her supporters from No Red Tape and the Carry That Weight Campaign. Emma publicly stated as follows:

> "I'm no less afraid [now] of seeing my rapist every time I leave my dorm . . . . I don't need to say his name. You know who it is."[39]

---

[37] *See http://irwgs.columbia.edu/blog/announcement-office-closed-today-support-carrying-weight* (Columbia University Institute for Research on Women, Gender, and Sexuality, Sept. 9, 2014).

[38] *See http://irwgs.columbia.edu/blog/carry-weight-day-action-happening-today* (Columbia University Institute for Research on Women, Gender, and Sexuality, Oct. 29, 2014).

[39] *See http://www.thedailybeast.com/articles/2014/11/06/is-columbia-failing-campus-rape-victims.html*.  (The Daily Beast, Nov. 6, 2014).

94.    The rally centered on a list of ten demands that were read to the public and were published in writing on one of the mattresses which was signed by activists, including Emma. The last demand explicitly alleged that Paul posed *"an ongoing threat to the community"*:

> "The investigation and adjudication process of the sexual assault report made by Emma Sulkowicz against Jean-Paul[40] Nungesser was grossly mishandled. <u>An alleged serial perpetrator remains on our campus and presents an ongoing threat to the community.</u> Given these facts, we demand you re-open this case and evaluate it under the newly revised policy."[41]

(Emphasis added.)

95.    In response, Columbia published the following statement, in relevant part:

> <u>"Columbia embraces its responsibility to be a leader in preventing sexual assault and other gender-based misconduct anywhere it may occur, with a special duty to protect the safety and well-being of our own students. Student activism plays an important role in encouraging these efforts, and the University appreciates this attention to a significant issue affecting the lives of college and university students around the nation.</u>
>
> We understand that reports about these cases in the media can be deeply distressing and <u>our hearts go out to any students who feel they have been mistreated.</u> Importantly, the University will not address reports about individual cases or experiences. This is so not only because of federal student privacy law but also—and most fundamentally—because of our commitment to help students feel as comfortable as possible accessing the many resources to support them on campus without concern that the University would ever comment publicly on them or their experiences. <u>As a University we have made substantial new investments to further strengthen our personnel, physical resources, and policies dedicated to preventing and responding to gender-based misconduct.</u>"[42]

(Emphasis added.)  This statement did not include anything related to the actual breaches of the University's confidentiality policy, the press publicity, or the University sponsored activities that had falsely branded Paul a rapist and constituted gender-based harassment.

---

[40] Paul's given name is Paul Jonathan Nungesser.  Jean-Paul is a username he used on Facebook.
[41] *See http://bwog.com/2014/10/29/carry-that-weight-day-of-action-at-columbia/* (Bwog, Oct. 29, 2014).
[42] *See http://www.sexualrespect.columbia.edu/columbia-university-statement-enhanced-personnel-physical-resources-and-policies-october-29-2014* (Columbia University Statement on Enhanced Personnel, Physical Resources, and Policies, Oct. 29, 2014).

96.     The same day, October 29, 2014, Defendant Bollinger co-authored an article in *The New Republic* that opened with a large picture of a smiling Emma carrying her mattress. The article stated in part:

> "There is a long history in America of movements seeking to change deeply rooted behavioral norms that show promise and then, disappointingly, produce only marginal recalibrations of the status quo. No one can guarantee that the present public focus on sexual assault and other forms of gender-based misconduct will result in the degree of prevention and culture change we seek across society. What we can and must do, though, is sustain the effort to make our campuses safer over the long term and to encourage and train students to contribute thoughtfully to these changes in their own communities, both while they are in school and as they take their place in the broader world."[43]

Again, this statement did not include anything related to the actual breaches of the University's confidentiality policy, the press publicity, or the University sponsored activities that had falsely branded Paul a rapist and constituted gender-based harassment.

97.     In December 2014, Columbia student activists from No Red Tape and Carry That Weight Allie Rickard, Becca Breslaw, Michela Weihl, and Zoe Ridolfi-Starr (the "Activists"), read a letter at Defendant Bollinger's office containing the following passage:

> "Since then, Emma Sulkowicz's senior thesis Mattress Project: Carry That Weight has called national attention to the injustices survivors have been forced to carry alone for too long. You have not responded once to this piece, and <u>her serial rapist remains on campus today</u>."[44]

(Emphasis added.)

98.     Columbia initially told the Activists it would cost $1,500 to clean up the protest, but ultimately decided to sponsor the balance and billed the Activists only $471. Columbia thus spent over $1,000 (one thousand dollars) to effectively sponsor a defamation and harassment

---

[43] *See http://www.newrepublic.com/article/120021/columbia-president-lee-bollinger-campus-sexual-assault* (New Republic, Oct. 29, 2014).

[44] *See http://columbiaspectator.com/spectrum/2014/12/15/activists-deliver-mattress-representing-check-and-letter-bollinger-protest* (Columbia Spectator, Dec. 15, 2014).

movement against Paul.  Defendant Bollinger, continuing to show moral cowardice, did not issue any statement to the effect that the University and the District Attorney had cleared Paul of any wrong-doing.

99.     Columbia University further endorsed the public harassment of Paul by making Michaela Weihl a member of the Presidential Advisory Committee for Sexual Assault as well as the special task force of Suzanne Goldberg on the Sexual Respect initiative, advising on important university policy changes[45]. Michaela Weihl took part in substantial public defamation against Paul, calling him "an ongoing threat to the community" as well as a "serial rapist".

*Emma Encourages One of Her Supporters to File a Fourth False Complaint Against Paul*

100.     In late 2014, Paul learned that one of Emma's friends and supporters, a student (hereinafter referred to as "John Doe #2"), had filed a complaint against Paul for sexual misconduct. John Doe #2's complaint alleged that Paul touched him inappropriately while they were engaged in a conversation more than three years prior, in late 2011. The complaint was riddled with inconsistencies, including the actual date and year of the alleged incident. It was apparent that John Doe #2 was encouraged by Emma to file the false complaint, in order to add clout to Emma's campaign of harassment and defamation against Paul.

101.     On April 24, 2015, for the fourth time, a hearing panel was convened to determine whether Paul had engaged in behavior that violates the Columbia University Gender-Based Misconduct Policy for Students; specifically, behavior that meets the definition of Sexual-Assault – Non-Consensual Sexual Contact. John Doe #2's nonchalant behavior during the proceedings, including his frequent giggling, coupled with his inconsistent statements which

---

[45] See *http://columbiaspectator.com/news/2015/02/10/barnard-declines-require-students-participate-new-sexual-respect-program* and *http://columbiaspectator.com/news/2014/10/24/what-know-fridays-university-senate-plenary*

were rebutted by Facebook messages presented by Paul demonstrated that John Doe #2 was aware of the frivolity of his accusations.

102.    After a thorough review of the information provided through the investigative and hearing processes, including interviews with both Paul and John Doe #2, the panel found that Paul was not responsible for the alleged misconduct. In its April 30, 2015 decision, the panel expressed that its decision was based, in part, on the credibility of the statements contained within the investigative report as well as the statements made during the hearing. Therefore, the charges against Paul were dismissed. Notably, John Doe #2 had previously participated in at least one on-campus protest that promoted the harassment against and defamation of Paul. Moreover, John Doe #2 had been extensively quoted in an article published by Jezebel in February 2015, which focused on repairing Emma's narrative.[46]

103.    Furthermore, Paul was made aware in January 2015 that Emma leaked the information regarding John Doe #2's complaint to the media, thus strengthening the belief that Emma and John Doe #2 acted in concurrence to further damage Paul's reputation. Paul provided notice of this to Columbia administrators, who did not find this behavior actionable.

### *Paul's Columbia Experience Is Effectively Destroyed*

104.    As a result of Defendants' actions, Paul's entire social and academic experience at Columbia suffered tremendously.  In adherence to Columbia's Confidentiality Policy, he did not discuss anything about the investigations with any of his classmates.  Yet, Emma did the exact opposite, gaining support from classmates, professors, the administration, and Defendant Bollinger by breaching Columbia's Confidentiality Policy repeatedly. Notably, Emma has not faced any consequences for breaching the confidentiality policy nor for relentless engaging in student-on-student harassment.

---

[46] *See http://jezebel.com/how-to-make-an-accused-rapist-look-good-1682583526* (Jezebel, Feb. 6, 2015).

105.    Silenced by Emma's campaign, and enduring suspensions and increasing ostracism from his two main social activities (ADP and the Columbia Outdoor Orientation Program ("COÖP")), Paul's social life crumbled to the point of isolation. Even after Paul was cleared of the outrageous allegations on more than one occasion, Columbia never made any serious attempts to rehabilitate Paul within those groups. Day-to-day life for Paul became unbearably stressful, as Emma and her mattress paraded around campus each and every day.

106.    Due to this ostracism, and worrisome threats to Paul's physical safety, University resources such as the dorms, libraries, dining halls, and the gym were not reasonably available for Paul's access from April 2013 until May 2015.  Even attending classes had become problematic, as he endured constant harassment and would have his photo taken against his will while in class.

107.    The gender-based harassment and defamation from the "Carry That Weight" campaign continues to this day.  On the "Carry That Weight" Facebook page, activists and official hosts of events Zoe Ridolfi Starr and Allie Richard stated: *"This campaign is inspired by the activism and art of Emma Sulkowicz, who is boldly carrying a dorm mattress around campus with her as long as her rapist continues to attend Columbia University."*[47]  Zoe Ridolfi Starr and Allie Richard were two of the activists who signed the ten demands and read the defamatory statements at Defendant Bollinger's office.  These activists have incited and supported gender-based harassment and defamation of Paul in the past and have publicly announced their intention to continue their activism.[48]

---

[47] *See https://www.facebook.com/events/1550372131902005* (Facebook, 2014).
[48] *See https://vimeo.com/125262075* (Vimeo, Apr. 17, 2015).

