UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/11/2016

-------------------------------------------------------------X

PAUL NUNGESSER,                                    :
                                                   :
                              Plaintiff,           :
                                                   :          1:15-cv-3216-GHW
               -v -                                :
                                                   :          MEMORANDUM OPINION
COLUMBIA UNIVERSITY, TRUSTEES OF                   :          AND ORDER
COLUMBIA UNIVERSITY, LEE C.                        :
BOLLINGER, and JON KESSLER,                        :
                                                   :
                              Defendants.  :
-------------------------------------------------------------X

GREGORY H. WOODS, United States District Judge:

In 2013, Paul Nungesser was accused of rape by fellow Columbia University ("Columbia")

student Emma Sulkowicz.  Sulkowicz filed a complaint with Columbia's Office of Gender-Based

Misconduct, and, after an investigation and hearing, Nungesser was found "not responsible" for

"non-consensual sexual intercourse."  Notwithstanding the outcome of Columbia's investigation,

Sulkowicz maintained that Nungesser had raped her.  Over the course of their final year at Columbia

she became well known as an activist campaigning to raise awareness of sexual assault on college

campuses, and her senior thesis project, known as the Mattress Project (Carry That Weight) (the

"Mattress Project"), received widespread media attention.

Nungesser alleges that Columbia, by permitting Sulkowicz's activism and awarding her

academic credit for the Mattress Project, violated his rights under Title IX of the Education

Amendments of 1972 ("Title IX"); he also brings various related state-law claims against Columbia,

Columbia President Lee Bollinger, and Professor Jon Kessler.  As it considers these claims, the

Court is mindful that its role is limited:  it does not "advocate for best practices or policies," or even

"decide whether Columbia treated Plaintiff fairly or unfairly."  *Doe v. Columbia Univ.*, 101 F. Supp. 3d

356, 376 (S.D.N.Y. 2015).  The Court's task is to determine whether Nungesser plausibly alleges a

claim for gender-based discrimination under Title IX, or otherwise states a claim under New York state law.  For the reasons that follow, the Court finds that Nungesser fails to state a claim, and thus Defendants' motion to dismiss is GRANTED.

## I.  Background[1]

Nungesser, a German national, is a 2015 graduate of Columbia.  Amended and Supplemented Complaint ("Amended Complaint" or "AC"), ECF No. 26, ¶ 3.  In April 2013, Sulkowicz, who, like Nungesser, was a sophomore at Columbia at that time, filed a complaint with Columbia's Office of Gender-Based Misconduct alleging that Nungesser raped her in August 2012.  AC ¶¶ 32, 37.  Nungesser maintains that he and Sulkowicz engaged in consensual intercourse.  AC ¶ 26.  After Columbia conducted an investigation and held a hearing on October 29, 2013, Nungesser was found "not responsible" for "non-consensual sexual intercourse."  AC ¶ 34.

The core of the allegations in the Amended Complaint concern what Nungesser describes as Sulkowicz's efforts to brand him as a "serial rapist" during and after the investigation into the August 2012 incident.  AC ¶ 46.

### A.  Incidents Before Nungesser's Name Was Made Public

Nungesser alleges that in addition to filing her complaint, Sulkowicz sought to label him a rapist within the Columbia community.  Shortly after Sulkowicz filed the incident report, she encouraged the president of Alpha Delta Pi—the coed fraternity of which she and Nungesser were both members—to notify its alumni board and several other ADP members that an alleged rapist was living at ADP.  AC ¶ 47.  This notification occurred.  *Id.*

Nungesser asserts that Sulkowicz also encouraged other Columbia students to file complaints of gender-based misconduct against him, and that two female students and one male

---

[1] Unless otherwise noted, the facts are taken from the Amended Complaint, and are accepted as true for the purposes of this Rule 12(b)(6) motion.  *See, e.g., Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002).  However, "[t]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

student eventually did so.  AC ¶¶ 38, 100.  In April or May 2013, shortly after Sulkowicz filed her complaint, a woman referred to as Jane Doe 1 filed a complaint alleging that Nungesser grabbed her at a party and tried to kiss her. AC ¶ 39.  Columbia ultimately found Nungesser "not responsible" for "non-consensual sexual contact" with respect to that allegation.  *Id.*  Around the same time, a second woman, Jane Doe 2, filed a complaint alleging that while she was dating Nungesser during their freshman year, she felt obligated to have sex with him.  AC ¶ 40.  Columbia terminated its investigation into Jane Doe 2's complaint without a hearing due to the lack of information of any alleged intimate partner violence.  *Id.*

After Nungesser was found "not responsible" for the alleged rape, Sulkowicz began speaking with reporters.  On December 3, 2013, Nungesser was approached by New York Post reporters in front of his dorm and was followed by one on his way to class.  AC ¶ 48.  Shortly thereafter, an article appeared in which it was apparent that all three of the women who had filed complaints against Nungesser had spoken to the Post, although his name did not appear in the article.  *Id.*  Nungesser alleges that his parents notified Bollinger of the incident prior to the publication of the article, but that no action was taken in response.  *Id.*  Sulkowicz also provided information and identified Nungesser to a student reporter, who subsequently published an article on Columbia's student news blog, BWOG, on January 23, 2014.  AC ¶ 49.  Like the Post story, the BWOG post did not identify Nungesser by name, but allegedly made him "easily identifiable to most of his peers on campus."  *Id.*  Nungesser was advised by Columbia to remain silent when the BWOG reporter requested a comment from him, and was not notified by Columbia when the blog post was published.  AC ¶¶ 50-51.

Approximately two weeks after the BWOG story, Bollinger announced a change in Columbia's policies with respect to sexual assault, and also announced that Columbia would release data on sexual assault complaints.  AC ¶ 53.  Nungesser alleges that these changes were prompted by the BWOG article.  *Id.*

3

In April 2014, Sulkowicz made her first public press statement, in which she said that her rapist remained on campus. AC ¶ 56. She did not identify Nungesser by name. *Id.* On April 7, 2014, Bollinger announced further measures to address the issue of sexual assault at Columbia. AC ¶ 57. In May 2014, Sulkowicz published an op-ed in Time Magazine entitled "My Rapist is Still on Campus." AC ¶ 59. Nungesser was not identified by name in the op-ed. *See id.* n.20.

