UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

| | |
|---|---|
| PAUL NUNGESSER, | 15-cv-3216 (GHW) |
| Plaintiff, | |
| v. | |
| COLUMBIA UNIVERSITY, TRUSTEES OF COLUMBIA UNIVERSITY, LEE C. BOLLINGER, individually and as agent of Columbia University, JON KESSLER, individually and as agent of Columbia University, THOMAS VU-DANIEL, individually and as agent of Columbia University, and MARIANNE HIRSCH, individually and as agent of Columbia University, | **SECOND AMENDED & SUPPLEMENTED COMPLAINT** |
| Defendants. | **JURY TRIAL DEMANDED** |

-------------------------------------------------------------x

**PLAINTIFF PAUL NUNGESSER**, by and through his undersigned attorneys Nesenoff & Miltenberg, LLP, hereby alleges as follows:

## PRELIMINARY STATEMENT

1.      Plaintiff Paul Nungesser, a male former scholarship student at and now a graduate from Defendant Columbia University, brings this action against Defendants Columbia University, the Trustees of Columbia University, Columbia University's President Lee C. Bollinger, Columbia University's Visual Arts Professor Jon Kessler, the Director of Printmaking and Artistic Director of the LeRoy Neiman Center for Print Studies at Columbia University School of the Arts Thomas Vu-Daniel, and Director of Columbia University's Institute for Research on Women, Gender and Sexuality ("IRWGS") Marianne Hirsch (collectively, "Defendants"). Plaintiff Paul Nungesser asserts claims under Title IX of the Education Amendments of 1972, 20 U.S.C. §1681 *et seq.* ("Title IX") and state law for Defendants' knowing indifference to and

participation in gender-based harassment, sexual harassment of and gender-based misconduct[1] targeting Plaintiff Paul Nungesser that was known and participated in by Defendants, that was severe, pervasive and objectively offensive and that deprived Plaintiff Paul Nungesser of educational opportunities. To remedy these claims, Plaintiff Paul Nungesser seeks damages and declaratory relief.

## THE PARTIES

2.      Plaintiff Paul Nungesser ("Paul") is a German national who was a scholarship student at Columbia University, graduating in May 2015. During his time in the United States, he was living in the country as a non-resident alien with a valid F1 Visa. After graduation, Paul's remaining in the United States on this Visa would have required employment, but Paul was unable to secure such employment due to the events at issue in this case. As a result, Paul Nungesser has returned to Germany.

3.      Defendant Columbia University ("Columbia" or "Columbia University") is an elite private Ivy League University located in New York (Manhattan), New York. Upon information and belief, Columbia receives nearly $645,000,000 in federal funding for research and development.

4.      Upon information and belief, Columbia operates under a 1787 charter that places the institution under a Board of Trustees -- Defendant Trustees of Columbia University ("Board of Trustees"). Overall governance of Columbia lies in the hands of its twenty-four-member

---

[1] "Gender-based misconduct": this is the term Columbia University uses in its policies to describe all different kinds of behavior ranging from violent rape over intimate partner violence to offensive speech that potentially could result in discrimination. Under Columbia's policy sexual harassment, gender-based harassment, and intimate partner violence are subcategories of gender-based misconduct, which however are independent terms and also used in documents such as the Department of Education's Office of Civil Rights "Dear Colleague letters". This text also uses the term "sex-based harassment" whenever referring to texts which use this term also. "Sex-based harassment" is widely used synonymously with "gender-based harassment" (with the important difference that the latter shifts the focus from biology to cultural and social norms and opens the discussion to genders other than the traditionally male and female gender) and is nowhere found to mean "based on an act of sex."

Board of Trustees. The Board of Trustees is entrusted to select the President, oversee all faculty and senior administrative appointments, monitor the budget, supervise the endowment, and protect Columbia property.

5.      Defendant Lee C. Bollinger ("Defendant Bollinger") is the President of Columbia.

6.      Defendant Jon Kessler ("Defendant Kessler") is a Professor of Visual Arts at Columbia.

7.      Defendant Thomas Vu-Daniel ("Defendant Vu-Daniel") is Director of printmaking and Artistic Director of the LeRoy Neiman Center for Print Studies at Columbia University School of the Arts.

8.      Defendant Marianne Hirsch ("Defendant Hirsch") is the Director of Columbia's Institute for Research on Women, Gender and Sexuality (IRWGS).

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction pursuant to federal question jurisdiction under 28 U.S.C. § 1331 and diversity of citizenship jurisdiction under 28 U.S.C. § 1332.  For federal question jurisdiction, Paul invokes Title IX; and for diversity of citizenship jurisdiction, the Plaintiff Paul is a German national, the Defendants are New York citizens, and the amount in controversy well exceeds the statutory limit, exclusive of interest and costs.

10.      Venue in the Southern District of New York is proper pursuant to 28 U.S.C. § 1391 because all Defendants reside in this Judicial District and because a substantial part of the events or omissions giving rise to the claims occurred in this Judicial District.

[3]

## FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

### A.   Columbia University Exonerates Paul But Fails To Stop The Harassment Campaign Against Him.

11.     On November 1, 2013, a Columbia University Hearing Panel found Paul "not responsible" for the allegations of sexual assault made by a fellow student, Emma Sulkowicz. The Office of Gender-based Misconduct, led by Assistant Director Rosalie Siler, investigated Sulkowicz's allegations[2] for over seven months, including countless interviews, hearings, written statements, meetings and several dozens of e-mails as part of the fact finding process.

---

[2] Although Sulkowicz claimed that she was almost strangled to death and subject to a brutal anal rape in her dorm room in Summer 2012, there was not one single piece of evidence that could confirm her severe allegations:

    a.   There were no witnesses to Sulkowicz's alleged screams in the badly soundproofed student dorm.

    b.   There was no medical report, even though an attack as massive as described would have caused serious injuries requiring medical attention and would have left visible bruises on Sulkowicz's body for days.

    c.   There was no testimony from Sulkowicz's friends or family members who could confirm such injuries or changes in her behavior. On the contrary, in the days following the alleged attack, Sulkowicz participated in various social events with friends and with the fencing team. Given the multitude of social contact, any changes in behavior or physical injuries would have likely been noticed by people on campus or those close to Sulkowicz.

    d.   There were varying accounts by Sulkowicz as to whether and when she had spoken to anyone about the alleged assault: At times she claimed she hadn't spoken to anyone, not even her parents; at other times, she claimed that she told a few good friends. Her latest claim was that she spoke to a friend days after the alleged event who had to make clear to her that being nearly strangled to death and being penetrated anally while struggling against it and screaming "NO" constituted rape.

    e.   There was also no evidence whatsoever that Sulkowicz's attitude or behavior regarding Paul had changed after the alleged incident. On the contrary, Paul was able to present numerous love messages that Sulkowicz wrote to him before and after the alleged event with no apparent change in mood. Even though these messages were excluded as exculpatory evidence from the investigation, Columbia was informed about their existence and their content.

    f.   Columbia was also informed that Sulkowicz had a history of alleging sexual assault. During the investigation, Paul had provided further messages from Sulkowicz to Columbia, in which she alleged abuse and sexual assault by other students at Columbia University, including her former boyfriend. These messages, too, were excluded from evidence. Nonetheless, Columbia was informed that Sulkowicz had a history of claiming to be a victim of sexual assault and should have included this knowledge in its assessment of Sulkowicz's harassment campaign in the course of the events.

Evidence, which was not admitted in Columbia's investigation, such as written conversation also showed that Sulkowicz felt unbroken affection for Paul after the alleged incident:

    •   Two days after the alleged incident, on August 29, 2012, Paul Facebook messaged Sulkowicz to invite her to a gathering in his room, stating, "small shindig in our room tonight ~ bring cool freshmen." Sulkowicz messaged back four minutes later, "lol yussss – also i feel like we need to have some real time where we can talk about life and thingz." Paul immediately agreed, writing "word." Sulkowicz continued, "because we still haven't really had a paul-emma chill sesh since summmerrrrr." Paul responded "when are you guys

12.     The Hearing Panel in Paul's case consisted of: Robert J. Jenkins, Assistant Dean of Students at the School of General Studies; Sandra Garcia, Assistant Dean at the College of Dental Medicine; and Morgan Murray, Director of Disability Services at Barnard College. The Hearing Panel had to evaluate the allegations under the extremely low preponderance of evidence standard. Their finding was and is clear: even under this low burden of proof, Sulkowicz's allegations lacked credibility; in fact, Paul was innocent.[3]

13.     With Paul´s exoneration, a seventh-month long period of fear and uncertainty concluded – rumors were spread around the campus, friends had withdrawn from him, he had to move out of his dorm and his membership in several extra-curricular activities was suspended. However, the shock over what has occurred still remains: During his freshman year Paul developed a close friendship with Sulkowicz. They became "friends with benefits" and had sex on three occasions; however, Paul did not want to pursue a romantic relationship with Sulkowicz.[4]

---

coming through." Sulkowicz wrote, "I'll probs come at 10:45. Is that cool?0." Paul wrote back "sweet – yeah – you at the fencing thing." Sulkowicz wrote back "Yeah I'm just gonna chill with them for a bit haha is adp a rager?" Paul wrote back "naah – a little too many guys right now haha – so bring some peepz." Sulkowicz wrote back "Okay let them know I'll be der w da females spon." At 11:06 p.m., she messaged Paul "Ack are people still there? Heading over now."

- Paul remained at the ADP party but he and Sulkowicz did not see one another. The next day, he messaged her at 4:55 p.m., "part II tonight – you're coming?" She messaged him back seconds later, "lol i came and left already!!!" Paul responded, "lolcats – when were you here – I dont believe you – its not the truth – to the tune of pretty women."
- Two weeks later, on September 9, 2012, Sulkowicz messaged Paul, "I wanna see yoyouououou." Thereafter, Paul sent Sulkowicz a happy birthday message as follows: "oh hai. happy born day! you better be celebrating muchos, no? also: donde estas tu i mi viva – see i'm so desperate with out you, i even try to speak spanish. – anywho: merry happy days!" Sulkowicz responded, "I love you Paul. Where are you?!?!?!?!"

[3] The outcome notification letter Paul received on November 1[st,] 2013 states: "After careful consideration and review of the information provided to us through the investigative and hearing processes, the hearing panel found you not responsible for violating the policy based on the preponderance of evidence standard. (…) Therefore, the charge has been dismissed."

[4] Sulkowicz messaged Paul obsessively throughout the summer of 2012 with messages including: "wuv youuuu," – "i miss and love you btw" – "Paul i really miss you" – "i really mis you" – "Paul I wuv you so much. Please stay w me foevah" – "paul I miss you so much" – "like u know when you tell people you miss them and you don't really mean it? - i actually mean it – i miss you so much – ahhh" – "pookie – i miss you" – "I LOVE YOU – SO MUCH" – "I MISS YOU MORE THAN ANYTHING" – "I love youuuu" – "and I would LOVE to have you here – omg –

14.     Paul was a highly talented student with a wide range of interests: he wanted to produce films, create set designs and take part in the countless curricular and extra-curricular opportunities at Columbia and in New York – a dream come true after winning a prestigious scholarship to attend the university. Sulkowicz however, unable to accept his rejection, spent the next three years to destroy Paul's dream.

15.     In April 2013, Sulkowicz falsely accused Paul of sexual assault and instigated others to do the same.[5] Her goal, which she stated repeatedly during the investigation, was to have Paul expelled from Columbia, knowing that it would also force Paul to leave New York and the United States.

16.     As soon as Sulkowicz had filed her false allegations with the Office of Gender Based Misconduct, she started spreading rumors in order to motivate others to join her campaign against Paul.[6]

17.     At the end of the process that would eventually lead to Paul's exoneration in November 2013 and the rejection of Sulkowicz's appeal, Sulkowicz sought other means to force Paul out of Columbia. She sought counsel from Stanley Arkin, one of New York's most expensive attorneys and PR consultants.

18.     What followed was an unprecedented harassment campaign: Sulkowicz enabled reporters to stalk Paul, she defamed him as a "serial rapist," and her campaign resulted in Paul's

---

we could snuggle" – "PAUL I MISS YOU PAUL I MISS YOU PAUL I MISS YOU PAULLL" – "DUDE I MISS YOU SO MUCH" – "I love you Paul!!!!!!."

