UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X

PAUL NUNGESSER,

                            Plaintiff,

              - v -

COLUMBIA UNIVERSITY, TRUSTEES OF
COLUMBIA UNIVERSITY, LEE C.
BOLLINGER, JON KESSLER, THOMAS VU-
DANIEL, and MARIANNE HIRSCH,

                      Defendants.

------------------------------------------------------------------ X

:
:
:
:
:
:
:
:
:
:
:
:
:
:

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/24/2017

1:15-cv-3216-GHW

MEMORANDUM OPINION
AND ORDER

GREGORY H. WOODS, United States District Judge:

In 2013, Paul Nungesser was accused of rape by fellow Columbia University ("Columbia") student Emma Sulkowicz. Sulkowicz filed a complaint with Columbia's Office of Gender-Based Misconduct and, after an investigation and hearing, a panel convened by Columbia found Nungesser "not responsible." Notwithstanding the outcome of Columbia's investigation, Sulkowicz maintained that Nungesser had raped her. Over the course of their final year at Columbia, she became well-known as an activist campaigning to raise awareness of sexual assault on college campuses, and her senior thesis project, known as the Mattress Project: Carry That Weight (the "Mattress Project"), received widespread media attention.

In this lawsuit, Nungesser alleges that Columbia violated his rights under Title IX of the Education Amendments of 1972 ("Title IX") by permitting Sulkowicz, among other things, to carry out the Mattress Project and receive academic credit for it; he also brings various related state-law claims against Columbia, Lee Bollinger (Columbia's President), Jon Kessler (Professor of Visual Arts), Thomas Vu-Daniel (Director of Printmaking and Artistic Director of the LeRoy Neiman

Center for Print Studies at Columbia's School of the Arts),[1] and Marianne Hirsch (Director of Columbia's Institute for Research on Women, Gender, and Sexuality).  On March 11, 2016, this Court granted Defendants' motion to dismiss the Amended and Supplemented Complaint, but gave Nungesser leave to replead certain of his claims.  ECF No. 36.  On April 25, 2016, Nungesser filed his Second Amended and Supplemented Complaint ("SAC"), ECF No. 43, which Defendants moved to dismiss on June 15 2016, ECF No. 53.[2]

The Court's task here is not to weigh in on the social debate regarding sexual assault on college campuses, to comment on best practices, or to render generalized judgments about the fairness of conduct between the parties.  Indeed, it is not even the Court's role here to determine the truth.  Instead, the Court's role is limited to determining whether, viewed through the lens of the relevant pleading standards, Nungesser has stated a claim for relief within the meaning of the substantive law that he invokes based upon the facts that he pleads.  *See Doe v. Columbia Univ.*, 831 F.3d 46, 48 (2d Cir. 2016) ("[A] court at this stage of our proceeding is not engaged in an effort to determine the true facts.  The issue is simply whether the facts the plaintiff alleges, if true, are plausibly sufficient to state a legal claim.").  Because Nungesser has not cured the deficiencies identified in the Court's March 11, 2016 opinion, the Court concludes that he has not adequately pleaded the claims that he has chosen to pursue here.  Accordingly, Defendants' motion to dismiss is GRANTED.

---

[1] According to Columbia, Mr. Vu-Daniel's first name is spelled "Tomas."  ECF No. 54, Mem. in Supp. of Mot. to Dismiss, at 1.  For the purposes of this opinion, however, the Court uses his name as spelled in the operative pleading.

[2] Defendants have also moved to strike portions of the SAC.  ECF No. 55.  The Court has addressed that motion in a separate opinion and order.  ECF No. 70.

# I.   BACKGROUND[3]

## A.  The Events at Issue

Plaintiff Paul Nungesser, a German national, is a 2015 graduate of Columbia University. SAC ¶ 2.  During his freshman year, Nungesser developed a close friendship with fellow student Emma Sulkowicz.  SAC ¶ 13.  Nungesser and Sulkowicz became "friends with benefits and had sex on three occasions," but Nungesser "did not want to pursue a romantic relationship with Sulkowicz."  *Id.*  According to the SAC, Sulkowicz was "unable to accept his rejection" and "sought revenge."  SAC ¶¶ 14, 24.

In April 2013, Sulkowicz filed a complaint with Columbia's Office of Gender-Based Misconduct alleging that Nungesser had sexually assaulted her.  SAC ¶ 15.  Nungesser maintains that Sulkowicz's accusation was false.  *Id.*  He alleges that Sulkowicz's goal, "which she stated repeatedly during the investigation, was to have [him] expelled from Columbia, knowing that it would also force [him] to leave New York and the United States."  *Id.*  In furtherance of that goal, Sulkowicz "started spreading rumors in order to motivate others to join her campaign against" him.  SAC ¶ 16. Shortly after filing her complaint with the Office of Gender-Based Misconduct, Sulkowicz "encouraged the President of ADP to notify its alumni board and several members that an alleged rapist was living at ADP."  SAC ¶ 16 n.6.[4]  She also "instigated others" to file false accusations against him.  SAC ¶ 15.  Three other individuals (two women and one man) did so.  SAC ¶ 15 n.5.

In response to Sulkowicz's complaint, the Office of Gender-Based Misconduct conducted a seven-month investigation, including "countless interviews, hearings, written statements, meetings

---

[3] Unless otherwise noted, the facts are taken from the second amended and supplemented complaint, and are accepted as true for the purposes of this motion. *See, e.g., Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[4] The SAC does not define "ADP."  However, Nungesser's First Amended Complaint explains that it refers to Alpha Delta Pi, a coed fraternity of which both Nungesser and Sulkowicz were members.  ECF No. 26, First Am. & Supplemented Compl. ("FAC"), ¶ 27 n.3.

and several dozens of e-mails as part of the fact finding process." SAC ¶ 11. On November 1,

2013, a Columbia Hearing Panel found Nungesser "not responsible" for the allegation of sexual

assault and dismissed the charge against him. SAC ¶¶ 11-12. Sulkowicz unsuccessfully appealed the

Panel's finding. SAC ¶ 17. Nungesser was also "fully exonerated" by Columbia from the

accusations made by the other three students. SAC ¶ 15 n.5.

As alleged in the SAC, Sulkowicz "claimed that her allegations were swept under the rug."

SAC ¶ 19. The Hearing Panel's conclusion that Nungesser was "not responsible" and the denial of

Sulkowicz's appeal "only strengthened Sulkowicz's resolve to have [Nungesser] removed from

campus," and she "sought other means" to do so. SAC ¶¶ 17, 24. Nungesser similarly alleges that

"Sulkowicz had failed to get [him] expelled from Columbia with her false allegations," and that

"[b]ecause [he] successfully participated in the investigation against him and proved his innocence as

well as the baselessness of her allegations, Sulkowicz became furious." SAC ¶ 41. Nungesser

describes the events that followed as "an unprecedented harassment campaign." SAC ¶ 18.

Soon after Sulkowicz's appeal was denied, she contacted a reporter from The New York

Post and identified Nungesser by providing his name, dorm address, and e-mail. SAC ¶ 25. On

December 4, 2013, a reporter and photographer from The Post "ambushed" him at the entrance to

his dorm and confronted him with Sulkowicz's accusations. *Id.* The same day, Nungesser's parents

sent an email to Columbia President Bollinger, Provost Coatsworth, and Title IX Coordinator

Melinda Rooker, reading:

> Dear President Bollinger, dear Provost Coatsworth, dear Melissa Rooker, with
> utter bewilderment we have just learned that our son was ambushed outside his
> residence by two reporters from the New York Post who were informed about
> the accusations against our son. (…) This retaliatory action represents a blatant
> violation of the Confidentiality Agreement according to Columbia policy. (…)
> We feel that Columbia shares a significant responsibility for the escalation which
> now takes place: There was clear evidence from early on during the investigation
> that the complainant was defaming our son. Her repeated violations of the
> Confidentiality Agreement remained without consequences. Given the fact that
> our son – though innocent – has endured almost seven months of severe so

> called "interim measures," it is now high time that sanctions against those
> responsible for this public defamation be imposed. (…).  Let us also know what
> actions are taken by Columbia to restore the good name of our son, especially,
> but not only, if an article should appear in the *New York Post*.

SAC ¶ 25 n.19.  Nungesser alleges that Columbia "failed to initiate an investigation" or to take any

action in response to this email.  SAC ¶ 26.

Shortly thereafter, an article appeared in The Post entitled "Columbia drops ball on jock

'rapist' probe: students."  SAC ¶ 25 n.17.  The article "suggest[ed] that all three students that are part

of the campaign initiated by Sulkowicz [had] spoken with" the reporter, but it did not contain

Nungesser's name.  *Id.*  Sulkowicz also provided information to a student reporter, who

subsequently published a two-part article on Columbia's student news blog, BWOG.  SAC ¶ 28.

While the article used pseudonyms, it "contained a plethora of details, making [Nungesser] easily

identifiable to a large part of the Columbia community."  *Id.*  Nungesser was "urged" by Columbia

administrators not to comment when the BWOG reporter requested a comment from him before

publishing the article.  SAC ¶ 29.

In early April 2014, Sulkowicz appeared publicly at a press conference with Senator Kristen

Gillibrand on the Columbia campus.  SAC ¶ 30.  According to the SAC, "Sulkowicz presented

herself as a survivor of sexual violence, thus making [Nungesser] clearly identifiable to her friends as

the alleged perpetrator."  *Id.*  In May 2014, Sulkowicz published an op-ed in Time Magazine entitled

"My Rapist is Still on Campus."  SAC ¶ 33.  The op-ed did not identify Nungesser by name.  *See id.*

n.29.

In May 2014, while Nungesser was spending a semester studying abroad in Prague, his name

was made public in connection with Sulkowicz's allegations for the first time.  On May 14, 2014,

Sulkowicz filed a police report "in order to have [Nungesser's] full name printed in the press."

SAC ¶ 34.  Nungesser alleges that she "leaked the report immediately to George Joseph, Title IX

activist at Columbia," who contacted Nungesser via email the following day about it.  SAC ¶ 34 &

n.32.  On May 16, 2014, Columbia's student newspaper, the Columbia Spectator, and its student

news blog, BWOG, published articles identifying Nungesser by his full name.  SAC ¶ 34.  Also in

May 2014, a "rapist list" that identified Nungesser as a "serial rapist" appeared on campus in flyers

and on graffiti.  SAC ¶ 32.  According to the SAC, Columbia administration "failed to investigate

and sanction those responsible" and did not inform Nungesser about the distribution of the list.  *Id.*

Columbia issued the following statement to CNN in connection with a story about the "rapist list:"

> The University is mindful of the multiple federal laws that govern these matters
> and provide important protections to survivors of sexual violence and to students
> engaged in our investigative process.  These laws and our constitutional values do
> not permit us to silence debate on the difficult issues being discussed.

SAC ¶ 32 n.27.  Nungesser alleges that comments were posted on event listings on the BWOG and

Columbia Spectator websites threatening violence, murder, and revenge rape for the people on the

list, but the comments were subsequently removed from the sites.  SAC ¶ 32 n.28.