108.    Paul has suffered substantially in (i) his ability to work at his campus audio-visual technician job; (ii) his ability to perform academically; and (iii) his physical and emotional well-being.

109.    The Mattress Project and related events precluded Paul from attending vital on-campus career recruiting events. These events were hosted at Columbia through the end of classes on May 8, 2015.

110.    On April 12, 2015, during the recent "Days on Campus" at Columbia University, activists projected "Rape happens here" and "Columbia protects rapists" onto Low Library and held banners reading "Carry That Weight" and "Columbia Protects Rapists" over Low steps and ledges by Kent Hall.  Columbia University did not stop the activists, even though it was clear to everyone on campus that the projected slogans and banners referred to Paul specifically and was another attempt to shame him away.

111.    Paul requested a security escort for a sexual respect workshop he had to attend on March 26 2015, part of a new Columbia initiative that is mandatory for all Columbia students. His request was denied. Columbia administrators suggested instead he should write an essay, which would have required substantially more time. As his participation in the program was a requirement for graduation, he ultimately decided to attend the workshop. He later discovered an email, sent to him by Columbia administrators just ten minutes before the start of the workshop, explicitly recommending him not to attend the workshop.

112.    Paul requested from Columbia public safety a security escort during the 2nd National Day of Action, scheduled for April 13 2015, because he felt unsafe to walk around campus, after he was publicly threatened by Emma during a protest held in the fall and because he was anticipating extended media presence.

113.   In both instances, Columbia's refusal to protect Paul's physical safety despite repeated public threats for his life placed undue emotional stress on him and made him fearful to walk around campus, rendering campus facilities not reasonably accessible to him.

### *Columbia's Exhibition of Pornographic Prints*

114.   Towards the end of Paul's and Emma's senior year at Columbia University, Emma was permitted and facilitated by Defendant Columbia to defame and harass Paul in more ways, with such assistance and blessing by Defendant Columbia that Defendant Columbia perpetrated gender-based discriminatory harassment of Paul that was deeply humiliating.

115.   From May 11, 2015 to May 15, 2015, Defendant Columbia had on display Emma's pornographic prints at the Columbia University Visual Arts Program in the Leroy Neiman Gallery in the Dodge Building on Defendant Columbia's campus.

116.   Emma's pornographic prints were printed over as well as next to two New York Times articles previously published about Emma's false allegations against Paul.[49] Due to one of the articles identifying Paul by his full name, to any reasonable viewer of the prints, these prints portrayed Paul engaged in sexual assault and in explicit pornographic images.  One of the prints depicted a sexual assault committed by Paul against Emma as falsely alleged by Emma. Another print is a pornographic portrayal closely resembling Paul, printed over a newspaper article that included Paul's full name.  A third print depicted the infamous mattress carried by Emma.

117.   The prints were displayed to the public by Defendant Columbia at the Columbia University Visual Arts Program / Undergraduate Thesis Show Reception, which took place in the

---

[49] The two articles featured in the prints were:
New York Times (May 3, 2014) Fight Against Sexual Assaults Holds Colleges to Account. By RICHARD PÉREZ-PEÑA and KATE TAYLOR (http://www.nytimes.com/2014/05/04/us/fight-against-sex-crimes-holds-colleges-to-account.html)
New York Times (Dec 21, 2014) Accusers and the Accused, Crossing Paths at Columbia University. By ARIEL KAMINER (http://www.nytimes.com/2014/12/22/nyregion/accusers-and-the-accused-crossing-paths-at-columbia.html?_r=0)

Leroy Neiman Gallery, in the Dodge Building on Defendant Columbia's campus. Approximately forty people attended the reception alone, including Thomas Vu-Daniel, artistic director of the LeRoy Neiman Center for Print Studies and employee of Defendant Columbia.

118.    The display was open and visible to the public for an entire week just prior to graduation, when many visitors were on campus. Among those who viewed the display were Paul's parents, who had flown in from Germany for Paul's graduation. For them, the exhibition was "a deeply humiliating experience."[50]

119.    Defendant Columbia's faculty explicitly approved the display of Emma's prints, directly facilitated the installation of the prints in the gallery, and supervised the reception of the exhibition, thus being explicitly liable for the contents of the exhibit.

120.    Paul was never put on notice by Defendant Columbia that graphic prints depicting him would be publicly exhibited on the Columbia campus. Defendant Columbia, when put on notice of the gender-based harassment of Paul, refused to provide any relief to Paul.

121.    Columbia's policy lists, among others, the following examples of gender-based misconduct: "Unwelcome remarks about the private parts of a person's body" as well as "Graffiti concerning the sexual activity of another person"[51], leaving no doubt that Emma's prints are in clear violation to the spirit of Columbia's Gender-based Misconduct Policy, since they make both explicit reference to private parts of Paul's body as well has his alleged sexual activity.

122.    Defendant Columbia's gender-based discriminatory harassment of Paul was distressing and emotionally damaging not only to Paul, but to his family as well. Defendant Columbia once again gave Emma a platform to engage in gender-based harassment of Paul,

---

[50] http://nymag.com/thecut/2015/05/accused-columbia-rapist-parents-release-statement-sulkowicz.html?mid=facebook_nymag
[51] See Page 5 of Columbia Gender-Based Misconduct Policy, which can be accessed at http://sexualrespect.columbia.edu/files/sexualrespect/content/007-02606%20Gender%20Based%20Misconduct_JL_F.pdf

attempting to publicly shame him. A male student would not have been able to publicly display graphic nude prints of a female classmate showing female genitalia and female perpetrated sexual abuse without Defendant Columbia intervening to stop it.  Yet, in this case, Defendant Columbia provided the Leroy Neiman Gallery, in the Dodge Building on Defendant Columbia's campus for the presentation of Emma's pornographic prints at a school sponsored art event for a full week. However, Defendant Columbia allowed Emma to do so. The fact that Columbia refused to comply with its own policies regarding a male student, when it would have intervened if the prints had depicted a female student, constitute yet another instance of gender-based discrimination.

### *The Mattress Attends Graduation*

123.    Emma's assertion that she would carry her mattress until graduation unless she succeeded to harass Paul into leaving the University proved accurate on May 19, 2015. Emma was permitted by Defendant Columbia to carry the mattress to her and Paul's graduation in another instance of Defendant Columbia perpetrated gender-based discriminatory harassment of Paul that was deeply humiliating.

124.    In the weeks and months before graduation, Paul reached out repeatedly to Columbia administrators, requesting detailed information regarding whether Defendant Columbia would allow Emma to carry the mattress at the graduation ceremony. Despite repeated requests, Defendant Columbia refused to provide him with any information.

125.    The evening prior to the graduation, Columbia University administrators e-mailed all graduating students, instructing them no to bring "large objects which could interfere with the proceedings or create discomfort to others in close, crowded spaces shared by thousands of

people." Emma's mattress without doubt constitutes such a "large object" that was prohibited at graduation, being explicitly designed to "create discomfort" to Paul, who was also in attendance.

126.   Led to believe by this email that the mattress would not be allowed at the graduation ceremony, Paul and his parents attended graduation the following day, May 19, 2015.

127.   Defendant Columbia did not only let Emma once again publicly harass Paul at his very own college graduation – what should have been one of the best days of his life to date – but also allowed Emma to breach the University's restrictions and regulations in order to do so, affording her a special privilege at the university to engage in gender-based discriminatory harassment of Paul.

128.   Emma, in interviews following the graduation ceremony, stated that Columbia administrators approached her twice, once immediately before and once during the graduation ceremony, asking her to not to carry the mattress; however, Defendant Columbia did not take effective steps with use of campus police to enforce its rules that had been specifically noted in the e-mail sent out to students the day before graduation.[52]

129.   The fact that Defendant Columbia failed to take appropriate action when knowing that Emma's actions were in violation of university rules clearly shows that they were aware of the gender-based discriminatory harassment of Paul in Emma's carrying of the mattress to graduation.

130.   Emma – with the help of three other graduating student activists – was allowed to enter the graduation ceremony with her mattress, the symbol of the gender-based discriminatory harassment campaign against Paul. Defendant Columbia further permitted Emma and the student activists helping Emma to carry the mattress onstage, assuring that the graduation had once again

---

[52] New York Times (May 19, 2015) Mattress Protest at Columbia University Continues Into Graduation Event**,** KATE TAYLOR (http://www.nytimes.com/2015/05/20/nyregion/mattress-protest-at-columbia-university-continues-into-graduation-event.html?ref=topics)

become an event of Defendant Columbia perpetrated gender-based discriminatory harassment of Paul, public shaming and protest against a fellow graduating student. Therefore, despite the fact that objects such as mattresses were prohibited at the graduation, Defendants allowed Emma to violate the regulation, granting her a special university privilege to carry her mattress and engage in gender-based discriminatory harassment of Paul.