## B. Nungesser's Name Is Made Public

In May 2014, at the end of his junior year, Nungesser's name was made public in connection with Sulkowicz's allegations for the first time. Columbia's student newspaper, the Columbia Spectator, published a story regarding Sulkowicz's allegations that named Nungesser as her alleged rapist. AC ¶ 63. Also in May 2014, a "rapist list" that included Nungesser's name appeared in multiple Columbia bathrooms, and fliers with the list were distributed at several Columbia events. AC ¶ 58. He was not notified by Columbia about the distribution of the lists. *Id.*

## C. The Mattress Project

Sulkowicz undertook the Mattress Project, a performance art piece that involved carrying her mattress around Columbia's campus with her, throughout her senior year. AC ¶¶ 68-73. She publicly stated that the goal of her project was to "[g]et my rapist off campus." AC ¶ 70. Professor Jon Kessler approved the Mattress Project as Sulkowicz's senior thesis project, for which she received class credit. AC ¶¶ 68, 72, 73. The Mattress Project received widespread media attention both nationally and internationally, and many of the news articles linked to the Columbia Spectator article that contained Nungesser's name. AC ¶¶ 79, 84.[2] The Mattress Project culminated in May

---

[2] The Court does not credit Nungesser's allegation that Sulkowicz threatened him in a December 2014 New York Times article. AC ¶ 85 n.35. The quote in the Amended Complaint was taken out of context and when read within Sulkowicz's complete statement in the article it is obvious that she meant that Columbia students were not safe while Nungesser remained on campus, not that Nungesser himself was vulnerable to harm. Nungesser's interpretation is at best a misreading of the article and at worst an attempt to mislead the Court. Regardless, the Court will disregard this allegation in the complaint. *See Tuf America, Inc. v. Diamond*, 968 F. Supp. 2d 588, 592 (S.D.N.Y. 2013) ("If a document relied on in the complaint contradicts allegations in the complaint, the document, not the allegations, control, and the court need not accept the allegations in the complaint as true.") (citation omitted).

2015, when Sulkowicz carried the mattress at Columbia's graduation ceremony. She did so despite the fact that Columbia administrators had emailed graduating students and asked that they not bring "large objects" to the ceremony, and that administrators had spoken to her both before and during the ceremony, asking that she not carry the mattress. AC ¶¶ 123-28.

Both Bollinger and Kessler made public statements regarding the Mattress Project. Specifically, Kessler said that he discussed endurance art with Sulkowicz and was struck by the fact that she was "making an enormous statement for change." AC ¶ 72. Bollinger said that he cared "about all of [his] students" and "when one of them feels that she has been a victim of mistreatment" it affected him. AC ¶ 76. Columbia also partially paid for the clean-up costs associated with an October 2014 campus rally organized by Sulkowicz and other student activists entitled "Carry That Weight National Day of Action." AC ¶ 92. The rally focused on a list of demands signed by the activists, including a demand that Columbia re-open its investigation into Sulkowicz's complaint against Nungesser, who the activists described as an "ongoing threat to the community." AC ¶ 94. In response, Columbia published a statement that said "our hearts go out to any students who feel they have been mistreated," and promised to strengthen its policies related to preventing and responding to gender-based misconduct. AC ¶ 95. Columbia did not, however, re-open its investigation into Sulkowicz's complaint.

In addition to the Mattress Project, prints created by Sulkowicz—depicting images of her alleged assault superimposed over two New York Times articles describing her claims against Nungesser—were displayed the week before graduation as part of the Columbia University Visual Arts Program/Undergraduate Thesis Show Reception. AC ¶¶ 115-117. Columbia faculty approved the display of the prints, facilitated their installation, and supervised the exhibition. AC ¶ 119. Nungesser was not notified by Columbia that the prints would be displayed. AC ¶ 120.

### D.  Nungesser's Experience at Columbia

As a result of the events described above, Nungesser's social and academic experience at Columbia suffered.  He states that he was precluded from attending on-campus career recruiting events, and, consequently, was unable to obtain employment in the United States, forcing him to return to Germany after his graduation.  AC ¶ 109, 154-55.  Nungesser also feared for his safety as a result of several comments posted on Sulkowicz's Facebook page in late 2014, and requested and was denied a security escort on two occasions—once for a mandatory sexual respect workshop, and a second time for the second National Day of Action in April 2015.  AC ¶¶ 87, 111-12.  Columbia provided Nungesser the option of writing an essay rather than attending the workshop, which he declined.  AC ¶ 111.  Columbia later emailed Nungesser—ten minutes before the workshop was due to start—recommending that he not attend, but he did not receive the email until after the workshop.  *Id.*

### E.  Nungesser's Complaint Against Sulkowicz and John Doe

In late 2014, a third student filed a gender-based misconduct complaint against Nungesser. This time a male student, John Doe, alleged that Nungesser had touched him inappropriately during a conversation in 2011.  *Id.*  After a hearing, Nungesser was found not responsible for the alleged misconduct described in John Doe's complaint.  AC ¶ 102.

Nungesser and his parents have complained to the university multiple times regarding Sulkowicz's actions and Columbia's treatment of Nungesser.  AC ¶ 165.  In the spring of 2015, Nungesser filed a formal complaint with Columbia regarding Sulkowicz's and John Doe's conduct. AC ¶ 166.  Columbia declined to open an investigation, and stated that the conduct Nungesser alleged did not constitute actionable retaliation under Columbia policy.  *Id.*

### F.  Procedural History

Nungesser's July 30, 2015 Amended Complaint, the operative pleading here, alleges ten causes of action:  (1) gender discrimination in violation of Title IX; (2-4) gender discrimination in

violation of New York's Human Rights Law against Columbia, Bollinger, and Kessler; (5) breach of

contract; (6) breach of the covenant of good faith and fair dealing; (7) unfair or deceptive trade

practices; (8) promissory estoppel; (9) intentional infliction of emotional distress; and (10)

negligence.  Defendants moved to dismiss on August 28, 2015, Nungesser filed his brief in

opposition on September 21, 2015, and Defendants replied on September 28, 2015.

## II.  Legal Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted

as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678

(2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility

when the plaintiff pleads factual content that allows the court to draw the reasonable inference that

the defendant is liable for the misconduct alleged."  *Id.*  (citing *Twombly*, 550 U.S. at 556).  It is not

enough for a plaintiff to allege facts that are consistent with liability; the complaint must "nudge"

claims "across the line from conceivable to plausible."  *Twombly*, 550 U.S. at 570.

In evaluating a 12(b)(6) motion, a court must accept all facts alleged in the complaint as true

and draw all reasonable inferences in the plaintiff's favor.  *Burch v. Pioneer Credit Recovery, Inc.*, 551

F.3d 122, 124 (2d Cir. 2008) (per curiam)).  Legal conclusions, unlike facts, are not entitled to an

assumption of truth.  *Iqbal*, 556 U.S. at 679.  A complaint that offers "labels and conclusions" or

"naked assertion[s]" without "further factual enhancement" will not survive a motion to dismiss.  *Id.*

at 678 (citing *Twombly*, 550 U.S. at 555).

## III.  Discussion

### A.  Title IX

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be

excluded from participation in, be denied the benefits of, or be subjected to discrimination under

any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681.

Congress intended, through Title IX, "to avoid the use of federal resources to support

discriminatory practices" and "to provide individual citizens effective protection against those practices." *Cannon v. Univ. of Chicago*, 441 U.S. 677, 704 (1979).  There is no dispute that Title IX applies to Columbia.