[5] Accusations against Paul were made by four different individuals. During the investigation process, Sulkowicz, Jane Doe#1 and Jane Doe#2 admitted collusion. John Doe, the fourth accuser, was also a friend of Sulkowicz and like Sulkowicz a student at Columbia's visual arts department. Paul was fully exonerated from all accusations.

[6] In April 2013, days after the she filed her report, Sulkowicz encouraged the President of ADP to notify its alumni board and several members that an alleged rapist was living at ADP. She also tried to convince other women to join her with false allegations against Paul, in order "to support her as a woman", as a fellow student, Jane Doe#3 told Paul in spring 2013. While Jane Doe#3 declined to file a false allegation she also declined to testify in front of the OGBM-Investigator, citing fear of retaliation by Sulkowicz's friends and other activists if she testified in Paul's favor.

public intimidation, isolation on campus and receipt of threats against him. Sulkowicz successfully initiated a media campaign against Paul leading to media outlets in over 35 countries reporting, encouraging complete strangers to demand Paul's murder, imprisonment and rape,[7] and almost completely destroying Paul's reputation and name.

19.     Throughout this ordeal, the Columbia University administration was fully aware of the lack of credibility of Sulkowicz's allegations, having conducted an investigation, held a hearing and exonerated Paul. They were also acutely aware of the harassment and witch-hunt unfolding on-campus against Paul, a then 21-year old international student with no friends or family in the United States outside of Columbia. But fearful of the media campaign unleashed by Sulkowicz,[8] Columbia administrators refused not only to support Paul as one of their students, but also they failed to dispel even the most obvious fabrications. Sulkowicz claimed that her allegations were swept under the rug, when in truth, far from it, they were investigated at length over a seven-month period and, after a hearing, were found without merit.

20.     Sulkowicz's harassment campaign could not possibly have been as widespread and as pervasive without Columbia University's actions and inaction. The escalation of Sulkowicz's harassment campaign into a global media spectacle was contingent upon the university's public silence coupled with university administrators discouraging Paul to speak out publicly as well as their failure to investigate Sulkowicz's violations of university policy[9]. Columbia's confidentiality policy was silencing Paul, but was being ignored by Sulkowicz without any action by Columbia. Even worse: after refusing to protect Paul and becoming a

---

[7] Compare also ¶¶ 137-155 of this document.
[8] A media campaign she had announced to start in her eventually unsuccessful attempt to appeal Paul's exoneration for the case the university would not grant her the appeal.
[9] In the letter that notified Paul of Sulkowicz's allegations he was, under the threat of disciplinary action, explicitly advised to "not discuss the incident with others."

[7]

silent bystander in a deliberately indifferent manner, Columbia University turned into an active

supporter of Sulkowicz's harassment campaign by institutionalizing it and heralding it.

**B.** **Columbia University Fails to Adhere To Its Own Policy and Encourages Sulkowicz's Gradual Escalation.**

21.   According to its policy effective in 2013, Columbia University is bound to

investigate when a university official gains knowledge of an allegation of gender-based

misconduct. [10]

22.   Columbia University policy recognizes "intimate partner violence" [11] as a form of

gender-based misconduct, which it defines as *"The use of physical violence, coercion, threats,*

*intimidation, isolation, stalking, or other forms of emotional, sexual or economic abuse directed*

*towards a partner in an intimate relationship* (…). *This includes any behaviors that intimidate,*

*manipulate, humiliate, isolate, frighten, terrorize, coerce, threaten, blame, hurt, injure, or wound*

*someone. Intimate partner violence can be a single act or a pattern of behavior in relationships."*

The policy explicitly includes sexual relationships that have already ended and those that only

existed briefly.[12]

23.   Despite the language around gender-based violence becoming increasingly

gender-neutral, women are still commonly only considered as potential victims of sexual

---

[10] "Any University official (e.g. Student Affairs staff, Advising and Residential Programs staff, Officers of Administration, Full-time and Adjunct Faculty, Teaching Assistants, etc.) informed of an allegation of gender-based misconduct against a student is expected to file a report with Student Services for Gender-Based and Sexual Misconduct." *Gender-Based Misconduct Policies for Students, January 2013* (the "2013-1 Policy"), p. 4; *Gender-Based Misconduct Policies for Students, August 2013* (the "2013-8 Policy"), p. 2.

[11] "Gender-based misconduct comprises a broad range of behaviors focused on sex and/or gender discrimination that may or may not be sexual in nature. Sexual harassment, sexual assault, gender-based harassment, stalking, and intimate partner violence are forms of gender-based misconduct under this policy. (…) Gender-based misconduct can be committed by anyone regardless of gender identity, and it can occur between people of the same or different sex or gender."(2013-1 Policy, p. 4; 2013-8 Policy, p. 2, emphasis added)

[12] „Intimate partner relationships are defined as short or long-term relationships (current or former) between persons intended to provide some emotional/romantic and/or physical intimacy"."(2013-1 Policy, p. 4; 2013-8 Policy, p. 2, emphasis added)

discrimination, intimate partner violence / dating violence and gender-based harassment. That they can also act as perpetrators in the same realm towards male victims, is largely disregarded.[13]

24.      Sulkowicz's behavior towards Paul fully fit the definition of intimate partner violence[14] as provided in Columbia's policy: They engaged in a brief, sexual relationship in 2012. Unable to accept the end of that relationship, Sulkowicz felt rejected and sought revenge.[15] Her attempt to get Paul expelled by filing a false accusation against him, failed and instead she experienced a second defeat when, as part of the university's investigation, Paul highlighted major discrepancies in her narrative, revealing a complete lack of credibility on Sulkowicz's part, and the university exonerated Paul.  This outcome, however, only strengthened Sulkowicz's resolve to have Paul removed from campus.[16]

---

[13] The American literature scholar and feminist Sharon Marcus calls this "the gendered grammar of violence". She writes: "The gendered grammar of violence predicates men as the objects of violence and the operators of its tools, and predicates women as the objects of violence and the subjects of fear." Marcus, Sharon (1992): *"Fighting Bodies, Fighting Words. A Theory and Politics of Rape Prevention".* In: Judith Butler, Joan W. Scott (ed.): *Feminists Theorize the Political.* New York, London Routledge, 1992, pp. 385-403, p. 393.

[14] Recent studies show the magnitude of the underestimated phenomenon of male victims of intimate partner violence: According to the *National Intimate Partner and Sexual Violence Survey (NISVS)* more than 1 in 3 women (35.6%) and more than 1 in 4 men (28.5%) in the United States have experienced rape, physical violence, and/or stalking by an intimate partner in their lifetime. (Black, M.C., Basile, K.C., Breiding, M.J., Smith, S.G., Walters, M.L., Merrick, M.T., Chen, J., & Stevens, M.R. (2011*): The National Intimate Partner and Sexual Violence Survey (NISVS): 2010 Summary Report.* Atlanta, GA: National Center for Injury Prevention and Control, Centers for Disease Control and Prevention, p. 2. http://www.cdc.gov/violenceprevention/pdf/nisvs_report2010-a.pdf, last accessed April 24, 2016.)

In analogy to Columbia's Policies, the CDC's definition of intimate partner violence includes "psychological aggression", which is defined as follows: "Use of verbal and non-verbal communication with the intent to: a) harm another person mentally or emotionally, and/or b) exert control over another person. (…) Psychological aggression can include, but is not limited to: Expressive aggression (e.g., name-calling, humiliating, degrading, acting angry in a way that seems dangerous) and "exploitation of victim's vulnerability (e.g., immigration status, disability, undisclosed sexual orientation)". (Breiding  MJ, Basile KC, Smith SG, Black MC, Mahendra RR. *Intimate Partner Violence Surveillance: Uniform Definitions and Recommended Data Elements, Version 2.0.* Atlanta (GA): National Center for Injury Prevention and Control, Centers for Disease Control and Prevention; 2015, p. 15, http://www.cdc.gov/violenceprevention/pdf/intimatepartnerviolence.pdf. Accessed April 24, 2016)

[15] Intimate partner violence after the end of a relationship is so far spread that there are a specific terms for it: "post-separation violence" or "post-separation abuse".

[16] As late as December 2014, during a conversation with art critic Roberta Smith Sulkowicz says about Paul: "The longer he stays the angrier I get with him. So ... I am angrier with him than I´ve ever been with him in my life." (YouTube/Brooklyn Museum (December 17, 2014): "Carry That Weight" https://www.youtube.com/watch?v=OMXp3RLOVNg, 1:03:28. Accessed April 24, 2016)

25.     Only days after Sulkowicz appeal was rejected and Paul's exoneration upheld, Sulkowicz reached out to Tara Palmieri,[17] a reporter from the *New York Post*, and identified Paul by providing Paul's name, his dorm address and e-mail.[18] On December 4, 2013, a reporter and a photographer ambushed Paul at the entrance to his dorm and confront him with Sulkowicz' false accusations. As a result, Paul's parents immediately informed President Bollinger, Provost Coatsworth and Title IX Coordinator Melissa Rooker.[19]

26.     Following the notice given to Columbia by Paul's parents, Columbia failed to initiate an investigation, despite its own policy requiring it to do so. Sulkowicz's actions constitute harassment against a previous sexual partner[20], which clearly meets the definition of

---

[17] The article is published December 11, 2013, in the *New York Post* (Palmeri, Tara: *Columbia drops ball on jock 'rapist' probe: students.* http://nypost.com/2013/12/11/co-eds-rip-columbia-over-athlete-rape-probes/. Accessed April 24. 2016). Even though the content suggests that all three students that are part of the campaign initiated by Sulkowicz have spoken with Tara Palmeri and even though the policy (see footnote 20) explicitly bans retaliation, their public denunciation of Paul, who Columbia rightfully exonerated, stays without consequences for the students.

[18] December 9, 2013, Tara Palmeri from the *New York Post* contacted Paul via e-mail, giving him a deadline till 5pm the same day to respond.

[19] From an e-mail sent December 4, 2013, 10.55am: "Dear President Bollinger, dear Provost Coatsworth, dear Melissa Rooker, with utter bewilderment we have just learned that our son was ambushed outside his residence by two reporters from the New York Post who were informed about the accusations against our son. (…) This retaliatory action represents a blatant violation of the Confidentiality Agreement according to Columbia policy. (…) We feel that Columbia shares a significant responsibility for the escalation which now takes place: There was clear evidence from early on during the investigation that the complainant was defaming our son. Her repeated violations of the Confidentiality Agreement remained without consequences. Given the fact that our son - though innocent - has endured almost seven months of severe so called 'interim measures', it is now high time that sanctions against those responsible for this public defamation be imposed. (…). Let us also know what actions are taken by Columbia to restore the good name of our son, especially, but not only, if an article should appear in the *New York Post*. Sincerely, Andreas Probosch and Karin Nungesser"

[20] In the Department of Education's Office of Civil Rights "Dear Colleague Letter" from October 2010, a strikingly similar case - with reversed gender roles - serves as the paradigmatic example for sexual harassment under Title IX:

**"Title IX: Sexual Harassment**
*Shortly after enrolling at a new high school, a female student had a brief romance with another student. After the couple broke up, other male and female students began routinely calling the new student sexually charged names, spreading rumors about her sexual behavior, and sending her threatening text messages and emails. One of the student's teachers and an athletic coach witnessed the name calling and heard the rumors, but identified it as "hazing" that new students often experience. They also noticed the new student's anxiety and declining class participation. The school attempted to resolve the situation by requiring the student to work the problem out directly with her harassers.*
Sexual harassment is unwelcome conduct of a sexual nature, which can include unwelcome sexual advances, requests for sexual favors, or other verbal, nonverbal, or physical conduct of a sexual nature. Thus, sexual harassment prohibited by Title IX can include conduct such as touching of a sexual nature; making sexual comments, jokes, or gestures; writing graffiti or displaying or distributing sexually explicit drawings, pictures, or written materials; calling students sexually charged names; spreading sexual rumors;

intimate partner violence found in Columbia's Policies, is thus considered gender-based misconduct and must be investigated accordingly.[21]

27.    In addition, Columbia´s policy[22] effective at the time prohibited retaliation against anyone involved in a gender-based misconduct investigation, explicitly including retaliation against the respondent, regardless of the reasons for the retaliation[23]. The punishment for cases of retaliation according to the Columbia's Policies is "disciplinary action,"[24] but Columbia failed to even initiate an investigation against Sulkowicz.