As Nungesser's return to the Columbia campus for his senior year approached, he and his

parents "repeatedly reached out to Columbia administrators Monique Rinere and Jeri Henry as well

as Defendant Bollinger, asking for Columbia's measure to ensure his safety and unhindered access to

educational opportunities."  SAC ¶ 36.  Nungesser alleges that, "[r]ather than searching for possible

solutions involving protecting [him] on campus, they only came up with a single suggestion:  to take

a yearlong academic leave and return the year following Sulkowicz's graduation."  *Id.*

Nungesser did not take academic leave.  He returned to New York early, on August 11,

2014, to attend a voluntary interview with the New York County District Attorney's Office.

SAC ¶ 38.  Immediately after the interview, Nungesser's criminal lawyer was informed by one of the

Assistant District Attorneys who had conducted the interview that no criminal charges would be

brought.[5]  *Id.*

---

[5] Nungesser alleges that the District Attorney's office chose not to bring charges against him because they found
Sulkowicz's allegations not to be credible.  SAC ¶ 38.  However, he also alleges that Sulkowicz told New York Magazine

Even though Nungesser had been found "not responsible" for violation of Columbia's policies, and he had learned that he would not be subject to criminal charges, "Sulkowicz's efforts to vilify [him] had already considerably damaged [his] reputation on campus and beyond." SAC ¶ 39. He alleges that he lost a cinematography job for a TV pilot in Berlin because the producers were afraid to lose financing if his name was linked to the project. *Id.* He also alleges that he had been asked to work on a feature film in New York, but that the director suddenly stopped all communication with him after his name was published in the media. *Id.*

Beginning in August 2014 and extending throughout their senior year, Sulkowicz undertook the Mattress Project, a performance art piece that involved carrying her mattress around Columbia's campus with her at all times. SAC ¶ 40. The Mattress Project received widespread media attention both nationally and internationally, and much of the news coverage either linked to the Columbia Spectator article that contained Nungesser's name or mentioned his name directly.[6] SAC ¶ 52. Nungesser refers to this widespread coverage as a "defamatory media storm" and alleges that it "would never have occurred had Columbia early on stated publicly that the allegations were properly investigated and found not credible by the university hearing panel." SAC ¶ 53. He describes the

---

that it was her decision not to pursue criminal charges any further: "I decided I didn't want to pursue it any further because they told me it would take nine months to a year to actually go to court, which would be after I graduated and probably wanting to erase all of my memories of Columbia from my brain anyway, so I decided not to pursue it." *Id.* at n.38

[6] An article published in The New York Times on December 21, 2014 quotes Sulkowicz as saying: "It's not safe for him to be on this campus." SAC ¶ 57 & n.64. In the SAC, Nungesser characterizes that statement as a threat to him and alleges that, in making the statement, Sulkowicz "declared that [he] was not safe on campus." SAC ¶¶ 57, 137. In ruling on a motion to dismiss, courts are required to "draw all *reasonable* inferences in the plaintiff's favor." *Doe v. Columbia Univ.*, 831 F.3d at 48 (emphasis added). The obvious inverse of that rule is that courts need not draw *unreasonable* inferences in the plaintiff's favor. Nungesser's characterization of Sulkowicz's statement is not reasonable. The quote in the SAC was taken out of context and, when read within Sulkowicz's complete statement in the article, it is clear that she meant that Columbia students were not safe while Nungesser remained on campus, not that Nungesser himself was vulnerable to harm. Nungesser's interpretation is at best a misreading of the article and at worst an attempt to mislead the Court. Consequently, the Court will not accept Nungesser's characterization of this statement in the SAC as true. *See TufAmerica, Inc. v. Diamond*, 968 F. Supp. 2d 588, 592 (S.D.N.Y. 2013) ("If a document relied on in the complaint contradicts allegations in the complaint, the document, not the allegations, control, and the court need not accept the allegations in the complaint as true.").

atmosphere on campus during this time as "openly hostile" and "dominated by . . . activists," alleging that "[s]ocial networks, including comments on campus media, were filled with threats against [him]," and that "[p]rofessors and teachers who in private conversations expressed their support for [Nungesser] refrained from doing so publicly out of fear of endangering their future career at Columbia."  SAC ¶ 63.

Sulkowicz publicly stated that the goal of the project was to "[g]et my rapist off campus" and stated:  "I hope that when my attacker sees me doing this piece he will want to leave on his own." SAC ¶ 43.  She also vowed:  "I will carry the mattress with me to all of my classes, every campus building, for as long as my rapist stays on the same campus with me."  *Id.*

Near the beginning of the Mattress Project, Columbia issued the following comment to the New York Daily News:

> The University respects the choice of any member of our community to peacefully express personal or political views on this and other issues.  At the same time, the University is committed to protecting the privacy of students participating in gender-based misconduct proceedings.  These matters are extremely sensitive, and we do not want to deter survivors from reporting them. The University therefore does not comment on these matters.

SAC ¶ 40 n.39.

Nungesser alleges that Defendant Kessler helped Sulkowicz design the Mattress Project; he also approved it as Sulkowicz's senior thesis project, for which she received course credit.  SAC ¶ 47. Kessler also made public statements about the project.  Specifically, he said that he had discussed endurance art with Sulkowicz and that he was struck by the fact that she was "making an enormous statement for change."  *Id.* n.48.  He also stated:  "Carrying around your university bed—which was also the site of your rape—is an amazingly significant and poignant and powerful symbol."  SAC ¶ 47 & n.49.  In making the latter comment, Nungesser alleges, Kessler "publicly refer[red] to Sulkowicz's accusation as fact" and "publicly endorsed [Sulkowicz's] harassment and defamation of [Nungesser]."  SAC ¶ 47.

According to the SAC, "Defendant Kessler was not the only Columbia University employee that actively supported Sulkowicz's harassment campaign and represented her false accusation that [Nungesser] has committed rape as fact, directly defaming [him]." SAC ¶ 48. On September 10, 2014, Columbia's Institute for Research on Women, Gender, and Sexuality ("IRWGS") announced on its website that the Institute would be closed for the day in support of "Carrying the Weight." *Id.* The announcement also read: "Help Emma Carry the Weight . . . This is an open call to action for participation in our first collective carry." *Id.* Nungesser alleges that, by closing the Institute and making this "call to action," IRWGS "publicized its support for Sulkowicz's harassment." *Id.* Nungesser also alleges that an article published by IRWGS on a Columbia-owned website a few days later "presented it as a fact that [he] had raped Sulkowicz," because the article referred to Sulkowicz as a "survivor of sexual assault" and stated that Sulkowicz "has promised to carry a mattress to each of her classes so long as she attends school with same student who sexually assaulted her." SAC ¶ 50 & n.51.

In a September 21, 2014 cover story in New York Magazine, Bollinger stated: "This is a person who is one of my students, and I care about all of my students. And when one of them feels that she has been a victim of mistreatment, I am affected by that. This is all very painful." SAC ¶ 51. Although Bollinger was referring to Sulkowicz in his statement, Nungesser alleges that "victim of mistreatment" and "painful" "more accurately describe [his] experience caused by the media fallout from Sulkowicz's harassment against [him] and Columbia's failure to protect him." SAC ¶ 52.

On October 2, 2014, Sulkowicz's parents published an op-ed in the Columbia Spectator styled as an open letter to Bollinger and Columbia's board of trustees. SAC ¶ 62 & n.69. The op-ed, which named Nungesser, argued that the investigation, hearing, and appeals process that Columbia had undertaken in response to Sulkowicz's complaint had been "painfully mishandled"

and that Columbia had "violated standards of impartiality, fairness, and serious attention to the facts of the case." *See id.* n.69.  It also listed six specific ways in which Sulkowicz's parents believed the hearing process had been "stacked against" Sulkowicz.  *Id.*  In addition, her parents noted in the op-ed that they had written to Bollinger in November 2013 about "the facts of the case, the existence of procedural errors, and the failure to abide by University policy in the scheduling and administration of the hearing," but that they "received no reply from [him]."  *Id.*

On October 29, 2014, a "National Day of Action" was held on the Columbia campus. SAC ¶ 54.  Nungesser alleges that, on that day, activists brought their mattresses to a class that he attended, and that "[t]hroughout the class they stared at him and took his picture without his consent."  SAC ¶ 71 n.77.  The day culminated with a group of activists, including Sulkowicz, delivering a mattress to Bollinger on which they had written a set of demands.  SAC ¶ 56.  Their demands were also read in public, published in writing, and posted at Bollinger's door.  *Id.*  The last demand on the list stated:

> The investigation and adjudication process of the sexual assault report made by Emma Sulkowicz against Jean-Paul Nungesser was grossly mishandled.  An alleged serial perpetrator remains on our campus and presents an ongoing threat to the community.  Given these facts, we demand you re-open this case and evaluate it under the newly revised policy.

*Id.*[7]  Columbia did not, however, re-open the investigation into Sulkowicz's complaint.

Also on the date of the National Day of Action, Columbia published the following statement:

> Student activism plays an important role in encouraging these efforts, and the University appreciates this attention to a significant issue affecting the lives of college and university students around the nation.  We understand that reports about these cases in the media can be deeply distressing and our hearts go out to any students who feel they have been mistreated.  Importantly, the University will not address reports about individual cases or experiences.  This is so not only because of federal student privacy law but also—and most

---

[7] According to the SAC, "Jean-Paul" is a username that Nungesser used on Facebook.  SAC ¶ 56 n.61.

> fundamentally—because of our commitment to help students feel as comfortable as possible accessing the many resources to support them on campus without concern that the University would ever comment publicly on them or their experiences.  As a University we have made substantial new investments to further strengthen our personnel, physical resources, and policies dedicated to preventing and responding to gender-based misconduct.

SAC ¶ 58 n.66.  According to Nungesser, Columbia "decided to sponsor financially the defamation campaign against him" when it paid for some of the cost of cleanup after the Day of Action and made the above statement.  SAC ¶ 58 & n.65.  He alleges that Columbia's "sponsorship of the defamation campaign against [him] was also evidenced by" the following passage from an article written by Bollinger and Special Advisor on Sexual Assault Suzanne Goldberg and published in The New Republic on the same day as the Day of Action:

> No person who comes to a university or college to learn and live should have to endure gender-based misconduct today, particularly the young women who most frequently sustain these violations and already are saddled with gender-based burdens in their lives and interactions with others that remain deeply embedded in society even as we make great progress on this front.

SAC ¶ 59 & n.67.  According to the SAC, Bollinger and Goldberg "ignored that [Nungesser], on the receiving end of an extremely public gender-based harassment campaign and egregious intimate partner violence, was deserving of protection."  SAC ¶ 60.

The New Republic article also explained Columbia's policy against commenting on individual students or their cases:

> In addition to federal laws protecting student privacy, we understand that students in need are less likely to get help on campus if they worry that the university might one day comment on them.  This is true even if some students speak publicly about their own experiences.

> An absolute rule of never commenting can help lay the groundwork for students to feel comfortable confiding in the medical or rape crisis counseling professionals who can help them, or to engage the university disciplinary process. In an environment of substantial underreporting of sexual assault, whatever value could be gained from adding the University's perspective about any one student's case is far outweighed by the importance of protecting all students' access to resources.

*See* SAC ¶ 59 n.67.

Starting in February 2015, a few students began to speak out in Nungesser's favor. SAC ¶ 69.  Nungesser himself also decided to speak out publicly "against the expressed advice of Columbia administrators," including in an article published by the Daily Beast entitled "Columbia Student:  I didn't rape her."  *Id.* & n.76.  According to the SAC, "Columbia administrators refused to protect [him] from harassment," even after he spoke out publicly.  SAC ¶ 70.