131.    The graduation ceremony became another event of Defendant Columbia perpetrated gender-based discriminatory harassment of Paul that was deeply humiliating and that intended to bestow accolades upon Emma for her part in the discriminatory harassment of Paul. In the keynote address at the Columbia graduation ceremony, Los Angeles Mayor Eric Garcetti, CC '92, SIPA '93, stated "You've held contrary opinions, held die-ins and sit-ins, <u>carried</u> <u>mattresses</u>". He also said in his speech. "It is the responsibility of an active citizen to engage with one another… Never stop being academics, and never stop being activists."[53]   This statement was made at the graduation ceremony despite the fact that Paul had been cleared on multiple occasions of Emma's false allegations.

132.    Similarly at the Barnard College graduation ceremony, a Columbia affiliated institution, the keynote speaker, UN Ambassador Samantha Power, explicitly referenced and applauded Emma's harassment campaign, stating "And yet, even as we are aware of the seriousness of this problem, it takes a woman picking up a mattress and carrying it around her campus to make people really see it"[54]. She also said: "to secure lasting equality – … using a range of means - from mattresses to human contact - to make the invisible visible", without making clear that Paul had indeed been cleared from all false allegations against him.

---

[53] http://columbiaspectator.com/news/2015/05/19/sulkowicz-carrying-mattress-across-stage-speakers-emphasize-activism-cc-class-day
[54] https://barnard.edu/news/ambassador-samantha-power-us-permanent-representative-united-nations-address-class-2015

133.     Furthermore, Columbia decided to bestow Magna Cum Laude honors on Emma. According to Columbia, the decision to grant honors to students "*is based not on GPA alone, but on the high quality of academic achievement, departmental recommendations, and outstanding work beyond which is required for the degree*"[55]. Since Emma's time and indeed her academic work at Columbia has largely been defined by her part in the gender-based discriminatory harassment campaign against Paul, these honors constitute yet another instant of Defendant Columbia directly rewarding, encouraging and celebrating Emma's role in the gender-based discriminatory harassment.

134.     Emma's actions at graduation caused a global media echo – leading to hundreds of articles, among others in the New York Times, Time, NBC News, Huffington Post, Cosmopolitan, Washington Examiner, Newsweek, Slate, Salon, Jezebel, as well as internationally in leading mainstream media such as Spiegel Online, Daily Mail, Guardian, CBC, Independent, Elle, Business Insider, Le Soir, and countless others, many of which mentioned Paul's full name, making greater the damaging effects of Defendant Columbia perpetrated gender-based discriminatory harassment of Paul.

135.     The damaging effects of Defendant Columbia perpetrated gender-based discriminatory harassment of Paul was made even more damaging by the Deputy News Editor for the Columbia Spectator, a campus publication. While reporting on Emma's continued campaign at graduation, with live Twitter posts, Teo Armus, a student of Columbia University, posted clear photographs of Paul, so that the world would recognize and remember the face of Emma's target.[56] Within a day, that photograph was published by several news outlets. On some

---

[55] As printed in the program for the Columbia College Class of 2015 graduation ceremony.

[56] https://twitter.com/teoarmus/status/600689820860551168
https://twitter.com/teoarmus/status/600689603037790209

occasions, the word "Rapist" was pasted over the photo and then published further.[57] Teo Armus has since then relentlessly stalked Paul, going as far as contacting various employers of his mother in Germany. However, this comes as no surprise as the Columbia Spectator Newspaper has systematically promoted and financially benefited from the campus witch-hunt conducted against Paul through its biased and uncritical reporting. Managing editor Steve Lau and Editor in chief Abby Abrams heralded Paul's public persecution when they together with Emma Bogler, in complete disregard of basic journalistic principles, decided to leak Paul's full name to the public in May 2014, without even bothering to contact him for comment and falsely alleging that she had done so[58]. By allowing Teo Armus to take and publish Paul's pictures, once again, Defendants assisted in furthering a defamatory and systematic attack on Paul.

136.    Columbia's support for Emma's role in the gender-based discriminatory campaign against Paul has allowed her to gain prominence and access to publicity she would not have otherwise had access to. By doing so, Defendant Columbia has actively enabled Emma to build a public persona surrounding her false allegations.

137.    On June 3, 2015, Emma published the video "Ceci n'est pas un viol" depicting a graphic re-enactment of Emma's false allegations against Paul. The video was set and filmed on Defendant Columbia's campus. The amount of publicity generated by the video would have been unthinkable without the notoriety she gained previously with the support and involvement of Defendant Columbia.

138.    Similarly, Defendant Columbia's support of and involvement in the gender-based discriminatory harassment campaign against Paul has also encouraged another Columbia student, John Doe #2, to imitate Emma's action and initiate a senior thesis for the next academic year.

---

[57] https://twitter.com/witteeme/status/600791730993016833
[58] http://columbiaspectator.com/news/2014/05/16/frustrated-columbias-inaction-student-reports-sexual-assault-police

According to a post on Facebook, the student is planning to use "dance as an individual form of protest that leverages my identity, body and experiences against […] serial rapists like Paul Nungesser." The fact that now several projects sponsored and supervised by Defendant Columbia directly attack and harass Paul is highly indicative that the Defendant not only tacitly condones, but actively seeks to create a hostile climate against Paul in which his extra-legal persecution and public shaming is explicitly welcomed and academically rewarded.

139.    Columbia's actions both before and during graduation once again exhibited a blatant disregard for its own rules and regulations, affording Emma yet another special university exception, providing a clear-cut example of gender-based discrimination against Paul.

### Paul's Dream of Living in the United States

140.    The foregoing turn of events destroyed Paul's long-held dream of living in the United States. That dream had become a reality back in the spring of 2011, when he was accepted to Columbia as a John Jay Scholar.

141.    Paul, an only child, was born and raised in Germany by parents who had been educated internationally.

142.    Paul was born in Berlin in 1991, two years after the fall of the Berlin Wall.

143.    Paul and his family have always honored the United States as the country whose government and people were critical in defeating Fascism in Europe and re-establishing freedom, democracy, and the rule of law in western Germany following World War II.

144.    Paul was raised in a progressive egalitarian home in which both of his parents assumed full-time responsibilities as caretakers and as breadwinners.

145.    Paul's mother, Karin, is a long-time journalist for the National Council of German Women's Organizations, *Deutscher Frauenrat*.  She is the co-founder, and a writer, on the

feminist writer's blog *weibblick* and has published on gender-related issues such as feminist theory, women in the media, discrimination of migrant women, equal pay, and women's rights as human rights.

146.    His father, Andreas, is a long-time teacher at one of Berlin's most culturally-diverse and underprivileged neighborhoods. His job as a teacher included working with children of all ages who were victims of child molestation, and sexual harassment, as well as physical and sexual abuse.

147.    In the mid-1990s, while Paul's father was an exchange student at Yale University, Paul's parents brought him to visit the United States.  This experience fostered Paul's dream to study at an Ivy League college and thereafter build a prosperous career here in the United States.

148.    While attending school in Germany (prior to attending high school in Swaziland in southern Africa), Paul was class president and head of the student council.  He initiated a day-long program entitled "Work 4 Peace" that raised funds for teenage day-laborers in Africa.  He was also involved in various choral and athletic clubs.   In addition, he organized a CD production of his school choir to raise funds for a classmate suffering from Leukemia.

149.    Paul attended high school on full scholarship at the esteemed Waterford Kamhlaba United World College ("UWC") of Southern Africa (Swaziland).  Well adept at integrating into a new and multi-cultural environment, he spent extensive time in Africa working on social community projects.  These projects included teaching literacy to fourth graders at a local elementary school, managing a soup kitchen, and working at a facility caring for orphans and vulnerable children.

150.    At UWC, Paul also participated in numerous drama productions as a director and stage designer.  His productions toured in Johannesburg and at the Grahamstown National Arts

Festival.  For his contributions to the community, he was awarded a principal's recommendation three semesters in a row.  All the while, Paul performed at the highest academic level and graduated at the top of his class.

151.    Paul viewed Columbia as the ideal place for him to advance his intellect, pursue his various passions (such as drama, architecture, photography, and outdoor adventure) and to interact socially with a diverse and highly engaging student body.

152.    Upon his acceptance to Columbia, he was granted an F1 Visa.  Pursuant to this Visa, he was entitled to remain in the United States during his four-year undergraduate program at Columbia.

153.    Paul aspired to stay and work in the United States following his graduation. Despite the gender-based harassment and defamation that he faced, Paul attempted to build a life for himself in the United States. He has a girlfriend who he has been dating for over a year. In spring 2015, he was seeking consulting work in New York.

154.    Paul's ability to obtain employment in the U.S. has been effectively destroyed by Defendants' wrongdoings. Essentially, Paul has been prevented from seeking employment opportunities to which the rest of Columbia's students have access. All the while, Paul has been cleared of all charges and complaints against him, and he has attempted to go on with his life. On the other hand, Emma, with Defendants' assistance and encouragement, has worked tirelessly to make sure that cannot happen and even built a career out of this pursuit.

155.    To remain in the country, Paul would have had to secure employment to apply for additional Optional Practical Training, which is granted for up to twelve months following graduation. Since he was unable to do this, his visa status expired and he had to return to Germany.

### *Columbia Breached Its Own Gender-Based Misconduct and Confidentiality Policies*

156.    Following Emma's sexual misconduct charge against Paul, Columbia provided

him with a copy of its Gender-Based Misconduct Policies for Students (the "2013 Policy").

Columbia amended this policy in August 2014 (the "2014 Policy").