Federal courts have long recognized an implied private right of action under Title IX.  *See Hayut v. State Univ. of New York*, 352 F.3d 733, 749 (2d Cir. 2003) (citing *Cannon*, 441 U.S. at 691).  It is also well established that courts interpret "Title IX by looking to the body of law developed under Title VI, as well as the caselaw interpreting Title VII." *Yusuf v. Vassar Coll.*, 35 F.3d 709, 714 (2d Cir. 1994) (citations omitted); *see also Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633 F.3d 81, 89 (2d Cir. 2011).  As two other courts in this district have recently noted, however, there is at least one significant difference between Title VII and Title IX:  although a private plaintiff may bring a claim under Title IX for instances of intentional discrimination, courts have held that a private right of action based on the alleged disparate impact of a policy on a protected group is not cognizable under Title IX.  *See Doe v. Columbia Univ.*, 101 F. Supp. 3d 356, 367 (S.D.N.Y. 2015) (citing *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009) and *Alexander v. Sandoval*, 532 U.S. 275, 280 (2001)); *Yu v. Vassar Coll.*, 97 F. Supp. 3d 448, 461 (S.D.N.Y. 2015) (same).  "Thus, in order to establish a claim of discrimination under Title IX, a plaintiff must ultimately show that the defendant discriminated against him or her because of sex; that the discrimination was intentional; and that the discrimination was a 'substantial' or 'motivating factor' for the defendant's actions." *Doe v. Columbia Univ.*, 101 F. Supp. 3d at 367 (citing *Tolbert v. Queens Coll.*, 242 F.3d 58, 69 (2d Cir. 2001).

Under Title IX, educational institutions may be held liable for "deliberate indifference to known acts of harassment," of one student by another, *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 643 (1999), or of a student by a teacher.  *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290-91 (1998).  For a school to be held liable for such harassment, it must be "deliberately indifferent to sexual harassment, of which [it] had actual knowledge, that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or

benefits provided by the school." *Davis*, 526 U.S. at 650.  The peer harassment forming the basis for a Title IX claim must also, of course, be "gender-oriented."  *Id.* at 651.

Here, Nungesser claims that Columbia was deliberately indifferent to what he asserts was gender-based harassment by Sulkowicz, a fellow student, that was condoned by Bollinger and Kessler.[3]  For the reasons that follow, he fails to state a Title IX claim.

### 1. Nungesser Has Not Established Gender-Based Discrimination

Nungesser's argument rests on a logical fallacy.[4]  He assumes that because the allegations against him concerned a sexual act that everything that follows from it is "sex-based" within the meaning of Title IX.[5]  He is wrong.  Taken to its logical extreme, Nungesser's position would lead to the conclusion that those who commit, or are accused of committing, sexual assault are a protected class under Title IX.  The statute does not permit that result.

Title IX prohibits discrimination "on the basis of sex."  The word sex has two distinct meanings:  "(1) The sum of the peculiarities of structure and function that distinguish a male from a female organism; gender.  (2) Sexual intercourse."  BLACK'S LAW DICTIONARY 1583 (Bryan Garner, et al., eds., 10th ed. 2014).[6]  Anti-discrimination laws, such as Title VI, Title VII, and Title IX, are concerned with the first definition—the gender status conferred by a particular set of characteristics.[7]  Implicit in Nungesser's claim is the belief that sex-based discrimination, for the

---

[3] Title IX also "bars the imposition of university discipline where gender is a motivating factor in the decision to discipline." *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994).  Nungesser does not argue that the disciplinary proceedings against him resulted in an erroneous outcome or that Columbia selectively enforced its policies regarding gender-based misconduct.  *See Yusuf*, 35 F.3d at 715; AC 50-56; Opp. Br. 8-20.

[4] The fallacy even has a name—equivocation.

[5] Forcible rape is obviously an act of violence, but for purposes of analyzing Nungesser's argument it is the sexual dimension of the act which is relevant.

[6] Black's also presents a third definition "sexual relations," which, in turn, is further defined as "physical sexual activity that does not necessarily culminate in intercourse."  BLACK'S LAW DICTIONARY 1584.  For the purposes of the analysis in this decision, this third definition is subsumed within the second.

[7] The Court is mindful that sex and gender are not synonymous terms.  In this opinion, the Court will use the terms gender-based harassment and gender discrimination to refer to the discrimination prohibited by Title IX.  This is intended to provide clarity as to the way the word "sex" is being discussed in this decision, not to conflate gender— which is now used frequently to refer to psychological and societal aspects of sexual identity—with the use of the word sex, as used to refer to the physical aspects of being male or female.  *See* Sex discrimination, BLACK'S LAW DICTIONARY 567.

purposes of Title IX, means "based on the act of sex" rather than "gender."  As both the case law and logic show, this cannot be correct.

"On the basis of sex," as used in Title IX, refers to one's status, not to whether the underlying conduct was sexual in nature.  "[T]he natural meaning of the phrase 'on the basis of sex' is on the basis of the plaintiff's sex . . . .  Even within Title VII of the Civil Rights of 1964 itself, Congress used the phrase 'on the basis of sex' as shorthand for discrimination 'on the basis of such individual's sex.'" *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 185 (2005) (Thomas, J., dissenting).  Thus, "[t]he mere fact that sexual harassment proceedings have as their subject sexual behavior and speech does not itself implicate sex discrimination . . . ." *Haley v. Virginia Commonwealth Univ.*, 948 F. Supp. 573, 579 (E.D. Va. 1996).

Harassment, "even harassment between men and women" is not automatically considered to be gender-based discrimination "merely because the words used have sexual content or connotations." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998).  In order to be considered gender-based harassment, the harassing conduct must "support an inference of discrimination on the basis of sex." *Id.*; *see also Bowman v. Shawnee State Univ.*, 220 F.3d 456, 464 (6th Cir. 2000) (holding plaintiff was not subjected to a hostile environment for purposes of Title VII because "[w]hile he may have been subject to intimidation, ridicule, and mistreatment, he has not shown that he was treated in a discriminatory manner because of his gender.").  In evaluating whether actions against a particular plaintiff were discriminatory, "courts have consistently emphasized that the ultimate issue is the reasons for the *individual plaintiff's* treatment . . . ." *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001) (affirming grant of summary judgment to defendants in Title VII case where female plaintiff was subjected to "highly cruel and vulgar" harassment, but harassment did not reflect an attack on plaintiff as a woman).  "In other words, was Plaintiff being harassed because of [his or her] gender or for some other reason?" *Patenaude v. Salmon River Central Sch. Dist.*, 3:03-cv-1016, 2005 WL 6152380, at *5 (N.D.N.Y. 2005).