28.    Columbia's failure to properly investigate Sulkowicz's action had serious consequences: encouraged by the lack of disciplinary action against her, Sulkowicz reached out to Columbia student Anna Bahr, who prepared a detailed article for the student publication

---

rating students on sexual activity or performance; or circulating, showing, or creating emails or Web sites of a sexual nature." (http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201010.pdf, p.6. Accessed April 26, 2016)

[21] The policy is phrased gender neutral – "Gender-based misconduct can be committed by anyone regardless of gender identity" – and has to apply to female perpetrators and male victims, therefore such behavior has to be investigated and sanctioned if applicable. However, an investigation never occurred.

[22] Under „Confidentiality, Privacy, & Non-Retaliation Policy" the policy states: "Retaliation against any person involved in the investigation, including the complainant, respondent, witnesses, or the investigators, is strictly prohibited and may result in disciplinary action, including additional interim or permanent measures. The University defines retaliation as any adverse action taken against an individual who has participated in any manner in an investigation, proceeding, or hearing under these policies and procedures." (2013/8 Policy, pp. 10,11, emphasis added)

[23] Columbia amended the Policy in 2014: The 2014-8 Policy states „The University strictly prohibits retaliation against and intimidation of any person because of his or her reporting of an incident of gender-based misconduct or involvement in the University's response". As a result it is not applicable for the events that are recounted here because it was not in effect at the time. However, also the mattress project, which started after August 2014, was in retaliation to Paul's participation in the investigation. The sexual relationship at that point is over two years ago. If Paul had not participated in the university investigation and given up any opportunity to defend himself and present exonerating evidence, he likely would have already been expelled from the university at that time. As such, the investigation itself and Paul's resulting exoneration present a necessary condition for Paul's continued presence on campus in 2014. Most of all, Sulkowicz' actions beginning in November 2013 address primarily the defeat and the perceived slight derived from Paul's exoneration and her desire to punish him for that defeat. Thus her actions by all means represent "retaliation against and intimidation of any person because of his or her reporting of an incident of gender-based misconduct or involvement in the University's response".

[24] When, if not in a case like the one at hand, where the investigation reached a result where the accusations are not found credible, it should be incumbent upon the university exercise its ability to sanction a complainant for retaliatory behavior?

[11]

BWOG. While names were substituted through pseudonyms, the article contained a plethora of details, making Paul easily identifiable to a large part of the Columbia community.[25]

29.     As part of writing her article, Anna Bahr reached out to Paul. Contacting his academic advisor, Paul was urged not to comment by Columbia administrators.[26] By doing so, Columbia administrators allowed Sulkowicz's false and debunked accusations to circulate without public rebuttal.

30.     In early April 2014, Sulkowicz appeared publicly at a press conference with Senator Kirsten Gillibrand, hosted on the Columbia campus, in Columbia facilities. There, Sulkowicz presented herself as a survivor of sexual violence, thus making Paul clearly identifiable to her friends as the alleged perpetrator.

## C.    Columbia University Panders to Sulkowicz's Campaign and Enables a Hostile Environment on Campus.

31.     Five months after Paul had been cleared of Sulkowicz´s accusation, Paul was spending a semester with a prestigious study abroad program at a renowned film school in Prague, something he had planned and dreamt of even before Sulkowicz had filed her false accusation. In the meantime, Sulkowicz was working tireless on her harassment campaign, advised by a PR consultant. While Paul's reputation on campus was largely destroyed, Sulkowicz had yet to succeed to get Paul's name published in the media.

32.     In May 2014, flyers and graffiti appeared on campus, containing a "rapist list," denouncing Paul with his full name and identified as a "serial rapist". It was quickly leaked to the student media. Even though a majority of Columbia facilities have CCTV, the administration failed to investigate and sanction those responsible.[27] Columbia administrators did not even see

---

[25] This two-part article has a length of over 9000 words.

[26] Paul, still under the gag order from his notification letter, obeyed.

[27] Instead Columbia issued the following statement and re-interpreted a public witch hunt as a civilized 'debate':

the necessity to inform Paul that a witch-hunt had been unleashed on campus, threatening his safety[28] and that his name had now been made public.

33.     Also in May 2014, Sulkowicz's media coverage snowballs, most notably Sulkowicz's op-ed in *Time Magazine*, entitled "My Rapist is Still on Campus."[29] Not even the fabrication that Paul was on campus (he was in Prague) was corrected by Columbia[30] - quite the opposite, public statements were issued by the Columbia administration and President Bollinger that aimed to appease Sulkowicz and highlight the institution's empathy for "survivors of sexual violence."[31] Public empathy, however, for a student that they themselves exonerated but was now being publicly denounced as a "serial rapist" was non-existent.

34.     On May 14, 2014, Sulkowicz filed a police report in order to have Paul's full name printed in the press. Sulkowicz leaked the report immediately to George Joseph, Title IX activist at Columbia.[32] On May 16, 2014, the student newspapers Columbia Spectator[33] and

---

The University is mindful of the multiple federal laws that govern these matters and provide important protections to survivors of sexual violence and to students engaged in our investigative process. These laws and our constitutional values do not permit us to silence debate on the difficult issues being discussed. (http://edition.cnn.com/2014/05/14/us/columbia-university-flier-rapes/. Accessed April 24, 2016)

[28] Various comments under publications of the events in student media (Bwog and Columbia Spectator) openly threatened violence, murder and revenge rape for the people on the list, commenters demanded the publication of the names of the people on the list. These comments were subsequently removed from the sites.

[29] Sulkowicz stated, among other things, "Every day, I am afraid to leave my room". See Sulkowicz, Emma: *'My Rapist is still on Campus'*. Time Magazine, May 15, 2014. http://time.com/99780/campus-sexual-assault-emma-sulkowicz/. Accessed April 24, 2016.

[30] Sulkowicz knew fully well that Paul was far away in Prague. See Van Syckle, Katie: *After Police Report, Columbia Spectator Publishes Name From Campus 'Rape List'*. NY Magazine, May 18, 2014. http://nymag.com/daily/intelligencer/2014/05/columbia-spectator-prints-name-from-rape-list.html. Accessed April 24, 2016.

[31] Columbia by no means refrained from public commentary as a whole of the case as Columbia admins repeatedly told Paul and his parents, it merely refrained from commenting in favor of the student of whose innocence they were convinced enough to exonerate him under a preponderance of evidence standard.

[32] Already the next day, May 15, 2014, at 7pm, George Joseph contacted Paul via e-mail about the police report.

[33] See Bogler, Emma: *Frustrated by Columbia's inaction, student reports sexual assault to police*. Columbia Spectator, May 16, 2014. http://columbiaspectator.com/news/2014/05/16/frustrated-columbias-inaction-student-reports-sexual-assault-police. Accessed April 24, 2016. Abrams, Abby and Steven Lau: *Why we published the name of an alleged rapist*. Columbia Spectator, May 16, 2014. http://columbiaspectator.com/2014/05/16/why-we-published-name-alleged-rapist. Accessed April 24, 2016.

Bwog[34] published Paul's full name. Columbia again failed to correct the most fundamental lie of Sulkowicz, who claimed that the university never investigated.[35]

35.     Columbia University, priding itself as a bastion of civil liberty and democratic principles, had now completely yielded to the public witch hunt and mob justice raging against one of its own students. While continuing to pander to the headlines of the day, any references to the basic principles of justice like due process and the presumption of innocence,[36] were absent. The message sent to Sulkowicz by the university, however, was clear:   Columbia's administration, which investigated Sulkowicz's claims and found them unsubstantiated, would allow her harassment campaign, regardless of how damaging to Paul it might be.

## D.   Columbia University Fails To Provide Effective Remedy and Relief To Paul For Hostile Environment.

36.     With the situation on the Columbia campus escalating and Paul's return to campus scheduled for August 2014, Paul and his parents repeatedly reached out to Columbia administrators Monique Rinere and Jeri Henry as well as Defendant Bollinger, asking for Columbia's measure to ensure his safety and unhindered access to educational opportunities for his senior year at Columbia. Stonewalling Paul's request for information regarding his return to New York, on information and belief, these Columbia officials were hoping that Paul would simply be too afraid return to Columbia. Rather than searching for possible solutions involving

---

[34] See *Emma Sulkowicz Files Police Report For Sexual Assault.* Bwog, May 16, 2014.
http://bwog.com/2014/05/16/emma-sulkowicz-files-police-report-for-sexual-assault/. Accessed April 24, 2016.
[35] "At the end of the day, my rapist still goes to this school and they haven't done anything about that," Sulkowicz said. "What good is all this if I know my serial rapist is still going to be attacking women on campus?"
See Bogler, Emma: *Frustrated by Columbia's inaction, student reports sexual assault to police.* Columbia Spectator, May 16, 2014.
[36] Columbia's own *Rules of Conduct*, which "are University-wide and supersede all other rules of any school or division",  contain a strong commitment to the presumption of innocence: "All members of the University community are assumed to be innocent until proven guilty of a violation of the Rules." (Columbia University: *Rules of University Conduct.* In: Columbia University in the City of New York: Essential Policies for the Columbia Community 2013-2014. http://www.essential-
policies.columbia.edu/files_facets/imce_shared/Essential_Policies_2013-14.pdf. Accessed April 24, 2016, p.5-9. p. 5, emphasis added)

[14]

protecting Paul on campus, they only came up with a single suggestion: to take a yearlong academic leave and return the year following Sulkowicz's graduation. [37]

37.    It was only due to Paul's exceptional moral strength, his courage and his principled character that he did not give in to Columbia's hope but instead returns to campus. He had earned his place at one of the foremost U.S. American universities, had done no wrong and had cooperated with the investigation against him in any way possible. Since he was fully exonerated, Paul felt he had every right to continue his studies in New York, just as much as any other student at Columbia.

38.    On August 11, 2014, Paul returned to New York early in order to attend a voluntary interview with New York County District Attorney's Office von Assistant District Attorney Kat Holderness and Assistant District Attorney Martha Bashford. Immediately thereafter, Kat Holderness informed Paul's criminal lawyer that no charges would be brought against Paul.[38] As a result, Paul had not only been cleared from any allegations by Columbia University internal proceedings, but also the District Attorney's Office had re-affirmed the lack of credibility to Sulkowicz's false accusations.

39.    Despite Paul's renewed exoneration, Sulkowicz's efforts to vilify Paul had already considerably damaged Paul's reputation on campus and beyond. In Berlin, he had lost a cinematography job for a TV Pilot in summer 2014. While the producers were convinced of Paul's innocence, they were afraid to lose financing if Paul's name were linked to the project. On

---

[37] It seems particularly disdainful to make this kind of proposal to someone who was exonerated – where would be the difference to a student found guilty and sanctioned to a year-long suspension?

[38] Sulkowicz three weeks later represents the situation as if it was her decision to end the DA's investigation, when it was in fact the DA's office that had declared it wouldn't pursue the case: *"I decided I didn't want to pursue it any further because they told it me it would take nine months to a year to actually go to court, which would be after I graduated and probably wanting to erase all of my memories of Columbia from my brain anyway, so I decided not to pursue it."* Van Syckle, Katie: *The Columbia Student Carrying a Mattress Everywhere Says Reporters Are Triggering Rape Memories.* NY Magazine, Sept. 4, 2014. http://nymag.com/thecut/2014/09/columbia-emma-sulkowicz-mattress-rape-performance-interview.html. Accessed April 24, 2016. As many of the comments pointed out, her desire to forget did not prevent her from carrying a mattress across campus for nine months.

a New York feature film, still in pre-production, where Paul was asked to work as director of photography, the director suddenly stopped all communication after Paul's name was published in countless news sources.

### E.   Columbia University Turns into an Active Supporter of Sulkowicz's Campaign and Directly Sponsors Gender-Based Harassment against Paul.