On April 11, 2015, Nungesser alleges, activists projected "Rape happens here" and "Columbia protects rapists" in "huge letters over Low Library and held banners reading 'Carry That Weight' and 'Columbia Protects Rapists' over Low Library steps and ledges by Kent Hall." SAC ¶ 72.  Nungesser asserts that Columbia "did not stop the activists, even though it was clear that the projected slogans and banners referred to [him] specifically and were another attempt to shame him away."  *Id.*

During the week before Sulkowicz's and Nungesser's graduation, three prints created by Sulkowicz were displayed in Columbia's Leroy Nieman Gallery as part of the University Visual Arts Program/Undergraduate Thesis Show.  SAC ¶¶ 74-75.  The prints were superimposed over New York Times articles describing Sulkowicz's claims against Nungesser, one of which identified Nungesser by his full name.  SAC ¶ 74.  One of them "depicted [Nungesser] choking and committing rape against her."[8]  SAC ¶ 75.  A second print allegedly showed Nungesser alone and naked with an erect penis.  *Id.*  A third print depicted the mattress carried by Sulkowicz as her senior thesis.  *Id.*

The show was open to the public.  SAC ¶ 76.  Approximately forty people attended a reception that was held for the show, including Defendant Thomas Vu-Daniel, who was the artistic

---

[8] Nungesser alleges that, because one of the articles identified him by his full name, it was clear that the images were meant to portray him.  SAC ¶ 74.  The Court accepts that inference for purposes of this motion.

director of the LeRoy Nieman Center for Print Studies and a Columbia employee.  SAC ¶ 75.
Columbia faculty approved the display of the prints, facilitated their installation, and supervised the
reception.  SAC ¶ 76.  Nungesser was not notified by Columbia that the prints would be displayed.
SAC ¶ 77.

Sulkowicz's Mattress Project culminated on May 19, 2015, when she carried the mattress at
Columbia's graduation ceremony.  SAC ¶ 79.  She did so despite the fact that Columbia
administrators had emailed graduating students and asked that they not bring "large objects" to the
ceremony, and administrators had spoken to her both before and during the ceremony, asking that
she not carry the mattress.  SAC ¶¶ 81, 84.  The appearance of the mattress at the graduation
ceremony generated a renewed round of media attention, with hundreds of articles published
nationally and internationally.  SAC ¶ 88.  Many of those articles included Nungesser's full name.  *Id.*
In addition, a Columbia student took photographs of Nungesser during the ceremony and posted
them on his Twitter feed.  SAC ¶ 89.  One of the photographs was published in several news outlets.
"On some occasions, the word 'Rapist' was pasted over the photo and then published further."  *Id.*
Nungesser alleges that, by allowing the student to take and publish his picture, "Defendants assisted
in furthering a defamatory and systematic attack on [him]."  *Id.*

### B.  The Effect of the Events on Nungesser's Experience at Columbia

As a result of the events described above, Nungesser's social and academic experience at
Columbia suffered.  He began to fear for his safety as a result of several comments posted on
Sulkowicz's Facebook page in late 2014, as well as on other social media sources.  SAC ¶¶ 137-146.
During a series of at least twenty "collective carry" events held between September 2014 and April
2015, during which "Sulkowicz carried her mattress across campus and was supported by her
followers," Nungesser "completely avoided being on campus unless he absolutely had to."
SAC ¶ 147.  He alleges that he was "fearful to access the campus resources of the dining hall,

athletic center, libraries as well as the center for career education, and he only did so when he absolutely had to." SAC ¶ 148.

On March 26, 2015, Nungesser requested a public safety escort in order to attend a sexual respect workshop that was mandatory for all Columbia students, but his request was denied. SAC ¶¶ 71, 149. Administrators provided him with the option of writing an essay in lieu of attending the workshop, but he declined. SAC ¶ 149. Because his participation in the program was a requirement for graduation, he ultimately decided to attend the workshop. *Id.* After the workshop, he discovered an e-mail, sent to him by Columbia administrators "just minutes before the start of the workshop," recommending that he not attend. SAC ¶ 71. Nungesser requested a public safety escort again during the second National Day of Action held on April 13, 2015 because he "felt unsafe to walk around campus" and "was anticipating extended media presence," but his requested was denied. SAC ¶ 73.

The SAC also describes a small number of uncomfortable encounters that Nungesser experienced during his classes. On the National Day of Action, several "activists" brought mattresses and pillows to one of his classes and stared at him "throughout the class." SAC ¶ 151. "[S]upporters of Sulkowicz" also took his picture. *Id.* On another occasion, a student from the same class blogged about Sulkowicz's allegations and about being in class with Nungesser. SAC ¶ 152. Nungesser asserts that this made him fearful to participate in class discussion. *Id.* He ultimately elected to take the class on a Pass/Fail basis to avoid having his "poor performance" affect his GPA. *Id.*

During the summer of 2014, Nungesser took a course that involved travel through several foreign countries. During the first stop on the trip, two Barnard students expressed to the professor that Nungesser "should leave the course, since they felt that the prestige of the course had been lowered due to his 'bad public reputation.'" SAC ¶ 154. Nungesser also alleges that he was

"interrogated in detail" by two other students regarding Sulkowicz's allegations.  SAC ¶ 155.  He expressed concern to the professor of the course, who "dismissed his concerns, telling him that the people who were most upset with his presence were physically inferior to [him] and thus posed no threat to him."  SAC ¶ 156.  When he complained again, the professor "recommended" that he drop out of the course, stating that "it would make everything easier for everyone else in the class."  SAC ¶ 157.  After Nungesser's parents complained to Bollinger about the professor's response to his complaints, Columbia's Office of the President sent them an email stating that "the administrators on Paul's study abroad program acted appropriately."  SAC ¶ 158.

Notwithstanding the above events, Nungesser chose to complete the course.  SAC ¶ 159.  Due to the emotional distress that those events caused him, however, he "had problems concentrating on discussions during the trip and finally was only able to submit his final research paper late."  *Id.*

According to the SAC, Nungesser's participation in non-academic opportunities also took a toll because, "[a]fter his formal exoneration, Columbia never attempted to rehabilitate [him] in the eyes of the Campus Community."  SAC ¶ 161.  Specifically, he alleges that his membership in "his two main social peer groups"— COOP and ADP—was "effectively terminated due to Columbia's failure to rehabilitate [him]."  *Id.*  He also alleges that he is "ostracized from the alumni network and professional opportunities that would arise from access to that network."  SAC ¶ 162.

Nungesser further alleges that, "[d]ue to the intense defamation campaign in the fall of 2014 and Columbia's refusal to provide even the slightest support to [him]" and because he "feared to be addressed with regard to the allegations and that he would not know how to answer," he felt "discouraged" from attending a number of on-campus career events during late 2014 and early 2015, including an on-campus interview program, a tour of New York architecture firms, Employment VISA and F1 OPT sessions, and the Spring Career Fair.  SAC ¶¶ 163-164.  During the spring of

2015, while interning at a consultancy, Nungesser had "discussed employment options" many times; however, the "offer . . . was rescinded" in early June 2015.  SAC ¶ 164(b).  According to the SAC, the rescission of the offer followed the media's coverage of "Sulkowicz's actions at graduation" as well as her alleged publication—after she had graduated—of a pornographic video reenacting Nungesser's alleged rape of her.  SAC ¶ 164(b) & n.151.

Finally, Nungesser alleges that Sulkowicz's complaint and the events that followed negatively impacted his academic experience and performance.  In his fall 2014 Architectural Criticism course, the final exam was administered in two parts:  an oral presentation and a critique of other students' presentations.  SAC ¶ 166(a).  Although Nungesser attended the first session and gave his presentation, he alleges that he missed the critiquing session because he "suffered from sleep deprivation, depression and feelings of isolation due to the severe distress he had endured as a consequence of Sulkowicz's harassment campaign and the Columbia-fostered hostile environment." *Id.*  During the same semester, Nungesser was "psychologically unable" to take the exam for his General Physics course, which was scheduled to take place a few days after he "became aware that new allegations had been leaked by Sulkowicz and her supporters."  SAC ¶ 166(b).  Nungesser took the exam the next month and received a B+, though he alleges that he "had consistently scored much higher on homework assignments."  *Id.*  Nungesser also alleges that he was unable to attend the final few sessions and complete the final assignment for a voluntary, not-for-credit Architectural Portfolio Workshop during the spring of 2015 due to his emotional distress.  SAC ¶ 166(c).

### C.  Procedural History

Nungesser alleges nine causes of action in the SAC:  (1) gender discrimination in violation of Title IX, against Columbia; (2-6) gender discrimination in violation of New York's Human Rights Law, against Columbia, Bollinger, Kessler, Vu-Daniel, and Hirsch; (7) breach of contract, against Columbia; (8) unfair or deceptive trade practices, against Columbia; and (9) intentional infliction of

emotional distress, against all defendants.  The defendants moved to dismiss on June 15, 2016.

Nungesser filed his brief in opposition on July 20, 2016, and the defendants replied on August 3,

2016.  With leave of the Court, Nungesser filed a supplemental brief on August 19, 2016 addressing

the impact of the Second Circuit's recent decision in *Doe v. Columbia Univ.* on Defendants' motion.

The defendants filed a sur-reply on the same issue on August 25, 2016.

### D.  The New Defendants

In the SAC, Nungesser has added two defendants who were not previously named in this

lawsuit; namely, Thomas Vu-Daniel and Marianne Hirsch.  The Court's order dismissing

Nungesser's FAC did not grant leave for him to add new defendants.  As a result, it is within the

Court's authority to dismiss the claims against Vu-Daniel and Hirsch at the gate.  *See Dhar v. City of

New York*, No. 12-cv-3733 (ENV), 2015 WL 4509627, at *2 (E.D.N.Y. July 24, 2015) (dismissing

newly added defendant as outside the scope of the court's leave to amend).  The Court is mindful,

however, of the "preference expressed in the Federal Rules of Civil Procedure in general, and Rule

15 in particular, for resolving disputes on their merits."  *Krupski v. Costa Crociere S.p.A.*, 560 U.S. 538,

550 (2010).  As a result, the Court grants leave to join the new defendants and will resolve the claims

against them on the merits.

## II.   LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted

as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678

(2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility

when the plaintiff pleads factual content that allows the court to draw the reasonable inference that

the defendant is liable for the misconduct alleged."  *Id.*  (citing *Twombly*, 550 U.S. at 556).  It is not

enough for a plaintiff to allege facts that are consistent with liability; the complaint must "nudge"

claims "across the line from conceivable to plausible."  *Twombly*, 550 U.S. at 570.  Determining

whether a complaint states a plausible claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

In evaluating a 12(b)(6) motion, a court must accept all facts alleged in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 124 (2d Cir. 2008) (per curiam). Matters other than allegations of existing facts, however, are not entitled to the assumption of truth. Such matters include legal conclusions, *Iqbal*, 556 U.S. at 679, "hypothetical speculation," *Solow v. Citigroup, Inc.*, 827 F. Supp. 2d 280, 289 (S.D.N.Y. 2011), and arguments, *Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009).

"To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'" *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 555). A complaint that offers "labels and conclusions" or "naked assertion[s]" without "further factual enhancement" will not survive a motion to dismiss. *Id.* at 678 (citing *Twombly*, 550 U.S. at 555).