157.    The 2013 Gender-Based Misconduct Policy states in relevant part:

> Columbia University, Barnard College, and Teachers College are committed to
> providing a learning environment free from gender-based discrimination and
> harassment.  As such, the University does not tolerate any kind of gender-based
> discrimination or harassment, which includes sexual assault, sexual harassment,
> and gender-based harassment. The University community is committed to
> fostering a healthy and safe environment in which every member of the
> community can realize her or his fullest potential.
> . . . .
>
> Students who believe they have been subjected to gender-based discrimination or
> harassment are encouraged to report these incidents Upon receiving a report, the
> University will respond promptly, equitably, and thoroughly. In addition, the
> University will take steps to prevent the recurrence of the discrimination or
> harassment and correct its effects, if appropriate.

(Emphasis added.)

158.    In the 2013 Gender-Based Misconduct Policy, Columbia promises the following

rights to students accused of gender-based misconduct:

- To be treated with respect, dignity, and sensitivity throughout the process.

- To seek support services at the University.

- To confidentiality and privacy to the extent provided under applicable law.
  The University will make all reasonable efforts to ensure preservation of
  privacy, restricting information to those with a legitimate need to know.

- To be informed of the University's Gender-Based Misconduct Policies and
  Procedures for Students.

- To a prompt and thorough investigation of the allegations.

- To an adequate amount of time to prepare for the hearing. Participants shall be
  given at least five (5) calendar days' notice prior to the hearing except in rare
  circumstances.

- To review all applicable documents prior to the hearing in the Student Services for Gender-Based and Sexual Misconduct office.
- To challenge investigator(s) or any hearing panel member if a possible conflict of interest is present.
- The right to replace the student panelist with a dean or senior-level administrator if both parties agree.
- To be accompanied at the hearing by a supporter.
- To participate or decline to participate in the investigation or hearing panel process. However, the disciplinary process will continue with the information available, and not participating in the investigation may preclude participation in the hearing panel.
- To refrain from making self-incriminating statements. However, the disciplinary process will continue with the information available.
- To appeal either the hearing panel's decision or the sanctions determined by the Dean of Students.
- To be notified, in writing, of the case resolution including the outcome of the appeal.
- To understand that information collected in this process may be subpoenaed in criminal or civil proceedings.

(Emphasis added.)

159.    Columbia's 2013 Confidentiality/Privacy & Non-Retaliation Policy states:

> When a report of gender-based misconduct is filed, the complainant, the respondent, and all identified witnesses who are named in the investigation, will be notified of the University's expectation of confidentiality/privacy.  <u>The University will make all reasonable efforts to maintain the confidentiality/privacy of parties involved in gender-based misconduct investigations. Breaches of confidentiality/privacy or retaliation against any person involved in the investigation, including the complainant, respondent, witnesses, or the investigators, may result in additional disciplinary action.</u>

(Emphasis added.)

160.    Columbia wrongly did not take any disciplinary action against Emma for her breaches of the confidentiality/privacy rules and her retaliation.

### *Columbia Removes Students' Right to Confidentiality in its 2014 Policy*

[45]

161.    In a comparison of the 2013 and 2014 versions of Columbia's Gender-Based Misconduct Policies, it is evident that Columbia deleted any references with regard to the privacy of the respondent. This deletion occurred after Emma had begun a campaign against Paul, spreading confidential information to Jane Doe #1 and Jane Doe #2, as well as to the press. Regardless of Columbia's accommodation of Emma's practices, what remained in the 2014 Gender-Based Misconduct Policy should have still protected Paul from the abuse and harassment that he has faced and continues to face to this day.

162.    The 2014 Gender-Based Misconduct Policy states in relevant part:

> Columbia University, Barnard College, and Teachers College are committed to fostering an environment that is free from gender-based discrimination and harassment, including sexual assault and all other forms of gender-based misconduct. The University recognizes its responsibility to increase awareness of such misconduct, prevent its occurrence, support victims, deal fairly and firmly with offenders, and diligently investigate reports of misconduct. In addressing issues of gender-based misconduct, all members of the University must come together to respect and care for one another in a manner consistent with our deeply held academic and community values.
>
> . . .
>
> **Anti-Retaliation/Anti-Intimidation Policy**
>
> The University strictly prohibits retaliation against and intimidation of any person because of his or her reporting of an incident of gender-based misconduct or involvement in the University's response. The University will take strong disciplinary action in response to any retaliation or intimidation. The University will pursue such discipline through the applicable student conduct policy or other disciplinary process and follow the applicable time frames within such policies or processes.
>
> . . .
>
> **Rights of the Complainant and Respondent**
>
> In order to provide accessible, prompt, and fair methods of investigation and resolution of incidents of student gender-based misconduct, the University has developed a process for investigation and adjudication of misconduct reports. Throughout this process, both the complainant and respondent have the following rights:
>
> • To respect, dignity, and sensitivity.

- To appropriate support from the University.

- To privacy to the extent possible consistent with applicable law and University policy.

- To information about the University's Gender-Based Misconduct Policy for Students.

- To the presence of an advisor throughout the process.

- To participate or to decline to participate in the investigation or hearing panel process. However, a decision to refrain from participating in the process either wholly or in part will not prevent the process from proceeding with the information available.

- To a prompt and thorough investigation of the allegations.

- To adequate time to review documents in the Gender-Based Misconduct Office following the investigation.

- To adequate time to prepare for a hearing.

- To an opportunity to challenge investigator(s) or hearing panel member(s) for a possible conflict of interest.

- To refrain from making self-incriminating statements.

- To appeal the decision made by the hearing panel and any sanctions.

- To notification, in writing, of the case resolution, including the outcome of any appeal.

- To report the incident to law enforcement at any time.

- To understand that information collected in the process may be subpoenaed in criminal or civil proceedings.

(Emphasis added.)

163.    The Privacy provision states as follows:

The University will reveal information about its investigations and adjudication of gender-based misconduct only to those who need to know the information in order to carry out their duties and responsibilities. It will inform all University personnel participating in an investigation, proceeding, or hearing that they are expected to maintain the privacy of the process. This does not prohibit either a complainant or respondent from obtaining the assistance of family members, counselors, therapists, clergy, doctors, attorneys, or similar resources.

164.    Also provided to Paul upon Emma's charge against him was a copy of Columbia's Student Policies and Procedures on Discrimination and Harassment as of April 2013 ("Student Policies").  This document states in relevant part as follows:

> Columbia University is <u>committed to providing a learning, living, and working environment free from discrimination and harassment and to fostering a nurturing and vibrant community founded upon the fundamental dignity and worth of all of its members</u>. Consistent with this commitment and with applicable laws, the University does not discriminate against any person in the administration of its educational policies, admissions policies, scholarship and loan programs, and athletic and other University - administered programs or permit the harassment of any student or applicant for admission on the basis of membership in a Protected Class as defined below. <u>The University provides students who believe that they have been the subject of discrimination or harassment with mechanisms for seeking redress.</u>

> Nothing in this policy shall abridge academic freedom or the University's educational mission. Prohibitions against discrimination and harassment do not extend to statements or written materials that are germane to the classroom subject matter.

> All members of the University community are expected to adhere to the applicable policies, to cooperate with the procedures for responding to complaints of discrimination and harassment, and <u>to report conduct or behavior they believe to be in violation of these policies</u> to the Office of Equal Opportunity and Affirmative Action or Student Services for Gender - Based and Sexual Misconduct.

> Management and supervisory personnel have a duty to act as defined below; <u>they are responsible for taking reasonable and necessary action to prevent discrimination and harassment and for responding promptly and thoroughly to any such claims</u>. Management and supervisory personnel include any officer having formal supervisory responsibility over employees. For the purpose of these policies, faculty are supervisors of other faculty when they are acting in a supervisory role as department chair, dean, academic vice president, institute director, center director, or similar position. Faculty and officers of research who are the principal investigators on a grant or contract act in a supervisory capacity over the individuals in the lab they lead. A manager or supervisor who fails to act may be found to have violated Columbia's policies even though the underlying event does not constitute discrimination or harassment.

> <u>University officers who learn of an allegation of gender-based misconduct, discrimination or harassment have a duty to report as defined below</u>. An officer who fails to report may be found to have violated Columbia's policies even though the underlying event does not constitute gender-based misconduct, discrimination or harassment.

[48]

All students are protected from retaliation for filing a complaint or assisting in an investigation under Columbia's Student Policies and Procedures on Discrimination and Harassment. Appropriate disciplinary action may be taken against any student or employee who violates these policies.

**Discriminatory Harassment**

Discriminatory Harassment is defined as subjecting an individual on the basis of her or his membership in a Protected Class to <u>humiliating, abusive, or threatening conduct that denigrates or shows hostility or aversion toward an individual or group; that creates an intimidating, hostile, or abusive learning, living, or working environment; that alters the conditions of the learning, living, or working environment; or that unreasonably interferes with an individual's academic performance</u>. Discriminatory harassment includes but is not limited to: epithets or slurs; negative stereotyping; threatening, intimidating or hostile acts; denigrating jokes; and display or circulation (including through e-mail) of written or graphic material in the learning, living, or working environment. Sexual harassment and gender-based harassment which are defined in detail below, are forms of discriminatory harassment.

**Gender-based Misconduct**

Gender-based misconduct includes sexual harassment, sexual assault, gender-based harassment, stalking, and intimate partner violence. Misconduct can occur between strangers or acquaintances, including people involved in an intimate or sexual relationship. Gender - based misconduct can be committed by men or by women, and it can occur between people of the same or different sex.

**Gender-based Harassment**

Gender-based harassment is defined as acts of verbal, nonverbal, or physical aggression, intimidation, stalking, or hostility <u>based on gender or gender - stereotyping. The conduct must be such that it has the purpose or effect of unreasonably interfering with an individual's academic performance or creating an intimidating, hostile, demeaning, or offensive learning, living or working environment</u>. Gender-based harassment can occur if students are harassed either for exhibiting what is perceived as a stereotypical characteristic for their sex, or for failing to conform to stereotypical notions of masculinity or femininity.