That the accusations against Nungesser involved an act of sex does not mean they were motivated by his gender.  Nungesser distills his argument to a sentence in his opposition brief: "falsely accusing a male of being a 'rapist' . . . is inherently gender based and was directed to Nungesser as a male."  Opp. Br. 11.  As an initial matter, the Court rejects the assumption that calling someone a rapist, falsely or not, is inherently gendered.[8]  *See Doe v. Univ. of Massachusetts-Amherst*, No. 14-cv-30143, 2015 WL 4306521, at *8 (D. Mass. July 14, 2015) (dismissing a Title IX claim where the plaintiff cited only comments that targeted him as a student accused of sexual assault, not any comments "based on his gender" or "suggestive of gender bias").

Moreover, Nungesser's conclusory statement that he was publicly branded a serial rapist "because he is a male," AC ¶ 77, is belied by the facts he pleads.[9]  Nungesser alleges that Sulkowicz's gender-based misconduct complaint, as well as the Mattress Project and her public statements, were motivated by her anger at his rejection of her.  AC ¶¶ 31, 38.  To the extent that Sulkowicz's activism was aimed at Nungesser it was because of *his conduct* toward her (whether because of his rejection of her, as he alleges, or because of the rape, as she claims) not because of *his status* as a male.[10]  Personal animus is not gender-based harassment, and cannot form the basis for a Title IX

---

[8] Persons of any gender may be perpetrators, or victims, of sexual assault.  *See Haley*, 948 F. Supp. at 579 ("allegations [that] at best reflect a bias against people accused of sexual harassment and in favor of victims [ ] indicate nothing about gender discrimination."); *see also* Lara Stemple and Ilan H. Meyer, *The Sexual Victimization of Men in America: New Data Challenge Old Assumptions*, 104 AM. J. OF PUBLIC HEALTH, e19 (June 2014) (noting that although the idea of female perpetrators sexually assaulting male victims is "politically unpalatable," studies have found that up to 46% of male victims report a female perpetrator).  The Second Circuit has long recognized that the gender of the parties involved in gender-based harassment cases can vary.  *See Torres v. Pisano*, 116 F.3d 625, 634 n.8 (2d Cir. 1997) ("We use the male pronounce since the context of this case, and most harassment cases, is that of a male supervisor and female victim.  We do not doubt that in other contexts, the genders can be different."); *see also Doe v. Columbia Univ.*, 101 F. Supp. 3d at 375 n.9 ("Of course, there is nothing inherently gendered about sexual misconduct or sexual misconduct complaints.").

[9] This conclusory statement is one of only two instances in his factual allegations where Nungesser links the complained-of conduct to his gender.  See AC ¶¶ 1-166.  The other is found in Nungesser's allegations regarding the exhibition of Sulkowicz's prints prior to graduation, where he asserts that "[a] male student would not have been able to publicly display graphic nude prints of a female classmates showing female genitalia and female perpetrated sexual abuse without Defendant Columbia intervening to stop it."  AC ¶ 122.  This is mere speculation.  Nothing in the complaint suggests that Columbia treats artwork, including work that has sexual connotations or deals with sexual violence, differently based on the gender of the artist or the subject.  The complaint is devoid of any facts suggesting how Columbia might handle Nungesser's hypothetical display, much less facts suggesting that it would be treated differently than Sulkowicz's work.

[10] It is worth noting that in the context of Title VII, "courts often find that harassment by a co-worker is not considered to be 'based on sex' when it arises from a failed relationship."  *Conklin v. Cnty. of Suffolk*, 859 F. Supp. 2d, 415, 428-29 (E.D.N.Y. 2012) (collecting cases).  The Court is not holding that harassment based on romantic rejection can never lead

violation.  *See Sanches v. Carrollton-Farmers Branch Indep. Sch. Dist.*, 647 F.3d 156, 165 (5th Cir. 2011) (dismissing Title IX claim where there was "nothing in the record to suggest" that the harasser "was motivated by anything other than personal animus"); *see also Eskenazi-McGibney v. Connetquot Central Sch. Dist.*, 84 F. Supp. 3d 221, 233 (E.D.N.Y. 2015) (dismissing claims where plaintiffs failed to allege non-conclusory facts connecting bullying to student's disabilities, and bullying may have been based on some other reason "such as personal animus").

Nungesser not only fails to plead facts giving rise to a plausible inference that Sulkowicz's actions were *motivated* by his gender, he fails to allege harassing *conduct* that is sexual in nature such that it states a Title IX claim.  Cases in which a plaintiff has stated a claim based on peer harassment under Title IX typically include allegations of unwelcome sexual touching or the use of gendered slurs.  *See Davis*, 526 U.S. at 633-34 (harassing student made vulgar statements about wanting to touch female student, attempted to touch female student's breasts and genital area, and rubbed his body against hers in a sexually suggestive manner); *Doe v. East Haven Bd. of Educ.*, 200 F. App'x 46, 48 (2d Cir. 2006) (female student who reported being raped was verbally abused by other students who called her "a slut" and "a whore," names that "reflect[ed] sex-based stereotypes"); *T.Z. v. City of New York*, 634 F. Supp. 2s 263, 266 (E.D.N.Y. 2009) (harassing students touched female special needs student's breasts, touched her genital area outside of her clothing, pulled down her pants, and touched her buttocks as other students watched); *Riccio v. New Haven Bd. of Educ.*, 467 F. Supp. 2d 219, 222-23 (D. Conn. 2006) (harassing students called female student names including "bitch" and "dyke," and threw objects at her).

---

liability under Title IX—one can easily imagine a situation where the scorned student sexually harasses the peer by whom he or she was rejected, giving rise to a Title IX claim.  *See Novak v. Waterfront Comm'n of N.Y. Harbor*, 928 F. Supp. 2d 723, 730 (S.D.N.Y. 2013) ("There are clearly circumstances in which an employee's failed romantic relationship with a supervisor can lead to an actionable Title VII claim, such as when the employee's subsequent mistreatment can be tied to the rejected supervisor's unwanted sexual advances or other inappropriate efforts to resume the relationship.") (citing *Babcock v. Frank*, 729 F. Supp. 279, 287-88 (S.D.N.Y. 1990)).  But here, where the alleged motivation for the harassment is romantic rejection (not gender) and the harassing conduct is not sexual in nature, there is no basis for such a claim.

The Mattress Project, the National Day of Action, and Sulkowicz's public statements that she wanted her rapist off campus are not the type of conduct that creates an actionable Title IX claim.  Nungesser does not allege that Sulkowicz ever attempted to touch him, spoke to him, followed him, or otherwise interacted with him after the October 2013 hearing.  Nor does he allege that she ever used his name in any of her public statements.