40.     In August 2014, Sulkowicz's efforts to wreak havoc on Paul's life were reignited by Columbia Professor Defendant Kessler. Defendant Kessler directed Sulkowicz to transform her Columbia tolerated personal vendetta against Paul into a Columbia-sponsored and course-approved activity. Defendant Kessler and Sulkowicz jointly designed the "Mattress Project" as her senior thesis project. "The Mattress Project," named "Carry That Weight" involved Sulkowicz carrying a mattress around campus at all times during her senior year. Under the guise of "performance art," Sulkowicz's thesis project was solely focused on Paul. The idea that it was just an "expression of personal or political views"[39] stands in stark contrast to countless statements made by Sulkowicz publicly about the true goals of her project.

41.     Sulkowicz had failed to get Paul expelled from Columbia with her false allegations. Because Paul successfully participated in the investigation against him and proved his innocence as well as the baselessness of her allegations, Sulkowicz became furious.

42.     Her actions now concentrated on her goal as to have Paul withdraw from the University with means of public shaming. She was impressed by the actions of Lena Sclove, a Brown University student who had publicized the name of a male student suspended by Brown

---

[39] A comment issued by Columbia at the beginning of the "Mattress Project" concluded as follows (emphasis added): "The University respects the choice of any member of our community to peacefully express personal or political views on this and other issues [=gender-based misconduct and sexual violence]. At the same time, the University is committed to protecting the privacy of students participating in gender-based misconduct proceedings. These matters are extremely sensitive, and we do not want to deter survivors from reporting them. The University therefore does not comment on these matters." Taylor, Victoria: *Columbia University student vows to carry mattress everywhere while alleged rapist remains on campus*. Daily News, September 3, 2014. http://www.nydailynews.com/life-style/columbia-student- carrying-mattress-long-alleged-rapist-campus-article-1.1926393. Accessed April 24, 2016.

[16]

University for sexual misconduct.[40] Like Lena Sclove, Sulkowicz intended to publicize Paul's name such that he would withdraw from Columbia. Sulkowicz stated as follows:

> I was recently friended on Facebook by Lena Sclove, who has been such an inspiration for me, and to see the way that she was able to create a safe space for herself definitely made me realize that after I had made the police report I had that as an option to me as well.[41]

43.    Subsequent statements show how the mattress project was inextricably bound to Sulkowicz's goal of shaming Paul away from campus:

> "I hope that when my attacker sees me doing this piece he will want to leave on his own."[42]

> (Question:) So what do you think — realistically — is the best outcome that could come from all this? (Sulkowicz:) That he would leave campus and I wouldn't have to carry the mattress anymore. [43]

> The protest in mind, I ask if she can articulate exactly what she (Sulkowicz) wants to convey to Columbia. "Get my rapist off campus." She says it slowly, enunciating, putting into words what her piece shows. But she laughs and atones for her gravity: "…in those few words."[44]

> She (Sulkowicz) has said she will carry the mattress around campus until the male student who she alleges raped her leaves Columbia, either by university action or his own volition.[45]

> "Yeah, until—I will carry the mattress with me to all of my classes, every campus building, for as long as my rapist stays on the same campus with me." [46]

---

[40] While there exist serious doubts about the credibility of Sclove's claims, Sclove was also heralded by Senator Gillibrand. The expression „creating a safe space for me" as used by Sclove and Sulkowicz has become an atrocious euphemism for shaming away people by resorting to mob justice and inspiring public witch hunts.

[41] Van Syckle, Katie: *After Police Report, Columbia Spectator Publishes Name From Campus 'Rape List'*. NY Magazine, May 18, 2014. http://nymag.com/daily/intelligencer/2014/05/columbia-spectator-prints-name-from-rape-list.html. Accessed April 24, 2016.

[42] Frej, Willa: *I Just Want My Campus Back*. MSNBC, August 29, 2014. http://www.msnbc.com/ronan-farrow-daily/i-just-want-my-campus-back. Accessed April 24, 2016.

[43] Ehrlich, Brenna: *What's It Like To Become A Mattress-Carrying Voice For Rape Survivors? We Asked*. MTV News, September 4, 2014. http://www.mtv.com/news/1920622/emma-sulkowicz-interview-mattress-rape-survivor/. Accessed April 24, 2016.

[44] Grasdalen, Taylor: *Speaking With Emma Sulkowicz*. Bwog, September 5, 2014. http://bwog.com/2014/09/05/speaking-with-emma-sulkowicz/. Accessed April 24, 2016.

[45] Jacobs, Peter: *The Columbia Student Who's Carrying A Mattress Until Her Alleged Rapist Leaves Campus Says She's Getting A Ton Of Support*. Business Insider, September 10, 2014. http://www.businessinsider.com/columbia-student-emma-sulkowicz-still-carrying-mattress-around-campus-2014-9?IR=T. Accessed April 24, 2016.

[17]

44.    As the foregoing quotes demonstrate, the thesis project's duration was directly tied to Paul's presence on the Columbia campus. If Sulkowicz had been successful with her harassment and Paul had indeed left the campus, she would have stopped carrying the mattress and ended the project. In the face of these facts, to claim that the thesis project was not focused on forcing Paul to leave campus is absurd and intellectually dishonest.

45.    "The Mattress Project" was also inseparably connected to Paul's name: Sulkowicz used her many public appearances to remind the public of Paul's identity.[47]

46.    Columbia University employees did repeatedly afford special privilege to Sulkowicz, going directly against university policy, by allowing her to bring the mattress to the library as well as using the campus transportation.

47.    Even more damaging, however, were countless statements made by employees of Columbia University in direct support of Sulkowicz's harassment. Defendant Kessler not only

---

[46] *"We Will Not Be Silenced": Students Denounce Rape at Columbia as Schools Face Scrutiny for Inaction.* (Video and transcript). Democracy Now, September 9, 2014.
http://www.democracynow.org/2014/9/16/we_will_not_be_silenced_students. Accessed April 24, 2016.
[47] Sulkowicz publicly stated that her sole intention in filing a police report was to get Paul's name published and as soon as that goal was achieved she stopped cooperating with the police:
*"'One of my main goals was to have his name somewhere (...)', Sulkowicz told Daily Intelligencer!"* (Van Syckle, Katie: *After Police Report, Columbia Spectator Publishes Name From Campus 'Rape List'.* NY Magazine, May 18, 2014. http://nymag.com/daily/intelligencer/2014/05/columbia-spectator-prints-name-from-rape-list.html. Accessed April 24, 2016.)
In a *NY Mag* cover story from September 21, 2014, where Sulkowicz explained her bullying campaign in length, Paul is named 15 times. See Grigoriades, Vanessa: *Meet the College Women Who Are Starting a Revolution Against Campus Sexual Assault.* NY Magazin, September 21, 2014. http://nymag.com/thecut/2014/09/emma-sulkowicz-campus-sexual-assault-activism.html?mid=twitter_nymag. Accessed April 24, 2016.
A few weeks later, on October 29, 2014 along with several others, Sulkowicz presents written demands to the university addressed to President Bollinger himself and pinned on his door. Paul is named with his full name, called a "serial perpetrator" and "an ongoing threat to the community". See *Carry That Weight Day Of Action At Columbia.* Bwog, October 29, 2014. http://bwog.com/2014/10/29/carry-that-weight-day-of-action-at-columbia/. Accessed April 24, 2016.
On December 14, 2014 Sulkowicz repeatedly named Paul during a public talk at the Brooklyn Museum. When NYT art critic Roberta Smith asked what Sulkowicz planned to do if Paul didn't "die of shame and embarrassment" before graduation as a result of Sulkowicz's bullying campaign, Sulkowicz reacted with an approving outburst of joyful laughter. A video recording of that talk is still available today, the quote occurs at 55:13 (https://www.youtube.com/watch?v=OMXp3RLOVNg)

[18]

approved Sulkowicz's "The Mattress Project" for course credit and helped her to design it,[48] but also publicly endorsed her harassment and defamation of Paul, stating: *"carrying around your university bed – which was also <u>the site of your rape</u> – is an amazingly significant and poignant and powerful symbol . . . with all this evidence coming up ... it's so clear the way uni [sic] feels about this issue."*[49] It should be noted, that Jon Kessler in his official capacity as a professor of Columbia University publicly refers to Sulkowicz's accusation as fact, completely ignoring the investigation, Paul's subsequent exoneration and his duty to adhere to the privacy and confidentiality regulations from Columbia's policies and laws such as FERPA.[50]

48.    Defendant Kessler was not the only Columbia University employee that actively supported Sulkowicz's harassment campaign and represented her false accusation that Paul had committed rape as fact, directly defaming Paul. The Institute for Research on Women, Gender, and Sexuality (IRWGS), an official institute of Columbia University, publicized its support for Sulkowicz's harassment on September 9, 2014, on the official Columbia website and announced the closure of its institute for the duration of a solidarity march for Sulkowicz:

---

[48] "The impulse was there for her to carry the bed around, and she didn't necessarily have the information as to how that would fit into the context or the history of performance art," said Defendant Kessler, a professor at Columbia who advised Sulkowicz on the piece. "So this summer we got involved in phone conversations about the nature of endurance art, talking about pieces by Tehching Hsieh and Marina and Ulay and Chris Burden.
"But what struck me from the get-go," Kessler added, "is that, more than any of those people, Emma's work comes from something which is so much more personal and so much deeper and so much less of a programmatic idea about what to do, but really about working something out cathartically and also making an enormous statement for change. And that's what makes it so powerful." (Steinhauer, Jillian: Two Weeks Into Performance, Columbia Student Discusses the Weight of Her Mattress. Hyperallergic, September 17, 2014.
http://hyperallergic.com/149368/two-weeks-into- performance-columbia-student-discusses-the-weight-of-her-mattress. Accessed April 24, 2016.)
Sulkowicz later publicly declared that without Kessler the mattress project would not have been possible:
(https://www.youtube.com/watch?v=1meMY1CBD-U, accessed April 24, 2016)
[49] See Bogler, Emma: Emma Sulkowicz's performance art draws support from campus activists. Columbia Spectator, Sept. 2, 2014. http://columbiaspectator.com/news/2014/09/02/emma-sulkowiczs-performance-art-draws-support-campus-activists. Accessed April 24, 2016
[50] At this point of time, Paul's name is automatically suggested by Google's autocomplete after entering the search terms „Sulkowicz" and „rape".



49.    On September 12th, 2014 IRWGS@Columbia, the official Twitter account of Columbia's Institute for Research on Women, Gender and Sexuality tweeted about the mattress rally at the beginning of the semester in support of "No Red Tape":



50.     Ten days later, on September 22, 2014, the IRWGS published a longer article on a Columbia-owned website, showing complete disregard for the presumption of innocence as enacted by Columbia's Rules of Conduct: The article presented it as a fact that Paul had raped Sulkowicz, calling Sulkowicz a survivor.[51]

51.     In a cover story of the *NY Magazine*, published on September 21, 2014, regarding Sulkowicz, Defendant President Lee C. Bollinger stated:

> This is a person who is one of my students, and I care about all of my students. And when one of them feels that she has been a victim of mistreatment, I am affected by that. This is all very painful.[52]

52.     "Victim of mistreatment" and "painful": these terms, however, more accurately describe Paul's experience caused by the media fallout from Sulkowicz´s harassment against Paul and Columbia´s failure to protect him. Still without any effective support from Columbia administrators, despite Paul having reached out to them time and again, a global media campaign unfolds following the begin of the mattress project in late August 2014: In the United States, Argentina, Brazil, Colombia, Mexico, Panama, Peru, in Austria, Belgium, Croatia, Czech Republic, Denmark, France, in Paul´s home country Germany, in Greece, Hungary, Ireland, Italy, Netherlands, Norway, Poland, Romania, Slovakia, Spain, Switzerland, Sweden, Turkey, United Kingdom, in China, India, Sri-Lanka, Vietnam, and in Australia and New Zealand almost all

---

[51] In this article the IRWGS states: "In solidarity with Sulkowicz's aptly titled 'Mattress Performance: Carry That Weight' - in which Sulkowicz has promised to carry a mattress to each of her classes so long as she attends school with the same student who sexually assaulted her – Allie Rickard (BC '15) and a group of students have committed to organizing a series of what they consider to be 'collective carries.' The group, organized under the name Carry That Weight Together, hopes 'to help Emma carry the weight of the physical mattress, give her and other survivors of sexual assault in our community a powerful symbol of our support and solidarity, and show the administration that we stand united in demanding better policies designed to end sexual violence and rape culture on campus.'" (http://irwgs.columbia.edu/blog/carrying-weight-together-activism-sexual-violence-and-tranforming-justice-columbia. Accessed April 24, 2016)

[52] Grigoriades, Vanessa: *Meet the College Women Who Are Starting a Revolution Against Campus Sexual Assault.* NY Magazin, September 21, 2014. http://nymag.com/thecut/2014/09/emma-sulkowicz-campus-sexual-assault-activism.html?mid=twitter_nymag. Accessed April 24, 2016. See also Baruha, Mihika: NY Magazine publishes cover story on anti-sexual assault movement at Columbia. Columbia Spectator, September 21, 2014. http://columbiaspectator.com/spectrum/2014/09/22/ny-magazine-publishes-cover-story-anti-sexual-assault-movement-columbia. Accessed April 24, 2016. That this alleged mistreatment was investigated and the accusations dismissed, however, is left out, providing further credibility to Sulkowicz's agenda.