## III.   DISCUSSION

### A.  Title IX

Title IX of the Education Amendments of 1972 prohibits discrimination on the basis of gender in educational programs and activities receiving federal funds, providing, with certain exceptions not relevant here, that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any educational program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Title IX was "enacted to supplement the Civil Rights Act of 1964's bans on racial discrimination in the workplace and in universities." *Doe v. Columbia Univ.*, 831 F.3d at 53. There is no dispute that Title IX applies to Columbia.

Federal courts have long recognized an implied private right of action under Title IX. *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 255 (2009); *Hayut v. State Univ. of New York*, 352 F.3d 733, 749-50 (2d Cir. 2003). It is also well established that courts interpret "Title IX by looking to the body of law developed under Title VI, as well as the caselaw interpreting Title VII." *Yusuf v. Vassar Coll.*, 35 F.3d 709, 714 (2d Cir. 1994) (citations omitted); *Papelino v. Albany Coll. Of Pharmacy of Union Univ.*, 633 F.3d 81, 89 (2d Cir. 2011) ("[A] Title IX sex discrimination claim requires the same kind of proof required in a Title VII sex discrimination claim . . . [and] a Title IX hostile education environment claim is governed by traditional Title VII hostile environment jurisprudence." (internal quotation marks and citations omitted)). While a private plaintiff may bring a claim under Title IX for intentional discrimination, courts have held that a private right of action based on the alleged disparate impact of a policy is not cognizable under Title IX. *See Yu v. Vassar Coll.*, 97 F. Supp. 3d 448, 461 (S.D.N.Y. 2015); *Doe v. Columbia Univ.*, 101 F. Supp. 3d 356, 367 (S.D.N.Y. 2015), *vacated and remanded on other grounds*, 831 F.3d 46 (2d Cir. 2016).

Courts have recognized several theories of liability under Title IX. Under the most direct theory, a plaintiff can establish a Title IX claim by showing that "the defendant discriminated against him or her because of sex; that the discrimination was intentional; and that the discrimination was a 'substantial' or 'motivating factor' for the defendant's actions." *Doe v. Columbia Univ.*, 101 F. Supp. 3d at 367 (citing *Tolbert v. Queens Coll.*, 242 F.3d 58, 69 (2d Cir. 2001)); *accord Pungitore v. Barbera*, 506 F. App'x 40, 42 (2d Cir. 2012); *Chandrapaul v. City Univ. of New York*, No. 14-cv-790 (AMD), 2016 WL 1611468, at *17 (E.D.N.Y. Apr. 20, 2016). [9]

An educational institution may also be held liable under Title IX for "deliberate indifference to known acts of harassment" of one student by another, *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S.

---

[9] For example, Title IX "bars the imposition of university discipline where gender is a motivating factor in the decision to discipline." *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994). Nungesser does not raise such a claim.

629, 633 (1999), or of a student by a teacher, *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290-91 (1998); *see also Davis*, 526 U.S. at 650 (stating that sexual harassment, if sufficiently severe, is a form of "discrimination" under Title IX).  A school may be held liable under this theory if it was "deliberately indifferent to sexual harassment, of which [it] ha[d] actual knowledge, that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." *Davis*, 526 U.S. at 650.  The student-on-student or teacher-on-student harassment forming the basis for a Title IX claim must also, of course, be "gender-oriented." *Id.* at 651.  In order to constitute deliberate indifference, the school's actions must be "clearly unreasonable in light of the known circumstances." *Id.* at 648.  This is not a "mere 'reasonableness' standard." *Id.* at 649.  Title IX does not require schools to "'remedy' peer harassment" or to "ensure that students conform their conduct to certain rules." *Id.* at 648 (alterations omitted).  "On the contrary, the recipient must merely respond to known peer harassment in a manner that is not clearly unreasonable." *Id.* at 648-49.

As in his First Amended and Supplemented Complaint, Nungesser alleges that Columbia was deliberately indifferent to what he asserts was gender-based harassment by Sulkowicz, a fellow student, that was condoned by Columbia and the individual defendants.  For the reasons that follow, he fails to state such a claim.

### 1.  Nungesser Still Fails to Plead Actionable Sexual Harassment

Harassment, "even harassment between men and women" is not automatically considered to be gender-based discrimination "merely because the words used have sexual content or connotations." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998).[10]  In order to be

---

[10] In its opinion dismissing Nungesser's FAC, the Court explained in detail that the phrase "on the basis of sex" as used in Title IX refers to the plaintiff's gender status, not to the act of sexual intercourse. *See Nungesser v. Columbia Univ.*, 169 F. Supp. 3d 353, 364-66 (S.D.N.Y. 2016) ("*Nungesser I*").  The Court assumes familiarity with that analysis and does not repeat it here.

considered gender-based harassment, the harassing conduct must "support an inference of discrimination on the basis of sex." *Id.*; *see Bowman v. Shawnee State Univ.*, 220 F.3d 456, 464 (6th Cir. 2000) (holding plaintiff was not subjected to a hostile environment for purposes of Title VII because "[w]hile he may have been subject to intimidation, ridicule, and mistreatment, he has not shown that he was treated in a discriminatory manner because of his gender."); *cf. Yusuf*, 35 F.3d at 714 (stating that Title IX bars a university from taking adverse action against a student "where gender is a motivating factor in the decision"); *Chandrapaul*, 2016 WL 1611468, at *17 ("[A] 'disparate treatment claim cannot succeed' unless the plaintiff's 'protected trait actually played a role in' and had a 'determinative influence' on the adverse action." (quoting *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993))). In evaluating whether actions against a particular plaintiff were discriminatory, "courts have consistently emphasized that the ultimate issue is the reasons for the *individual plaintiff's* treatment . . . ." *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001) (affirming grant of summary judgment to defendants in Title VII case where female plaintiff was subjected to "highly cruel and vulgar" harassment, but harassment did not reflect an attack on plaintiff as a woman). "In other words, was Plaintiff being harassed because of [his or] her gender or for some other reason?" *Patenaude v. Salmon River Central Sch. Dist.*, 3:03-cv-1016, 2005 WL 6152380, at *5 (N.D.N.Y. Feb. 16, 2005).

In dismissing Nungesser's FAC, the Court held that he had "fail[ed] to plead facts giving rise to a plausible inference that Sulkowicz's actions were *motivated* by his gender." *Nungesser I*, 169 F. Supp. 3d at 366. The same is true of his SAC. As the above factual recitation shows, Nungesser once again pleads that Sulkowicz's conduct was motivated by her anger at his rejection of her as well as her anger at his having been found "not responsible" by the Hearing Panel. *See, e.g.*, SAC ¶ 14 ("Sulkowicz however, unable to accept his rejection, spent the next three years to destroy Paul's dream."); SAC ¶ 24 ("They engaged in a brief, sexual relationship in 2012. Unable to accept the end

of that relationship, Sulkowicz felt rejected and sought revenge."); SAC ¶ 41 ("Because Paul successfully participated in the investigation against him and proved his innocence as well as the baselessness of her allegations, Sulkowicz became furious.").  Thus, to the extent that Sulkowicz's activism was aimed at Nungesser, the SAC specifically alleges that it was because of *his conduct* toward her (whether because of his rejection of her, as he alleges, or because of the rape that she maintained had occurred) and her resulting personal animus against him, not because of *his status* as a male.  *See Sanches v. Carrollton-Farmers Branch Indep. Sch. Dist.*, 647 F.3d 156, 165 (5th Cir. 2011) (dismissing Title IX claim where there was "nothing in the record to suggest" that the harasser "was motivated by anything other than personal animus"); *see also Eskenazi-McGibney v. Connetquot Cent. Sch. Dist.*, 84 F. Supp. 3d 221, 233 (E.D.N.Y. 2015) (dismissing claims where plaintiffs failed to allege non-conclusory facts connecting bullying to student's disabilities, and bullying may have been based on some other reason "such as personal animus").[11]

The Court also concludes that Nungesser has failed to allege harassing conduct that states a Title IX claim.  Throughout his briefs—and, indeed, in the SAC itself—Nungesser argues that the words "rapist" and "serial rapist" are gender-based slurs such that he suffered gender-based harassment when Sulkowicz and others used those words to describe him.  He supports this argument with a number of non-legal sources (including social science articles, dictionaries, the results of a google search, and urbandictionary.com) as well as a counter-factual hypothetical.

---

[11] To the extent that Nungesser relies on Columbia's policy against "intimate partner violence" for his Title IX claim, that reliance fails.  According to the SAC, Columbia's policies "recognize 'intimate partner violence'" as a form of gender-based misconduct."  SAC ¶ 22.  "Intimate partner violence" is defined in Columbia's policies to include "any behaviors that intimidate, manipulate, humiliate, isolate, frighten, terrorize, coerce, threaten, blame, hurt, injure, or wound" a "partner in an intimate relationship," including a former partner.  SAC ¶ 22.  Columbia's policies do not define the scope of actionable conduct under Title IX, which does not create liability for every form of hurtful conduct merely because the source and target of the conduct were once involved in an intimate relationship.  Indeed, in the analogous context of Title VII, "courts often find that harassment by a co-worker is not considered to be 'based on sex' when it arises from a failed relationship." *Conklin v. Cty. of Suffolk*, 859 F. Supp. 2d 415, 428-29 (E.D.N.Y. 2012) (collecting cases).  To be sure, the Court does not hold that harassment of a former romantic partner can never constitute actionable harassment under Title IX, only that the mere fact of a romantic relationship does not convert all hurtful conduct into harassment "on the basis of sex."

The parties dispute whether the terms "rapist" and "serial rapist" ever constitute gendered slurs. Nungesser argues that, like the term "whore," "rapist" is susceptible of two meanings:

> [S]imilar to "whore," "rapist" is a term, that can either describe a fact – a person is offering sexual service / a person having committed sexual violence against another person – or be used as a gendered slur: "You dress / dance / act like a whore" is a gendered slur, a form of verbal abuse that is only directed at women, because it criticizes an alleged behavior that violates the social norms of "how a woman should behave." To describe a woman who does not work as a prostitute, as a whore, aims to demean her and accuse her of violating assumed female virtues (like chastity, restraint in sexual activities, rejection of promiscuous behavior) and instead equates her with a standard, sex-based, misogynist stereotype ("women are whores").

SAC ¶ 113. Nungesser argues that "rapist" has a similar secondary meaning that operates not as a statement of fact that someone has committed the crime of forcible sexual intercourse, but rather as an insult that reflects gender-based stereotypes of men as "sex-driven." SAC ¶¶ 105-106, 118; ECF No. 59, Pl.'s Mem. in Opp'n to Defs.' Mot. to Dismiss ("Pl.'s Mem."), at 7-8. Defendants disagree. ECF No. 54, Defs.' Mem. in Supp. of Mot. to Dismiss ("Defs.' Mem."), at 9.