**Protected Class**

A Protected Class is a class of persons who are protected under applicable federal, state or local laws against discrimination and harassment on the basis of: race, color, sex, gender (including gender identity and expression), pregnancy, religion, creed, marital status, partnership status, age, sexual orientation, national origin, disability, military status, or any other legally protected status.

**Retaliation**

<u>Retaliation occurs when</u> an alleged perpetrator or respondent, her or his friends or associates, or <u>other member of the University community intimidates, threatens, coerces, harasses, or discriminates against an individual who has</u> made a

complaint, or <u>participated in any manner in an investigation, proceeding or hearing under these policies and procedures</u>. A retaliatory action is an action taken to deter a reasonable person from opposing a discriminatory or harassing practice, participating in a discrimination or harassment proceeding or, more generally, pursuing her or his rights under these policies. Retaliation may take the form of name - calling and taunting.

. . . .

**Stalking**

Stalking is defined as repeated and continued harassment made against the expressed wishes of another individual, which causes the targeted individual reasonably to feel emotional distress, including fear and apprehension.

(Emphasis added.)

165.    Paul's parents alone have lodged 19 written complaints, plus numerous more by Paul himself, to Columbia's administration regarding its mistreatment of Paul, its breach of its own policies, and its violations of federal and state law.  Columbia has utterly failed to act.

166.    In spring 2015, Paul filed a formal harassment complaint with Columbia administrators regarding Emma's and John Doe #2 behavior towards him. While Columbia investigated even the most bizarre claims against Paul, they declined to open any investigation following his complaint, stating:

"Based on a review of the facts and circumstances you described regarding (1) Ms. Sulkowicz's performance art project; and (2) the statements made to the media regarding your pending GBM matter, the acts alleged do not constitute actionable retaliation in violation of the Policy.

Retaliation based on your participation in an investigation, proceeding or hearing under the Policy, and intimidation that reasonably leads you to fear for your physical well-being or to engage in sexual conduct for self-protection would violate the Policy."

**AS AND FOR THE FIRST CAUSE OF ACTION**

**(Violation of Title IX of the Education Amendments of 1972-Deliberate Indifference Against Columbia University)**

167.    Paul repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

168.    Title IX of the Education Amendments of 1972 provides, in relevant part, that:

No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

169.    Title IX of the Education Amendments of 1972 applies to an entire school or institution if any part of that school receives federal funds; hence, athletic programs are subject to Title IX of the Education Amendments of 1972, even though there is very little direct federal funding of school sports.

170.    Upon information and belief, Columbia receives nearly $645,000,000 in federal funding for research and development. Accordingly, Columbia is a recipient of Federal financial assistance within the meaning of the Statute.

171.    Both the Department of Education and the Department of Justice have promulgated regulations under Title IX that require a school to "adopt and publish grievance procedures providing for the prompt and equitable resolution of student. . . complaints alleging any action which would be prohibited by" Title IX or regulations thereunder. 34 C.F.R. § 106.8(b) (Dep't of Education); 28 C.F.R. § 54.135(b) (Dep't of Justice). Such prohibited actions include all forms of sexual harassment, including sexual intercourse, sexual assault, and rape. *See* U.S. Dep't of Education, Office for Civil Rights, *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties -- Title IX* (2001) at 19-20, 21 & nn. 98-101.

172.    The procedures adopted by a school covered by Title IX must not only "ensure the Title IX rights of the complainant," but must also "accord[] due process to both parties involved..."  U.S. Dep't of Education, Office for Civil Rights, *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties -- Title IX* (2001) at 22.

173.    A school also has an obligation under Title IX to make sure that all employees involved in the conduct of the procedures have "adequate training as to what conduct constitutes sexual harassment, which includes "alleged sexual assaults."  U.S. Dep't of Education, Office for Civil Rights, *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties -- Title IX* (2001) at 21.

174.    A school that receives Federal financial assistance is liable for a violation of Title IX when it is deliberately indifferent to known acts of student-on-student sexual harassment. A school is deemed to have acted with "deliberate indifference" when its response to the harassment, or lack thereof, is clearly unreasonable in light of the circumstances.

175.    Columbia, in violation of Title IX, intentionally discriminated against Paul on the basis of his male sex by condoning a hostile educational environment due to knowingly permitting Columbia student Emma and Defendant Kessler to engage in a campaign of gender-based harassment and defamation against Paul, based on what Columbia determined to be untrue allegations of sexual misconduct.

176.    At all times relevant hereto, Columbia President Lee C. Bollinger, Dean of Columbia College and Vice President for Undergraduate Education James J. Valentini, Provost of the University John Coatsworth and Professor of Visual Arts Jon Kessler all had actual notice of: (a) the significant and repeated breaches of Columbia's Confidentiality Policy; (b) Emma's

public campaign to harass and defame Paul; and (c) the approval of Emma's Mattress Project for Columbia course credit which contributed to her scheme to publicly harass and defame Paul while gaining national and international mass media attention.

177.    Despite their actual notice of Columbia's misconduct and the resulting harm to Paul, each of the foregoing individuals failed and/or refused to take any actions to rectify Columbia's discrimination against Paul, in violation of Title IX.

178.    Despite their authority to address Columbia's misconduct and the resulting harm to Paul, each of the foregoing individuals failed and/or refused to institute any corrective measures, in violation of their obligations under Title IX.

179.    This failure and/or refusal of the foregoing individuals to institute corrective measures can only be explained by a gender bias against Paul as the male accused of sexual misconduct, despite the fact that he was previously cleared of any wrongdoing.

180.    By permitting Emma and Defendant Kessler to engage in a campaign of gender-based harassment and defamation against Paul, Columbia had actual knowledge of, and was deliberately indifferent to, sexual harassment that was so severe, pervasive and objectively offensive that it deprived Paul of equal access since April to the educational opportunities, benefits and resources available to other students at Columbia.

181.    Columbia permitted this gender-based harassment and gender-based misconduct in the school's programs or activities with actual knowledge of, a deliberate indifference to and an apparent approval of said gender-based harassment and gender-based misconduct, with the consequence that Paul has been effectively denied equal access to Columbia's resources and opportunities, thereby undermining and detracting from Paul's educational experience.

182.     Paul suffered from student-on-student gender-based harassment and gender-based misconduct when fellow Columbia student Emma engaged in a campaign of gender-based harassment and defamation, falsely labeled Paul a "serial rapist" and walked around campus with a mattress to protest his presence on campus. Yet, Columbia took no action to intercede and stop this gender-based harassment and gender-based misconduct. To the contrary, in complete disregard of Paul's rights, Columbia acted unreasonably when it allowed Columbia student Emma to carry the mattress into each of her classes, the library, and on campus-provided transportation and thereby endorsed, and even provided course credit for, Columbia student Emma's gender-based harassment against Paul.

183.     Paul suffered from teacher-on-student gender-based harassment and gender-based misconduct when Defendant Kessler assisted in the development of, and approved Emma's Mattress Project for course credit, publicly endorsed her gender-based harassment and defamation campaign against Paul, and made public statements endorsing Columbia student Emma's carrying around a mattress as a powerful symbol. Columbia took no action to intercede and stop this gender-based harassment and gender-based misconduct. To the contrary, Columbia acted with deliberate indifference and in complete disregard of Paul's rights, when it permitted Defendant Kessler's granting of course credit to Emma for her Mattress Project, and invoked the support of the University for Columbia student Emma's campaign of gender-based harassment and defamation against Paul.

184.     As a result of Columbia's failure to end the gender-based harassment and misconduct against Paul, he has been subjected to severe, pervasive and offensive harassing and threatening behavior by other Columbia students whenever Paul has appeared at university activities.

185.    Paul and his parents have made numerous reports and complaints to Columbia officials about the gender-based harassment and defamation of Paul, but Columbia has acted with, at best, deliberate indifference to, and at times, apparent approval of, what have been known acts of gender-based harassment and gender-based misconduct in Columbia's programs and activities.

186.    As a result of the foregoing, Columbia acted with deliberate indifference when it failed to take any reasonable actions in response to the known acts of student-on-student and teacher-on-student gender-based harassment and gender-based misconduct against Paul, as outlined above.

187.    Columbia violated Title IX when it knowingly failed to take any reasonable action to eliminate the sexually hostile educational environment created by Emma, Defendant Bollinger and Defendant Kessler, which effectively denied Paul equal access to Columbia's resources and opportunities.

188.    Paul is entitled to injunctive relief [PN2]to prevent threatened future acts of gender-based harassment and gender-based misconduct that subject Paul to a hostile educational environment in violation of Title IX.

189.    As a result of the foregoing, Paul has suffered and continues to suffer from Columbia's deliberate indifference. This unlawful discrimination by Columbia, in violation of Title IX, proximately caused Paul to suffer tremendous damages, including psychological, emotional and reputational damages, economic injuries and the loss of educational and post-graduate opportunities.

190.     As a result of the foregoing, Paul is entitled to damages for past acts of gender-based harassment and defamation in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## AS AND FOR THE SECOND CAUSE OF ACTION
### (Violation of New York Executive Law Section 296(4) Against Columbia University)

191.     Paul repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

192.     New York Executive Law, Article 15, Human Rights Law, section 296(4) provides in pertinent part:

> It shall be an unlawful discriminatory practice for an education corporation or association ... to permit the harassment of any student or applicant, by reason of his race, color, religion, disability, national origin, sexual orientation, military status, sex, age, or marital status[.]