Even if Sulkowicz had publicly called Nungesser a rapist (by name), when considered with the other facts as alleged, the complaint would not state a Title IX claim.  As previously stated, the Court rejects the assumption that "rapist" is a gender-specific term.  But even if one considered a hypothetical instance of harassment in which a man was called a rapist—completely unconnected to any sex act, but simply as a gender-based slur because he is a male—this is not that case.  The complaint pleads an August 2012 sexual encounter between Sulkowicz and Nungesser, which he maintains was consensual and she says was rape.  AC ¶¶ 26, 32.  For the purposes of this motion the Court accepts, as it must, Nungesser's version of events—that Sulkowicz, scorned, revenged Nungesser's rejection of her.  In this case, Sulkowicz's use of the word was based on a particular event involving a particular male; it was not used as a generic term to disparage men, or Nungesser as a man.

Nungesser alleges that he was called a name that has "sexual content or connotation[ ]."  *Oncale*, 523 U.S. at 80.  But he alleges neither that he was harassed because of his male gender, nor that he was subjected to sexually harassing conduct that gives rise to a claim for peer harassment under Title IX, so he does not allege discrimination "on the basis of sex" as required by Title IX.  Because Nungesser does not plausibly plead actionable sexual harassment, he does not state a claim under Title IX.

To hold otherwise would, in essence, create a new right of action under which all students accused of sexual assault could bring a Title IX claim against their educational institutions—so long as they could plausibly plead that the accusations were known to the institution and that the

institution failed to silence their accusers—simply because the misconduct they were accused of has a sexual element.[11]  Neither the text nor the purpose of Title IX supports this conclusion, and the Court declines to read it into the statute.  This conclusion does not leave a student who is the victim of sexually charged slander without any remedy—state laws have long provided claims for defamation and slander.[12]  But Nungesser has not pursued such a claim here.

### 2.  Nungesser Was Not Deprived of Access to Educational Opportunities

Even if Nungesser had pleaded facts sufficient to support a plausible inference of gender-based harassment, his Title IX claim would still fail because he has not alleged harassment "that is so severe, pervasive, and objectively offensive that it can be said to deprive [him] of access to the educational opportunities or benefits provided by the school."  *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 650 (1999).

"The most obvious example" of actionable peer harassment would "involve the overt, physical deprivation of access to school resources."  *Id.*  "It is not necessary, however, to show physical exclusion to demonstrate that students have been deprived by the actions of another student or students on the basis of sex."  *Id.*  In situations in which there is no physical exclusion, courts consider whether the harassment "had a concrete, negative effect" on the plaintiff's "ability to receive an education."  *Id.* at 654; *see also Fennell v. Marion Indep. Sch. Dist.*, 804 F.3d 398, 410 (5th Cir. 2015) (applying *Davis* in the context of a Title VI claim); *Jennings v. Univ. of North Carolina*, 482 F.3d 686, 699 (4th Cir. 2007); *Hawkins v. Sarasota Cnty. Sch. Bd.*, 322 F.3d 1279, 1289 (11th Cir. 2003);

---

[11]In this case, Nungesser pleads that Sulkowicz's allegations were false, and that Columbia found her claims to be not substantiated.  But Nungesser's claim does not turn on the fact that the accusations were false.  Under Nungesser's theory of Title IX, a predicate act of sexual harassment occurs whenever one student accuses another of rape or sexual assault, irrespective of the veracity of the accusation.  Unlike a common law slander or defamation claim under state law, the expansive Title IX claim that Nungesser seeks to develop in this case does not provide the defendant educational institution with a defense that the underlying accusation of sexual assault was truthful.

[12]In New York, for example "[m]aking a false statement that tends to expose a person to public contempt, hatred, ridicule, aversion or disgrace constitutes defamation," and "[a] verbal utterance that inaccurately accuses a person of a serious crime can be slander *per se*."  *Thomas H. v. Paul B.*, 18 N.Y.3d 580, 584 (N.Y. 2012) (citations omitted).  "Because the falsity of the statement is an element of the defamation claim, the statement's truth or substantial truth is an absolute defense."  *Moorhouse v. Standard, New York*, 997 N.Y.S.2d 127, 135 (App Div. 2014) (citation omitted).

*Gabrielle M. v. Park Forest Chicago-Heights, Ill. Sch. Dist. 163*, 315 F.3d 817, 821 (7th Cir. 2003).

Examples of such negative effects include a drop in grades, missing school, being forced to transfer

schools, or mental health issues requiring therapy or medication.  *Davis*, 526 U.S. at 652 (numerous

acts of offensive touching resulted in drop in grades and petitioner writing a suicide note); *Hill v.

Cundiff*, 797 F.3d 948, 976 (11th Cir. 2015) (student who was raped when school officials decided to

use her as "bait" in a sting operation to catch another student in the act of sexual harassment missed

school, withdrew from extracurricular activities, transferred schools, her grades suffered, and she

became depressed).

      The Court does not suggest that Nungesser's senior year at Columbia was pleasant or easy.

Title IX, however, sets a high bar before a private plaintiff may recover and Nungesser has not

alleged facts showing that he was effectively deprived of Columbia's educational opportunities.

Nungesser claims that his ability to perform academically suffered as a result of Sulkowicz's actions,

that he was prevented from attending on campus career-recruiting events, and that Columbia

facilities were not "reasonably available" to him due to threats to his physical safety.  AC ¶¶ 106,

108-09.  These claims consist primarily of conclusory statements, and the few facts alleged are not

sufficient to state a plausible claim.

      Nungesser's conclusory assertions that his academic performance suffered and that he was

prevented from attending recruiting events, without more, do not suffice.  There is no suggestion

that his grades dropped, that he was delayed or prevented from graduating (to the contrary, he

graduated on time in May 2015), or that he missed a single class as a result of these events.  *Compare

Davis*, 526 U.S. at 653-54 (petitioner stated a claim where "repeated acts" of verbal harassment and

touching resulted in "a concrete negative effect on her daughter's ability to receive an education")

*with Manfredi v. Mount Vernon Bd. of Educ.*, 94 F. Supp. 2d 447, 455 (S.D.N.Y. 2000) (student who

missed a single day of school and advanced with her class to the next grade at the end of the year

was not denied access to educational opportunities).  Nungesser's allegation that the Mattress

Project and related events precluded him from attending on-campus career events is equally perfunctory. AC ¶ 109. Aside from the fact that it is debatable whether such events are an educational opportunity or benefit for the purposes of Title IX, there are no facts supporting this bare assertion—did he even attempt to attend these events? how many events were there? was he turned away at the door?—and so the Court must disregard it.

In addition, the only factual support provided in support of Nungesser's contention that he feared for his safety was a pair of comments made by a single individual on Sulkowicz's Facebook page. AC ¶ 86-87. In September 2014 the commenter said that he was "pissed that I'm not in NY to CUT HIS THROAT MYSELF," referring to Nungesser, and three months later the same commenter said that Nungesser "needs to practice silence or suicide before he gets dealt with accordingly." *Id.* But there is no suggestion that these threats actually impacted Nungesser's ability to access the educational benefits and opportunities offered by Columbia. Nungesser does not allege that he ever missed class, altered his study habits, or was otherwise unable to access educational opportunities as a result of these threats. This makes sense, because, as is evident from the first comment, the speaker was not in New York. Likewise, while Nungesser states that attending class was "problematic" because his fellow students would take his photo against his will, he does not claim to have ever missed class or been unable to successfully complete a course he was enrolled in as a result of the harassment.