[21]

major TV stations, newspapers and online news sources report about the "courageous student Emma Sulkowicz and her protest." Paul's name was either directly mentioned or just one click away – most of the media outlets link the Columbia Spectator article[53], in which Abby Abrams and Steven Lau on May 16, 2014[54] decided to print Paul's full name, as well as a video by the Columbia Spectator about "Carry That Weight," which received almost 2.235 Million views as of April 20, 2016[55].

53. For the media, "The Mattress Project" not only provided "viral" images, it also portrayed Sulkowicz's false accusations as true. Why else would Columbia University permit such a spectacle against another student on its campus? Why else would there be appeasement of Sulkowicz and the activists of "No Red Tape" and "Carry That Weight,"[56] who formed an active part of Sulkowicz's harassment tactics?[57] This defamatory media storm against Paul would never have occurred had Columbia early on stated publicly that the allegations were properly investigated and found not credible by the university hearing panel.

---

[53] Bogler, Emma: *Frustrated by Columbia's inaction, student reports sexual assault to police.* Columbia Spectator, May, 16, 2014. http://columbiaspectator.com/news/2014/05/16/frustrated-columbias-inaction-student-reports-sexual-assault-police, accessed April 24, 2014.
[54] Abrams, Abby and Steven Lau: *Why we published the name of an alleged rapist.* Columbia Spectator, May, 16, 2014. http://columbiaspectator.com/2014/05/16/why-we-published-name-alleged-rapist, accessed April 24, 2014.
[55] See https://www.youtube.com/watch?v=l9hHZbuYVnU (YouTube, Sept. 2, 2014).
[56] On the "Carry That Weight" Facebook page, activists and official hosts of events Zoe Ridolfi Starr and Allie Richard stated: "This campaign is inspired by the activism and art of Emma Sulkowicz, who is boldly carrying a dorm mattress around campus with her as long as her rapist continues to attend Columbia University." See https://www.facebook.com/events/1550372131902005, accessed April, 26, 2016.
[57] How far Columbia's policy of appeasement went was documented by the promotion of one of the leading activists behind the defamatory harassment campaign against Paul, Michaela Weihl, to become a member of the Presidential Advisory Committee for Sexual Assault as well as the Special Task Force of Suzanne Goldberg on the Sexual Respect initiative, advising on important university policy changes. Michaela Weihl as well as other Columbia student activists from "No Red Tape" and "Carry That Weight" had taken part in substantial public defamation against Paul, calling him publicly "an ongoing threat to the community" at the "National Day of Action". In December 2014, Michaela Weihl together with Allie Rickard, Becca Breslaw, and Zoe Ridolfi-Starr read a letter at Defendant Bollinger's office containing the following passage: "Since then, Emma Sulkowicz's senior thesis Mattress Project: Carry That Weight has called national attention to the injustices survivors have been forced to carry alone for too long. You have not responded once to this piece, and her serial rapist remains on campus today." See Armus, Teo: *Activists deliver mattress representing check and letter to Bollinger in protest of cleanup fee.* Columbia Spectator, December 15, 2014. http://columbiaspectator.com/spectrum/2014/12/15/activists-deliver-mattress-representing-check-and-letter-bollinger-protest. Accessed April 24, 2016, emphasis added.

54.     Sulkowicz harassment campaign intensified during the first "National Day of Action" on October 29, 2014. Columbia University's Institute for Research in Women, Gender and Sexuality mobilizes for participation and writes on its website about Sulkowicz: *"[she] is boldly carrying a dorm mattress around campus with her as long as her rapist continues to attend Columbia University."*[58]

55.     Even though most of the gatherings at universities across the country consisted only of a handful of students carrying mattresses and pillows, the media response was huge. At Columbia, Sulkowicz gave a speech to a roaring crowd, that was paraphrased by reporter Amanda Hess the next day as follows:

> "When Sulkowicz seized the megaphone to deliver the rally's final speech, wind and rain drew listeners closer. 'I don't need to say his name,' Sulkowicz said of the man she says attacked her. 'You know who it is.'"[59]

56.     Later that day of the "National Day of Action," the activists, among them Sulkowicz, delivered a mattress to Defendant Bollinger on which they had written their demands -- demands that were read to the public and were published in writing on one of the mattresses which was signed by activists, including Sulkowicz. A letter with the same demands was posted at his door.[60] The last demand explicitly alleged that Paul posed "an ongoing threat to the community":

---

[58] They further write: "Carrying a mattress with others brings us together to collectively help carry the weight, shows our shared support for survivors, and our collective commitment to working together toward cultural and community-level change to end sexual and domestic violence. Through this powerful demonstration of solidarity, participants will tangibly express their commitment to lift the burden of sexual violence from the shoulders of survivors—to carry the weight together. Will you join us to help carry that weight? Please invite your friends, family, and colleagues!" (October 29, 2014): Carry That Weight Day Of Action Happening TODAY! (http://irwgs.columbia.edu/blog/carry-weight-day-action-happening-today, accessed April 24, 2016).

[59] See Hess, Amanda: *Emma Sulkowicz Inspired Students Across the Country to Carry Their Mattresses. Now What?* Slate, October 30, 2014. http://www.slate.com/blogs/xx_factor/2014/10/30/carry_that_weight_emma_sulkowicz_s_mattress_becomes_a_nati onal_movement.html. Accessed April 24, 2016. This is also mentioned in Crocker, Lizzy: *Is Columbia Failing Campus Rape Victims?* The Daily Beast, November 6, 2014. http://www.thedailybeast.com/articles/2014/11/06/is-columbia-failing-campus-rape-victims.html. Accessed April 24, 2016.

[60] "Carry That Weight" and "No Red Tape" later proudly published photos of activists with the defamatory demand on their respective Facebook pages.

"The investigation and adjudication process of the sexual assault report made by Emma Sulkowicz against Jean-Paul Nungesser[61] was grossly mishandled. An alleged serial perpetrator[62] remains on our campus and presents an ongoing threat to the community. Given these facts, we demand you re-open this case and evaluate it under the newly revised policy."[63]

57.    Not only did Sulkowicz personally call Paul "a threat to the community" in writing, citing his full name, she also later declared that Paul was not safe on campus: *It's not safe for him to be on this campus," Ms. Sulkowicz said this month.*[64]

58.    Instead of addressing the mob-like atmosphere and highlighting the importance of rule of law, Columbia decided to sponsor financially the defamation campaign against Paul[65] as evidenced by Columbia University's Sexual Respect Office publication of yet another statement in support of the activist.[66]

59.    Columbia's sponsorship of the defamation campaign against Paul was also evidenced by Defendant Bollinger and Special Advisor on Sexual Assault Suzanne B. Goldberg,

---

[61] Paul's given name is Paul Jonathan Nungesser. Jean-Paul is a username he used on Facebook.

[62] To describe Paul as an alleged serial perpetrator in fall 2014, almost a year after he had been exonerated by both the school's detailed investigation and months after the DA's office refused to press charges raises the question of how long one remains "alleged" of a an accusation that has already been investigated and discredited. The continued use of the phrase 'alleged' seems disingenuous at best and defamatory at worst.

[63] These demands are published on Bwog (See *Carry That Weight Day Of Action At Columbia.* Bwog, October 29, 2014. http://bwog.com/2014/10/29/carry-that-weight-day-of-action-at-columbia/. Accessed April 24, 2016).

[64] Kaminer, Ariel: *Accusers and the Accused, Crossing Paths at Columbia University.* NY Times, December 21, 2014. http://www.nytimes.com/2014/12/22/nyregion/accusers-and-the-accused-crossing-paths-at-columbia.html?_r=0, Accessed April 24, 2016.

[65] Columbia initially told the activists it would cost $1,500 to clean up the protest, but ultimately decided to sponsor the balance and billed the Activists only $471. Columbia thus spent over $1,000 (one thousand dollars) to effectively sponsor defamatory harassment of Paul Nungesser.

[66] The statement reads:
      (…) Student activism plays an important role in encouraging these efforts, and the University appreciates this attention to a significant issue affecting the lives of college and university students around the nation. We understand that reports about these cases in the media can be deeply distressing and our hearts go out to any students who feel they have been mistreated. Importantly, the University will not address reports about individual cases or experiences. This is so not only because of federal student privacy law but also—and most fundamentally—because of our commitment to help students feel as comfortable as possible accessing the many resources to support them on campus without concern that the University would ever comment publicly on them or their experiences. As a University we have made substantial new investments to further strengthen our personnel, physical resources, and policies dedicated to preventing and responding to gender based-misconduct. Columbia University (…) *Columbia University Statement on Enhanced Personnel, Physical Resources, and Policies.* October 29, 2014.
      http://sexualrespect.columbia.edu/files/sexualrespect/content/Columbia-University-Statement-Oct-29-2014.pdf. Accessed April 24, 2016. Emphasis added.

publishing an article in the *New Republic* on the same day as the "National Day of Action" on October 29, 2014, accompanied by a picture of smiling Sulkowicz.  Defendant Bollinger and Ms. Goldberg state:

> No person who comes to a university or college to learn and live should have to endure gender-based misconduct today, particularly the young women who most frequently sustain these violations and already are saddled with gender-based burdens in their lives and interactions with others that remain deeply embedded in society even as we make great progress on this front.[67]

60.    Defendant Bollinger and Goldberg ignored that Paul, on the receiving end of an extremely public gender-based harassment campaign and egregious intimate partner violence, was deserving of protection, even though they explicitly mention "sexual coercion and other forms of violence and intimidation [that] form part of ongoing relationships and post-breakup behaviors" in their article.[68]

**F.    Paul's Safety and Well-Being Are Threatened and Columbia Fails to Provide Effective Remedy.**

61.    The situation for Paul on campus grew increasingly more threatening. He was being subjected to a systematic and professionally orchestrated harassment campaign, and Columbia University was wholly unwilling to stop this campaign:

62.    On October 2, 2014, Sulkowicz's parents published an Op-Ed in the Columbia Spectator addressed to Defendant Bollinger and Defendant Board of Trustees, naming Paul twelve times.[69]

---

[67] See Bollinger, Lee C. and Suzanne Goldberg: *Columbia's President Explains His Response to Campus Rape.* New Republic, October 29, 2014. https://newrepublic.com/article/120021/columbia-president-lee-bollinger-campus-sexual-assault. Accessed April 24, 2016.

[68] "The picture of gender-based misconduct on campus is complex. University-based education efforts need to focus prevention efforts not only on scenarios where students have a one-time sexual encounter but also on situations where sexual coercion and other forms of violence and intimidation form part of ongoing relationships and post-breakup behaviors." (Ibid)

[69] See Leong, Sandra and Kerry Sulkowicz: *An open letter to President Bollinger and the board of trustees.* Columbia Spectator, October 2, 2014. http://columbiaspectator.com/opinion/2014/10/02/open-letter-president-bollinger-and-board-trustees, accessed April 24, 2016). Five days later, a business partner of Sulkowicz's father, A.