The Court need not decide this question. The Court accepts for the purposes of this motion that the terms "rapist" and "serial rapist" constitute gendered slurs in some circumstances. But this is not an examination of hypotheticals or arguments in the abstract, including the many arguments and hypotheticals embedded in the SAC. Rather, it is an examination of the facts pleaded, and the facts pleaded in the SAC show that the terms were not used in such a manner here. The SAC alleges a sexual encounter between Sulkowicz and Nungesser, which he maintains was consensual and she says was rape. SAC ¶ 15. The SAC also alleges that three other students filed complaints of sexual assault against Nungesser. SAC ¶ 15 n.5. For the purposes of this motion, the Court accepts, as it must, Nungesser's version of events—that Sulkowicz, scorned, revenged Nungesser's rejection of her and instigated others to aid her. In this case, the use by Sulkowicz and others of the words "rapist" and "serial rapist" is pleaded to have been based on particular events involving a particular

male; they were not used as generic terms to disparage men, or Nungesser as a man.[12]  Instead, Nungesser expressly alleges that Sulkowicz falsely accused him—both before and after the Hearing Panel found him "not responsible"—of committing a criminal act that was sexual in nature.  Indeed, Nungesser effectively concedes this in his brief.  *See, e.g.*, Pl.'s Mem. at 10-11 ("A gender-based hostile educational environment was created by Columbia condoning and at times participating in Sulkowicz's public denunciations at Columbia of Paul as a 'rapist' *in fact* . . . ." (emphasis added)).[13]  Therefore, while the Court accepts that those terms could be used in such a way (as *argued* in the SAC and Nungesser's briefs), the *facts* alleged in the SAC plausibly suggest only that they were used on account of Nungesser's asserted sexual misconduct—to describe him as a rapist "in fact," as Nungesser asserts—not because of his gender.

Nungesser's reliance on *Doe v. East Haven Board of Education*, 200 F. App'x 46 (2d Cir. 2006) is unavailing.  In that case, the plaintiff brought a Title IX claim on behalf of her minor daughter, alleging that her daughter had suffered student-on-student sexual harassment in the form of verbal abuse after reporting that she was the victim of an off-campus rape by two other students at her high school, and that the school acted with deliberate indifference, thereby depriving her of access to educational opportunities and benefits.  *Id.* at 47.  At trial, the daughter testified that, "beginning the day after she reported the rape, she was subjected to verbal abuse by other, primarily female, students:  'A lot of people were calling me a slut, saying I slept with two boys.  Just nasty names. . . .

---

[12] Nungesser argues that Sulkowicz's use of the term "rapist" was not "based on an actual event," because he "never raped Sulkowicz, Columbia exonerated him after a thorough lengthy investigation, [and] the police declined to even investigate due to the lack of reasonable suspicion."  SAC ¶ 119-120.  Therefore, he asserts, Sulkowicz "invented an event in order to stigmatize Nungesser as a rapist."  SAC ¶ 120.  Even accepting Nungesser's allegation that Sulkowicz's rape complaint was "false," as the Court must at this juncture, other facts pleaded in the SAC show that Sulkowicz's conduct was nevertheless based on an actual event—Nungesser's romantic rejection of Sulkowicz.  *E.g.*, SAC ¶¶ 14, 24.  And even accepting that Sulkowicz "invented an event in order to stigmatize Nungesser as a rapist," the only plausible inference to be drawn from the SAC is that she did so using the "primary" meaning of the word (that is, to falsely state that Nungesser had actually raped her).

[13] The Court observes that at least one circuit has held that "acts of name-calling do not amount to sexual harassment, even if the words used are gender-specific, unless the underlying motivation for the harassment is hostility toward the person's gender."  *Wolfe v. Fayetteville, Ark. Sch. Dist.*, 648 F.3d 860, 867 (8th Cir. 2011).

A slut, a liar, a bitch, a whore.'"  *Id.* at 48.  The jury returned a verdict in favor of the plaintiff, and

the district court denied a renewed motion for judgment as a matter of law and motion to set aside

the verdict.  *Id.* at 47.  On appeal, the Second Circuit affirmed the denial of that motion, holding:

> Although we recognize that name-calling in school which implicates a student's
> sex does not in itself permit an inference of sex-based discrimination, we cannot
> exclude the possibility that such name-calling in the context of a reported rape
> constitutes sexual harassment. A reasonable fact-finder could conclude that, when
> a fourteen-year-old girl reports a rape and then is persistently subjected by other
> students to verbal abuse that reflects sex-based stereotypes *and* questions the
> veracity of her account, the harassment would not have occurred but for the girl's
> sex.

*Id.* at 48 ((internal citation omitted) (emphasis in original).  Nungesser argues that *Doe v. East Haven*

"is directly applicable here."  Pl.'s Mem. at 9.  The Court does not agree.

     *Doe v. East Haven* was issued by summary order; thus, it is non-precedential.  In addition, the

post-trial, post-verdict posture of that case is wholly different than the posture here.[14]  But even

overlooking those distinctions, the facts here are not the same.  First, unlike the student in *Doe v.*

*East Haven*, Nungesser was not the alleged victim of a rape, nor did he report being raped.  And, as

explained earlier, in contrast to the clearly non-literal usage of the terms "slut," "bitch," and "whore"

in *Doe v. East Haven*, Nungesser has not plausibly alleged that the names he was called were used in a

manner driven by sex-based stereotypes, as opposed to an alleged criminal act that involved sex.  He

argues in the SAC and his briefs that the terms "rapist" and "serial rapist" reflect stereotypes of the

"sex-driven male."  *See, e.g.*, SAC ¶ 105.  As already explained, the Court accepts for purposes of this

motion that such a use exists under some circumstances.  But the facts that Nungesser alleges in the

SAC show that those names were used under the circumstances relevant to his claims according to

their primary meaning—that is, to accuse him of being a rapist, whether falsely or not.[15]

---

[14] The case was also decided before the Supreme Court's decisions regarding the Rule 8 pleading standard in *Twombly* and *Iqbal*.

[15] Nungesser may, in fact, concede as much.  In his opposition brief, he argues that "Sulkowicz's words and actions accusing [him] of rape" are "clearly" defamatory statements of fact (and therefore not protected by the First

Finally, it is not necessary for the Court to determine whether the graphic images displayed in the Leroy Nieman Gallery in May 2015 amounted to actionable sexual harassment under Title IX. That is so because, even assuming the images constitute actionable sexual harassment, their display a mere one week before Nungesser graduated could not have resulted in the kind of systemic effect on Nungesser's education that Title IX requires.[16]

As the Court observed in its prior ruling, to hold that Nungesser has stated a claim simply because the term "rapist" involves a sexual act would give every accused campus rapist the opportunity to sue under Title IX merely because the alleged criminal act complained of involved sex, as opposed to any other form of violence.  The Court accepts for purposes of this motion that the term can be used as an abusive gendered stereotype in certain circumstances.  However, Nungesser cannot invoke Title IX to censor the use of the terms "rapist" and "rape" by an alleged victim of the crime—those are the English words that define the criminal and the crime.  The Court does not accept Nungesser's categorical proposition that the use of the term "rapist" by an alleged student victim to describe his or her alleged attacker necessarily establishes the predicate of a Title IX claim because the term may also have a gendered secondary meaning.  "Neither the text nor the purpose of Title IX supports this conclusion."  *Nungesser I*, 169 F. Supp. 3d at 367.  Therefore, the Court has closely analyzed the facts alleged in the SAC to evaluate the use of the term as pleaded in this case.

---

Amendment) because "(1) accusing someone of rape has a precise meaning that is readily understood; (2) the accusation of rape can be proven true or false; and (3) the full context of the communication and the broader social context signal that the accusation Paul raped Sulkowicz is a factual one."  Pl.'s Mem. at 22.

[16] In addition, the Court in *Davis* stated:  "Although, in theory, a single instance of sufficiently severe one-on-one peer harassment could be said to have [a systemic effect on educational programs or activities], we think it unlikely that Congress would have thought such behavior sufficient to rise to this level in light of the inevitability of student misconduct and the amount of litigation that would be invited by entertaining claims of official indifference to a single instance of one-on-one peer harassment."  526 U.S. at 652-53; *see also Carabello v. N.Y.C Dept. of Educ.*, 928 F. Supp. 2d 627, 643 (E.D.N.Y. 2013) ("[I]n a narrow realm of cases, courts have found 'sufficiently severe' harassment under Title IX from a single incident, but only where the conduct consists of extreme sexual assault or rape.")

Nungesser alleges time and again throughout the SAC that he was "defamed," and the facts

he pleads, when accepted as true, bear that characterization out.  But Nungesser did not bring a

defamation action.  Instead, he chose to bring a Title IX action.  Because he plausibly alleges neither

that he was harassed because of his male gender, nor that he was subjected to sexually harassing

conduct that gives rise to a claim for student-on-student or teacher-on-student harassment under

Title IX, he does not allege discrimination "on the basis of sex" as required by Title IX.  In so

holding, the Court has not weighed the facts alleged in the SAC—to the contrary, it has assumed

their truth—but neither has the Court accepted as true the hypotheticals, abstract arguments, and

other polemics contained within the SAC.

Because Nungesser does not plausibly plead actionable sexual harassment, he does not state

a claim under Title IX.  As the Court stated in dismissing the FAC, this conclusion does not leave

him without any remedy.  State laws have long provided claims for defamation.[17]  But Nungesser has

not pursued such a claim here.

### 2. Nungesser Still Does Not Allege a Sufficient Deprivation of Access to Educational Opportunities

Even if Nungesser had pleaded facts sufficient to support a plausible inference of gender-

based harassment, his Title IX claim would still fail because he has not alleged harassment "that is so

severe, pervasive, and objectively offensive that it can be said to deprive [him] of access to the

educational opportunities or benefits provided by the school."  *Davis*, 526 U.S. at 650.

"The most obvious example" of actionable peer harassment would "involve the overt,

physical deprivation of access to school resources."  *Id.*  "It is not necessary, however, to show

---

[17] In New York, for example "[m]aking a false statement that tends to expose a person to public contempt, hatred, ridicule, aversion or disgrace constitutes defamation," and "[a] verbal utterance that inaccurately accuses a person of a serious crime can be slander *per se*."  *Thomas H. v. Paul B.*, 18 N.Y.3d 580, 584 (N.Y. 2012) (citations omitted).  "Because the falsity of the statement is an element of the defamation claim, the statement's truth or substantial truth is an absolute defense."  *Moorhouse v. Standard, New York*, 997 N.Y.S.2d 127, 135 (App Div. 2014) (citation omitted).

physical exclusion to demonstrate that students have been deprived by the actions of another student or students on the basis of sex." *Id.* at 651.  In situations in which there is no physical exclusion, courts consider whether the harassment "had a concrete, negative effect" on the plaintiff's "ability to receive an education."  *Id.* at 654; *see Fennell v. Marion Indep. Sch. Dist.*, 804 F.3d 398, 410 (5th Cir. 2015) (applying *Davis* in the context of a Title VI claim); *Jennings v. Univ. of North Carolina*, 482 F.3d 686, 699 (4th Cir. 2007); *Gabrielle M. v. Park Forest Chicago-Heights, Ill. Sch. Dist. 163*, 315 F.3d 817, 821 (7th Cir. 2003); *see also Hawkins v. Sarasota Cty. Sch. Bd.*, 322 F.3d 1279, 1289 (11th Cir. 2003) (holding that "the effects of the harassment must touch the whole or entirety of an educational program or activity").  Examples of such negative effects include a drop in grades, missing school, being forced to transfer schools, or mental health issues requiring therapy or medication.  *Davis*, 526 U.S. at 652 (numerous acts of offensive touching resulted in drop in grades and petitioner writing a suicide note); *Hill v. Cundiff*, 797 F.3d 948, 976 (11th Cir. 2015) (student who was raped when school officials decided to use her as "bait" in a sting operation to catch another student in the act of sexual harassment missed school, withdrew from extracurricular activities, transferred schools, her grades suffered, and she became depressed).