193.     Based on the foregoing *supra,* at ¶¶ 1-166 Columbia permitted discrimination against Paul on the basis of his sex.

194.     Based on the foregoing *supra,* at ¶¶ 1-166, Columbia authorized, condoned, approved of and/or acquiesced to discriminatory conduct and harassment against Paul.

195.     Based on the foregoing *supra,* at ¶¶ 1-166, Columbia had actual knowledge of such harassment and discriminatory conduct and failed to undertake any action to prevent or stop it.

196.     Specifically, Columbia, in violation of New York Executive Law, Article 15, Human Rights Law, section 296(4), intentionally discriminated against Paul on the basis of his male sex as follows: by condoning a hostile educational environment due to knowingly permitting Columbia student Emma and Defendant Kessler to engage in prolonged gender-based harassment of, and gender-based misconduct, as to Paul based on what Columbia had determined

to be untrue allegations of sexual misconduct; by permitting that gender-based harassment and gender-based misconduct in the school's programs or activities with actual knowledge of, a deliberate indifference to and an apparent approval of said gender-based harassment and misconduct; and by allowing such consequences that Paul has been effectively denied equal access to Columbia's resources and opportunities, thereby undermining and detracting from Paul's educational experience.

197.    Based on the foregoing, Columbia engaged in unlawful discriminatory practices in violation of N.Y. Exec. Law § 296(4).

198.    As a result of the foregoing, Paul is entitled to injunctive relief [PN3] to prevent threatened future acts of gender-based harassment and gender-based misconduct that subject Paul to a hostile educational environment in violation of New York Executive Law, Article 15, Human Rights Law, section 296(4).

199.    As a result of the foregoing, Paul is entitled to damages for past acts of gender-based harassment and defamation in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

### AS AND FOR THE THIRD CAUSE OF ACTION
### (Violation of New York Executive Law Section 296(6)
### Against Lee C. Bollinger)

200.    Paul repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

201.    New York Executive Law, Article 15, Human Rights Law, section 296(6) provides in pertinent part:

> "it shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article or to attempt to do so."

202.   Based on the foregoing *supra* at ¶¶ 1-166 Defendant Bollinger actually and actively participated in the gender-based discrimination and harassment against Paul.

203.   Specifically, Defendant Bollinger aided, abetted, incited, compelled and/or coerced Columbia's gender-based discrimination and harassment against Paul as follows:

- by publishing a statement in which he acquiesced to the activists' demands by announcing further measures to address the issue of sexual assault at Columbia, instead of addressing Emma's false and defamatory statements;

- by permitting Emma to actively earn course credit from Columbia for her outrageous display of harassment and defamation of Paul, despite clear notice from Paul and his parents that Paul's well-being and future prospects were suffering immensely;

- by basking in the spotlight that Emma's display brought to Columbia rather than showing any regard for Paul, who was being victimized by Emma's campaign of false allegations;

- by bowing down to the witch hunt against an innocent student instead of standing up for the truth and taking appropriate steps to protect Paul from gender-based harassment; and

- by encouraging, condoning and approving Defendant Kessler's granting of course credit to Emma for her Mattress Project, which was nothing more than a ruse to further harass and defame Paul to the Columbia community and the public at large.

204.   Based on the foregoing, Defendant Bollinger engaged in unlawful discriminatory practices in violation of N.Y. Exec. Law § 296(6).

205.   As a result of the foregoing, Paul is entitled to injunctive[PN4] relief to prevent threatened future acts of gender-based harassment and gender-based misconduct that subject Paul to a hostile educational environment in violation of New York Executive Law, Article 15, Human Rights Law, section 296(6).

206.   As a result of the foregoing, Paul is entitled to damages for past acts of gender-based harassment and defamation in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

### AS AND FOR THE FOURTH CAUSE OF ACTION
### (Violation of New York Executive Law Section 296(6) Against Jon Kessler)

207.   Paul repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

208.   New York Executive Law, Article 15, Human Rights Law, section 296(6) provides in pertinent part:

> "it shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article or to attempt to do so."

209.   Based on the foregoing *supra* at ¶¶ 1-166, Defendant Kessler actually and actively participated in the gender-based discrimination and harassment against Paul.

210.   Specifically, Defendant Kessler aided, abetted, incited, compelled and/or coerced Columbia's gender-based discrimination and harassment against Paul as follows:

- by directing Emma to transform her personal vendetta against Paul into a Columbia-sponsored and course-approved calumny;

- by approving Emma's Mattress Project for course credit;

- by publicly endorsing her harassment and defamation of Paul;

- by actively encouraging Emma's campaign of gender-based harassment and defamation against Paul; and

- by guiding Emma in developing the Mattress Project, knowing that her piece was targeted at a fellow Columbia student.

211.    Based on the foregoing, Defendant Kessler engaged in unlawful discriminatory practices in violation of N.Y. Exec. Law § 296(6).

212.    As a result of the foregoing, Paul is entitled to injunctive [PN5]relief to prevent threatened future acts of gender-based harassment and gender-based misconduct that subject Paul to a hostile educational environment in violation of New York Executive Law, Article 15, Human Rights Law, section 296(6).

213.    As a result of the foregoing, Paul is entitled to damages for past acts of gender-based harassment and defamation in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## AS AND FOR THE FIFTH CAUSE OF ACTION
### (Breach of Contract Against Columbia University)

214.    Paul repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

215.    Based on the aforementioned facts and circumstances, Columbia breached express and/or implied agreement(s) with Paul.

216.    Columbia's acceptance of Paul into a degree program at Columbia and his subsequent enrollment and payment of tuition fees created an express contract or, alternatively, a contract implied in law or in fact between Columbia and Paul governed by, *inter alia* the 2013 Gender-Based Misconduct Policy, the 2014 Gender-Based Misconduct Policy (collectively, the "Regulations"), and the parties' reasonable expectations.

217.    The contract formed between Columbia and Paul contained the following provisions, among others, that expressly guarantee certain rights to a student accused of sexual misconduct:

[60]

> Columbia University, Barnard College, and Teachers College are committed to providing an environment <u>free from gender-based discrimination and harassment.</u> As such, the <u>University does not tolerate any kind of gender-based misconduct, which includes sexual assault, sexual harassment, gender-based harassment,</u> stalking, and intimate partner violence. The University is committed to fostering a healthy and safe environment in which every member of the community can realize her or his fullest potential.

(emphasis added).

218.    As set forth below, Defendant Columbia materially breached these guarantees of providing an environment free from gender-based discrimination and harassment, and other contractual provisions.

## A. Breach of the Obligation to Provide an Environment Free From Gender-Based Harassment and Discrimination.

219.    Columbia's Regulations explicitly provide that Columbia is committed to fostering an environment that is free from gender-based discrimination and harassment. In the 2014 Policy, Columbia specifically identifies its responsibility to prevent the occurrence of such gender-based misconduct and assures that it does not tolerate any form of gender-based misconduct.

220.    Nonetheless, Columbia tolerated, permitted and even condoned Emma's campaign of harassment and defamation against Paul. Specifically, Columbia breached its contractual obligations when it permitted Emma to receive course credit for her Mattress Project, which was unquestionably a mere ruse to further her campaign against Paul by publicly harassing and defaming him.

221.    Columbia failed to provide Paul with an environment free from gender-based harassment and discrimination when it did not notify Paul that he was listed on the so-called "rapist-list" that appeared in several bathrooms at Columbia in May of 2014, and failed to take

any steps whatsoever to prevent the circulation of the same "rapist-list" at several Columbia student events.

222.   Columbia further breached its obligation when it failed to take any action with respect to Emma's outrageous displays of harassment and defamation against Paul, despite clear notice from Paul and his parents to Defendant Bollinger and other Columbia persons of authority, that Paul's legal rights were being violated and that his well-being and future prospects were suffering immensely.

223.   Columbia breached its obligations to Paul when it failed to take any steps to prevent Emma's repeated and public declarations that Paul was a "serial rapist," while gaining national and international attention in the mass media.

224.   In complete disregard of Paul's rights to be free of, among other things, gender-based harassment and gender-based misconduct, Columbia breached its obligation to provide Paul with an environment free from discrimination and harassment when it allowed Emma to carry the mattress into each of her classes, the library, and on Columbia campus-provided transportation.

225.   Moreover, Columbia breached its obligation to provide Paul with an environment free from discrimination and harassment when it provided financial endorsement to the "Carry That Weight National Day of Action," by paying a portion of the clean-up fee for a Columba campus rally at which Emma publicly declared that Paul is her rapist.

226.   Columbia's effective sponsorship of the gender-based harassment and discrimination of Paul resulted in an intimidating, hostile, demeaning, and offensive learning and living environment that deprived him of equal access to educational benefits and opportunities at Columbia on the basis of his gender.

[62]

227.    Based on the foregoing, Columbia's failure to provide Paul with an environment free from gender-based harassment and discrimination was a material breach of its own policies and the rights expressly guaranteed to Paul as a student accused of sexual misconduct.

**B. Breach of the Obligation to Maintain the Confidentiality and Privacy of Parties Involved in Gender-Based Misconduct Investigations.**

228.    Columbia's 2014 Policy explicitly provides that the University "will protect and respect students' privacy to the greatest extent possible..." and  "will reveal information about its investigations and adjudications of gender-based misconduct *only to those who need to know* the information in order to carry out their duties and responsibilities." (emphasis added).