Thus, taken together, the few factual allegations in the complaint do not plausibly plead deprivation of access to educational opportunities and Defendants' motion to dismiss Nungesser's Title IX claim is granted. The Court will, however, permit Nungesser to replead his Title IX claim. *See Cruz v. TD Bank, N.A.*, 742 F.3d 520, 523 (2d Cir. 2013) ("[I]t is the usual practice upon granting a motion to dismiss to allow leave to replead.").

16

**B.  New York Human Rights Law**

The parties agree that Nungesser's claims under the New York Human Rights Law should be evaluated under the same standard as his analogous claims under Title IX.  *See* Defs.' Br. 22 (citing *T.P. ex rel. Patterson v. Elmsford Union Free Sch. Dist.*, No. 11-cv-5133, 2012 WL 860367, at *9 (S.D.N.Y. Feb. 27, 2012)) *and* Opp. Br. 24.  Because Nungesser fails to state a claim under Title IX, he likewise fails to state a claim under the New York Human Rights Law.  As with his Title IX claim, Nungesser may replead his claim under the New York Human Rights Law if he so chooses.

**C.  Breach of Contract**

"In New York, the relationship between a university and its students is contractual in nature."  *Yu v. Vassar Coll.*, 97 F. Supp. 3d 448, 481 (S.D.N.Y. 2015) (quoting *Papaspiridakos v. Educ. Affiliates, Inc.*, No. 10-cv-5628-RJD, 2013 WL 4899136, at *3 (E.D.N.Y. Sept. 11, 2013) *aff'd*, 580 F. App'x 17 (2d Cir. 2014)).  But "[n]ot every dispute between a student and a university is amenable to a breach of contract claim."  *Gally v. Columbia Univ.*, 22 F. Supp. 2d 199, 206 (S.D.N.Y. 1998). "[T]he mere allegation of mistreatment without the identification of a specific breached promise or obligation does not state a claim on which relief can be granted."  *Id.* at 207; *see also Baldridge v. State*, 740 N.Y.S.2d 723, 725 (3d Dep't 2002) ("[W]hile a school may be subject to a cause of action for breach of contract, this requires a contract which provides for 'certain specified services' as 'courts have quite properly exercised the utmost restraint applying traditional legal rules to disputes within the academic community.'") (internal citations omitted).

"When a student is admitted to a university, an implied contract arises between the parties which states that if the student complies with the terms prescribed by the university, he will obtain the degree he seeks."  *Vought v. Teachers Coll., Columbia Univ.*, 511 N.Y.S.2d 880, 881 (App. Div. 1987) (citing *Carr v. St. John's Univ.*, 231 N.Y.S.2d 410, 413 (App. Div.) *aff'd*, 12 N.Y.2d 802 (1962)).  "The rights and obligations of the parties as contained in the university's bulletins, circulars and

regulations made available to the student, become a part of this contract." *Id.* at 881 (citing *Prusack v. State of New York*, 498 N.Y.S.2d 455 (App. Div. 1986)).

In order to state a claim for breach of such a contract, a student must identify "specifically designated and discrete promises." *Ward v. New York Univ.*, 2000 WL 1448641, at *4 (S.D.N.Y. Sept. 28, 2000). "General policy statements" and "broad and unspecified procedures and guidelines" will not suffice. *Id.*; *see also Gally*, 22 F. Supp. 2d at 208 ("[G]eneral promises about ethical standards" that are "subject to neither quantification nor objective evaluation" "are far different from the types of specific promises which have led to valid breach of contract claims against universities."). For example, a student who alleged that she did not receive the field work supervision she was promised in her student handbook—including a one-and-a-half to two-hour weekly supervision conference— stated a claim. *Clarke v. Columbia Univ. et al.*, No. 95-cv-10627-PKL, 1996 WL 609271, at *5-6 (S.D.N.Y. Oct. 23, 1996). In contrast, "a general statement" of a university's adherence "to existing anti-discrimination laws" "does not create a separate and independent contractual obligation." *Gally*, 22 F. Supp. 2d at 208 (citing *Blaise-Williams v. Sumitomo Bank, Ltd.*, 592 N.Y.S.2d 41, 42 (App. Div. 1993); *see also Cheves v. Columbia Univ.*, 931 N.Y.S.2d 877 (App. Div. 2011) (holding that alumni relations brochure listing certain benefits and services generally available to alumni did not guarantee alumni access to campus).

Nungesser argues that Columbia breached three policies in its treatment of him: (1) its policy concerning gender-based harassment; (2) its policy concerning confidentiality; and (3) its policy concerning retaliation. None of these claims withstand scrutiny, however, because Nungesser has not identified the specific promises that Columbia has breached.

### 1. Gender-Based Harassment Policy

Nungesser claims that Columbia violated its Student Policies and Procedures on Discrimination and Harassment by failing to take disciplinary action against Sulkowicz for the Mattress Project and her other activism, allowing her to earn academic credit for the Mattress

Project, failing to notify him of various events, including when his name appeared on the "rapist-list" on campus in May 2014, and for partially paying for the clean-up costs associated with the National Day of Action.  This claim fails.

Columbia's 2013 and 2014 Gender-Based Misconduct policies state that it is "committed to providing an environment free from gender-based discrimination and harassment."  AC ¶¶ 157, 162. This is exactly the type of general policy statement that cannot form the basis for a breach of contract action.  In contrast, there are some specific provisions contained within the policies that may well be actionable:  accused students "shall be given at least five (5) calendar days' notice prior to the hearing" to prepare, and have a right to appeal "either the hearing panel's decision or the sanctions determined by the Dean of Students."  AC ¶ 157.  Nungesser is unable to point to any such concrete, specific promises that were breached in this case.

Additionally, Columbia's policies define discriminatory harassment as harassment "on the basis of [the victim's] membership in a Protected Class" and gender-based harassment as harassment "based on gender or gender-stereotyping."  AC ¶ 164.  As discussed at length above, Nungesser has not pleaded facts that support an inference that any of the actions that he complains of were caused by his *status as a male*.  The harassment against him was explicitly based on specific events and alleged conduct, which, although it was related to a sex act, does not constitute gender-based harassment.

To the extent Nungesser's breach of contract claim may rely on Columbia's response to his complaint of gender-based misconduct against Sulkowicz, it is foreclosed by the fact that Columbia's policy does not promise students who believe they have been the victim of gender-based misconduct any specific outcome.  Instead, "[t]he University provides students who believe that they have been the subject of discrimination or harassment with mechanisms for seeking redress."  AC ¶ 164.  It encourages "[s]tudents who believe they have been subjected to gender-based discrimination or harassment" to report the incidents, and Columbia will "respond promptly, equitably, and thoroughly."  AC ¶ 157.