63.     The atmosphere on campus is openly hostile, dominated by the activists of "No Red Tape" and "Carry That Weight." Social networks, including comments on campus media, were filled with threats against Paul. It required a great deal of courage to continue to remain friends with Paul during that time or even just publicly advocate a different opinion.[70] Professors and teachers who in private conversations expressed their support for Paul refrained from doing so publicly out of fear of endangering their future career at Columbia.

64.     Toni Airaksinen, a student at Barnard College and a Columnist for the Columbia Spectator, described the atmosphere later as follows:

---

G. Newmyer III, pretending to be a concerned parent of a Columbia student, published an Op-Ed in the Columbia Spectator demanding that the case be reopened. (See *Letter to the editor: Columbia needs to reopen the Sulkowicz case.* Columbia Spectator, October 7, 2014. http://columbiaspectator.com/opinion/2014/10/07/letter-editor-columbia-needs-reopen-sulkowicz-case. Accessed April 24, 2016) Commenters discover that the author was an acquaintance of Sulkowicz's father and that he might not even be a father of a Columbia student, despite his claims. These comments under the article have meanwhile been deleted.

In the face of this orchestrated campaign against an innocent student, Columbia did everything to appease Sulkowicz and her family and to avoid antagonizing them any further. By staying silent, it allowed the false information, such as the notion that Paul was advised by a lawyer at the hearing while Sulkowicz wasn't, to find its way into the public.

[70] An impression of the atmosphere on campus is provided by the comments that were posted in December 2014 on the website of the Columbia Spectator and later deleted as part of a "re-design" of the website. They vividly describe the repressive atmosphere on campus, most notably the following commenters:

"(...)I am not one of his friends but I talked to people who admitted they knew him before Emma went public. They all seem hesitant to believe Emma's story and the way she characterizes him. Some recall having seen them together on various events acting friendly AFTER the alleged incident and they remember that Emma seemed to like him a lot. They all are, however, afraid of retaliation by Emma and her friends - so they chose "not to get involved". While I don't think this type of behavior is courageous, I can understand it and I think it is typical for our campus. The majority of our students tries to mind their own business, the ones who are 'activists' tend to have a strange attraction to group think while claiming they are unconventional thinkers."

"This topic is extremely toxic and NRT (=No Red Tape) supporters are dominating the discussion on campus. Actually I think there are much more active NRT supporters than some people here think and they will do everything to defend Emma (Btw, I don't think most of Emma's supporters know Nungesser, they have just subscribed to her characterization). (...) To me the campus seems less safe since Emma started her campaign and I can't believe that members of faculty support it.(...)"

"Hey, first of all, his name is Nungesser, but anyway, setting up a legal fund would be a good idea - I doubt, however, that anyone on this campus has the guts to publicly stand for Nungesser. I once tried to raise the issue of innocence until proven guilty in a discussion but was insulted and shouted down by Emma's and Zoe's friends who called me a rape apologist. One later even threatened to file a Title IX complaint against me. She literally said: 'Do you want to have your name on a rapist list, too?'

(...)NRT and their followers are high on power and are a threat to free speech and to people who exercise this right on campus. Read Emma's statement in the NYT article: 'It's not safe for him to be on this campus,' Ms. Sulkowicz said this month.'

Let me add: It's not safe for anyone else on this campus who dares to use his or her own head."

(http://columbiaspectator.com/spectrum/2014/12/22/paul-nungesser-speaks-out-sulkowicz-columbia-hearings-new-york-times-article).

At these rallies, which I attended, fellow students shared stories of assault and admonished the university for condoning "rape culture". (...) the trope of the powerless victim and the depraved predator was propagated relentlessly.[71]

65.    How deeply engrained this gender-based stereotype was in the Carry That Weight Campaign demonstrates the answer of fellow activist Becca Breslaw[72], who told Reporter Rudy Novotny that Paul, as a white, heterosexual male, was "privileged", thus did not deserve to be called a victim.[73]

66.    Daniel Garisto, Columbia student and a former editorial page editor for Spectator, also admitted in hindsight:

> We, the members of the campus media, failed specifically with Sulkowicz's story by not being thorough and impartial. Instead, campus media's goal to promote discussion about sexual assault and to support survivors became conflated with a fear of rigorous reporting. Personally, I felt that if I covered the existence of a different perspective—say, that due process should be respected—not only would I have been excoriated, but many would have said that I was harming survivors and the fight against sexual assault.[74] (Emphasis added.)

67.    Columbia student Caroline Williamson, then a senior at Barnard College, states on February 5, 2015 in her article titled "Our role in the unofficial conviction of Paul Nungesser":

> Were we, the public, sure enough about the events in question to make that judgment? Did the media give us a choice, or was Nungesser the scapegoat for the movement against rape on campus that's been building steam for years? The mistake we've all made has been substituting belief in an ideal with certainty about a specific case. There was never enough evidence presented to the public to expel Nungesser from school or convict him in court, so there should not have been enough to convict him in the media. No matter how fiercely we may have believed Sulkowicz, we just don't know what happened that night. The university adjudication system, especially the concept of due process that is meant to protect

[71] Airaksinen, Toni: *The Myth of "Rape Culture" at Columbia University,* February 25, 2016, http://quillette.com/2016/02/25/the-myth-of-rape-culture-at-columbia-university/. Accessed April 24, 2016.

[72] Becca Breslaw was one of the lead activists behind the CarryThatWeight Campaign and "No Red Tape". She also signed the demand list which called Paul an „ongoing threat" and called Paul a "serial rapist" in a letter to President Bollinger.

[73] "But I'm not sorry for Paul. He's privileged and is presenting himself as a victim." (Novotny, Rudy: *What Happened on the Mattress.* Die Zeit, June 1, 2015. http://www.zeit.de/studium/uni-leben/2015-05/columbia-university-sexual-assault-trial/komplettansicht. Accessed April 24, 2016.)

[74] See Garisto, Daniel: *Better media coverage of sexual assault for survivors.* Columbia Spectator, February 3, 2015. http://columbiaspectator.com/opinion/2015/02/03/better-media-coverage-sexual-assault-survivors. Accessed April 24, 2016.

all of us, failed Paul Nungesser, who was officially found innocent and yet still presumed guilty by the masses.[75] (Emphasis added.)

**G.   Columbia University's Systematic and Institutional Failure To Remedy and Active Support Of Hostile Environment Continues.**

68.    One of the nation's foremost universities that prides itself in educating its students to become critical, independent thinkers, stood by idly, while one of its own students, whom the institution itself had cleared from the accusation against him, was turned into a public pariah on its campus and publicly defamed as a serial rapist.

69.    It was not Columbia's accomplishment that starting in February 2015 a few dissenting voices began to speak out in Paul's favor. Paul himself – against the expressed advice of Columbia administrators – decided to speak out publicly,[76] a task that without the help of an expensive PR consultant or connections to the press took tremendous time and energy during a time when most senior college students are in the vital phase of concluding their college degree.

70.    Even after Paul spoke out publicly, Columbia administrators refused to protect Paul from the harassment. The following are just the most egregious examples for Defendant Columbia's refusal to provide adequate support of Paul:

71.    On March 26, 2015, Paul requested a public safety escort in order to attend a Sexual Respect Workshop, part of a new Columbia initiative that was mandatory for all Columbia students. As his participation in the program was a requirement for graduation, he ultimately decided to attend the workshop even without the escort. He was fearful of how other

---

[75] See Williamson, Caroline: *Our role in the unofficial conviction of Paul Nungesser*. Columbia Spectator, February 5, 2015. http://columbiaspectator.com/opinion/2015/02/05/our-role-unofficial-conviction-paul-nungesser. Accessed April 24, 2016.
[76] In an article in the *New York Times* published on December 21st, 2014 and in a *Daily Beast* article, dated February 2nd, 2015, Paul spoke out publicly for the first time. Columbia mentors and professors that he had asked for anonymous commentary were all too afraid to speak with journalists. See Kaminer, Ariel: *Accusers and the Accused, Crossing Paths at Columbia University*. NY Times, December 21, 2014.
http://www.nytimes.com/2014/12/22/nyregion/accusers-and-the-accused-crossing-paths-at-columbia.html?_r=0.
Accessed April 24, 2016. Also Young, Cathy: *Columbia Student: I didn't rape her*. The Daily Beast, February 2, 2015. http://www.thedailybeast.com/articles/2015/02/03/columbia-student-i-didn-t-rape-her.html. Accessed April 24, 2016

students would react to him and whether activists of "No Red Tape" and "Carry That Weight" would attack him – after all he was harassed and photographed in class during the first "National Day of Action" in October 2014.[77]  After the workshop was over, he discovered an e-mail, sent to him by Columbia administrators just minutes before the start of the workshop, recommending him not to attend the workshop.

72.   On April 12, 2015, during the recent "Days on Campus" at Columbia University, activists projected "Rape happens here" and "Columbia protects rapists" in huge letters onto Low Library and held banners reading "Carry That Weight" and "Columbia Protects Rapists" over Low Library steps and ledges by Kent Hall. Columbia University did not stop the activists, even though it was clear that the projected slogans and banners referred to Paul specifically and were another attempt to shame him away.

73.   On April 13, 2015, a "Second National Day of Action" was scheduled. Paul requested from Columbia public safety a security escort. He felt unsafe to walk around campus, after he was publicly threatened by Sulkowicz during a protest held in the fall and because he was anticipating extended media presence. Again, Columbia refused to protect Paul's physical safety, despite repeated public threats for his life placed undue emotional stress on him and made him fearful to walk around campus, rendering campus facilities not reasonably accessible to him.

74.   Between May 11, 2015 and May 15, 2015, the senior thesis exhibition of the Columbia University Visual Arts Program takes place in the Leroy Neiman Gallery in the Dodge Building on Defendant Columbia's campus. Among the exhibition three large prints, made by Sulkowicz, printed over as well as next to *New York Times* articles previously published about Sulkowicz's false allegations against Paul. One of the articles identified Paul by his full name, so

---

[77] On that day, activists had brought their mattresses to a class Paul attended. Throughout the class they stared at him and took his picture without his consent.

that to any reasonable viewer of the prints, these prints portray Paul engaged in sexual assault and in explicit pornographic images.



75.    One of the prints depicted Paul chocking Sulkowicz and committing rape against her. Another print was a pornographic portrayal of Paul, printed over a newspaper article that includes Paul's full name and shows him masturbating. A third print depicted the mattress carried by Sulkowicz as her senior thesis. The prints were displayed to the public by Columbia at the Columbia University Visual Arts Program/Undergraduate Thesis Show Reception, which took place in the Leroy Neiman Gallery, in the Dodge Building on Defendant Columbia's campus. Approximately forty people attended the reception alone, including Thomas Vu-Daniel,



artistic director of the LeRoy Neiman Center for Print Studies and employee of Defendant

Columbia.

76.    The display was open and visible to the public for an entire week just prior to

graduation when many visitors were on campus. Columbia's faculty explicitly approved the

display of Sulkowicz's prints, directly facilitated the installation of the prints in the gallery, and

supervised the reception of the exhibition, thus being explicitly responsible for the contents of

the exhibit.

77.    Paul was never put on notice by Columbia that graphic prints of a sexual nature

depicting him without his consent would be publicly exhibited on the Columbia campus.

Columbia, when put on notice of the gender-based harassment of Paul, refused to provide any

relief to Paul.

[31]

78.     Columbia's policy lists, among others, the following examples of gender-based misconduct: "Unwelcome remarks about the private parts of a person's body" as well as "Graffiti concerning the sexual activity of another person,"[78] leaving no doubt that Sulkowicz's prints were in clear violation to Columbia's Gender-based Misconduct Policy, since they make both explicit reference to private parts of Paul's body as well as his alleged sexual activity.

**H.     Columbia University Affords Special Privilege to Sulkowicz at Graduation.**

79.     Sulkowicz's assertion[79] that she would carry her mattress until graduation unless she succeeded to harass Paul into leaving the University proved accurate on May 19, 2015. Sulkowicz was permitted by Defendant Columbia to carry the mattress to her and Paul's graduation.

80.     In the weeks and months before graduation, Paul reached out repeatedly to Columbia administrators, requesting detailed information regarding whether Defendant Columbia would allow Sulkowicz to carry the mattress at the graduation ceremony. Despite repeated requests, Defendant Columbia refused to provide him with any information.