Assuming the truth of the well-pleaded factual allegations in the SAC, the Court recognizes that Nungesser's senior year at Columbia was neither pleasant nor easy.  Title IX, however, sets a high bar before a private plaintiff may recover.  Although Nungesser has added more detail to his allegations on this prong of his Title IX claim, he still has not alleged facts showing that he was effectively deprived of Columbia's educational opportunities.

Nungesser alleges that "threats by Sulkowicz and her followers made [him] reasonably fearful for his safety and his physical well-being."  SAC at p. 54.  The only threat that Nungesser alleges to have been made by Sulkowicz, however, is her statement in a New York Times article that "[i]t's not safe for him to be on campus."  SAC ¶ 137.  As the Court has already explained, the

inference that this statement was meant as a threat against Nungesser, rather than a statement suggesting that others were not safe while he was on campus, is implausible when read in context, and the Court does not accept Nungesser's interpretation as true for purposes of this motion. *See supra* note 6.

With respect to Sulkowicz's "followers," Nungesser has added a number of screenshots of social media posts that allegedly made him fear for his safety, but he does not allege any concrete facts suggesting that those messages were posted by members of the Columbia community. Title IX does not impose liability for deliberate indifference to conduct over which an educational institution has no control. *See Davis*, 526 U.S. at 645 (stating that a funding recipient's damages liability is limited to "circumstances wherein the recipient exercises substantial control over both the harasser and the context in which the known harassment occurs"). Columbia does not exercise control over postings made on Facebook, Twitter, or Tumblr, on which the majority of the threats are alleged to have been posted. SAC ¶¶ 137-145. The only allegation Nungesser makes in the SAC of threats actually posted by Columbia students in a context over which Columbia may be said to exercise control is a vague allegation that certain unspecified threats were published in the comments section of the Columbia Spectator and BWOG websites and that, "[e]ven though most of these offensive comments were later deleted by moderators, they made Paul reasonably fear for his safety since it was reasonable to suppose that while anonymous, most of the comments were written by students at Columbia." SAC ¶ 138 & n.141.

In any event, even assuming that some of those threats came from Columbia students, Nungesser does not sufficiently allege that they actually had a concrete, negative impact on his ability to access the educational benefits and opportunities offered by Columbia. Nothing in the SAC suggests that the alleged threats ever escalated into any situations of actual physical danger. Similarly, although Nungesser alleges that he requested and was denied a security escort on two

occasions, he does not allege that he was actually physically endangered on those occasions or that campus security withheld its services from him in the face of actual physical danger on any occasion.

Nungesser also alleges in conclusory fashion that he was "deprived of the use of campus facilities," SAC at p. 59, and that he was "reasonably fearful to access the campus resources of the dining hall, athletic center, libraries as well as the center for career education," SAC ¶ 148. A closer examination of the facts alleged, however, shows that Nungesser was able to access campus facilities when it was necessary for him to do so, including in the two instances in which he had requested a security escort but was not given one. *See* SAC ¶¶ 147-149.[18]

Further, the two occasions—out of hundreds of class meetings—on which Nungesser alleges that he was "harassed" in class when other students brought mattresses and pillows to class, stared at him, or took pictures of him do not amount to the kind of pervasive interference with his educational experience that Title IX requires. Although he alleges that these incidents made him "fearful to participate in class discussion," and that he elected to "take the class Pass/Fail only to avoid that his poor performance affected his GPA," SAC ¶ 152, he does not allege that this affected his ability to learn the class material or that the decision to take the class on a pass/fail basis negatively affected his GPA or his ability to graduate.

Similarly, Nungesser's allegation that "[his] academic experience suffered," SAC at p. 67, is insufficient. Of course, that conclusory assertion, without more, does not suffice. Instead, the Court must look at the actual factual allegations made in the SAC. The only classes that he alleges that he missed during the entirety of the events underlying his lawsuit are "the last few sessions" of a voluntary, not-for-credit workshop. SAC ¶ 166(c). While the SAC alleges that Nungesser was scheduled to take a final exam in his General Physics course on December 19, 2014, and was

---

[18] As already noted, Nungesser alleges that, when he expressed concern about attending a mandatory sexual respect workshop in March 2015, the Columbia administration provided him with an alternate way to meet that requirement, though he chose to attend the workshop anyway. SAC ¶ 149.

granted an extension that allowed him to take it in January 2015, SAC ¶ 166(b), his assertion that he would have received a higher grade than a B+ had he taken the exam in December, as scheduled, is wholly speculative.[19]  But even accepting that allegation as true, a "mere decline in grades" is not enough to survive a motion to dismiss a Title IX claim, particularly absent an allegation that it substantially affected his GPA as a whole or his ability to graduate.  *See Davis*, 562 U.S. at 652.  In addition, while Nungesser alleges that he was unable to participate in a critique of other students' work, he does not suggest that his grade in that course suffered in any way as a result.  SAC ¶ 166(a).

Although Nungesser alleges that he was made uncomfortable during his summer 2014 traveling course when other students expressed to the professor their opinion that he should leave the course, and that the professor eventually recommended that he drop out, he does not allege that he was required to drop out.  SAC ¶ 153-159.  To the contrary, Nungesser alleges that he completed the course.  SAC ¶ 159.  And while he alleges that he submitted his "final research paper late," he does not allege that doing so adversely affected his grades or his ability to graduate in any way.  SAC ¶ 159.  *See, e.g.*, *Hawkins*, 322 F.3d at 1289 (affirming dismissal of a Title IX claim where there was "[n]o physical exclusion or denial of access to facilities" and plaintiffs did not suffer "a decline in grades"); *see also, e.g.*, *Gabrielle M.*, 315 F.3d at 823 (affirming dismissal of a Title IX claim where plaintiff's "grades remained steady and her absenteeism from school did not increase"); *Spinka v. E.H.*, No. 14-cv-583, 2016 WL 1294593, at *5 (S.D. Ill. Mar. 31, 2016) (finding no denial of educational opportunities where the "school made accommodations for her to finish assignments and take her AP History Exam").

Nungesser also alleges that the Mattress Project and related events "precluded" him from attending on-campus career events.  SAC at p. 63.  In its order dismissing the FAC, the Court noted

---

[19] Moreover, the Court observes that, as alleged in the SAC, Columbia accommodated Nungesser by permitting him to take the exam at a later time.  SAC ¶ 166(b).

that "it is debatable whether such events are an educational opportunity or benefit for the purposes of Title IX." *Nungesser I*, 169 F. Supp. 3d at 368. Nungesser provides no legal authority to the contrary this time around. Even assuming that such events form part of the educational experience addressed by Title IX, however, Nungesser fails to allege that he was actually precluded from attending them. He does not allege that he attempted to attend them or that we was turned away at the door. Instead, he asserts that he felt "discouraged" from doing so because he was unsatisfied with the advice he had received from the administration concerning how to respond to questions about Sulkowicz's allegations against him or the media attention that followed. SAC ¶¶ 163-164. But Title IX did not require Columbia to provide him with any particular advice. *See Davis*, 526 U.S. at 648 (stating that Title IX does not grant victims of peer harassment the "right to make particular remedial demands"). As alleged in the SAC, Nungesser ultimately chose not to attend these events; he was not precluded from doing so.

Finally, Nungesser asserts that a job offer was rescinded in June 2015. The Court notes that Nungesser's allegations with respect to that offer are somewhat vague. He alleges that, during an internship at "Office:MG," he "discussed employment options many times." SAC ¶ 164(b). It is not clear to the Court that Nungesser ever received a formal job offer, but the Court will draw that inference in his favor. Even so, Nungesser concedes in the SAC that the offer was rescinded in June 2015—*after* he and Sulkowicz had graduated from Columbia—and alleges that the rescission was caused by Sulkowicz's behavior during the graduation ceremony and a pornographic video that she published *after* they graduated. SAC ¶ 164(b) & n.151. At the time that the alleged offer was rescinded, Columbia no longer any had ability, much less any obligation, to silence or otherwise discipline Sulkowicz. Moreover, like the prints discussed above, Sulkowicz's behavior during the graduation ceremony (the very last moment during which Nungesser was a Columbia student) could

not logically have caused the kind of severe and pervasive interference with Nungesser's educational experience that Title IX proscribes.

Although Nungesser includes more detail in his SAC than in his previous pleadings, he still fails to allege a concrete, negative, and systemic effect on his ability to receive an education. He does not allege that his grades dropped significantly, that he suffered mental health issues that required therapy or medication, that he was unable successfully to complete a course, that he was delayed or prevented from graduating (to the contrary, he graduated on time in May 2015), or that he missed a significant number of classes as a result of these events. *Compare Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 666-67 (2d Cir. 2012) (applying *Davis* and affirming Title VI liability where high school student was "taunted, harassed, menaced, and physically assaulted" for over three-and-half years, called "a 'nigger' nearly every day," "received explicit threat as well as implied threats, such as references to lynching," and was driven to leave the school without completing his education) *with Manfredi v. Mount Vernon Bd. of Educ.*, 94 F. Supp. 2d 447, 455 (S.D.N.Y. 2000) (student who missed a single day of school and advanced with her class to the next grade at the end of the year was not denied access to educational opportunities). Thus, taken together, Nungesser's factual allegations in the SAC do not plausibly plead deprivation of access to educational opportunities within the meaning of Title IX.

### 3.  Observations Related to the "Clearly Unreasonable" Prong

As noted earlier, an educational institution is not "deliberately indifferent" within the meaning of Title IX unless its response to student-on-student harassment or lack thereof was "clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 648; *see also id.* at 649 (stating that courts may "identify a response as not 'clearly unreasonable' as a matter of law" in appropriate cases). *Davis* makes clear that Title IX does not require school administrators to

"purg[e] their schools of actionable peer harassment" or to take "particular disciplinary action;" nor does Title IX grant students the "right to make particular remedial demands." *Id.* at 648.

Columbia raises a number of significant arguments in its briefs in support of its position that its response to the events at issue in this case was not "clearly unreasonable" in light of its conflicting interests and responsibilities. Most significantly, Columbia points to its responsibility to account for students' rights to free speech and the University's own responsibility as an academic institution to promote free speech and debate, as well as academic freedom. *See* Defs.' Mem. at 19-22. These arguments may provide additional support for the Court's conclusion that Nungesser has failed to state a Title IX claim. Because the Court has held that Nungesser has failed to plead facts plausibly alleging the other prongs of the *Davis* standard, however, the Court need not reach a holding with respect to whether Columbia's actions were "clearly unreasonable."

* * *

Nungesser's Title IX deliberate indifference claim appears to rest largely on an assumption that Title IX required Columbia to rehabilitate his image after he was found "not responsible" for having sexually assaulted Sulkowicz. It is clear from the SAC that Nungesser wanted Columbia to do this in part by silencing any statements made by Sulkowicz or others that contradicted that finding. But Title IX does not require educational institutions to prevent defamation or to otherwise force its students to accept without challenge the results of its disciplinary processes. Instead, Title IX requires only that educational institutions respond to severe and pervasive sexual harassment in a manner that is not clearly unreasonable. Nungesser has failed adequately to allege that Columbia breached that obligation.

Because the Court has already afforded Nungesser an opportunity to correct the same deficiencies identified herein, and he has failed to do so, the Court concludes that further leave to amend would be futile. Accordingly, Nungesser's Title IX claim is dismissed with prejudice.