229.    Columbia repeatedly breached its obligation to maintain Paul's privacy and confidentiality, by allowing the disclosure of information concerning the investigation to those who did not have any legitimate "need to know," including the entire Columbia community, the general public, and the national and international mass media.

230.    Columbia breached its obligation to maintain Paul's confidentiality and privacy when it failed to discipline Emma for identifying Paul to reporters who subsequently ambushed him outside his residence in December 2013.

231.    Columbia further breached its obligation with respect to maintaining Paul's privacy and confidentiality when it failed to mete out any discipline, even though the New York Post article made clear that all three accusers had spoken to the author of the article and identified Paul as the respondent to reporters.

232.    Columbia breached its obligation to maintain Paul's confidentiality and privacy when it failed to prohibit the publication of Anna Bahr's article in Columbia's Student News Blog in January 2014, which made Paul easily identifiable as the student found not responsible for raping Emma.

233.    Notably, Columbia was well aware of the impending publication of such article, as demonstrated by the fact that Columbia advised Paul to stay silent when Anna Bahr reached out to him for comment. Nonetheless, Columbia further breached its obligation to maintain Paul's confidentiality and privacy when it failed to advise Paul that the article had appeared online and took no action to have such publication removed from Columbia's student blog website.

234.    Columbia further breached its contractual obligation to Paul when it permitted the publication of Emma's false rape allegation, which included Paul's name, in the University's student newspaper, the Columbia Spectator.

235.    Columbia breached its contractual obligation to maintain Paul's confidentiality and privacy when it approved of and authorized Emma's Mattress Project for course credit, despite its knowledge that the piece was targeted at a fellow student, whose identity had become notorious at Columbia.

236.    Moreover, Columbia breached its obligation to protect and respect Paul's privacy when it failed to take any action to prevent Emma's repeated and public declarations to the mass media that Paul was a "serial rapist."

237.    Based on the foregoing, Columbia breached its contractual obligation to maintain Paul's privacy and confidentiality by condoning such breaches, by failing to take any actions to remedy the breaches, and by failing to penalize any of the individuals who repeatedly and blatantly violated Columbia's policies.

C.  **Breach of the Obligation to Prohibit Retaliation Against Any Person Involved in an Investigation.**

238.    Columbia's 2014 Policy covenants to protect its students by strictly prohibiting retaliation against, or intimidation of, any person involved in a sexual misconduct investigation.

The Policy explicitly provides that "[t]he University will take strong disciplinary action in response to any retaliation or intimidation." Retaliation is defined as "any adverse action, or attempted adverse action, against an individual…because of their participation in any manner in an investigation…" and can take various forms such as sustained abuse, threats or intimidation.

239.    Columbia breached this contractual obligation to Paul when it failed to penalize Emma for encouraging three other Columbia students to file false claims of sexual misconduct against Paul.

240.    Columbia breached its obligation to Paul when it failed to penalize Emma for coercing the President of ADP to notify its alumni board and several of its members that an alleged rapist was living at ADP.

241.    Columbia breached its obligation to Paul when it failed to prevent and/or penalize Emma for talking to a reporter of the New York Post in December 2013 and identifying him as her assailant.

242.    Columbia breached its obligation to Paul when it failed to prevent and/or penalize Emma for making a public press statement in April 2014, at a press conference with Senator Gillibrand, stating that she lives in fear of seeing Paul every day.

243.    Columbia breached its obligation to Paul when it failed to prevent and/or penalize Emma for drafting an op-ed piece to be published in Time Magazine in May 2014, titled "My Rapist is Still on Campus."

244.    Columbia breached its obligation to Paul when it failed to prevent and/or penalize Emma for getting the Columbia Spectator to publish her false rape allegations and identify Paul by name.

245.   Columbia breached its obligation to Paul when it permitted Emma to proceed with her Mattress Project in an effort to further harass and publicly defame Paul and failed to penalize her for such acts of retaliation.

246.   Columbia breached its obligations to Paul when it repeatedly permitted Emma to engage in her campaign of publicly harassing and defaming Paul to the national and international media, and failed to penalize her for these acts of retaliation.

247.   Based on the foregoing, Columbia repeatedly breached its obligation to Paul when it failed to prohibit retaliation or intimidation against him, and failed to dole out appropriate discipline to those involved in such retaliation.

248.   As a direct and foreseeable consequence of these breaches, Paul sustained tremendous damages, including, without limitation, emotional distress, loss of educational and athletic opportunities, economic injuries and other direct and consequential damages.

249.   Paul is entitled to recover damages for Columbia's breach of the express and/or implied contractual obligations described above.

250.   As a direct and proximate result of the above conduct, actions and inactions, Paul has suffered physical, psychological, emotional and reputational damages, economic injuries and the loss of educational and athletic opportunities.

251.   As a result of the foregoing, Paul is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

### AS AND FOR THE SIXTH CAUSE OF ACTION
### (Covenant of Good Faith and Fair Dealing Against Columbia University)

252.   Paul repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

253.    Based on the aforementioned facts and circumstances, Columbia breached and violated a covenant of good faith and fair dealing implied in the agreement(s) with Paul by intentionally discriminating against Paul on the basis of his male sex as follows: by condoning a hostile educational environment due to knowingly permitting Columbia student Emma and Defendant Kessler to engage in prolonged gender-based harassment of and gender-based misconduct against Paul based on what Columbia had determined after investigation to be untrue allegations; by permitting that gender-based harassment and gender-based misconduct in the school's programs or activities with actual knowledge of, a deliberate indifference to, and an apparent approval of said gender-based harassment and gender-based misconduct; and by allowing the foregoing conduct to effectively deny Paul equal access to Columbia's resources and opportunities, thereby undermining and detracting from Paul's educational experience.

254.    As a direct and foreseeable consequence of these breaches, Paul sustained tremendous damages, including, without limitation, emotional distress, psychological damages, loss of educational and athletic opportunities, economic injuries and other direct and consequential damages.

255.    Paul is entitled to recover damages for Columbia's breach of the express and/or implied contractual obligations described above.

256.    As a result of the foregoing, Paul is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

### AS AND FOR THE SEVENTH CAUSE OF ACTION
### (Unfair or Deceptive Trade Practices Against Columbia University)

257.    Paul repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.[PN6]

258.    Section 349(a) of New York General Business Law provides consumer protection by declaring as unlawful "deceptive acts and practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state."

259.    Columbia's Student Policies and Procedures on Discrimination and Harassment state, among other things:

> Columbia University is committed to providing a learning, living, and working environment free from discrimination and harassment and to fostering a nurturing and vibrant community founded upon the fundamental dignity and worth of all of its members. **The University does not tolerate discrimination or harassment on the basis of membership in a Protected Class**, and it provides students who believe that they have been the subject of discrimination or harassment with mechanisms for seeking redress. Nothing in this policy shall abridge academic freedom or the University's educational mission. **All members of the University community are expected to adhere to the applicable policies, to cooperate with the procedures for responding to complaints of discrimination and harassment, and to report conduct or behavior they believe to be in violation of these policies to EOAA.** Management and supervisory personnel have a duty to act; they are responsible for taking reasonable and necessary action to **prevent discrimination and harassment and for responding promptly and thoroughly to any such claims.** University officers who learn of an allegation of gender-based misconduct, discrimination, or harassment have a duty to report the allegation to EOAA or Student Services for Gender-Based and Sexual Misconduct. All students are protected from retaliation for filing a complaint or assisting in an investigation under these policies. **Appropriate disciplinary action may be taken against any student or employee who violates these policies**.

(Emphasis added.)

260.    According to Columbia's Gender-Based Misconduct Policies for Students: Columbia University, Barnard College, and Teachers College are committed to providing a learning environment **free from gender-based discrimination and harassment**. As such, the University does not tolerate any kind of gender-based discrimination or harassment, which includes sexual assault, sexual harassment, and gender-based harassment. **The University community is committed to fostering a healthy and safe environment in which every member of the community can realize her or his fullest potential.**

Gender-based misconduct is a serious concern on college campuses throughout the country. To address this problem, the University provides educational and preventive programs, services for individuals who have been impacted by gender-based and sexual misconduct, and accessible, prompt, and equitable methods of investigation and resolution.

Students who believe they have been subjected to gender-based discrimination or harassment are encouraged to report these incidents. Upon receiving a report, the University will respond promptly, equitably, and thoroughly. In addition, the University will take steps to prevent the recurrence of the discrimination or harassment and correct its effects, if appropriate.

(Emphasis added.)

261.   According to Columbia University's Confidentiality, Privacy, & Non-Retaliation Policy:

**The University will make all reasonable efforts to maintain the confidentiality and privacy of parties involved in gender-based misconduct investigations**, restricting information to those with a legitimate need to know. Individuals participating in an investigation, proceeding, or hearing are encouraged to maintain the privacy of the process in order to assist the office in conducting a thorough, fair, and accurate investigation. Individuals are also encouraged to seek appropriate administrative support on-campus. Strictly confidential on-campus resources include counseling services, medical care providers, the Rape Crisis/Anti-Violence Support Center, and clergy members. All other University administrators, such as faculty and advising staff, cannot promise strict confidentiality but can provide private support.

(Emphasis added.)

262.   Columbia has engaged in the following acts or practices that are deceptive or misleading in a material way, or committed deceptive acts or practices, which were aimed at the consumer public at large, that were a representation or omission likely to mislead a reasonable consumer acting reasonably under the circumstances:

a.   by causing Paul to believe that Columbia would follow its policies, copies of which were provided to Paul and are also available on Columbia's Internet website; and

b.   by causing Paul to believe that if he paid tuition and fees to Columbia, that Columbia would uphold its obligations, covenants and warranties to Paul described in its policies.