Nungesser filed a harassment complaint with Columbia in 2015, and Columbia declined to open an investigation stating that "the acts alleged do not constitute actionable retaliation in violation of the Policy." AC ¶ 166. But Nungesser was able to file a complaint and Columbia did respond to it, as the policy requires. The fact that the response was not the one Nungesser hoped for does not mean Columbia violated its policy.

### 2. Confidentiality Policy

Nungesser also asserts that Columbia breached its confidentiality policies, which provide, in relevant part, that "[t]he University will make all reasonable efforts to ensure preservation of privacy" of students accused of gender-based misconduct and will restrict "information to those with a legitimate need to know." AC ¶ 158.[13] Breaches of confidentiality "may result in additional disciplinary action." AC ¶ 159. These statements are found in Columbia's 2013 Gender-Based Misconduct Policy and 2013 Confidentiality/Privacy & Non-Retaliation Policy. AC ¶¶ 158-59. Nungesser again fails to identify a provision of the policy that Columbia has violated.

The policies state that Columbia will restrict information to those with a need to know—and there is no suggestion that Columbia disclosed any information regarding Nungesser. Nungesser also argues that Columbia violated its confidentiality policies when it failed to take action against Sulkowicz for disclosing his name. But the policies state only that a student who breaches the confidentiality policy *may* face disciplinary action. They do not promise, or require, that disciplinary action be taken each time the confidentiality polices are breached, they merely say that disciplinary action is a possible consequence.

Moreover, the Amended Complaint does not suggest that, pursuant to Columbia's policy, a student who has brought a gender-based misconduct complaint is *prohibited* from discussing the

---

[13] The Court notes that Columbia disputes the language of the 2013 policy. Defs.' Br. at 17 n.9. As neither Nungesser nor Defendants sought to incorporate the complete 2012, 2013, or 2014 policies into the pleadings, the Court is in no position to evaluate this argument and accepts the facts pleaded in the complaint as true, as it must.

complaint or the underlying allegations, either while the proceedings are ongoing or after they had

concluded.  Indeed, as Columbia points out, universities "may not require a complainant to abide by

a nondisclosure agreement" that would prevent rediscylosure of information—including the outcome

of any disciplinary proceeding brought alleging a sex offense—that the university has a legal

obligation to disclose.  Russlynn Ali, *"Dear Colleague" Letter*, 14, U.S. Dep't of Educ. (Apr. 4, 2011)

http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.html.  Columbia may

encourage students to maintain the privacy of all parties involved in a complaint of gender-based

misconduct, but, consistent with federal guidance, it does not mandate it.  Since the policy does not

mandate Sulkowicz's silence, failure to silence her does not breach the policy.

Nungesser asserts that the 2014 Gender-Based Misconduct Policy was revised to eliminate

protections for the privacy of respondents, after Sulkowicz began speaking out in public.  AC ¶ 161.

The 2014 Gender-Based Misconduct Policy, however, provides that "both the complainant and

respondent" have a right "[t]o privacy to the extent possible consistent with applicable law and

University policy."  AC ¶ 162.  The privacy provision of the policy then further explains that neither

complainants nor respondents are prohibited from "obtaining the assistance of family members,

counselors, therapists, clergy, doctors, attorneys, or similar resources."  AC ¶ 163.  This change in

Columbia's policies, even if it is a change that Nungesser disagrees with, does not form the basis for

a breach of contract claim.

Finally, although he repeatedly alleges that Columbia "failed to notify him" of certain

events—the graffiti, the publication of the BWOG post, the display of Sulkowicz's prints—

Nungesser pleads no basis for his proposition that such failures violated a binding agreement with

the university.

### 3.  Policy against Retaliation

Finally, Nungesser alleges breaches of Columbia's policy against retaliation.  Columbia

"strictly prohibits retaliation against and intimidation of any person because of his or her reporting

of an incident of gender-based misconduct or involvement in the University's response." AC ¶ 162. Under Columbia's policy, "[r]etaliation occurs when an alleged perpetrator or respondent, her or his friends or associates, or other member of the University community intimidates, threatens, coerces, harasses, or discriminates against an individual who has made a complaint, or participated in any manner in an investigation, proceeding, or hearing under these policies and procedures." AC ¶ 164.

Sulkowicz's Mattress Project, the National Day of Action, and her other public statements, were aimed at her dissatisfaction with Columbia's response to her gender-based misconduct complaint. In her view, the only appropriate outcome would have been Nungesser's expulsion. AC ¶ 70. To the extent that Sulkowicz's actions were aimed at Nungesser, the Court does not take issue with Nungesser's characterization of Sulkowicz's actions as retaliation—but he alleges that it was retaliation for Nungesser's rejection of her, *not* for his involvement in the gender-based misconduct investigation. The complaint does not plausibly allege that Sulkowicz's actions were motivated by Nungesser's *participation in the investigation*, and so Columbia cannot be said to have violated its policy by choosing not to discipline her.

Defendants' motion to dismiss Nungesser's breach of contract claims is granted without prejudice, and the Court gives Nungesser leave to replead this claim. *See Cruz*, 742 F.3d at 523.

### D. Covenant of Good Faith and Fair Dealing

"[A] breach of the implied covenant of good faith and fair dealing claim that is duplicative of a breach of contract claim must be dismissed." *Yu*, 97 F. Supp. 3d at 482 (quoting *MBIA Ins. Co. v. GMAC Mortg. LLC*, 914 N.Y.S.2d 604, 611 (N.Y. Sup. Ct. 2010). "New York law 'does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled.'" *Id.* (quoting *Ely v. Perthuis*, No. 12-cv-1078-DAB, 2013 WL 411348, at *5 (S.D.N.Y. Jan. 29, 2013)). "[R]aising both claims in a single complaint is redundant, and courts confronted with such complaints under New York law regularly dismiss any freestanding claim for breach of the covenant of fair dealing." *Jordan*

*v. Verizon Corp.*, No. 08-cv-6414 (GEL), 2008 WL 5209989, at *7 (S.D.N.Y. Dec. 10, 2008) (citing *Canstar v. J.A. Jones Const. Co.*, 622 N.Y.S.2d 730, 731 (App. Div. 1995)).  Nungesser asserts that the complaint's allegations "do not establish that the two claims are duplicative."  Opp. Br. 24.  The Court finds this argument unpersuasive.  Nungesser failed to plead any facts, separate from the facts with which he attempts to state a claim for breach of contract in support of his claim for a breach of the covenant of food faith and fair dealing.