81.     The evening prior to the graduation, Columbia University administrators e-mailed all graduating students, instructing them not to bring "large objects which could interfere with the proceedings or create discomfort to others in close, crowded spaces shared by thousands of people." Sulkowicz's mattress without doubt constituted such a "large object" that was prohibited at graduation, being explicitly designed to "create discomfort" to Paul, who was also in attendance.

82.     Led to believe by this e-mail that the mattress would not be allowed at the graduation ceremony, Paul and his parents attended graduation the following day, May 19, 2015.

---

[78] Compare 2014-8 Policy, p.5.
[79] An assertion she had made as early as in her talk at the Brooklyn Museum in December 14, 2014.

[32]

83.     Defendant Columbia not only let Sulkowicz once again publicly harass Paul at his very own college graduation – what should have been one of the best days of his life to date – but also allowed Sulkowicz to breach the University's restrictions and regulations in order to do so, affording her a special privilege at the university to engage in gender-based harassment of Paul.

84.     Sulkowicz, in interviews following the graduation ceremony, stated that Columbia administrators approached her twice, once immediately before and once during the graduation ceremony, asking her to not to carry the mattress; however, Columbia did not take effective steps with use of campus public safety to enforce its rules that had been specifically noted in the e-mail sent out to students the day before graduation.[80] Therefore, despite the fact that objects such as mattresses were prohibited at the graduation, Defendants allowed Sulkowicz to violate the regulation, granting her a special university privilege to carry her mattress and engage in harassment of Paul.

85.     In the keynote address at the Columbia graduation ceremony, Los Angeles Mayor Eric Garcetti, CC '92, SIPA '93, stated: *"You've held contrary opinions, held die-ins and sit-ins, carried mattresses."* He also said in his speech: *"It is the responsibility of an active citizen to engage with one another... Never stop being academics, and never stop being activists."*[81] This statement was made at the graduation ceremony despite the fact that Paul had been cleared on multiple occasions of Sulkowicz's false allegations and the mattress project did not present a political protest, but a means of harassing a fellow student into leaving the university.

---

[80] Taylor, Kate: *Mattress Protest at Columbia University Continues Into Graduation Event.* New York Times, May 19, 2015. http://www.nytimes.com/2015/05/20/nyregion/mattress-protest-at-columbia-university-continues-into-graduation-event.html?ref=topics. Accessed April 24, 2016.
[81] Armus, Teo: *With Sulkowicz carrying mattress across stage, speakers emphasize activism at CC Class Day.* Columbia Spectator, May 19, 2015. http://columbiaspectator.com/news/2015/05/19/sulkowicz-carrying-mattress-across-stage-speakers-emphasize-activism-cc-class-day. Accessed April 24, 2016.

86.     Similarly at the Barnard College graduation ceremony, a Columbia affiliated institution, the keynote speaker, UN Ambassador Samantha Power, explicitly referenced and applauded Sulkowicz's campaign, stating *"And yet, even as we are aware of the seriousness of this problem, it takes a woman <u>picking up a mattress and carrying it around her campus</u> to make people really see it"*[82]. She also said: *"to secure lasting equality – ... using a range of means - <u>from mattresses to human contact</u> - to make the invisible visible,"* without making clear that Paul had indeed been cleared from all false allegations against him.

87.     Furthermore, Columbia decided to bestow Magna Cum Laude honors on Sulkowicz. According to Columbia, the decision to grant honors to students *"is based not on GPA alone, but on the high quality of academic achievement, departmental recommendations, and outstanding work beyond which is required for the degree."*[83]  Since Sulkowicz's time and indeed her academic work at Columbia has been largely defined by her mattress toting, these honors constitute yet another instant of Columbia directly rewarding, encouraging and celebrating Sulkowicz's gender-based discriminatory harassment against Paul.

88.     Sulkowicz's mattress at graduation caused a global media echo -- leading to hundreds of articles, among others in the *New York Times, Time, NBC News, Huffington Post, Cosmopolitan, Washington Examiner, Newsweek, Slate, Salon, Jezebel*, as well as internationally in leading mainstream media such as *Spiegel Online, Daily Mail, Guardian, CBC, Independent, Business Insider, Le Soir,* and countless others, many of which mentioned Paul's full name, which increased the damaging effects of Sulkowicz's harassment campaign against Paul that was allowed and supported by Columbia.

---

[82] http://barnard.edu/student-services/commencement/commencement-archives/commencement-2015/samantha-power-del. Accessed April 24.
[83] As printed in the program for the Columbia College Class of 2015 graduation ceremony.

89.     While reporting on Sulkowicz's continued campaign at graduation, with live Twitter posts, Teo Armus, a student of Columbia University, posted clear photographs of Paul.[84] Within a day, that photograph was published by several news outlets. On some occasions, the word "Rapist" was pasted over the photo and then published further.[85] By allowing Teo Armus to take and publish Paul's pictures, once again, Defendants assisted in furthering a defamatory and systematic attack on Paul.

90.     Columbia's support for Sulkowicz's gender-based misconduct, which included gender-based harassment, sexual harassment and intimate partner violence against Paul had allowed her to gain prominence and access to publicity she would not have otherwise had access to. By doing so, Columbia has actively enabled Sulkowicz to build a public persona surrounding her false allegations. Columbia's actions both before and during graduation once again exhibited a blatant disregard for its own rules and regulations, affording Sulkowicz yet another special university exception, providing a clear-cut example of gender-based discrimination against Paul.

---

[84] See https://twitter.com/teoarmus/status/600689820860551168;
https://twitter.com/teoarmus/status/600689603037790209.
[85] Teo Armus has relentlessly stalked Paul, going as far as contacting various employers of his mother in Germany. However, this comes as no surprise as the *Columbia Spectator Newspaper* has systematically promoted and financially benefited from the campus witch-hunt conducted against Paul through its biased and uncritical reporting.

### AS AND FOR THE FIRST CAUSE OF ACTION
### (Against Columbia For Violation of Title IX)

91.     Paul repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

**A.     Understanding Why There Was Gender-Based Discrimination and Misconduct In This Case By Reversing Genders.**

92.      Understanding why there was gender-based discrimination in this case, involving a man as a victim of gender-based misconduct enacted by a female perpetrator, is assisted by considering the case at hand as if the genders were reversed:

93.     When Paula decides to end her brief relationship with Emmet, he gets furious. He contacts the Office for Gender-based Misconduct and files a complaint. He reports that Paula has an affair with one of her professors and that the professor has selected her to be part of a new research project solely because of their sexual relationship – a blatant violation of the university policy on the part of the professor.

94.     The Office of Gender-based Misconduct investigates Emmet's report in detail for seven months and concludes that Emmet's narrative has major inconsistencies, contradictions and is overall not credible.

95.     Emmet, unwilling to accept a defeat and furious at Paula, seeks counsel from a PR-consultant, who arranges for Emmet to tell his story to a reporter. Emmet also provides the reporter with Paula's name and her dorm address.

96.     Paula is ambushed outside her dorm by reporters, they confront her with allegations about an improper relationship with a professor. Paula's parents reach out to university administrators, but they decline to intervene.

[36]

97.    Emmet, encouraged by the lack of intervention from the university, decides to reach out to his friends at a student newspaper and persuades them to publicize the alleged affair between Paula and her professor. Again, the university remains silent.

98.    In the men's bathrooms and at several student events on campus flyer are circulated with Paula's name and those of three others – next to Paula's name it says *"high-class whore"*. The university never investigates those responsible for the flyers. They do, however, issue a statement, saying that they take the issue of student-faculty relationships very seriously and that they will revise their policy. In regard to Paula, they claim to be unable to comment.

99.    Emmet decides to begin carrying a mannequin dressed in lingerie around campus. He takes it into the library and to all his classes. The media picks up on his story and he gives countless interviews, spreading his disproven story. He explains that the mannequin represents the educational disadvantages male students face due to female student-male faculty relationships and that he will carry it for as long as Paula remains on campus. Asked for the goal of his project, he says: *"To get this whore to leave the university."* Searching for Emmet's name on Google, the autocomplete function suggests Paula's full name as well as the terms "whore" and "student-professor sex".

100.    Emmet's "art project" of carrying the mannequin around campus is awarded school credit from his professor and receives public accolades. In a cover story of a large weekly magazine, Emmet repeats his accusations against Paula and alleges that she works for an escort service on the weekends and that she has had sex with multiple professors on campus.

101.    Due to the immense media response, Emmet "friends" on Facebook have gone into the thousands. On his Facebook page a fan of his project writes: *"This fucking whore. A shame that I am not in New York – or else I would fuck her brains out."* Paula's parents reach

out to the university – they state that they are unable to do anything about it. A few days later, the same fan writes: *"This whore needs to practice silence or suicide before she gets dealt with accordingly."* Emmet "likes" the comment.

102.    At a party with his fraternity, Emmet picks up the microphone and under cheering from the crowd, he states: *"I don't have to say her name – you know who I am talking about."* Later he tells a reporter: "*It's not safe for her to be on this campus*." The university again refuses to intervene. Paula´s request for a security escort is denied.

103.    A week before graduation, a visual art exhibition opens on campus. Emmet is exhibiting a number of pornographic pictures closely resembling Paula – they also include Paula's full name. One of them shows her naked and masturbating. On another picture she is having sex with her professor. Paula's parents reach out to a lawyer, who puts the university on notice, but they refuse to act. The pictures are exhibited in the facilities of the university for a full week, open to the public.

104.    A day before graduation, the university sends out an email to all graduating students, instructing them not to bring *"large objects which could interfere with the proceedings or create discomfort to others in close, crowded spaces shared by thousands of people."* The next day however, Emmet walks at the ceremony – together with three friends and cheered on by other students in the crowd they carry the mannequin across stage. The university claims later that they were unable to intervene. They do, however, decide to bestow Magna Cum Laude on Emmet for his "outstanding work beyond which is required for the degree."

**B.**     **Columbia's Policy and Practice Is Gender-Biased Against Males.**

    **i.**     **Title IX Bans Sex-Based[86] Stereotyping and Overgeneralization.**

    98.     With Title IX, Congress tried "to avoid the use of federal resources to support discriminatory practices" and "to provide individual citizens effective protection against those practices"[87]

    99.     One of the most important aspects, to enforce such an environment free of discriminatory practices is the ban of "sex-based stereotyping and overgeneralization".[88]

    **a.**  **What is Sex-Based Stereotyping and Overgeneralization?**

    100.     Sex-based stereotyping consists of ascribing gender roles and the expectation to behave according to these roles to all women and men,[89] they are constructed in a binary way. Such ascribed stereotypical gender roles contain non-sexual behavior as well as sexual behavior.

---

[86] "Sex-based" in the sense of "gender-based" (Compare Nungesser vs. Columbia, Memorandum and Order, p. 9,10). Governmental agencies such as the U.S. Equal Employment Opportunity Commission (EEOC) which, in its own words, "is responsible for enforcing federal laws that make it illegal to discriminate against a job applicant or an employee because of the person´s race, color, religion, sex (including pregnancy), national origin, age (40 or older), disability or genetic information." (https://www.eeoc.gov/eeoc/, accessed April 19, 2016) use the terms "sex-based discrimination" synonymously with "gender-based discrimination" (compare https://www.eeoc.gov/laws/types/sex.cfm, accessed April 19, 2016). Also, the U.S. Department for Education's Office of Civil Rights uses the term "based on sex" synonymously to "based on gender" in its 2011 "Dear Colleague Letter" which clarified the fact that the OCR's Title IX interpretation includes the responsibility for schools and universities to regard sexual assault and rape as a violation of civil rights and adjudicate these cases. For clarification purposes and to avoid misunderstandings this complaint uses the term "gender-based" whenever not explicitly citing or referring to an existing discourse as it does in this section. The term "sex-based" in this section is taken from Cornelia Pillard (see below), whose important comment on gender discrimination is discussed here. Nowhere in this complaint is the use of the term "sex-based" intended to mean "based on an act of sex".

[87] *Canon v. Univ. of Chicago*, Opinion, p. 7f.