### B. New York Human Rights Law

The parties agree that Nungesser's claims under the New York Human Rights Law should be evaluated under the same standard as his analogous claim under Title IX.  *See* Defs.' Mem. at 23 (citing *T.P. ex rel. Patterson v. Elmsford Union Free Sch. Dist.*, No. 11-cv-5133 (VB), 2012 WL 860367, at *9 (S.D.N.Y. Feb. 27, 2012)) *and* Pl.'s Mem. at 26 (stating that, "[b]ecause the SAC does state a good Title IX claim . . . , the Human Rights Law claims are good as well").  Because Nungesser fails to state a claim under Title IX, he likewise fails to state claims under the New York Human Rights Law.  As with his Title IX claim, the Court concludes that any further amendment would be futile, and the claims are dismissed with prejudice.

### C. Breach of Contract

"In New York, the relationship between a university and its students is contractual in nature."  *Yu v. Vassar Coll.*, 97 F. Supp. 3d 448, 481 (S.D.N.Y. 2015) (quoting *Papaspiridakos v. Educ. Affiliates, Inc.*, No. 10-cv-5628 (RJD), 2013 WL 4899136, at *3 (E.D.N.Y. Sept. 11, 2013), *aff'd*, 580 F. App'x 17 (2d Cir. 2014)).  "When a student is admitted to a university, an implied contract arises between the parties which states that if the student complies with the terms prescribed by the university, he will obtain the degree he seeks."  *Vought v. Teachers Coll., Columbia Univ.*, 511 N.Y.S.2d 880, 881 (App. Div. 1987) (citing *Carr v. St. John's Univ.*, 231 N.Y.S.2d 410, 413 (App. Div.) *aff'd*, 12 N.Y.2d 802 (1962)).  "The rights and obligations of the parties as contained in the university's bulletins, circulars and regulations made available to the student, become a part of this contract."  *Id.* at 881 (citing *Prusack v. State of New York*, 498 N.Y.S.2d 455 (App. Div. 1986)).

But "[n]ot every dispute between a student and a university is amenable to a breach of contract claim."  *Gally v. Columbia Univ.*, 22 F. Supp. 2d 199, 206 (S.D.N.Y. 1998).  "[T]he mere allegation of mistreatment without the identification of a specific breached promise or obligation does not state a claim on which relief can be granted."  *Id.* at 207; *see also Baldridge v. State of New*

*York*, 740 N.Y.S.2d 723, 725 (App. Div. 2002) ("[W]hile a school may be subject to a cause of action for breach of contract, this requires a contract which provides for 'certain specified services' as 'courts have quite properly exercised the utmost restraint applying traditional legal rules to disputes within the academic community.'") (internal citations omitted).

In order to state a claim for breach of such a contract, a student must identify "specifically designated and discrete promises." *Ward v. New York Univ.*, No. 99-cv-8733 (RCC), 2000 WL 1448641, at *4 (S.D.N.Y. Sept. 28, 2000). "General policy statements" and "broad and unspecified procedures and guidelines" will not suffice. *Id.*; *see also Gally*, 22 F. Supp. 2d at 208 ("[G]eneral promises about ethical standards" that are "subject to neither quantification nor objective evaluation" "are far different from the types of specific promises which have led to valid breach of contract claims against universities."). For example, a student who alleged that she did not receive the field work supervision she was promised in her student handbook—including a one-and-a-half to two-hour weekly supervision conference—stated a claim. *Clarke v. Trustees of Columbia Univ.*, No. 95-cv-10627 (PKL), 1996 WL 609271, at *5-6 (S.D.N.Y. Oct. 23, 1996). In contrast, "a general statement" of a university's adherence "to existing anti-discrimination laws" "does not create a separate and independent contractual obligation." *Gally*, 22 F. Supp. 2d at 208 (citing *Blaise-Williams v. Sumitomo Bank, Ltd.*, 592 N.Y.S.2d 41, 42 (App. Div. 1993)); *see also Cheves v. Trustees of Columbia Univ.*, 931 N.Y.S.2d 877 (App. Div. 2011) (holding that alumni relations brochure listing certain benefits and services generally available to alumni did not guarantee alumni access to campus).

Nungesser alleges that Columbia breached six policies in its treatment of him: (1) its policy concerning gender-based harassment; (2) its policy concerning confidentiality; (3) its policy concerning retaliation against persons involved in an investigation, proceeding, or hearing; (4) its policy concerning the duty to report allegations of gender-based misconduct; (5) its policy concerning fair process to both complainants and respondents in disciplinary investigations and

proceedings; and (6) its policy concerning the presumption of innocence in disciplinary proceedings. He also alleges that Columbia violated the duty of good faith and fair dealing.  None of these claims withstand scrutiny, however, because Nungesser has not identified the specific promises that Columbia has breached.

### 1.  Gender-Based Harassment Policy

Nungesser claims that Columbia violated its Gender-Based Misconduct Policies for Students by failing to "provide an environment free from gender-based harassment and discrimination."  SAC at p. 78.  More specifically, he alleges that Columbia violated the policy by, among other things, failing to take disciplinary action against Sulkowicz for the Mattress Project and her other activism, allowing her to earn academic credit for the Mattress Project, failing to notify him of various events, including when his name appeared on the "rapist-list" on campus in May 2014, and for partially paying for the clean-up costs associated with the National Day of Action.  This claim is virtually indistinguishable from the analogous claim raised in the FAC, and it fails again for the same reasons.

Columbia's 2013 and 2014 Gender-Based Misconduct Policies for Students state that Columbia is "committed to providing an environment free from gender-based discrimination and harassment."  SAC ¶¶ 210-211.  This is precisely the type of general policy statement that cannot form the basis for a breach of contract action.  In contrast, there are some specific provisions contained within the policies that may well be actionable:  accused students "shall be given at least five calendar days' notice to prepare for the hearing," and have a right to appeal "(1) the decision made by the hearing panel, and (2) the sanctions determined by the Dean of Students."  *See* ECF No. 69, Ex. A (January 2013 Gender-Based Misconduct Policies for Students), at 14, 17.[20] Nungesser is unable to point to any such concrete, specific promises that were breached in this case.

---

[20] Nungesser cited to four appendices containing Columbia policies in his SAC, but inadvertently failed to attach them. On March 7, 2017, the Court issued an order directing him to file the appendices on the docket of this case.  ECF No.

To the extent that Nungesser's breach of contract claim may rely on Columbia's response to his complaint of gender-based misconduct against Sulkowicz, it is foreclosed by the fact that Columbia's policy does not promise students who believe they have been the victim of gender-based misconduct any specific outcome. Instead, the University "provides students who believe that they have been the subject of discrimination or harassment with mechanisms for seeking redress." SAC ¶ 245. It encourages "[s]tudents who believe they have been subjected to gender-based discrimination or harassment" to report the incidents, and Columbia will "respond promptly, equitably, and thoroughly" and "take steps to prevent the recurrence of the discrimination or harassment and correct its effects, if appropriate." SAC ¶ 263.

Nungesser does not allege that Columbia failed to provide him with any mechanism for seeking redress for what he believed to be gender-based misconduct targeted at him. To the contrary, he alleges that he was informed by letter that he could "file an official report." SAC ¶ 251. That he may not have filed a complaint because he was "discouraged . . . from doing so" or was advised that such a complaint "had no chance of being successful," *see id.*, does not mean that Columbia violated its promise to provide mechanisms for seeking redress.[21]

### 2. Confidentiality Policy

Nungesser also asserts that Columbia breached its confidentiality policies, which provide, in relevant part, that "[t]he University will make all reasonable efforts to maintain the confidentiality and privacy" of students accused of gender-based misconduct and will restrict "information to those with a legitimate need to know." SAC ¶¶ 222-223. Breaches of confidentiality "may result in additional disciplinary action." SAC ¶ 222. These statements are found in Columbia's January 2013

---

66. Nungesser refiled his SAC with the appendices attached on March 10, 2017. ECF No. 69. Accordingly, the Court cites to ECF No. 69 in discussing the appendices.

21 In the FAC, Nungesser alleged that he had filed a harassment complaint with Columbia in 2015, and Columbia declined to open an investigation, stating that "the acts alleged do not constitute actionable retaliation in violation of the Policy." FAC ¶ 166. He does not include that allegation in the SAC.

Gender-Based Misconduct Policies.  SAC ¶¶ 222-224.  Nungesser again fails to identify a provision of the policy that Columbia has violated.

The policies state that Columbia will restrict information to those with a need to know—and there is no suggestion that Columbia disclosed any information regarding Nungesser.  Nungesser also argues that Columbia violated its confidentiality policies when it failed to take action against Sulkowicz for disclosing his name.  But the policies state only that breaches of the confidentiality policy *may* result in additional disciplinary action.  They do not promise, or require, that disciplinary action be taken each time the confidentiality policies are breached; they merely say that disciplinary action is a possible consequence.

Moreover, the SAC does not suggest that, pursuant to Columbia's policy, a student who has brought a gender-based misconduct complaint is *prohibited* from discussing the complaint or the underlying allegations, either while the proceedings are ongoing or after they have concluded. Indeed, as Columbia points out, universities "may not require a complainant to abide by a nondisclosure agreement" that would prevent redisclosure of information—including the outcome of any disciplinary proceeding brought alleging a sex offense—that the university has a legal obligation to disclose.  Russlynn Ali, U.S. Dep't of Educ., "Dear Colleague" Letter 14 (Apr. 4, 2011) http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.html.  Columbia may encourage students to maintain the privacy of all parties involved in a complaint of gender-based misconduct, but, consistent with federal guidance, it does not mandate it.[22]  Since the policy does not mandate Sulkowicz's silence, failure to silence her does not breach the policy.

---

[22] This approach is made explicit in the August 2013 version of the Policy, which merely "encourage[s]" "[i]ndividuals participating in an investigation, proceeding, or hearing" to "maintain the privacy of the process in order to assist the office in conducting a thorough, fair, and accurate investigation."  ECF No. 69, Ex. B, at 10.

Finally, although he alleges that Columbia "failed to advise him" of certain events—including the publication of an online article and the display of Sulkowicz's prints—Nungesser pleads no basis for his proposition that such failures violated a binding agreement with the university.

### 3. Policy Against Retaliation

Nungesser also fails to state a claim for breach of contract premised on Columbia's policy against retaliation. Nungesser cites three different versions of that policy and, while they vary in minor ways, none of them support Nungesser's claim. First, like the confidentiality policy, the January 2013 version of the retaliation policy provides that "retaliation against any person involved in the investigation, including the complainant, respondent, witnesses, or the investigators, *may* result in disciplinary action." SAC ¶ 222 (emphasis added). Similarly, the August 2013 version states that "[r]etaliation against any person involved in the investigation, including the complainant, respondent, witnesses, or the investigators, is strictly prohibited and *may* result in disciplinary action." SAC ¶ 232 (emphasis added). Neither of those versions of Columbia's retaliation policy requires the University to take disciplinary action; thus, they do not create a promise the breach of which gives Nungesser a contractual remedy.

While the August 2014 version of the policy states that "[t]he University *will* take strong disciplinary action in response to any retaliation or intimidation, SAC ¶ 224 (emphasis added), Nungesser nevertheless fails to state a claim under that version because he does not allege the relevant form of retaliation. The August 2014 version of the policy states that "[t]he University strictly prohibits retaliation against and intimidation of any person *because of his or her reporting of an incident of gender-based misconduct or involvement in the University's response*." *Id.* (emphasis added).