263.     Columbia had no intention of following its own policies and procedures when it condoned a hostile educational environment by knowingly permitting Columbia student Emma and Defendant Kessler to engage in prolonged gender-based harassment and misconduct as to Paul based on what Columbia had determined after investigation to be untrue allegations, permitted that gender-based harassment and misconduct in the school's programs or activities with actual knowledge of, a deliberate indifference to, and an apparent approval of said gender-based harassment and misconduct, and allowed Paul to be effectively denied equal access to Columbia's resources and opportunities.

264.     Columbia's stated policies and procedures, together with its violations thereof only with respect to Paul as the male accused of sexual assault demonstrates Columbia's deceptive practices with respect to males accused of sexual misconduct at Columbia.

265.     Based on the foregoing, Columbia engaged in unfair or deceptive trade practices in violation of Section 349(a) of the General Business Law.

266.     As a result of Columbia's deceptive acts and practices, Paul sustained tremendous damages, including, without limitation, emotional distress, psychological damages, loss of educational and athletic opportunities, economic injuries and other direct and consequential damages.

267.     As a result of the foregoing, Paul is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## AS AND FOR THE EIGHTH CAUSE OF ACTION
### (Promissory Estoppel Against Columbia University)

268.    Paul repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

269.    Columbia's various policies constitute representations and promises that Columbia should have reasonably expected to induce action or forbearance by Paul.

270.    Columbia expected or should have expected Paul to accept its offer of admission, incur tuition and fees expenses, and choose not to attend other colleges based on its express and implied promises that Columbia would not tolerate, and Paul would not suffer, gender-based harassment and gender-based misconduct by fellow students and would not subject Paul to a hostile educational environment on the basis of his being a falsely accused male student that has effectively denied Paul equal access to Columbia's resources and opportunities, thereby undermining and detracting from Paul's educational experience.

271.    Paul relied to his detriment on these express and implied promises and representations made by Columbia.

272.    Based on the foregoing, Columbia is liable to Paul based on promissory estoppel.

273.    As a direct and proximate result of the above conduct, Paul sustained substantial damages, including, without limitation, emotional distress, psychological damages, loss of educational and athletic opportunities, economic injuries and other direct and consequential damages.

274.    As a result of the foregoing, Paul is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## AS AND FOR THE NINTH CAUSE OF ACTION
### (Intentional Infliction of Emotional Distress Against All Defendants)

275.    Paul repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

276.    Based on the foregoing facts and circumstances, Defendants intentionally discriminated against Paul when it condoned a hostile educational environment by knowingly permitting Columbia student Emma and Defendant Kessler to engage in prolonged gender-based harassment and misconduct as to Paul based on what Columbia had determined after investigation to be untrue allegations, permitted that gender-based harassment and misconduct in the school's programs or activities with actual knowledge of, a deliberate indifference to, and an apparent approval of said gender-based harassment and misconduct, and allowed Paul to be effectively denied equal access to Columbia's resources and opportunities.

277.    The above actions and inactions by Defendants were so outrageous and utterly intolerable that they caused mental anguish and severe psychological and emotional distress to Paul, as well as physical harm, financial loss, humiliation, loss of reputation and other damages.

278.    As a direct and proximate result of the above conduct, Paul sustained substantial damages, including, without limitation, emotional distress, loss of educational and athletic opportunities, economic injuries and other direct and consequential damages.

279.    As a result of the foregoing, Paul is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## AS AND FOR THE TENTH CAUSE OF ACTION
### (Negligence Against All Defendants)

280.    Paul repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

281.   Defendants owed duties of care to Paul, as an enrolled student at Columbia University.  Such duties included a duty of reasonable care to protect a student from the tortious acts of third parties.

282.   Defendants breached their duties owed to Paul when they participated in, authorized and condoned a hostile educational environment by knowingly permitting Columbia student Emma to engage in prolonged gender-based harassment, discrimination and misconduct against Paul based on what Columbia had determined after investigation to be untrue allegations of sexual misconduct, permitted that gender-based harassment and misconduct in the school's programs or activities with actual knowledge of, a deliberate indifference to, and an apparent approval of said gender-based harassment and misconduct, and allowed Columbia student Emma to continue in her campaign of publicly harassing and defaming Paul to the Columbia community, the general public, and the national and international mass media.

283.   As a direct and proximate result of the above conduct, Paul sustained substantial damages, including, without limitation, emotional distress, psychological damages, loss of educational and athletic opportunities, economic injuries and other direct and consequential damages.

284.   As a result of the foregoing, Paul is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## PRAYER FOR RELIEF

**WHEREFORE,** for the foregoing reasons, Paul demands judgment against the Defendants as follows:

(i)      on the first cause of action for violation of Title IX of the Education Amendments of 1972, a judgment awarding Paul: (i) damages in an amount to be determined at trial, including, without limitation, damages to physical well-

being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and athletic opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, (ii) injunctive [PN7] relief from to prevent threatened future acts of harassment that subject Paul to a hostile educational environment in violation of Title IX, and (iii) a declaratory judgment pursuant to 28 U.S.C. § 2201, that Defendant Columbia has intentionally discriminated against Paul on the basis of his male sex[PN8] by condoning a hostile educational environment due to knowingly permitting Columbia student Emma and Defendant Columbia Professor Kessler to engage in prolonged gender-based harassment of and gender-based misconduct as to Paul and permitting that gender-based harassment in the school's programs or activities with actual knowledge of, a deliberate indifference to and an apparent approval of said gender-based harassment and gender-based misconduct, with the consequence that Paul has been effectively denied equal access to Defendant Columbia's resources and opportunities, thereby undermining and detracting from Paul's educational experience;

(ii)     on the second cause of action for violation of New York Executive Law Section 296(4), a judgment awarding Paul: (i) damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and athletic opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, (ii) injunctive [PN9] relief from to prevent threatened future acts of harassment that subject Paul to a hostile educational environment in violation of New York Executive Law Section 296(4), and (iii) a declaratory judgment pursuant to 28 U.S.C. § 2201, that Defendant Columbia has intentionally discriminated against Paul on the basis of his male sex by condoning a hostile educational environment due to knowingly permitting Columbia student Emma and Defendant Columbia Professor Kessler to engage in prolonged gender-based harassment of and gender-based misconduct as to Paul and permitting that gender-based harassment and gender-based misconduct in the school's programs or activities with actual knowledge of, a deliberate indifference to and an apparent approval of said gender-based harassment and gender-based misconduct, with the consequence that Paul has been effectively denied equal access to Defendant Columbia's resources and opportunities, thereby undermining and detracting from Paul's educational experience;

(iii)    on the third cause of action for violation of New York Executive Law Section 296(6), a judgment awarding Paul: (i) damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and athletic opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, (ii) injunctive[PN10] relief from to prevent threatened

future acts of harassment that subject Paul to a hostile educational environment in violation of New York Executive Law Section 296(6), and (iii) a declaratory judgment pursuant to 28 U.S.C. § 2201, that Defendant Bollinger aided, abetted, incited, compelled and/or coerced Columbia's gender-based discrimination and harassment against Paul;

(iv)    on the fourth cause of action for violation of New York Executive Law Section 296(6), a judgment awarding Paul: (i) damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and athletic opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, (ii) injunctive[PN11] relief from to prevent threatened future acts of harassment that subject Paul to a hostile educational environment in violation of New York Executive Law Section 296(6), and (iii) a declaratory judgment pursuant to 28 U.S.C. § 2201, that Defendant Kessler aided, abetted, incited, compelled and/or coerced Columbia's gender-based discrimination and harassment against Paul;

(v)     on the fifth cause of action for breach of contract, a judgment awarding Paul damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and athletic opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(vi)    on the sixth cause of action for breach of the covenant of good faith and fair dealing, a judgment awarding Paul damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and athletic opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(vii)   on the seventh cause of action under Section 349(a) of the New York General Business Law, a judgment awarding Paul: (i) damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and athletic opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements and (ii) injunctive[PN12] relief from to prevent threatened future acts of gender-based harassment and gender-based misconduct that subject Paul to a hostile educational environment in violation of Section 349(a) of the New York General Business Law;

(viii)  on the eighth cause of action for promissory estoppel, a judgment awarding Paul damages in an amount to be determined at trial, including, without

[75]

limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and athletic opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(ix)    on the ninth cause of action for intentional infliction of emotional distress, a judgment awarding Paul damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and athletic opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(x)     on the tenth cause of action for negligence, a judgment awarding Paul damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and athletic opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements; and

(xi)    awarding Paul such other and further relief as the Court deems just, equitable and proper.

Dated:   New York, New York
         July 20, 2015

                    **NESENOFF & MILTENBERG, LLP**
                    *Attorneys for Plaintiff Paul Nungesser*

                    By:   *Andrew Miltenberg*
                          **Andrew T. Miltenberg, Esq. (AM 7006)**
                          **Philip A. Byler, Esq. (PB 1234)**
                          **Diana R. Zborovsky, Esq.** *(admission pending)*
                    **363 Seventh Avenue, Fifth Floor**
                    **New York, New York 10001**

[76]

**(212) 736-4500**
**amiltenberg@nmllplaw.com**
**pbyler@nmllplaw.com**
**dzborovsky@nmllplaw.com**
**tnovack@nmllplaw.com**