Where a plaintiff has alleged such redundant claims and is granted leave to replead his breach of contract claim, courts have recognized that leave to amend the claim for breach of the covenant of fair dealing would be futile.  *See Jordan*, 2008 WL 5209989, at *7 (denying leave to replead such a claim).  Therefore, Nungesser's claim for a breach of the implied covenant of good faith and fair dealing is dismissed with prejudice.

### E.  General Business Law Section 349

New York General Business Law Section 349(a) "declares unlawful '[d]eceptive acts or practices in the conduct of any business.'"  *City of New York v. Smokes-Spirits.Com, Inc.*, 12 N.Y.3d 616, 621 (2009) (quoting N.Y. Gen. Bus. Law § 349(a)).  The statute also provides a private right of action to persons harmed by such conduct.  *Id.* (citing N.Y. Gen. Bus. Law § 349(h)).  "To successfully assert a section 349(h) claim, a plaintiff must allege that a defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice."  *Id.* (citing *Stutman v. Chemical Bank*, 95 N.Y.2d 24, 29 (2000)).  Practices courts have found to be deceptive include "false advertising, pyramid schemes, deceptive preticketing, misrepresentation of the origin, nature or quality of the product, false testimonial, deceptive collection efforts against debtors, deceptive practices of insurance companies, and 'Bait and Switch' operations."  *Teller v. Bill Hayes, Ltd.* 630 N.Y.S.2d 769, 773 (App. Div. 1995) (citing *Goldberg v. Manhattan Ford Lincoln-Mercury*, 492 N.Y.S. 318, 321 (N.Y. Sup. Ct. 1985) (collecting cases)).

Nungesser's claim fails at the first element.  New York courts consider consumer-oriented conduct to be "acts or practices that have a [broad] impact on consumers at large."  *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 25 (1995).  "In other words, the deceptive act or practice may not be limited to just the parties."  *Teller v. Bill Hayes, Ltd.*, 630 N.Y.S.2d 769, 772 (App. Div. 1995).  Nungesser does not claim that Columbia's conduct affected anyone except him.  His sole argument on this point is that Columbia's student population is "not a small population of people," Opp. Br. 23, but he does not claim that any other students were affected by the allegedly deceptive practices, and so does not adequately plead "consumer-oriented" conduct.  Defendants' motion to dismiss this claim is granted; the Court grants Nungesser leave to replead this claim.

### F.  Promissory Estoppel

"In New York, promissory estoppel has three elements: 'a clear and unambiguous promise; a reasonable and foreseeable reliance by the party to whom the promise is made, and an injury sustained by the party asserting the estoppel by reason of the reliance.'"  *Cyberchron Corp. v. Calldata Sys. Dev., Inc.*, 47 F.3d 39, 44 (2d Cir. 1995) (quoting *Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69, 73 (2d Cir. 1989)).  Nungesser alleges that Columbia's "various policies constitute representations and promises" that he relied upon.  AC ¶¶ 269-71.  These various policies, however, are the exact same policies at issue in Nungesser's breach of contract claim.  Nungesser's "claim for promissory estoppel is precluded because a breach of contract claim may not give rise to tort liability unless a legal duty independent of the contract . . . has been violated."  *O'Grady v. BlueCrest Capital Mgmt. LLP*, 111 F. Supp. 3d 494, 504 (S.D.N.Y. June 15, 2015) (citing *MatlinPatterson ATA Holdings LLC v. Fed. Express Corp.*, 929 N.Y.S.2d 571, 577-78 (App. Div. 2011); *see also Yu*, 97 F. Supp. 3d at 483 (holding that a claim for equitable estoppel fails where the university complied with its procedures and there was insufficient evidence of gender discrimination); *Ward v. New York Univ.*,

2000 WL 1448641, at *6 (S.D.N.Y. Sept. 28, 2000) (dismissing claim for promissory estoppel where claim was based on university policies and no specific promise or representation was identified).

Because Nungesser's claim for promissory estoppel is redundant, amendment would be futile and this claim is dismissed with prejudice. *See Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Secs., LLC*, 797 F.3d 160, 191 (2d Cir. 2015).

### G. Negligence

Nungesser claims that Columbia owed him, as a student, a duty of care to protect him from tortious acts of third parties.  Columbia correctly points out, however, that New York courts have rejected the doctrine of *in loco parentis* at the university level.  *See Eisman v. State*, 70 N.Y.2d 175, 190 (1987).  Nungesser cites *Doe v. University of the South*, a case from the Eastern District of Tennessee, for the proposition that in the context of sexual misconduct cases universities owe their students a duty of care.  Opp. Br. 25 (citing 4:09-cv-1258104, 2011 WL 1258104 at *21 (E.D. Tenn. Mar. 31, 2011)).  But Nungesser's negligence claim is governed by New York law.  The Court declines to extend established New York law by finding that a duty of care exists on the facts as alleged.  *See Trans World Metals, Inc. v. Southwire Co.*, 769 F.2d 902, 908 (2d Cir. 1985) ("As a federal court sitting in diversity, we will not extend the application of this state law").  This claim is dismissed with prejudice, as repleading would be futile under New York law.  *See Loreley Fin.*, 797 F.3d at 191.

### H. Intentional Infliction of Emotional Distress

Nungesser's final claim is for intentional infliction of emotional distress.  In New York, in order to state a claim for intentional infliction of emotional distress, a plaintiff must allege (1) extreme and outrageous conduct; (2) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (3) a causal connection between the conduct and injury; and

(4) severe emotional distress.  *Howell v. New York Post Co., Inc.*, 81 N.Y.2d 115, 121 (N.Y. 1993).

Nungesser has failed to plead facts supporting the first and second elements of this claim.

Nungesser has not alleged conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  *Id.* at 122 (quoting *Murphy v. Am. Home Prods. Corp.*, 58 N.Y.2d 293, 303 (N.Y. 1983)).  He clearly disagrees with how Columbia and its agents, including Bollinger and Kessler, chose to handle Sulkowicz's—and other students'—activism.  But the Court cannot conclude that the complaint plausibly pleads that Columbia's response was anything approaching "extreme and outrageous conduct."  Indeed, "even a false charge of sexual harassment does not rise to the level of outrage required" under New York law, *James v. DeGrandis*, 138 F. Supp. 2d 402, 421 (W.D.N.Y. 2001).  Additionally, Nungesser failed to plead any facts supporting an inference that Defendants *intended* to cause him distress.  Accordingly, Nungesser's claim for intentional infliction of emotional distress is dismissed.  The Court grants Nungesser leave to replead this claim.

## IV.  Conclusion

For the foregoing reasons, the motion to dismiss is GRANTED in its entirety.  Nungesser may file a second amended complaint with respect to the claims that were dismissed without prejudice within 30 days from the date of this order.  If no amended complaint is filed within 30 days, the Court will enter a final judgment of dismissal and direct the Clerk of Court to close this case.

SO ORDERED.

Dated:  March 11, 2016
New York, New York

_____

GREGORY H. WOODS
United States District Judge