[88] Pillard, Cornelia: *Our Other Reproductive Choices: Equality in Sex Education, Contraceptive Access, and Work-Family Policy* (2007). 56 Emory L.J. 941, 948 (2007). http://scholarship.law.georgetown.edu/cgi/viewcontent.cgi?article=1191&context=facpub, accessed April 21, 2016.

[89] „Sex-role beliefs become sex-role stereotypes when individuals employ those sets of behaviors as rules to be applied to all males and females." (http://psychology.jrank.org/pages/575/Sex-Roles.html#ixzz446hCnZgT, accessed April 24, 2016)

### b. **Why Sexual Stereotyping Violates Title IX.**

101.    Judge Cornelia T. Pillard, United States Circuit Judge of the United States Court of Appeals for the District of Columbia Circuit, highlights why this kind of stereotyping violates Title IX:

> The Supreme Court's recent equal protection jurisprudence sets <u>a very high bar against sex-based stereotyping and overgeneralization</u>. Under a line of cases culminating in United States v. Virginia (VMI),[90] <u>even statistically accurate generalizations about "typically male or female tendencies"</u> – such as men's greater aggressiveness versus women's comparatively more cooperative temperament, or <u>men's tendency to harass and women's victimization by sex harassment</u> – cannot be grounds for official, sex-based discrimination.[91] (Emphasis added)

Judge Pillard explains why sex-based discrimination is considered unconstitutional:

> VMI builds on a long line of precedent that treats even laws enacted ostensibly to favor or protect women as <u>unconstitutionally discriminatory due in large part to the stereotypes they perpetuate.</u> (…) <u>It thus recognizes that sex-role stereotyping is itself harmful because it projects patriarchal messages that make discrimination at once more likely and less apparent.</u>"[92] (Emphasis added.)

### ii.    **Columbia's Policy Also Bans Sex-Based Stereotyping As A Type of Gender-based Harassment.**

102.    The ban of sex-based stereotyping is also at the core of Columbia's policies dealing with gender-based misconduct. In its 2013 Policies (2013-1 Policy and 2013-8 Policy) Gender-based misconduct is defined as follows:

> "<u>Acts</u> of verbal, nonverbal, or physical aggression, intimidation, stalking or <u>hostility based on gender or gender-stereotyping</u> constitute gender-based-harassment."[93] (Emphasis added.)

103.    The 2014-8 Policy states similarly:

> "Acts of aggression, intimidation, stalking, or hostility <u>based on gender or gender-stereotyping constitutes gender-based harassment.</u> (…) To constitute harassment,

---

[90] 518 U.S. 515 (1996)
[91] Id. at 541, 544, 550
[92] Pillard, Ibid.
[93] Policy 2013-1, p. 3, and, identical, in 2013-8, p. 5.

the conduct must unreasonably interfere with an individual's education or educational activities or create an intimidating, hostile, demeaning, or offensive academic or living environment."[94] (Emphasis added.)

### iii.   Sexual Stereotyping is a Form of Gender-Based Harassment According to the Department of Education's Office of Civil Rights.

104.   Columbia's policy almost literally adapts the definition supplied by the Department of Education's Office of Civil Rights in their so-called "Dear Colleague Letter" from April 2011:

> Title IX also prohibits gender-based harassment, which may include acts of verbal, nonverbal, or physical aggression, intimidation, or hostility based on sex or sex-stereotyping, even if those acts do not involve conduct of a sexual nature.[95] (Emphasis added.)

### iv.   The Stereotype of the (Serial) Rapist As the Sex-Driven Male.

105.   One of the most enduring sex-based stereotypes in our society ascribes different sexual needs to men and women: Men, according to this stereotype, are sex-driven. Their sole aim is to have sex as often as possible; they desire – assuming heterosexuality – women constantly.[96]

106.   A "rapist" and even more so a "serial rapist" represents the most negative example of the sex-driven men: Not getting what he needs he takes it with violence.[97] To iterate the difference here: Serial rapists obviously exist, but the idea that all men are sex-driven and have to constantly control their sexuality in order not to become rapists presents "sex-based stereotyping and overgeneralization" in the way described above. Like any sex-based stereotype, it is in itself harmful because it "makes discrimination at once more likely and less apparent" and therefore represents a violation of Title IX.

---

[94] Policy 2014-8, p.20.
[95] United States Department of Education – Office for Civil Rights: Dear Colleague Letter on Sexual Violence from April 4, 2011, p. 3, footnote 9.
[96] Compare: http://www.psychalive.org/sexual-stereotyping/, accessed April 24, 2016.
[97] Compare the definitions from the urban dictionary below.

[41]

### v.     Columbia's Policies and Practice Perpetuate the Stereotype of the Sex-Driven Male.

107.   It is exactly that sex-based stereotype of males that governs the policy and the current practice with regard to gender-based harassment and sexual assault at Columbia.

108.   While Columbia's 2013 Policies states that "gender-based misconduct can be committed <u>by men and women</u>"[98] there is no indication that sexual assaults, sexual and gender-based harassment <u>against men committed by women</u> are systematically addressed, investigated and punished by Columbia:

(a)     Even though nationwide studies show that almost as many males as females report being victims of sexual violence[99] and 46% of male victims report female perpetrators[100], there is no known case at Columbia of any female ever being accused, let alone being disciplined for gender-based misconduct or sexual violence.

(b)     The three examples for gender-based misconduct/sexual violence provided in Columbia's Policies[101] show two heterosexual male perpetrators and two female victims plus one case in which both perpetrator and victim are obviously gender non-conforming (signaled by the use of the pronoun "their"). The possibility of male victims of female perpetrators is not mentioned at all.

(c)     Just as discriminatory is the exclusion of an entire form of sexual violence that affects predominantly men: While Columbia's definition of "sexual assault -- non-

---

[98] Columbia Policy 2013-1, p. 4, Policy 2013-8, p. 2.

[99] In 2011 the Center for Disease Control and Prevention reported results from the National Intimate Partner and Sexual Violence Survey (NISVS), one of the most comprehensive surveys of sexual victimization conducted in the United States to date. The survey found that men and women had a similar prevalence of nonconsensual sex in the previous 12 months (1.270 million women and 1.267 million men). (Compare: Lara Stemple and Ilan H. Meyer, The Sexual Victimization of Men in America: New Data Challenge Old Assumptions, 104 AM. J. OF PUBLIC HEALTH (June 2014), p. e19.)

[100] Compare Stemple, Meyer p. e21.

[101] Policy 2013-1, p. 6,7, Policy 2013-8, p. 4,5 Policy 2014-8, p. 21.

consensual sexual intercourse" resembles the FBI's in 2012 revised definition of rape[102] it still focuses on the penetration of the victim. This -- as the authors of the above mentioned study rightfully see as problematic -- "excludes victims who were made to penetrate."[103] The kind of sexual violence -- "made to penetrate" -- which predominantly affects male victims and predominantly is applied by female perpetrators plays no role within the Columbia policy."[104]

109.    Excluding the possibility of female perpetrators constitutes the underlying bias that results also in the complete absence of the issue of "false accusation" from the school's policy and its current practice in dealing with sexual assault.[105]

110.    The extent of Columbia's gender bias that perpetrates the stereotype of "the male perpetrator" and "the female victim" and its blindness towards gender-based and sexual violence and harassment with female perpetrators and male victims is illustrated in its sexual respect program that was mandatory for every student in the academic year 2014-2015. Even though it is the stated goal of this program to raise awareness and to prevent any form of gender-based misconduct[106] male victims and female perpetrators are blatantly absent: None of the six videos[107] of Columbia's Sexual Respect video option focused on the issue of gender-based

---

[102] "In 2012 the FBI revised its 80-year-old definition of rape to the following: "the penetration, no matter how slight, of the vagina or anus with any body part or object, or oral penetration by a sex organ of another person, without the consent of the victim." (Stemple, Meyer, p. e19). Compare Columbia's „definition of sexual assault – non consensual sexual intercourse" from its 2013/2014 Policies (Policy 2013-1, p. 5; Policy 2013-8, p. 3, Policy 2014-8, p. 19): "Any form of intercourse (anal, oral or vaginal), however slight, with any object without consent. Intercourse means: vaginal penetration (however slight) by a penis, object, tongue or finger, anal penetration by a penis, object, tongue or finger: and oral copulation (mouth to genital contact or genital to mouth contact)."
[103] Stemple, Meyer, p. e21.
[104] Ibid. The authors also point out the consequences of this kind of gender-bias: „Therefore, to the extent that males experience nonconsensual sex differently (i.e., being made to penetrate), male victimization will remain vastly undercounted in federal data collection on violent crime."
[105] The existence of false allegations - of which predominantly men are victims - is completely ignored in Columbia's policies as well as in the recently developed sexual respect program, which is mandatory for every student at Columbia.
[106] The 2014-8 Policy states in relevant part (Emphasis added): "Columbia University, Barnard College, and Teachers College are committed to fostering an environment that is free from gender-based discrimination and harassment, including sexual assault and all other forms of gender-based misconduct. The University recognizes its responsibility to increase awareness of such misconduct, (…)"
[107] The following six videos were featured:

harassment or gender-based misconduct, as Columbia's policies would suggest. Rather all of them focused on the topic of "violence against women".[108]

**C.     Sulkowicz's Actions Constitute Gender-Based Harassment, Sexual Harassment and Intimate Partner Violence, a Form of Gender-Based Misconduct.**

**i.     Calling An Innocent Person A "Rapist"/ "Serial Rapist" Constitutes Gender-Based Harassment.**

111.    Columbia's gender-blindness in recognizing that males can be victimized by female perpetrators is shown by the fact that Columbia never took action against Sulkowicz's harassment. Sulkowicz repeatedly falsely called Paul a "rapist" or "serial rapist" in public.[109]

---

- "Violence against women—it's a men's issue" (http://www.ted.com/talks/jackson_katz_violence_against_women_it_s_a_men_s_issue?language=en )
- "Re-thinking Sexual Assault Prevention in High School and College: John Kalin at TEDxColbyCollege" (https://www.youtube.com/watch?v=dRuPFmo15Tk)
- "Who are you?" (http://www.whoareyou.co.nz)
- "Find your voice against gender violence" (http://www.ted.com/talks/meera_vijayann_find_your_voice_against_gender_violence?language=en )
- "Tony Porter: A call to men" (https://www.youtube.com/watch?v=td1PbsV6B80)
- "Words Speak Louder than Actions" (https://www.youtube.com/watch?v=-VBlQJFe_Ik ) (All links accessed April 20, 2016)

[108] Accordingly, in all five talks featured in the videos as well as in the training film exclusively men appear as actual or potential perpetrators of violence.

Sexual violence against women, its prevention and strategies to combat violence against women were the main focus of all five talks and of the training video. Three of the talks identified traditional masculinity as the main cause of violence. The main goal of at least three of the talks was to empower men to become allies in the fight against violence against women. The training film showed how women and men can intervene to prevent that a woman who gets drunk becomes a victim of sexual assault.

Sexual harassment, intimate partner violence, and sexual assault against men were not addressed at all. In cases where men were identified as victims, they were identified as victims of outdated traditional concepts of masculinity that were conveyed to them by other men (fathers, coaches or male peers).

Women, on the contrary, were featured only as victims and survivors of sexual violence, activists and bystanders – not as (potential) perpetrators. This way male victims of female perpetrators are made invisible. Instead of raising awareness and educating students and staff about the special needs of male victims, Columbia perpetuates the gender-based stereotype of the female victim and the male perpetrator and thus discriminates against all male students. They do so despite the fact that studies have found that up to 46% of male victims report a female perpetrator.

[109] In at least the following instances Sulkowicz falsely called Paul a "rapist" or a "serial rapist". For most readers of the Bwog article on campus, Paul was already identifiable in January 2014 as the individual Sulkowicz was accusing. After Paul was identified by Sulkowicz as being one of the men on the infamous "rapist lists" in May 2014 and at the latest after Columbia Spectator had published Paul's full name May 16, 2014, Paul's name was public knowledge and in any subsequent statements it was clear that Sulkowicz referred to him (emphasis in the following quotes) added).

- *"My rapist—a serial rapist—still remains on campus, even though three of the women he assaulted reported him to my university's Office of Gender-Based and Sexual Misconduct," Sulkowicz said in a press release.*

[44]