Sulkowicz's Mattress Project, the National Day of Action, and her other public statements, were aimed at her dissatisfaction with Columbia's response to her gender-based misconduct

complaint.  In her view, the only appropriate outcome would have been Nungesser's expulsion.

SAC ¶ 43.  To the extent that Sulkowicz's actions were aimed at Nungesser, the Court does not take

issue with Nungesser's characterization of Sulkowicz's actions as retaliation—but he alleges that it

was retaliation for Nungesser's rejection of her, *not* for his involvement in the gender-based

misconduct investigation.  The complaint does not plausibly allege that Sulkowicz's actions were

motivated by Nungesser's *participation in the investigation*, and so Columbia cannot be said to have

violated its policy by choosing not to discipline her.

### 4.  Reporting Policy

Columbia's policies state that "[a]ny University official . . . informed of an allegation of

gender-based misconduct against a student is expected to file a report with Student Services for

Gender-Based and Sexual Misconduct" and that "[a]ppropriate disciplinary action *may* be taken

against any student or employee who violates" that and other policies.  SAC ¶¶ 244-245 (emphasis

added).  Nungesser alleges that Columbia violated this policy because the letters and email that his

parents sent should have been treated as third-party complaints and reported under the policy.

SAC ¶ 250.  He similarly alleges that his "advisor and professors were on notice of the harassment

of Paul in class and under the Policies were expected to report it, but no report was made."  *Id.*

Even assuming that the complained-of conduct constituted "gender-based misconduct"

within the meaning of Columbia's policies—an assumption that is dubious, at best—neither the fact

that officials are "expected" to file a report nor the fact that disciplinary action "may" be taken

amounts to promises that Nungesser may enforce.

### 5.  Policy Concerning Fair Process

Nungesser also alleges that Columbia breached an "obligation to treat complainants and

respondents fairly and equally."  SAC ¶¶ 252-255.  As with the rest of his contractual claims, he fails

to identify any specific contractual promises that were violated.  This claim appears to rest on the

fact that Columbia's policies state that both complainants and respondents in the disciplinary investigation and hearing process have the right "[t]o confidentiality and privacy to the extent provided under the Family Education and Privacy Act (FERPA)" and that "[t]he University will make all reasonable efforts to ensure preservation of privacy, restricting information to those with a legitimate need to know." SAC ¶ 253.

Nungesser alleges that, although complainants and respondents "are to have the same basic rights with regard to confidentiality and FERPA protections," he and Sulkowicz were treated differently:

> Defendant Bollinger, Defendant Kessler and Defendant Hirsch at IRWGS commented expressly on the case in favor of Sulkowicz, but Columbia always declined to say anything in favor of Paul and, through Jeri Henri, Rosalie Siler and Melissa Rooker, informed Paul that FERPA disallowed any comment about the case by Columbia.

*Id.* at 255. The SAC does not allege, however, that Columbia or Bollinger ever spoke in any way about the disciplinary proceedings against Nungesser. In fact, Nungesser alleges at multiple points in the SAC that Columbia and Bollinger expressly declined to comment on the investigation or proceedings. While the SAC does allege that Kessler and Hirsch made statements in support of Sulkowicz's Mattress Project as a work of art and/or protest, it does not follow that they were "comment[ing] expressly on the case in favor of Sulkowicz," and nothing in the SAC implies that they were.

More to the point, the policy that Nungesser alleges was breached expressly refers to the rights that are afforded to complainants and respondents *in the investigation, hearing, and appeal "process."* *See* ECF No. 69, Ex. A, at 19 (emphasis added). Therefore, to the extent that the confidentiality language created any binding promise, it did not extend to the conduct of Kessler and Hirsch, which Nungesser alleges took place well after the hearing had concluded and Sulkowicz's appeal had been denied.

42

### 6. Policy Concerning the Assumption of Innocence

Nungesser also alleges that Columbia violated the portion of its Rules of Conduct that states that "[a]ll members of the University community are assumed to be innocent until proven guilty." SAC ¶ 256-257.  This claim also fails.  For one thing, the inference that Columbia treated Nungesser as "guilty" is not plausible, since Nungesser expressly alleges that Columbia found him to be "not responsible."  SAC ¶¶ 11, 12 n.3.  In any event, the statement in Columbia's Rules of Conduct about the presumption of innocence is too general to give rise to a breach of contract claim.  *See Blaise-Williams*, 592 N.Y.S.2d at 42 (holding that a "general statement . . . of existing law . . . may not serve as a basis for a breach of contract claim"); *Ward*, 2000 WL 1448641, at *4 (holding that "general policy statements . . . cannot form the basis for a breach of contract claim").

### 7. Duty of Good Faith and Fair Dealing

The Court has previously dismissed Nungesser's claim for breach of the duty of good faith and fair dealing with prejudice.  *Nungesser I*, 169 F. Supp. 3d at 373.  Because Nungesser did not have leave to replead this claim, the Court will not consider it again.

\* \* \*

In sum, Nungesser has again failed to state a claim for breach of contract against Columbia. As with his Title IX and New York Human Rights Law claims, the Court finds that further amendments would be futile.  The Court has already provided Nungesser an opportunity to cure the deficiencies identified in the Court's previous opinion, and he has failed to do so.  Accordingly, his breach of contract claims are dismissed with prejudice.

### D. General Business Law Section 349

New York General Business Law Section 349(a) "declares unlawful '[d]eceptive acts or practices in the conduct of any business.'"  *City of New York v. Smokes-Spirits.Com, Inc.*, 911 N.E.2d 834, 837 (N.Y. 2009) (quoting N.Y. Gen. Bus. Law § 349(a)).  The statute also provides a private

right of action to persons harmed by such conduct.  *Id.* (citing N.Y. Gen. Bus. Law § 349(h)).  "To successfully assert a section 349(h) claim, a plaintiff must allege that a defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice."  *Id.*  (citing *Stutman v. Chemical Bank*, 95 N.Y.2d 24, 29 (2000)).  Practices courts have found to be deceptive include "false advertising, pyramid schemes, deceptive preticketing, misrepresentation of the origin, nature or quality of the product, false testimonial, deceptive collection efforts against debtors, deceptive practices of insurance companies, and 'Bait and Switch' operations."  *Teller v. Bill Hayes, Ltd.*, 630 N.Y.S.2d 769, 773 (App. Div. 1995) (internal citations omitted) (citing *Goldberg v. Manhattan Ford Lincoln-Mercury*, 492 N.Y.S. 318, 321 (N.Y. Sup. Ct. 1985) (collecting cases)).

Nungesser's claim fails at the first element.  New York courts consider consumer-oriented conduct to be "acts or practices [that] have a broad[ ] impact on consumers at large."  *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 647 N.E.2d 741, 744 (N.Y. 1995).  "In other words, the deceptive act or practice may not be limited to just the parties."  *Teller*, 630 N.Y.S.2d at 772.  In dismissing the FAC, the Court explained that Nungesser "[did] not claim that Columbia's conduct affected anyone except him" or that "any other students were affected by the allegedly deceptive practices, and so does not adequately plead 'consumer-oriented' conduct."  *Nungesser I*, 169 F. Supp. 3d at 373-74.  The SAC does not add any facts that would allow this Court to reach a different result.  Nungesser alleges that Columbia "has engaged in . . . acts or practices" that violated § 349 "by causing Paul Nungesser to believe that Columbia would follow its policies" and "by causing Paul to believe that if he paid tuition and fees to Columbia, that Columbia would uphold its obligations, covenants and warranties to Paul described in its policies."  SAC ¶ 265. Nungesser's conclusory allegation that Columbia was "engaged in consumer oriented conduct" and that its conduct was "aimed at the consumer public at large," SAC ¶¶ 261, 265, are not sufficient to

transform what is, at best, a claim that Columbia failed to live up to its obligation to one student into a plausible claim of deceptive trade practices having a broad impact on consumers at large.

Nungesser's § 349 claim is dismissed with prejudice.  Because the Court has afforded him adequate opportunity to cure the deficiencies previously identified by the Court, and he has failed to do so, the Court finds that further amendment would be futile.

### E.  Intentional Infliction of Emotional Distress

Nungesser's final claim is for intentional infliction of emotional distress.  Under New York law, in order to state a claim for intentional infliction of emotional distress, a plaintiff must allege (1) extreme and outrageous conduct; (2) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (3) a causal connection between the conduct and injury; and (4) severe emotional distress.  *Howell v. New York Post Co.*, 612 N.E.2d 699, 702 (N.Y. 1993).  As before, Nungesser has failed to plead facts supporting the first and second elements of this claim.

Nungesser has not alleged conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  *Id.* (quoting *Murphy v. Am. Home Prods. Corp.*, 58 N.Y.2d 293, 303 (N.Y. 1983)).  The Court reiterates that Nungesser does not bring this claim (or any of his claims) against Sulkowicz or any of the individuals he alleged posted threatening messages on social media.  Thus, the Court looks not to the allegations concerning those individuals' conduct, but rather to the alleged conduct of Columbia and the individual defendants.  It is clear from the SAC that Nungesser disagrees with how Columbia and its agents, including Bollinger, Kessler, Vu-Daniel, and Hirsch, chose to handle Sulkowicz's—and other students'—activism.  It is also clear that he disapproves of Kessler's conduct in permitting Sulkowicz to receive credit for the Mattress Project, Hirsch's conduct in publicizing and allowing IRWGS to close for the day of the "collective carry," and Vu-Daniel's conduct in permitting the graphic prints to be displayed in the Leroy Nieman Gallery.  But

the Court cannot conclude that the SAC plausibly alleges that Columbia's response or any of the individual defendants' conduct was anything approaching "extreme and outrageous conduct." Indeed, "even a false charge of sexual harassment does not rise to the level of outrage required" under New York law. *James v. DeGrandis*, 138 F. Supp. 2d 402, 421 (W.D.N.Y. 2001). Nungesser also fails to plead any facts supporting an inference that the defendants *intended* to cause him distress.

In New York, "intentional infliction of emotional distress is a theory of recovery that is to be invoked only as a last resort, when traditional tort remedies are unavailable." *Moore v. City of New York*, 219 F. Supp. 2d 335, 339 (E.D.N.Y. 2002) (internal quotation marks and citation omitted). Accordingly, "no intentional infliction of emotional distress claim will lie where the conduct underlying the claim falls within the ambit of traditional tort liability." *Id.* It bears repeating here—at this late stage of the Court's opinion—that many of Nungesser allegations fall squarely within the ambit of the traditional tort of defamation. That he has elected not to pursue such a remedy does not mean that it is unavailable.

Nungesser's claim for intentional infliction of emotional distress is dismissed with prejudice, as the Court finds that any further amendment would be futile.

## IV.   CONCLUSION

For the foregoing reasons, the motion dismiss is GRANTED in its entirety. Because the Court has concluded that any further amendment would be futile, Nungesser's Second Amended and Supplemented Complaint is DISMISSED with prejudice.

The Clerk of Court is directed to terminate the motion pending at Dkt. No. 53, enter judgment in favor of the defendants, and close this case.

SO ORDERED.

Dated:  March 24, 2017
New York, New York

GREGORY H. WOODS
United States District Judge

46